JUDGE FAILLA

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JAMES COURI, | ) |
| *Plaintiff*, | )  Case No. _____ |
| -against- | ) |
| | )  **19 CV 5436** |
| GEORGE PAVIA ESQ., ANTONIA PAVIA, | ) |
| JOHN SIEBERT MD AND PC, | ) |
| JOSEPH M. BURKE ESQ., KENNETH V. | ) |
| GOMEZ ESQ., DIANE HENDRICKS, | ) |
| HENDRICKS HOLDING, GOV. SCOTT | ) |
| WALKER, DAVID RICHARDSON ESQ., | )  VERIFIED COMPLAINT |
| SULMEYER KUPETZ, SHAUN MURPHY | ) |
| ESQ., SBEMP, MICHAEL HESTRIN (DA), | ) |
| GARRETT BEHRENS (ADA), RIVERSIDE | ) |
| COUNTY CA DISTRICT ATTORNEY OFFICE, | ) |
| RIVERSIDE COUNTY CA, RIVERSIDE COUNTY | ) |
| CA SHERIFF DEPT., VINCENT CASTIGLIONE, | ) |
| THERESA CASTIGLIONE, MARIA CASTIGLIONI, | )  JURY REQUESTED |
| DAN ANGERS, PAUL WOOTEN (JSC/KINGS), | ) |
| DAVID CHAPMAN (JUDGE SUP. CT. | ) |
| PS/RIVERSIDE), UW HOSPITAL, LISA BRUNETTE, | ) |
| MAX FOLKENFLIK ESQ., FOLKENFLIK MCGERITY, | ) |
| DAVID FISHER ESQ. FISHER & WOLFE, | ) |
| JOHN DOES 1-15, | ) |
| | ) |
| | ) |
| *Defendants*. | ) |
| | ) |

**JAMES COURI (pro-se)**
**575 MADISON AVE. 10TH. FL.**
**NYC, NY 10022. TEL: 212-605-0277**

## INDEX OF EXHIBITS

A. PLAINTIFF JIM COURI'S  MEDICAL

B. SOME JIM COURI ACCOLADES

C. KROLL REPORT JOHN SIEBERT

D. NY COURT REFEREE JACK SUTER ADMISSION "SIEBERT CASE FIXED" & ONE OF MANY BURKE EX-PARTY CONSPIRING EMAILS

E. SIEBERT US TRUST FINANCIAL STATEMENT

F. SIEBERT'S SIGNED ADMISSIONS OF HIS INDEBTEDNESS TO COURI AS PER CORPORATE RESOLUTIONS & OTHER AGREEMENTS

G. SIEBERT SETTLEMENT AGREEMENT #1,  GENERAL RELEASE AND PROMISSORY NOTE  & A SIEBERT ADDITIONAL CONFESSION OF JUDGEMENT

H. SIEBERT SETTLEMENT AGREEMENT #2 & GENERAL RELEASE IN FAVOR OF JIM COURI INDIVIDUALLY; SIEBERT'S SWORN-TO DENIAL THAT HE SIGNED THE SETTLEMENT AGREEMENT #2 AND RELEASE; AND AFF OF INDEPENDENT NOTARY SWEARING THAT SIEBERT SIGNED THE AGREEMENT AND RELEASE IN JIM COURI'S FAVOR AND THAT SIEBERT IS "A LIAR"

I. JIM COURI AFF AND EXHIBITS IN CASE #12-CV-2220-(TPG) LYDIA COURI V PAUL ROBBINS ESQ. ET AL IN THIS COURT, A SCAM CASE BROUGHT BY FOLKENFLIK & FISHER USING LYDIA AS A STOOGE AND FRONT

J. SIEBERT'S SUSPENSION AS A MEDICAL DOCTOR FROM NY STATE AND CONFESSION THAT HE IS "MORALLY UNFIT" TO BE A DOCTOR & ADMITTING SEXUALLY ABUSING HIS PATIENTS

K. NUMEROUS SIEBERT PATIENT/VICTIMS' AFFS AND STATEMENTS OUTLINING SIEBERT'S IMORAL AND ILLEGAL CONDUCT; & SIEBERT'S TERMINATION AT NYU LANGONE HOSPITAL

L. SHERIFF REPORT AND COURT RESTRAINING ORDER AGAINST SIEBERT IN FAVOR OF COURI REGARDING FOILED PLOT BY CAPTURED EMAILS BETWEEN BURKE AND SIEBERT TO MURDER COURI

M. LETTER OF CONFESSION FROM SHAUN MURPHY ESQ. TO RIVERSIDE DA & DA HESTRIN, DATED APRIL 30 AND MAY 3, 2019, ADMITTING THAT MURPHY'S CRIMINAL COMPLAINT AGAINST COURI IS FALSE IN THAT COURI NEVER HARASSED HIM, INCLUDING BY TELEPHONE; DEMANDING CHARGE BE WITHDRAWN AND PHONY ILLEGAL ARREST WARRANT BE VACATED. ALSO, OUTLINE OF THE FRAUD & MISUSE OF THE RIVERSIDE CRIMINAL, COPY OF MURPHY'S PERJURED CRIMINAL COMPLAINT, EVIDENCE OF DA "SEWER SERVICE" TO COURI, AND COPY OF RIVERSIDE DOCKET IN CASE INM1707715, AND RELEVANT LETTERS

N. FIVE-YEAR OPTION GRANTED TO COURI OR HIS ASSIGNS BY VINCENT AND THERESA CASTIGLIONI TO PURCHASE 48625 CALLE ESPERANZA, LA QUINTA CA 92253, AT THE AGREED-TO FAIR MARKET PRICE, AS WELL AS RENTAL RIGHTS

O. JUDGE PAUL WOOTEN'S DISMISSAL FOR ALL PURPOSES OF CASE
#107240/04 (COURI ACQUISITION V SIEBERT) ON SEPT. 2, 2010, INCLUDING
THE DOCKET REPORT AND WOOTEN'S ORDER OF DISMISSAL

P. GOV. CUOMO CHAMBER'S LETTER OF 11-25-2015 STATING THAT THERE IS
NO RECORD OF PAUL WOOTEN'S VETTING MANDATES AS REQUIRED IN
THE STATE OF NY, AND LETTERS RELATED THERETO

Q. EXPOSE OF 1-4-2016 REGARDING THE ILLEGAL AND CORRUPT
ACTIVITIES ENGAGED IN BY PAUL WOOTEN AND SPECIFICALLY
RELATING TO WOOTEN'S CORRUPT ACTIVITIES IN CONCERT WITH
SIEBERT, BURKE, AND OTHER RICO ACTORS THAT RESULTED IN
WOOTEN'S FORGED AND ILLEGALLY ISSUED JUDICIAL ORDERS OF
1-20-2016, AFTER WOOTEN WAS REMOVED FROM NY COUNTY PART 7 ON
1-1-2016

R. DIANE HENDERICKS AND HENDRICKS HOLDINGS, AND DEATH OF
KENNETH HENDRICKS

S. KENNETH V. GOMEZ/PAVIAS' DOCTORED IMAGE PUBLISHED ON
GOMEZ'S CHARACTER-ASSASSINATION-OF-COURI BLOG (gvgblog)

T. NY SUPREME COURT CASE (JIM COURI, INDIVIDUALLY, V SIEBERT, INDEX
113512/08) ILLEGALLY DISMISSED BY WOOTEN ON 1-20-2016 WITH A
FORGED ORDER AND FALSELY CLAIMING THAT COURI DID NOT APPEAR
AT A STATUS CONFERENCE

U. LETTER TO USBJ WAYNE JOHNSON OF CALIFORNIA CENTRAL DIST.
BANKRUPTCY COURT OUTLINING THE FRAUD ON THE COURT AND RICO
ACTIVITIES ENGAGED IN BY SULMEYER KUPETZ, DAVID RICHARDSON

AND JOSEPH M. BURKE IN CONCERT WITH SIEBERT, AND ON

INFORMATION AND BELIEF, DIANE HENDERICKS AND OTHER RICO

ACTORS

V. JIM COURI DECLARATION IN SUPERIOR COURT PALM SPRINGS/

RIVERSIDE (CASE CASTIGLIONI V COURI) OUTLINING JUDGE

CHAPMAN'S DOCUMENTED OBSTRUCTION OF JUSTICE, DEPRIVATION OF

DUE PROCESS, VIOLATIONS OF US CONSTITUTION AND CALIFORNIA

CONSTITUTION, WITH ACCOMPANYING LETTERS

W. OUTLINE OF JUDGE DAVID CHAPMAN'S M.O. REGARDING THE

EMBEZZLEMENT FOR THE PAVIAS AND RICO ACTORS OF THE

$45MILLION DEFAULT JUDGMENT, FILED AND DOCKETED, DUE TO COURI

FROM THE PAVIAS

X. LETTER TO GOOGLE REGARDING THE MAIL AND WIRE FRAUD

ENGAGED IN BY DA HESTRIN, RIVERSIDE DA, MURPHY AND SBEMP

DEFRAUDING GOOGLE AS TO TRUTHFUL EXPOSES FILED ON A

FOURTEEN YEAR-OLD INTERNET PUBLISHING ENTERPRISE (SCAMSINC

PUBLISHING, FOUNDED BY JIM COURI)

RELATED CASES

A. NEW YORK COUNTY SUPREME COURT CASES/ OTHER NY CASES

1.      107240-04; COURI ACQ. CORP. V SIEBERT; DISMISSED AND DISPOSED
        BY JUDGE WOOTEN 9-2-2010

2.      113512-08, JIM COURI V SIEBERT; ILLEGALLY DISMISSED BY WOOTEN
        ON 1-20-2016 BASED ON WOOTEN'S PERJURY, FORGERY AND FRAUD
        ON THE COURT

3.      (2015 INDEX NOT AVAILABLE) JIM COURI V BURKE; JUDICIARY LAW
        VIOLATIONS BY BURKE, ALL DOCUMENTED, ILLEGALLY AND
        FRAUDULENTLY DISMISSED BY WOOTEN ON 1-20-2016

4.      DHCR COURT NY- DHCR V PAVIAS, RE RENT STABILIZATION 18E.
        73RD ST., NYC (COURI AND OTHER RENTAL UNITS GRANTED) (PAVIA
        LOST AGAIN ON APPEAL WITH DHCR)

5.      NEW YORK ECB COURT-  JIM COURI V PAVIA, 18 E. 73RD ST. NYC,
        12 VIOLATIONS AT PROPERTY, AFFIRMED BY ECB, FINDINGS: PAVIAS
ENGAGED IN PERJURY, FORGERY, FILING FALSE CERTIFICATES OF
CORRECTION WITH DOB AND PAVIAS LOST ON ECB COURT APPEAL. PAVIAS
THEN COMPROMISED JUDGE MADDEN.

6.      MED-MAL SETTLEMENT, JIM COURI V DR. ROBERT BURGER,
$230,000.00 LOOTED BY ACTORS GOMEZ, PAVIA, BURKE AND SIEBERT
IMPLEMENTING FALSE DOCUMENTS AND FRAUD ON THE COURT.

B.  BANKRUPTCY COURT RIVERSIDE COUNTY CALIFORNIA CASES

1.    FILED BY COURI ON OR ABOUT 3-2-2015 AND DISMISSED ON COURI'S
      MOTION ON 9-2-2015


C.  SUPERIOR COURT PALM SPRINGS RIVERSIDE COUNTY CALIFORNIA
    CASES

1.    PSC 1600482, JIM COURI V PAVIA, SIEBERT AND BURKE, DISMISSED BY
      JUDGE CHAPMAN WITHOUT PREJUDICE AND LOOTED COURI
      $45MILLION JUDGEMENT AGAINST THE PAVIAS, GROUND ON THEIR
      DEFAULT

2.    PSC 1700231, CASTIGLIONE V LYDIA COURI, JAMES COURI; COURI'S UD
      ANSWER TIMELY AND DULY FILED WITH ALL FEES PAID AND
      CONFIRMED BY THE CLERK OF THE COURT ILLEGALLY DISMISSED BY
      JUDGE CHAPMAN FOR "FAILURE TO PAY COURT FEE" AND IN
      CONCERT WITH CASTIGLIONE, MURPHY, SBEMP AND RIVERSIDE
      SHERIFF'S OFFICE AND DA HESTRIN EFFECTED ILLEGAL EVICTION .
      CASTIGLIONI AND MURPHY SECURED EX-PARTY VIA CHAPMAN
      JUDGEMENTS AGAINST JIM COURI (WHO WAS NOT A TENANT)
      ILLEGALLY AND IN EXCESS OF $70,000.00.

3.    CASTIGLIONI V COURI, RIVERSIDE APPEALS COURT: COURI MOVED
      FOR A STAY ON THE ILLEGAL EVICTION GROUND ON VARIOUS
      STATUTES. THE APPEALS COURT (3 JUDGES) UNANIMOUSLY DENIED A
      STAY OF THE EVICTION THAT WAS CLEARLY PROVEN BY COURI IN HIS
      MANDATE THAT THE CHAPMAN EVICTION RULINGS WERE GROUNDED

ON FRAUD AND IN VIOLATION OF DUE PROCESS AND CCP 170.3. THIS
ESTABLISHED BEYOND DOUBT THE CORROSIVE FRAUD ONGOING IN
THE SUPERIOR COURT IN CALIFORNIA.

4.    INM 1707715, PEOPLE OF RIVERSIDE V JIM COURI, GROUNDED ON
       MURPHY'S NOW ADMITTED FALSE COMPLAINT

5.    PSC 1800166, MURPHY V JIM COURI AND STANLEY WILSON (COURI'S
       ASSISTANT FOR 50 YRS.) MURPHY CAUSE OF ACTION IS LIBEL AND
       SLANDER FOR SCAMSINC PUBLICATIONS TELLING THE TRUTH. JUDGE
       CHAPMAN HAS RESIGNED PER CCP 170.3. MURPHY HAS REPRESENTED
       TO COURI HE INTENDS WITHDRAWING THIS CASE.


D.  SDNY RELATED

1. 12-CV-2220 (TPG) LYDIA COURI V ROBBINS ET AL


E.  USDC / ALBANY / NY CASE

1.   15 CV-00439, NATIONAL LIFE INSURANCE CO. V GOMEZ ,

GOMEZ ATTEMPTED THEFT OF INSURANCE PROCEEDS, EXPOSED BY USDJ

M. DAGOSTINO.


F. SUPERIOR COURT LOS ANGELES CALIFORNIA

1.      MALLORY HILL V SHAUN MURPHY, SBEMP ET AL, CLAIMS OF

EXTORTION (DISPOSED AT DAY OF TRIAL ON 4-2019)

## VERIFIED COMPLAINT

PLAINTIFF, James Couri (Couri), pro-se for his Verified Complaint with Exhibits,

demanding a trial by jury, respectfully alleges as follows:

## GENERAL OVERVIEW

1.     This Case embraces numbers of claims and causes of action, including civil action

for RICO remedies authorized by Federal Statutes at 18 USC 1961, et-seq, for

actual, consequential and exemplary damages: and for declaratory and injunctive

relief; and for all other relief which this Honorable Court deems just and proper

under all circumstances which have occasioned and within this COMPLAINT.  See

18 USC 1964 (a) and (c) ("Civil RICO").

2.     Such RICO cause of action involves a widespread criminal enterprise engaged in by

Defendants and involving a pattern of racketeering activity across State Lines, and

a conspiracy to engage in racketeering activity involving numerous RICO predicate

acts during the past ten (10) years. This enterprise is a "poster-child" of what the

state court legal system has deteriorated to in America today. Conspiracy involving

select lawyers, corrupt fixed judges, mostly unvetted, incompetent and desperate

for a courtroom orchestrating fixes.

3.   This is not a pattern isolated to just New York Supreme, but to Los Angeles, Riverside County CA, Greene County MO, and many other Counties where American citizens are being abused by a system of obstruction of justice, retaliation, police brutality, DA extortion, money laundering and extortion, under color of law, and serial violations of the US Constitution.

4.   I (Jim Couri) have spent over ten years carefully analyzing various State RICO activities and serial violations of 18USC 1962a-b-c, embracing multiple lawyers, elected officials, State Judges, Counties, Cities, all inexorably linked in order to retaliate against me as an informant, a whistleblower and a former protege of J. Edgar Hoover from 1960 to 1973, working with Mr. Hoover on high-profile matters, along with Columnist Walter Winchell, Roy M. Cohn and others.

5.   Our America is in great peril. Corrosion of the US Constitution has resulted in billions of dollars a year in evaded taxes as a result of bribery, extortion by public officials, money laundering, terrorism, narcotics, DA and FBI abuses of Office, and even murder coupled with false arrests, sheriff and police brutality and criminal acts condoned by law enforcement and with the local press turning a blind-eye to massive criminal activities.

6.   I expect to be attacked by defendants here as I have been for years. I have been the subject of assaults by deputy sheriffs, trespass, breaking and entering, police harassment, recruiting my daughter Lydia (an ill substance abuser) to turn on me

and falsify sheriff charges in concert with lawyers, DA Riverside and others. Such

acts plotted to murder me without any recourse with Law Enforcement which the

Court will understand when outlined here.

7. These activities are an extension of the criminal enterprises exposed and confirmed by

evidence in NY County, Kings County, LA County, Riverside County, Greene County;

these are Counties that I and my affiliates have firsthand participated and became a

victim of the "system", and the looting of over $100Million in my documented and

unconditional claims due to me as a result of Settlement Agreements, with Releases

issued in my favor; looted by bribery, mail and wire fraud, perjury.

8. Such activities include Default Judgments Filed by me and looted by a bribed judge

(David M. Chapman, Superior Court Palm Springs CA) who was automatically

Disqualified by California CCP170.3 and the US Constitution, and who in violation

failed and refused to "stand-down", and who issued impotent Orders depriving my

affirming a $45Million Default Judgement in my favor.

9. This is the tip of a deep iceberg. All of these Defendants and other participants have

been engaged in concert with the looting of my rights, money, liberty, all orchestrated

to proximately result in over $100Million in actual moneys due to me. These RICO

acts spawned from the ringleaders George and Antonia Pavia who, with John Siebert

(an admitted and convicted morally unfit doctor) and the intervention of Diane

Hendricks (the supposed richest woman in USA), Governor Scott Walker, conspired to

loot and embezzle over $100million dollars in real money contractually due to me, while violating Title 18 of the US Code and FRCP.

10. These RICO allegations are developed by detailed investigation by me and are not "half-baked" as many such RICO charges are. Here the conspiracy was well developed by the Pavias, Siebert, Hendricks, Murphy, Fisher, Folkenflik, and spanning to DAs, Counties, Sheriffs, Police and the named Defendants here, and Non-Party Entities affiliated with Defendants who have participated with RICO Actors, engaged in RICO violations and I believe have shredded any Immunity due to their serial disobedience of the US Constitution, grand larceny, murder plots and mail and wire fraud.

11. THE FOREGOING IS A SKELETAL OUTLINE OF THE CORRUPTION THAT HAS PERVERTED THE US CONSTITUTION THAT WILL BE SET FORTH IN PRECISE DETAIL WITHIN THIS COMPLAINT AND THE COUNTS CHARGED.

12. In order that the Court has an understanding of the Plaintiff, his background, experience and motivation, to follow "WHO IS JIM COURI", will provide the Court with a clear basis for this corrosion that has almost destroyed the American way in exchange for unjust enrichments.

## WHO IS JIM COURI

13. For the convenience of the Court, attached as Exhibit B, please find some Biographical Reports about JIM COURI (aka: James Couri).

14. Jim is eighty years of age and suffers from various medical disorders. He has stage four melanoma cancer which has been treated at UCLA Medical Center since 2007. Attached please find doctor Affidavits outlining Jim's other medical issues, as Exhibit A.

15. Any person knowing the age and medical disorders Jim Couri is exposed to asks "why is this guy doing this?. Why not enjoy the last few years in nature and not at 500 Pearl Street?". Well, here is the answer, from " the horses mouth". .....

16. In 2009, I was told that I had 9-12 months to live with the recurrence of stage four melanoma cancer in my lungs, back and neck. I was in California and I, my wife Marlene and daughter Lydia were all shocked and sick as to this death-knell. I prayed that if God helped me get more time, I would devote it to using my talents and knowledge to help people who are mistreated by local city and state judges, police, DA and prosecutors' abuse, and family court horrors.

17. Then I went from NY to LA, picking the brains of about thirty cancer oncologists and found one at UCLA who I believed in. I was advised that UCLA was about to offer a "compassionate use" for a then test drug called Ipulipulmed, from Bristol Meyers. I

was blessed to be illegible. The program was for select patients who had "no hope" for survival. I was provided a "slot" and began bi-weekly infusions. After about a month I called Dr. Chimilowski at UCLA and advised that my visible tumors were getting smaller.

18. They eventually evaporated. After three months and a PET-CT Scan my cancer had disappeared and I was in remission. That was by year-end 2010. Since that time when cancer lymph-nodes appear, I resume a newer drug called Keytruda by Merck. Since 2011, I have undergone various operations, quad cardiac by pass in 2017, trans-hiatial esophogectomy, and a few thoracic surgeries, but here I am just eighty and alive, so I am and have kept my promise to the Lord.

19. 1939 born in Brooklyn NY, blessed with a beloved grandmother,  and a father who was an active political Brooklyn "king-maker", where twice a week the high-profile NY and Brooklyn politicos would all show up to our home on Shore Road and plot the direction of NYC. The names of these guys at my ages of seven to thirteen, meant little to me then. This was 1945 to early 1950's: Tom  Dewy, Bill O'Dwyer, Louie Lefkowitz, Jake Javitz, Brooklyn Leader John R. Crews, Judge Beldock, Judge Jacob Fuchberg, to name some and my dad Al Couri who was in 1951 appointed Commissioner of US Customs by President Eisenhower.

20. While these guys were meeting and eating in our bar-room I was at the other end shooting billiards. I listened and learned, a lot.

21. In 1958 I enjoyed going to the NYC famed Stork Club. There, I became pals with
Lawyer Roy M. Cohn Esq., Columnist Walter Winchell and Stork owner Sherman
Billingsly. In that year I was introduced to FBI Founder J. Edgar Hoover and his
friend Clyde Tolsen.  Roy and Winchell, both of whom worked with Mr. Hoover (for
him not the FBI) introduced me to Hoover.. Mr Hoover was favorably impressed with
me and my instinct and invited me to work with him of his select matters. Although I
was attending Columbia at night and working during the day developing my
investment company, I agreed and after some modest orientation I began the
undertaking.

22. I can now report some of the persons I was assigned for various reasons; Frank
Costello, Frank Sinatra, Frank Rizzo,  Richard Nixon, Frank Polumbo,  Arnold
Hutchnecker MD., Oleg Cassini, Igor Cassini. Robert Vesco, Bernard Kornfeld to
name some. I was the assigned an investigator to obtain the Nixon Psychiatric
Records from Hutchneicker's files. They were delivered by me to Mr Hoover.

23. Roy Cohn, I and others were sent to Havana (about fifteen months before Castro's
takeover) attended Batista's Palace Tourism Ball honoring Roy, where Roy was
given a box of solid gold cigars by Batista.

24. In 1867 John Revson and I began an investment company. In 1974, I took Don Trump
to dinner and introduced him to Roy Cohn. In 1975 Revson and I met Eddy Gilbert

(the "the Boy Wonder of Wall Street"), who had been a "guest of the Government" about 10 years earlier. Revson and I learned a hard lesson and we both paid as price, but we "paid our dues".

25.   Sadly, we were cheated, but not by Eddy, but by our Attorney Milton Gould Esq. A series of now verified events that I will not explore here as it is irrelevant to this case, but if the Court is interested I will be pleased to subpoena former Assistant US Attorney Jeffery Livingston who worked on the Gilbert case. I am sure Mr. Livingston will tell the truth, if not, Peter Alkay Esq., formerly with Shea Gould, I am sure will tell the truth as to Mr. Gould's self-interested legal mal-practice.

26. It is sufficient to say that I made a plea deal with the Government and testified against Eddy. Why Revson was indicted was beyond me as he did nothing as I possessed his POA. Testifying against friends is awful, but I did my work, fulfilled my Governmental obligations, and received accolades from the US Attorney who stated that " Couri's testimony was of great value to law enforcement. Virtually every aspect of Couri's testimony was corroborated by other persons testimony and by documentary evidence, much supplied by Couri himself."

27.  Eddy Gilbert was convicted on all counts and Revson was acquitted on all counts. I began to see much about crimes as defined by US Codes Title 18, but not only by the indicted, but by shady lawyers, corrupt State Prosecutors, Corrupt State Judges, and police that moonlight as mafia hit men, and sheriffs who engage in Nazi-style

physical abuses, extortion, and shake-downs. This is not guess work. I have seen all

of this from the inside and as a victim.

28. Roy Cohn was a great friend and teacher. He brought me into the dark underbelly of

the corruption, bribery, obstruction of justice, DA false arrests, thefts of narcotics,

even murder. The fact really is that the "average-joe" has really little or no chance in

criminal courts, landlord courts, state courts unless you have a "Rabbi" who is

connected with the national underground of "fixes". Yes it is a system, so if you are

connected in NYC and need a fix in LA, you are steered to the right law office. In

Riverside County, LA County, CA; Greene County Missouri, Madison Wisconsin,

Beloit WI, it is the same MO.  Many citizens are subject to a fixed-stacked deck, are

clueless and have no idea that they cannot get fair justice.

29. I was not satisfied with watching this criminal enterprises in action, so I started with

NYC and took my crusade to Riverside, LA, Wisconsin and Missouri to see first hand

the most corrupt racketeering enterprise as this goes to the heart of the American way,

the violation of the US Constitution, giving the finger to the color of law, with false

arrests, lawyers cheating, extorting, bribery, vicious state judges/prosecutors who are

money grubbing and who have systems in place that unless you put yourself into it

you would not believe it to be true.

30. I HAVE ALL OF THE PROOFS, NOW MORE CREDIBLE AFTER SEEING THE DISGRACE ONGOING AT THE DOJ, THE WHITE HOUSE AND THE TRASHING OF AMERICA.

31. We must stand up and expose these criminal enterprises, and put a stop to these perverted thieves. In fact, NY County is bad but worse are California, Wisconsin and Missouri as the acts are so pervasive flagrant, and so transparent it becomes almost laughable if it were not so injurious to the lives of victims.

## RELATED FACTS

32. I, myself, have been a victim of mafia abuse, attorney threats, extortion, fraudulent criminal charges, and false arrest warrant by a corrupt Riverside County DA, Michael Hestrin, and his Chinese wife who appears to be a Chinese Govt. operative. Such acts include extortion, mail and wire fraud, conspiring with various superior court judges, judicial racketeering, sheriff threats, abuses, trespass, body injury ordered by judges, conspiring to deprive Due Process, ie: thefts of over $45million in concert with corrupt lawyers who engaged in perjury, bribery, fraud on the court and shrouding murder plots and probable murder.

## DEFENDANTS JOHN SIEBERT WITH DIANE HENDRICKS

33. John Siebert, after being convicted a a sex predator in New York, moved to Baraboo, Wisconsin (a superb of Madison) with his wife Kimberly and began to conduct

business in the clinic at UW Hospital. Diane Hendricks, widow of Kenneth

Hendricks, resides and conducts business in Beloit Wisconsin, a superb of Madison

WI. Diane is a seventy-one year old woman and according to Forbes worth $5billion

and is the wealthiest woman in America.

34. The Wisconsin Actors engaged in obstruction of justice by causing the intervention

of Gov. Walker (a stooge for Diane Hendricks) in a conspiracy with Dr. John Siebert

(kicked out of NYU Langone, as a thief, a narcotics abuser, and a confirmed perjurer

and a fixer) along with Mrs. Hendricks, who engaged in bribery, mail and wire fraud,

and publishing fraud as to Siebert.

35. Siebert also has threatened to plot my murder; verified by captured emails in 2014

with RICO Defendant Burke and the granting of a four-year Restraining Order in my

favor.

36. I have evidence that links the death of Diane Hendricks' husband Ken under

suspicious conditions; explored here as Diane Hendricks controls the town and the

State of WI. See Exhibit R, collectively.

## JIM COURI FURTHER MOTIVATIONS

37. So I have a mission culminating here. I have little interest in money.  If I am blessed

to secure a award here and a recovery of my money, claims and damages, I have

already assigned some to my loving wife of thirty-one years who is also my care

giver,  my ill daughter, Lydia, who was lured in by her spiteful lawyer/supposed

friend Fisher and was bribed and used by other RICO Actors SBEMP, Hestrin,

Murphy, and Folkenflik who used Lydia here and in Case BEFORE JUDGE GRISEA

in this Court (Lydia Couri v Robbins et al) See Exhibit I (see Jim Couri Affs. as

"Intervenor" and Exhibits on Pacer).  Sadly, Lydia was used as a stooge for these

corrupt lawyers to shake down Paul Robbins Esq., McLaughlin Stern, and me in

concert with Pavias, Siebert and Gomez to extort me (see my Aff. in that Case

exposing to USDJ Grisea that the Case was a shameful scam). I could go on for about

twenty more pages but the following and the Counts will expose these RICO criminal

enterprises all established by my own first hand front-line experience with each

defendant.


35. I wish to take this opportunity to state that my experiences in these state courts has

permitted me to express my sincere thanks to have been afforded the chance to be

involved in the SDNY Courtrooms with UDC Judges of honor and integrity so to

compare the judicial racketeers I have been victimize by. THE KNOWLEDGE,

DIGNITY, HONOR AND DECORUM HAS BEEN A HONOR FOR ME TO HAVE

BEEN A PART OF WITH THE FOLLOWING  WHO I MUST THANK HERE:

A. HON. CHARLES S. HAIGHT

B. HON. MORRIS LASKER

C. HON. SOTOMAYOR

D. HON. PRESKA

E. HON. BRODERICK

F. HON. C. KAPLAN

G. HON. THOMAS GRISEA

H. HON. CHARLES BRIANT

I. HON. BUSCHMAN, USBJ

J. HON HOWARD SCHWARTZBERG USBJ ( USBJ Schwartzberg on my Motion as a

creditor, appointed me in 1991 a Trustee (calling me "Sole Representative" as a non

lawyer). I guaranteed the Estate and (according to Judge Schwartzberg) I made more

Motions than were made in the Texaco Bankruptcy and made a small fortune for the

Creditors, including myself.


36. During the periods from 1960 to present I have been a recipient of many Federal and

New York Accolades including: SENATE MEDAL OF FREEDOM, CONGRESS

MEDAL OF DISTINCTION, AND OTHER AWARDS. I attach as Exhibit A,  some

of these appointments, etc.


37. I assert this final observation from the "eyes" as a witness to State judicial and

prosecutorial RICO Actors. If "lawmakers" do not obey the law and do not follow the

oath of offices, who is supposed to put a stop to this obstruction if these false-faced

criminals hide behind the "immunities" of their Offices. We are allowing these

corrupt judges to engage in fixes, bribery, conspiracy and alliances to further

America's criminal enterprises by giving Immunity as rewards for cheating,

obstructing justice and retaliation against and gaging patriots/whistleblowers.

38. I respectfully wish the Court to understand in sum, my life experience must report that the judges in State Courts that I have observed and interacted with, are either, corrupt, lazy, incompetent, alcoholics or are prejudiced. On the other hand, I can sincerely report that there are some state court judges who labor to seek the truth and avoid being part of the criminal enterprises operating under the black robes.

39. Warring against the US Constitution and perpetration of judicial and prosecutor fraud must void all such "umbrella" and all perpetrators must be subject to all reprisals (criminal and civil) for such violations of FRCP and Title 18.

40. Here is what I have learned and how the corruption enterprises use the press, the power of their office, law enforcement, and the judicial process to cheat Americans with con, cheating, lying, gaging informants, strangling due process, looting victims, abusing them and using "racketeering" tactics to quash the whistleblowers with the aid of a corrupt FBI Field Agent Office.

## PRELIMINARY STATEMENT

41. Statements herein, all allegations and charges are as a result and supported by over fifty years of experience by Plaintiff ("Couri or "I") in forensic investigations; and over ten years of first-hand interaction with all Defendants, (individuals and Agencies). Defendants activities that have specifically violated 18USC1962,

13USC1341, 18USC11343; 18USC1512, 18USC1513, 42USC1983 and a myriad of

Constitutional violations "Under Color of Law", judicial and prosecutorial violations

of Due Process Clause, CCP170.3 (mandating "automatic dismissal"); activities

beyond the scope of conventional duties of Judges and prosecutors engaging in Case

administration "AFTER" automatic dismissal and thud void judicial immunities.


42.  Prosecutors engaging in conspiracy to gag Free Press, Free Speech, using mail and

wires to gag truthful exposes of the Riverside County Criminal Enterprise. All of the

statements and charges herein are grounded on documentary evidence. It will be an

insurmountable task to exhibit as part of this Complaint every shred of Proof in

support. I have endeavored to display some high-points and I also respectfully refer

the court to two internet forensic news reporting domains (scamsinc.com and

scamraiders.com). These sites were conceived and created by me and others in 2007,

and due to my being advised in Oct 2009 that I had nine months to live, I disposed of

these domains to others, although still associated with me for advice.


## PARTIES AND NON PARTY CO-CONSPIRATORS


43. Couri became a target and victim of this RICO enterprise, in part as retaliation for

Couri investigating, confirming and exposing the RICO activities engaged in by George

and Antonia Pavia (Pavias); John Siebert MD & PC (Siebert); Diane Hendricks &

Hendricks Holdings (Hendricks), Gov. Scott Walker, Shaun Murphy Esq., Slovak Baron

Empy Law (SBEMP), Riverside County DA Mike Hestrin, ADA Garret Behrens; Desert

Sun Newspaper, Reporters Sherry Barkas and Julie Makinen, Joseph M. Burke Esq.,

Kenneth V. Gomez Esq. These conspirators engaged in retaliation under color of law,

mail and wire fraud, brutality, breaking and entering, false arrest warrants, conspiracy to

falsify criminal charges, perjury, obstruction of justice, grand larceny and extortion by

law enforcement persons, cities and counties, including FBI Agent Cindy Coppola,

Riverside Officer Baron Lane, Sheriff Deputies Pina, Peres, Reynolds, Rentle, Palm

Springs SUPERIOR COURT JUDGES Kara Klatchko, David Chapman, La Quinta CA

Mayor Linda Evans; DEFENDANT UW HOSPITAL WI, EMPLOYEE-OFFICERS

LISA BRUNETTE; RONALD SLWINSKI (President of UW Hospital during re\levant

Periods (2010-2016).


## JIM COURI MEDICAL DISABILITIES

44. See Exhibit B, doctor Affidavits confirming my medical condition.  I have suffered

from stage four melanoma cancer (15 yrs), COPD (10yrs.), cardiac disease (over

30yrs) and gastrointestinal problems (30yrs), eye conditions and recent cornea

transplant. These disabilities, coupled with the illegal and outrageous conduct of

Defendants, have adversely impacted my life and any meaningful activities. I cannot

travel and I am under the constant supervision of my doctors at UCLA Medical

Center and at Eisenhower Medical Center as well. In addition I am and have been

subject to the constant unprincipled conduct and invidious acts of these Defendants

from within and without California for a number of years causing grave impact upon

me, my health and finances.

JURISDICTION AND VENUE

45. This Court has subject matter jurisdiction over this action pursuant to 18USC1964

(jurisdiction may also be conferred based on Diversity or supplemental jurisdiction).

46. Venue is proper in this judicial district pursuant to 18USC1965 and 28USC1391,

because (Defendant(s)) are subject to personal jurisdiction in this judicial district and

reside in this district. (It is worthy of note that Courts have held that such "nationwide

service of process" provisions also confer personal jurisdiction over a defendant in any

judicial district as long as the defendant has minimum contact with the United States).

47. As to Counts here that embrace claims of violations of Plaintiff's Civil Rights, the

jurisdiction is proper here relating to certain California Defendants as grounded on the

exposing of the active criminal enterprise ongoing in Riverside County CA and involving

California Superior Court Judges, elected Officials and Prosecutors, it has been proved

that it is impossible for Plaintiff to obtain a fair Court under any jurisdiction in California

Courts. Thus, in the interests of justice and comety, jurisdiction and venue is fair and

proper in this Court for all purposes.

RICO DEFENDANTS

48. GEORGE PAVIA ESQ AND ANTONIA PAVIA. The Pavias reside at 580 Park Ave.

and conduct business in NYC, at Pavia Harcourt. The Pavias have been found guilty

of Federal tax evasion in or about 2015-6 having stolen the property at 15 East 77 St.
NYC, belonging to the mother of Antonia (Pierce), now deceased. The Pavias and the
PH Firm have been sued and accused of thefts of millions from multiple "clients" and
the Pavias have engaged in a massive RICO scam here, instigated and orchestrated by
the Pavias as "culpable persons", looting and embezzling Plaintiff's Rights to his
Rent Stabilized apartment at the Pavia brownstone 18 east 73 St, NYC. The Pavias
engaged in filing False "Certificates of Corrections", perjury, filing false Plans with
the Dept. of Buildings, along with Kenneth V. Gomez, Esq. (who resides In New York
and conducts business at 280 Park Ave., renting a small room in the law office of
David Deemer Esq.);  all of whom the ECB Court accused of Perjury and Fraud in
connection with Plaintiff's Apartment and the Pavia Building. See Exhibit W
regarding the $45million Pavia Default Judgement.

49. Pavias recruited Judge Joan Madden (NY Supreme) who engaged in serial fraud in
the Court and permitted Pavia to spread his RICO contamination throughout the NY
Supreme Court. George Pavia at emergency Deposition admitted that he was a Facist.
I know from Pavia's psychiatrist Arnold Hutchnecker that Pavia also was working for
the Nazis ratting on Jews (Pavia a Jew himself). George Pavia has a long history of
fraud, bribery, tax evasion, fixes and alliances with criminals. In fact Pavia's main
witness at the DHCR when Plaintiff secured Rent Stabilization for 18 E 73 St. was a
Ted Kohl who was a contractor with Herbert Construction who filed over 6 perjured
Affidavits for Pavia in Opposition to Rent Stabilization, which was granted and
sustained on Appeal at the DHCR. The DHCR granted Rent Stabilization on the Pavia

brownstone, 18 E 73rd, NY and affirmed by the APPL Div 1st Dept on application on Appeal by DHCR.

50. As a result, Pavia went wild and threatened to have me murdered and filed criminal harassment charges (thrown out by DA Schiff, calling George "a nut case"). So the Pavias and their lawyers Gomez and Jay Itkowitz got Madden in their pocket. The hate and RICO began to blossom with the alliances of Siebert, Hendricks, Gomez and the entire 60 Center Street Courthouse, NYC.

51. Pavia fixed the Madden Court so the Pavias could expunge Rent Stabilization and proceed to sell the 18E 73 St Brownstone with Couri out, selling for $20Million in cash and Couri received nothing and lost his home as a result of the Pavia RICO enterprise without one dollar in compensation. Couri moved to Disqualify Madden per Bias and worse, Madden refused to "stand-down", THUS DEPRIVING A FAIR TRIBUNAL BY WARRING AGAINST THE CONSTITUTION, THUS MADDEN'S RULINGS WERE AND SHOULD BE VOID AS WITHOUT AUTHORITY.

52. The Pavia and Gomez conspiracy continued as they engaged in a course of mail and wire fraud by Gomez creating and posting a Blog ongoing for over ten years relegated 100% for false and personal attacks on Couri for character assassination. This Gomez Blog at the behest of Pavia continues unabated and the Pavias enjoy their looted and ill gotten gains thumbing their nose at the Law, others rights and ignoring the findings of fraud and perjury by ECB Court--all precluded by JSC Madden. Appeal at the 1st

Department was a futile attempt based upon the poisoning of the Court by Pavia, Madden and Gomez announcing that Couri is a whistleblower and a judicial "bounty-hunter". This will more fully be explored and explained within the RICO Statutory mandates in the "FACTUAL BASIS FOR RICO CLAIMS".

53. It is sufficient to state here that the Pavias did not stop in 2014. They perpetuated their RICO role by aiding Siebert, Burke and Gomez in their conspiracy of falsifying and fabricating a phantom judgment against Couri of $15Million, illegally filed by Burke using the name defunct law firm (Abrams Deemer who were not the attorneys of record for Siebert). This "judgement" is bogus from beginning to end, but yet "fixed" Judge Wooten authorized it. All this illegally arising subsequent to the Dismissal of Case 107240/04 by Wooten on 9-2-2010. Thus thereby making Siebert's falsified Judgement against me a nullity. See Exhibits O, P, and Q.

54. Then Pavia and his minion Gomez with Defendants Burke and David Richardson Esq. compromised California Superior Court Judge David Chapman, and caused the ultimate dismissal "without prejudice of a $45Million Default Judgement Couri obtained arising out of Case PSC1600482, illegally administered by Chapman in violation of CCP170.3 and in contravention to article 14 of the US Constitution (Due-Process), thus vacating all Orders of impotent Judge Chapman. See Exhibits V, and W.

55. Judge Chapman engaged in intimidation of Couri, demanding that Chapman (in violation of CCP170.3) continue to administer a ministerial "prove-up" Hearing. Chapman also demanded that Couri appear in his Courtroom at a time Couri was in UCLA Hospital undergoing cancer treatment and against Medical Orders (See Medical Affs, Exhibit A).

56. These despicable activities will be explained and proved as part of the enterprise proximate causations, mail and wire fraud, interference with interstate commerce by a pattern of and racketeering activities. And within the equitable tolling of the mandates of the Statute of limitations and relating to the continuing enterprise of RICO, Retaliation and racketeering, and financial looting by the RICO Actors herein

RICO DEFENDANT KENNETH V. GOMEZ ESQ.

57. Gomez is a corrupt NY Lawyer who made his office in a "closet" at a now defunct firm at 600 Third Ave. NYC, "RUSSO & BURKE". Gomez was the in-house gofer who would engage in any activity for a fee. When Pavias became involved in the claims at DHCR by Couri seeking Rent Stabilization, Gomez was recruited by the Pavias to start a "character-assassination" Blog, relegated for ten years solely to excoriating Couri and his reputation by lies, ancient family history and forged Records, financed by the Pavias (see Exhibit S, also see kvgblog on the internet).

58. Then Gomez was hired by Pavia to engage in fraud, forgery and perjury at the NY ECB Court on John Street. Court Records (much in Couri's possession) shows Findings by the ECB Court of Gomez, George and Antonia Pavia engaging in serial perjury, fraud, DOB filings falsified, false Certificates of Corrections and forged Plans. the DOB Inspectors issued over 15 hazardous DOB violations at 18East 73 Street, in Couri Unit Atrium and in the public areas of the building. All of this fraudulent behavior was orchestrated by the Pavias in concert with Gomez.

59. Gomez acted in concert with Pavias, Siebert, Burke, with the aid of impotent Judge Joan Madden who improvidently precluded the real evidence in order to allow Pavias to embezzle my apartment at 18E. 73 Street and an illegal looting of my Rent Stabilized Rights and over $350,000.00 invested in the 3B unit.

60. Judge Madden PRECLUDED all evidence, all ECB Reports and all testimony from DOB Inspectors. Madden allowed only one DOB employee to appear who was never at premises. The Pavia Case was fixed and Madden used the Nuisance statute to steal my Rights. Except Madden re-wrote the nuisance statute by calling Couri's emails to Pavia's office from Couri's Office as "Nuisance". Pavias engaged in fraud, perjury, forgery and all allied with Gomez. All this in NY Supreme and all this with JSC Maddens refusal to recuse herself and she condoned Pavia's racketeering to use the Court to disenfranchise Couri of his home and Rent Stabilized rights.

61. Gomez also was hired by Siebert at or about the same period to intimidate Siebert sexual victims who were all planning to testify against Siebert for the sexual abuses over ten NY patients fell victims to. Gomez engaged in threats, stalking, intimidation and worse. Regardless Siebert was charged by NY State Department of Health in 2012 and was convicted and confessed as "morally-unfit". See Exhibits J and K.

62. Defendant Siebert was convicted by NYU Langone Internal Trial as a sexual deviant and fired. Defendant Siebert was also fired by Lenox Hill, MEET, NY Eye-Ear Infirmary and evicted from five NY Medical Offices for illegal "double-pledging" of Co-op Shares at office 799 Park Ave; evicted from Dr. Glen Jelks' Suites at 675 Park Ave, Sheril Aston's offices for sexual abuses of a fellow female doctor, and patients and evicted from Dr. Dan Baker office as well. After Siebert was barred from Medical Practice in NY State he traveled to Madison WI and began his antics in WI.

63. Defendant Gomez, fronting for the RICO enterprise, orchestrated the looting of my $230,000.00 Med/Mal Cancer settlement for the mis-diagnosis of a cancer mole. By use of false records, Gomez was awarded my money by a intimidated NY Supreme Court Judge. In sum, with the aid of Pavia and the Court by then in his "pocket" my money was taken from me. Defendant Gomez tried pulling the same scam in the USDC in Albany, before USDJ Mae DaGostino. (International Insurance Case). To follow is a brief outline on the Gomez and his brother Robert's scam, to steal approximately $350,000.00, the entire scheme foiled by me and Gomez was virtually

kicked out of the Courtroom by Justice DaGostino who was on-to the Gomez courthouse larceny.

64. Gomez was exposed by USDJ-Albany, Mae DaGostino when Gomez's MO was revealed by Couri; as a thief along with his brother Robert by attempting to and did "intervene" in a Case involving National Insurance Company where the "Gomez-Boys" engaged in fraud, forgery and perjury to embezzle from two minor relatives over $350,000.00. This was in 2017 yet the same MO when Gomez stole Couri's $230,000.00 Med Mal Settlement by intimidation of Judge Abdus Saalam, in NY Supreme. This Judge was later found dead in the East River under very suspect conditions.

## RICO DEFENDANT JOSEPH M. BURKE ESQ.

65. Defendant Burke maintains an office in NYC for years at 600 Third Ave NYC as Russo & Burke. In 2016 that law firm became Defunct and Burke joined Abrams Deemer at 280 Park Ave with Gomez. Soon after Abrams Deemer went Defunct and Burke continued at 280 Park Ave from 2016-2019. Burke was caught engaging in ex-party meetings with corrupted Judge Wooten all relating to Couri's Case assigned to Wooten who engaged in hatchet work with the aid of Burke and Referees Crespo and Jack Suter. Burke engaged in serial fraud and perjury at the lower court and at the App Div 1st Dept. Burke falsified Records, suborned Siebert's perjury on 6 sworn Affidavits where Burke and Siebert swore that Siebert never molested sexually any

patient while at the same time Burke was defending Siebert in NYU Trials, NYS Dept Health Trials and at least one criminal charge by Siebert victim Muriel Karass.

66. Defendant Siebert was by this time involved with Defendant Diane Hendricks. Hendricks intimate activities with Siebert also involve obstruction of justice by then Gov. Walker of Wisconsin, Journal Sentinel Paper and Reporter John Fauber and UW Hospital and racketeering to insulate Siebert.

67. Burke engaged in serial racketeering with JSC Wooten causing Couri to try and seek protection in the Riverside Bankruptcy Court as at the relevant period I was in California undergoing cancer treatment at UCLA. Those hopes of fair justice were fleeting and futile thanks to Burke, Siebert and, on information and belief, Hendricks who paid for fixed-lawyers Sulmeyer Kupitz and David Richardson who came into the Bankruptcy court "guns-blazing" with fraud, perjury and misuse of the Bankruptcy Statutes. Bankruptcy protection was a futile exercise (See Letters to USBJ Johnson re this issue Exhibit U).

68. My Case was Remanded back to JSC Wooten over clear evidence of systematic money laundering, fraud and conspiracy in concert with Burke, Gomez, Siebert, Richardson, Sulmeyer Kupetz and attempts to collect fabricated and non-existent sums Siebert and Burke with Pavia falsified by perjury, fraud, forgery and conspiracy to deprive my access to the Courts. (Judge Beeler issued an Order that Burke and I could not make Motions before getting his approval. The Order embraced Burke,

except I was the target, JSC Beeler soon after left the Court to become a mediator and
Wooten stonewalled me as to my attempts to comply with the Beeler Order. Burke
was also caught engaging in frequent ex-party "confabs" with Wooten in a locked
"dark" courtroom.

69. The ultimate was the illegal granting of Siebert a $15MILLION JUDGEMENT
AGAINST ME AS A RESULT OF MAIL AND WIRE FRAUD, CREATION OF
NON-EXISTENT OBLIGATIONS DUE FROM ME THAT WERE BELIED BY
TWO SETTLEMENT AGREEMENTS WHERE SIEBERT SWORE THAT HE AND
HIS PC ARE DEBTORS FOR MILLIONS AND SIEBERT WAVED ALL
DEFENSES IN THE COURI PURSUIT OF THE SIEBERT OBLIGATIONS. ALL
WAS VERIFIED BY SIEBERT'S THEN LAWYERS GTLS---TOM SPELLAINE
ESQ.

70. BURKE FALSIFIED COURT RECORDS, FILED AN ILLEGAL JUDGEMENT
AND USED A LAW FIRM THAT WAS NOT SIEBERT'S ATTORNEYS OF
RECORD. THIS HAS BEEN VERIFIED BY CHIEF JUDGEMENT CLERK AT NY
COUNTY, MS. PATEL.

71. This RICO con game was an orchestrated and premeditated charade.

RICO DEFENDANT JOHN WESTON SIEBERT MD AND HIS PC

a. Siebert bought the NY Office at 799 Park Ave of Dr. V. Michel Hogan (1887)

b. Couri was a friend and patient of Hogan

c. Couri had an emergency surgery need and called Hogan to find he retired to part time

d. When Couri visited 799 he met Siebert who claimed he was Hogan's partner (a lie)

e. Hogan relocated to Australia and never knew Siebert other that selling his office

f. Siebert promoted Couri to become involved in a new business venture

g. Siebert said that he and his wife were worth over $100Million

h. Siebert told Couri that Hogan had great respect for Couri in business matters

i. Siebert ultimately became a control person in a entity called Kindervest Planning

j. What Couri did not know was that Siebert was seeking a "patsy" business to engage in money laundering.

k. What Couri at the time did not know was the fact that Siebert was in deep debt

l. Siebert owed well over $20Million as subsequently affirmed by Kroll Reports, see Exhibit C

m. Kroll Investigation/Report and other evidence re John Siebert.

n. Siebert's conduct became more suspect and erratic seeking forming other Corps.

o. Finally Siebert had defaulted on the Kindervest project after Trans America agreed to participate; Siebert had agreed to finance Phase One with about $10Million

p. Siebert's checks began to bounce and Couri was distraught. Trans America bowed out

q. Siebert began to insist on making curious stock investments and then begged Couri to aid him in evaluating his Investments in Celexus Corp (aka: Freedom Wireless); Lithium Battery and a medical group organized by NY Dr. Roy Geronumus.

r. Couri did take the task with the understanding that Siebert and Couri would share equally on any of these investments that Couri deemed to have potential for capital appreciation.

s. Couri traveled to Phoenix three times to meet with Larry Day and Doug Fougnes at Freedom Wireless.

t. The Lithium Battery and Geronomus projects Couri advised Siebert to abort, which he did.

u. The Freedom Wireless was a probable windfall if the patents they possessed would stand up in litigation as all wireless carriers were using these Rights without payments to FW.

v. Couri advised Siebert to hold the FW shares and buy more. Siebert did that investing over $350,000.00 for which Couri paid most of as Siebert owwed Jim Couri and Couri Acquisition Corp substantial sums.

v. THEREFORE SIEBERT USED COURI'S MONEY TO PAY FOR THE FW SHARES.

w. SIEBERT EVALUATED THE INVESTMENT IN FREEDOM WIRELESS IN HIS US TRUST FINANCIAL STATEMENT AT $18MILLION. FROM THAT TIME FW COLLECTED IN LITIGATIONS RE "PATENT INFRINGEMENTS" OF CLOSER TO ONE BILLION. SIEBERT STATES THAT HIS INTEREST IN FW IN 2003 WERE 3% OR OVER $30MILLION BY 2017. THESE SUMS BELONGING TO COURI HAVE  BEEN SECRETED BY SIEBERT IN FREEDOM WIRELESS

HOLDINGS, A NEVADA ENTITY UNDER THE CONTROL OF FW OFFICERS

DOUG FOUGNES AND LARRY DAY.

x. Siebert used his then Lawyers GILBRIDE TUSA LAST SPELLAINE (TOM

SPELLAINE) (GTLS).

y. Settlement Agreement #1, General Release and Promissory was crafted by GTLS and

sworn to by Siebert and his PC (See Exhibit G).

z. At no time did Siebert ever claim that Couri or any Couri Entity owed Siebert or his

PC a CENT.

aa. Siebert Signed the Agreement and swore he would settle his debt to Couri Acquisition

Corp for about $1.5Million (Dec 2001).

bb. In 2003 and thereafter Siebert and his PC issued a Financial Statement to US Trust

Bank (Exhibit E) where he is seeking a credit line of $500,000.00. If Siebert was owed

any money from Couri et-al he surely would have listed that as a asset. He did not.

cc. In Oct 3, 2003 Siebert entered into a handwritten Agreement crafted by Siebert and

Plaintiff (Agreement #2) and a General Release to Couri crafted by one Siebert's

lawyers. These Documents were Notarized and sworn to by Siebert before independent

notary Gloria Rivera. Again, Siebert never claimed that he was a creditor and also

issued a General Release in 2003 to Couri and all his Affiliates.

dd. Siebert later falsely swore that he never signed the 2003 Agreement and Release yet

the Notary has sworn that Siebert is a perjurer (See Exhibit H collectively).

ee. IT IS IMPORTANT TO ADVISE THE COURT THAT I PRODUCED TO BURKE

(AS LAWYER FOR SIEBERT, IN THE NY COUNTY LITIGATION) DIRECTLY

FROM THE IRS-RAVS TEAM, ALL OF THE RELEVANT PERSONAL AND

CORPORATE FEDERAL TAX RETURNS; AND FROM NYS DEPT OF

TAXATION, ALL RELEVANT TAX RETURNS.

ff. I ALSO CAUSED CHASE BANK TO DELIVER ALL RELEVANT BANK

ACCOUNTS OF ANY SIEBERT BUSINESS INVOLVEMENTS WITH ME AND

RELATED COMPANIES FOR ALL RELEVANT YEARS IN WHICH SIEBERT WAS

AN OFFICER, DIRECTOR, STOCKHOLDER AND OFTEN A CONTROL PERSON

(SEE EXHIBIT F, RELEVANT RESOLUTIONS AND AGREEMENTS).

gg. BURKE PICKED ALL OF THEM UP AT THE OFFICES OF NY REFEREE JACK

SUTER AND ACKNOWLEDGED RECEIPT. AT NO TIME DID BURKE OR

SIEBERT'S CPA, SHINE CPA (BRIAN PECKER), LODGE A SINGLE FRAUD,

OBJECTION, OR CLAIM AGAINST COURI, COURI ACQUISITION CORP., OR

ANY OTHER AFFILIATED COMPANY THAT BURKE AND SIEBERT CLAIMED

FRAUDULENTLY HAD STOLEN HIS MONEY.

hh. ALL RECORDS, AGREEMENTS, GENERAL RELEASES SIEBERT ISSUED TO

ME AND IN MY FAVOR AND SIEBERT'S US TRUST FINANCIAL STATEMENT

VERIFY THAT THE SIEBERT CLAIM WAS A PERJURED FRAUDULENT SCAM

IN VIOLATION OF RICO STATUTES, SWORN TO AGREEMENTS AND

SIEBERT'S LAWYER GTLS-TOM SPELLAINE'S STATEMENTS THAT

SIEBERT WAS AND IS THE OBLIGOR, NOT COURI.

ii. FURTHER TO THE FOREGOING, ALTHOUGH I WAS DEPOSED OVER

TWO DAYS, SIEBERT AND BURKE REPEATEDLY CONCOCTED

"ROADBLOCKS" AND AIDED BY JUDGE WOOTEN AND REFEREE SUTER

(WHO TOLD ME THE "SIEBERT CASE IS FIXED"--SEE EXHIBIT D.

jj. ACCORDINGLY I HAVE NEVER DEPOSED SIEBERT OVER YEARS OF

THE COURTHOUSE RICO SHENANIGANS AND GRAND LARCENY

ORCHESTRATED BY THE RICO ACTORS WHO HAVE BEEN UNJUSTLY

ENRICHED BY DEFRAUDING ME UP TO NOW BY OVER $200MILLION

OF MY MONEY.

kk. IN FACT I MOVED TO STRIKE SIEBERT'S ANSWER FOR REFUSAL TO

BE DEPOSED AND WOOTEN FAILED TO RULE ON IT. I ALSO

PRODUCED 3900 PAGES OF DOCUMENTS, YET BURKE LIED IN COURT,

PLEADING THAT I PRODUCED NOTHING (HIS PERJURY BELIED BY BURK'S RECEIPT FOR THE PRODUCTION TO DEFUNCT "RUSSO BURKE).

ll. AS PART OF THE RICO ENTERPRISE SCHEME TO DISCREDIT ME AND SET ME UP IN THE PLATFORM OF THE CIVIL COURTS (A UNIQUE STAGE FOR A RICO ENTERPRISE RATHER THAN A BANK, STOCKBROKER, TRUMP ORG, PIZZA CHAINS), IN ORDER TO ALLOW DEFENDANT BURKE TO FALSELY ACCUSE ME BEFORE JUDGE HAROLD BEELER AND JHO GAMMERMAN THAT I WAS RUINING SIEBERT'S REPUTATION AND MEDICAL PRACTICE BY ACCUSING SIEBERT OF SEXUAL PREDATORY ACTS AGAINST MANY OF HIS PATIENTS. SIEBERT AND BURKE ALSO FALSELY REPEATED DENIED MY ACCUSATIONS OF SIEBERT'S PERVERTED SEXUAL ACTIVITIES WITH HIS PATIENTS (SEE EXHIBITS J, AND K, - PROVING SIEBERT AND BURKE ARE PERJURERS).

mm. ALTHOUGH I ASSURED MY CHARGES WERE TRUE AND ACCURATE, THE LIES OF BURKE AND SIEBERT TRUMPED MY PROTESTATIONS. JUDGE BEELER ENJOINED MY ABILITY TO ACCUSE SIEBERT OF BEING A SEXUAL PREDATOR DOCTOR. SOON AFTER BURKE ACCUSED ME OF VIOLATING THE GAG ORDER AND ORDERED A CONTEMPT HEARING.

nn. SIEBERT AND BURKE AGAIN COMMITTED PERJURY BEFORE
REFEREE LOUIS CRESPO AND I WAS FINED $5,000.00 BY CRESPO AS A
REWARD FOR MY TELLING THE TRUTH AND VIOLATING THE
ILLEGAL GAG ORDER.

oo. SOON AFTER BIRKE WENT TO THE APP DIV 1ST DEPT AND AGAIN
ACCUSED ME OF DAMAGING THE REPUTATION OF DR. SIEBERT.
SIEBERT AGAIN LIED, AS DID BURKE AND (AS I LATER LEARNED)
WHILE AT THE VERY SAME TIME BURKE WAS REPRESENTING
SIEBERT AT NYU/LANGONE HOSPITAL IN AN INTERNAL HEARING
WHERE SIEBERT WAS ACCUSED AND FOUND GUILTY OF SEXUALLY
ABUSING PATIENT/ATTY DIANE KLEEMEN (SEE EXHIBITS J, K AND R).

pp. THE APP DIV CASTIGATED ME FOR HARMING SIEBERT'S PRACTICE.
ALL THE WHILE I WAS TELLING THE TRUTH AND THESE RICO
ACTORS WERE ENGAGING IN PERJURY, FRAUD AND FALSIFICATION
OF EVIDENCE TO DISCREDIT ME AND OBSTRUCT JUSTICE IN ORDER
TO EMBEZZLE MY FINANCIAL RIGHTS AND MONEY AND PROPERTY
UNCONDITIONALLY DUE TO ME.

qq. A FEW YEARS LATER IN 2013, THE NY STATE DEPARTMENT OF
HEALTH ANNOUNCED THE FACT THAT SIEBERT WAS CHARGED WITH
IMMORAL CONDUCT TOWARDS PATIENTS AND HE WAS TO BE PUT ON

TRIAL.  BEFORE THE TRIAL BEGAN, SIEBERT CONFESSED AND

CONFESSED TO BEING "MORALLY UNFIT" (SEE EXHIBIT J ).

rr. DEFENDANT DIANE HENDRICKS KNOWING ALL OF THIS STILL

ENDOWED A $2MILLION CHAIR AT UW HOSPITAL(2014-2015) IN HONOR

OF SIEBERT; PUT OUT, ALONG WITH UW HOSPITAL, A KNOWN TO BE

FRAUDULENT PRESS RELEASE CLAIMING SIEBERT WAS A PRISTINE

MEDICAL RESEARCHER AND WITH A FINE REPUTATION.

ss. WHEN DIANE HENDRICKS LEARNED OF THE WISCONSIN DEPT OF

SAFETY AND PROF. SVCES. INVESTIGATION INTO SIEBERT  WHERE

SIEBERT WAS ABOUT TO HAVE HIS MEDICAL LICENSE TERMINATED,

HENDRICKS WAS HYSTERICAL AS WHAT GOOD IS HER PAID FOR

"CHAIR" FOR A DOCTOR WHO WAS HOLDING A VOIDED LICENSE

WHICH WOULD MARKEDLY INJURE HER REPUTATION.

tt.  SO DIANE HENDRICKS RECRUITED HER PAL GOV. SCOTT WALKER

WHO SHE HAD DONATED $500,000.00 (EARLY 2014). DIANE HENDRICKS

ALSO DONATED $5MILLION IN 2016 SUPPOSEDLY FOR WALKER'S

FAILED RUN FOR THE WHITE HOUSE. WALKER DID INTERVENE AND

DID FOIL THE SIEBERT INVESTIGATION AND TERMINATION AS A

DOCTOR.

uu. **THIS CONSPIRACY TO OBSTRUCT JUSTICE ALLOWED A CONVICTED SEX PREDATOR TO CONTINUE TO SERVICE UNWITTING PATIENTS AT UW HOSPITAL (WHO IS AS COMPLICIT AS HENDRICKS; A LISA BRUNETTE OF UW). ALL THIS CONSPIRACY WAS ALSO GEARED TO PERMIT SIEBERT AND BURKE TO CONTINUE TO CALL ME A LIAR RELATING TO SIEBERT'S CRIMINAL BACKGROUND.**

vv. **Burke, Siebert, Hendricks, Richardson, Gomez and Pavia have a long pattern of fraud and obstruction of justice, not only by fixing the NY Court and a corrupted Judge Wooten, falsifying the facts and resulting in State Court and App Div ignoring the truth and evidence, they escalated their RICO enterprise to Wisconsin and then to California.**

NEW YORK COURT REFEREE ADMITS SIEBERT CASES ARE FIXED

ww. In or about 2011, NY Referee Jack Suter told Couri on a phone call that "you have no chance - the Siebert cases are FIXED". (see Exhibit D )transcript of the phone call.

xx. So this continuing RICO enterprise has, by fraud, obstruction, mail and wire fraud, systematic cheating, bribery, withholding of property rights, falsifications of court files and records by JSC Wooten, Burke, Gomez, Luis Gonzalez, JHO Gammerman, ExParty emails between Referee Suter with Burke, all resulted in presently over

$200Million scam in actual and documented money looting. See Summary of Couri's actual contractual losses at end of this Complaint.

yy. Siebert, in 2015, in concert with Lawyer Burke and David Richardson engaged in willful and pervasive fraud and perjury in the Riverside CA Bankruptcy Court where Couri sought "Protection", See Exhibit U.

zz. In 2016 Richardson and Siebert and Burke surfaced again in the Palm Springs Superior Court, engaging in Fraud on the Court, perjury and extortion of Couri.

aaa. In fact Siebert and Burke engaged in at least forty counts of perjury in both the Bankruptcy Court and in the Palm Springs Superior Court before Judge Chapman; willingly suborned by lawyer Richardson.

bbb. Siebert and Burke were caught in 2015 plotting the murder of Couri by captured emails, Resulting in Restraining Orders in Couri's favor. Burke was also caught ex-party consorting with JSC Wooten, Referee Suter and others at the Lower Court and Appellate Court 1st, Dept.

## RICO DEFENDANTS MAX FOLKENFLIK AND DAVID FISHER

72. Max Folkenflik, a lawyer, resides and conducts business in NYC. David Fisher, also a lawyer, resides and conducts business in Los Angeles CA. I exposed the MO of this

"abbot & Costello" pair. Over all of the "Max & David" protestations, Folkenflik
was recently caught by a Federal Appellate Judge "double-dipping" for over
$30Million. See Bloomberg Expose, and see Exhibit I (please take particular note of
the exhibits to my AFF. within Exhibit I).

73. David Fisher Esq. learned that Lydia Couri was my daughter (after he accused Lydia
of illegally using the credit card of Lydia's then "friend/Art-thief" David DeSinctes.
A name given DeSinctes by Michel Basquiat's father for stealing some of the
Basquiat Foundation drawings. I defused the claim for Lydia and Fisher then
recruited Lydia as a "house-sitter" until Fisher learned of what Lydia outlined as her-
claim against McLaughlin Stern and Paul Robbins (my lawyers at the time). Lydia
told Fisher that Robbins stole her Trust.

74. This was a fabrication, but rather than call me, Fisher called a NY lawyer and friend
Max. Max Folkenflik called Gomez and Burke who were active maligning me on the
Gomez Blog with the aid and funding of the Pavias. The truth was that I was looted
out of my investment in Duty Free International a company I founded with my father
who when he was suffering from brain cancer was compromised by John Couri and
his wife Elaine. The money was put up by John as a pittance for his looting of me
FBO Lydia ($175,000.00), John embezzled over $20million, but "family is family";
at worst Robbins was negligent, but not a "crook".

75. Folkenflik, Siebert, Fisher, Gomez, Burke and Pavia again conspired in a scam to collect an unlawful debt, this time using the Federal Court-SDNY as a platform. Here, knowing that Lydia was and is a substance abuser and suffering from mental disorders, these persons conned Lydia into believing that she would collect $9Million if she filed the case against Robbins & MS (Case 12cv2220 TPG) in this Court. Cleverly, Folkenflik chose not to name me, refused to depose me and used Lydia as a stooge and convinced her not to speak to me or my wife, Marlene.

76. This RICO conspiracy was a cleaver scheme knowing that I would be responsible to Robbins and ACE, the Insurer. Gomez fed a pile of lies to Max Folkenflik, who crafted a fraudulent Complaint, got Lydia to sign it and engaged in the extortion and RICO scam to collect from me an unlawful debt by a conspiracy among the RICO Actors while defrauding USDJ Grisea.

77. My Intervention and three Affidavits ultimately deflated the Folkenflick-Fisher skulduggery as the Exhibit here as my Aff was Filed with Judge Grisea who demanded that it be placed on Pacer. It was the "death-knell" for the Case.

78. But it resulted in Lydia believing that I deprived her of $9Million, as she was "brainwashed" to believe by Folkenflik and Fisher. Fisher and Folkenflik have now been on a crusade to injure and malign me for exposing their systemic courthouse scam engaged in by these corrupt debased lawyers whose RICO activities are carbon copies of organized crime.

79. I am continuing to pray and hope to help Lydia to face her addictions and finally

enter Betty Ford. As yet no luck, but Fisher and Folkenflik, Murphy and SBEMP have

used Lydia to cause harm to me, Lydia herself, and Lydia's natural mother Carla (See

Aff. of Carla as an exhibit within Exhibit I).


RICO  DEFENDANTS DAVID RICHARDSON ANMD SULMEYER KUPETZ


80. Defendants Richardson and Sulmeyer Kupetz (SK) are lawyers who reside and

practice in Los Angeles CA. SK was recruited by Siebert, Gomez, Pavia and likely

Diane Hendricks (whose activities will be fully outlined herein). Richardson appeared

for Siebert and Burke in the Bankruptcy I Filed to preserve my claims against Siebert,

Pavia et-al. Within a few weeks, SK Filed an Adv. Proceeding in Central District of

California, Riverside, CA. Although my office has been at 575 Madison Ave. 10th. Fl.

NYC for twenty-five years, during 2003-2017, I was under care for cancer and

cardiac issues at UCLA Medical Center in Westwood CA, with rental property in Los

Angeles and using Lydia's rental in La Quinta as a hospice.


81. Richardson came into the Bankruptcy Court with a willfully fraudulent series of

bogus charges alleging that Plaintiff supposedly owed Siebert over $90Million dollars

(see Exhibit U) for fraud, embezzling, looting and other extortive activities (all

without basis in law; in sum-- lies) Their conspiracy here was to obtain and collect an

unlawful debt. Richardson knew that Siebert had entered into various Agreements

Settling Siebert obligations to me with the legal advice of GTLS and Thomas

Spellaine Esq. (who is committed to testify here).

82. SK and Richardson knew that Siebert also issued Bank Financial Statements which at

no time scheduled any sums due from Couri or any Couri Entities. Richardson also

knew that Siebert issued General Releases to Couri et-al and that Siebert waved all

defenses or claims against Couri.

83. SK, RICHARDSON, ENGAGED IN SERIAL FRAUD ON THE COURTS

(ATTEMPTING TO UNJUSTLY ENRICH SIEBERT), IN THAT RICHARDSON

FILED AN ADV PROC IN THE CALIFORNIA RIVERSIDE CENTRAL

DISTRICT BANKRUPTCY COURT AGAINST ME GROUNDED ON PERVASIVE

FRAUD, FALSIFIED ATTORNEY CLAIMS AND ATTEMPTING TO CAUSE THE

COURT TO BELIEVE THAT I STOLE MILLIONS FROM SIEBERT AND SUING

ME FOR ABOUT $90MILLION AND DEMANDING THAT ANY

INDEBTEDNESS TO SIEBERT BE EXEMPT FROM BANKRUPTCY

DISCHARGE. THEN DEMANDING THE CASE BE REMANDED BACK TO

NEW YORK PART 7, JSC WOOTEN (2014), a case that was Dismissed (107240/04)

by Wooten himself on Sept. 2, 2010 (see Exhibits O, P, Q and U).  Literally amazing -

all true facts known by Richardson.

84. RICHARDSON ENGAGED IN RAMPANT PERJURY, FRAUD ON THE COURT

AND WAS AND IS AN ACTIVE ACTOR IN THE RICO ENTERPRISE.

RICHARDSON, SIEBERT AND BURKE IN THE PLEADINGS IN THE
CALIFORNIA RIVERSIDE BANKRUPTCY COURT (AND COURT RECORDS
VERIFY) ENGAGED IN ABOUT 25 -40 COUNTS OF PERJURY.

85. THEN RICHARDSON TOOK THE RICO "CARAVAN" TO PALM SPRINGS
SUPERIOR COURT AND ENGAGED IN CLEAR COLLUSION WITH JUDGE
CHAPMAN, AND AGAINST STATUTES (WHEN I EXPOSED A CLEAR
ATTEMPT TO "SAND-BAG" ME WITH AN ORDER TO HOLD ME AS A
VEXATIOUS LITIGANT WHERE RICHARDSON HAD NO AUTHORITY AND
FALSIFIED THE STATUTE SO JUDGE CHAPMAN WOULD, WITHOUT A
SCINTILLA OF BASIS IN FACT OR LAW, LABEL ME A "VEXATIOUS
LITIGANT" TO GAG MY ACCESS TO THE COURTS SO THAT THE RICO
ENTERPRISE COULD CONTINUE UNABATED.

86. ON INFORMATION AND BELIEF, DIANE HENDRICKS AND HENDRICKS
HOLDINGS, IN CONCERT WITH GEORGE AND ANTONIA PAVIA, WERE
PAYING FOR SK AND RICHARDSON TO ENGAGE IN THESE ACTS THAT
CONSTITUTE VIOLATIONS OF 18USC1962, ET-SEQ.

87. IT HAS BEEN LEARNED THAT THE MO OF SK, HOWARD EHERENBERG
ESQ. AND RICHARDSON HAS BEEN YEARS OF FIXES, BRIBERY AND
FRAUD ON THE COURTS.

88. Richardson, bullied his way before Riverside USBJ Johnson whose Rulings were

    grounded on the racketeering acts engaged in by SK, Richardson, Burke and Siebert

    (with the advise of George Pavia). Judge Johnson's Rulings were in reliance on

    Richardson's fraud on the Court, all while Couri was then gravely ill and pro se. See

    Exhibit U, letter to the Court in Riverside County CA, to Judge Johnson, re

    Richardson and SK, fraud on the court and mail and wire fraud.

89. Richardson was deflated when I Moved to withdraw the Bankruptcy as the Siebert,

    Burke, Richardson scheme to collect an unlawful debt via their adversary proceeding

    which was replete with perjury, fraud upon the court, conspiracy and would have

    been a major boon for the RICO enterprise. Richardson even had the temerity to

    Oppose my well-supported, legal request of Dismissal of my bankruptcy case

    (supported by the Trustee and the Court).

90. Then Richardson resumed his RICO Frauds when I Filed a Case in Palm Springs CA,

    the courtroom of David Chapman (Case no PSC 1600482, Couri v Siebert et al)

    against Siebert, Burke, and Pavias (George and Antonia) in 2016 before Superior

    Court.

91. During that case, Richardson, Burke and Siebert began a major scheme to first plot a

    murder of Couri over interstate instrumentalities. Siebert's emails were captured by

    Couri, Reported to the sheriffs office, investigated by them and a Restraining Order

    was issued by the Courts against Siebert, verified by law enforcement (See Exhibit

L ) for 4 years to 2019 April. (Siebert and Burke and Gomez have threatened murder before and after toward some of Siebert's patient victims who testified against Siebert in the NY State Dept of Health and NYU Langone Proceedings against Siebert's sexual abuses of his patients (See Exhibits J, K, and R)).

92. In that Case, PSC 1600482, I moved under CCP170.3 and Due Process clause of the US Constitution to Automatically Disqualify Judge Chapman. Under CCP170.3 Chapman was mandated to immediately remove himself from all aspects of the Case. Chapman refused and continued to issue impotent Rulings and Orders in violation of the CCP170 Statute thus making all of Chapman's Rulings and Orders null and void. With that, Judge Chapman and Richardson ganged up and filed an illegal and falsified joint "Vexatious Litigant" charge against me in total violation of the CA Vexatious Litigant Statute and in violation of CCP170.3.

93. Soon after, Judge Chapman dismissed Case PSC 1600482, WITHOUT PREJUDICE, my causes of actions on Richardson's Motion to Quash the Service of Summons for lack of Jurisdiction. This was on or about July 2016, but not before I was retaliated against by being illegally and unfoundedly physically and verbally accosted in the Courthouse in Palm Springs by Deputy Sheriffs Pina and Perez, which resulted in my being hospitalized at Eisenhower Medical Center in Rancho Mirage CA.

94. Case (PSC 1600482) against Pavias was unanswered the Pavias and/or Richardson and SK, although duly served.  I served the Pavias in NYC at 580 Park Ave and per

Statute, Filed a Default Judgement against them for the pled Claims against the Pavias. The Pavia Default resulting in a $45million Judgement was Docketed by Letty Reyna, a chief clerk of the California Palm Springs Superior Court, who tendered me a Clerk-Judgement against the Pavias for $45million dollars. The RICO enterprise Actors recruited Judge Chapman to do their illegal misuse of the Court to loot the Pavia Judgement.

95. Although, months earlier, Judge Chapman was Automatically Disqualified For Cause under CCP170.3 and US Supreme Court mandates for bias, judicial fraud, conspiring with adversaries, depriving due process, engaging in obstruction of justice and other judicial acts beyond the scope of Chapman's daily duties, Judge Chapman unlawfully demanded that he and only he administer the ministerial "prove-up" hearing in the above case. This was a violation of law and my rights.

96. As soon as Judge Chapman was Automatically Disqualified as per CA Statute and Constitutional Law, he was warring against the US Constitution, the CCP and Cannons of Judicial Conduct and thus appears to have become devoid of any Immunities afforded a judge whose acts are beyond his legally appointed Duties. (In 2018, years later, Judge Chapman finally invoked CCP170.3 and Disqualified himself as to his bias and unwarranted misconduct; Case PSC00166, a reckless case recently brought against me by RICO Actor Shaun Murphy as part of the RICO scheme of retaliation against me).

97. In 2016 to 2017 in Case PSC1600482, Judge Chapman continued to engage in illegal acts against me, against my medical orders and demanded that I appear IN PERSON before him although I was in UCLA Hospital undergoing cancer chemo and cardiac evaluations. Judge Chapman refused to accept my Appearance by Court Call and Disconnected my Call. More deprivation of my Rights under the Constitution and judicial racketeering.

98. Judge Chapman then threatened that he was going to Dismiss and Vacate my Judgement against the Pavias for the Filed $45Million. I had submitted various Medical Doctor Affs advising the appearance by Couri would be "life threatening"; but Judge Chapman continued his crusade to steal my Rights in concert with SK, Richardson, Pavias and Siebert-Burke.

99. I WAS FORCED TO DISMISS MY JUDGEMENT AGAINST THE PAVIAS WITHOUT PREJUDICE BASED ON THE THREATS MADE BY JUDGE CHAPMAN THAT IF I DID NOT "SHOW-UP" IN PERSON CHAPMAN WAS GOING TO DISMISS MY JUDGEMENT WITH PREJUDICE. I WAS FORCED TO SUCCUMB TO JUDICIAL EXTORTION SINCE I WAS ILL AND IN HOSPITAL.

100. It is clear that Judge Chapman violated the law, the cannons of judicial ethics, the CCP, the US Constitution in a orchestrated scheme to rob me of my money legally OWED TO ME IN THE SUM OF $45MILLION BY DEFAULT.

RICO DEFENDANTS DIANE HENDRICKS,  HENDRICKS HOLDINGS,

GOV. SCOTT WALKER, AND UW HOSPITAL

101. All of these Defendants are residents of Wisconsin. Hendricks is supposed to be the
richest woman in America (according to Forbes, worth $5billion), Scott Walker was
the Gov. of Wisconsin until 1-1-19 and UW Hospital is located in Madison WI.
DIANE HENDRICKS IS THE WIDOW OF KENNETH HENDRICKS.

102. After John W. Siebert was fired and severed from NY State as a "Morally Unfit"
doctor, Siebert and his wife Kimberly moved to Baraboo WI, a superb of Madison
Wisconsin, and Siebert got a job at UW Hospital in the Surgery Clinic. This was in
or about 2006 according to information turned over to me.  Siebert met Mrs.
Hendricks and , on information and belief, soon after began a sexual relationship
with her. When I learned of this relationship, I cause Mrs. Hendricks to be advised
that Siebert was and is a "danger" to Society and has been terminated from five
prominent NY Hospitals for sexual abuses (a-la Harvey Weinstein style) and has
harmed many. See Please Exhibit R, collectively).

103. Diane Hendricks did not deny her intimate relationship with Siebert, which is further
confirmed when Diane Hendricks began to aid Siebert, on information and belief,  in
paying for cars, homes, lawyers and aiding Siebert to engage in off-shore money
laundering.

104. By 2007 Kenneth Hendricks was overweight, likely impotent, and Hendricks continued her intimate relationship with Defendant Siebert. On 12-21-07 Kenneth died in a highly suspicious fall (see Exhibit R, collectively).

105. Diane began a wild spending spree, gave Siebert a $2Million Chair at UW Hospital , and sent a fraudulent Press Release that SIEBERT WAS A FINE, RESPECTABLE DOCTOR WITH A PRISTINE BACKGROUND. Such acts were ALL MAIL AND WIRE FRAUD AND KNOWN TO BE FALSE BY DIANE HENDRICKS AND BY UW HOSPITAL (LISA BRUNETTE) AND BY SIEBERT HIMSELF. ALL WILLFUL MISREPRESENTATIONS AND ALL TO PROVIDE A CRIMINAL SEX PERVERT, PERJURER AND THIEF A MODICUM OF RESPECTABILITY.

106. Defendant Siebert was all the while embezzling and secreting mega-millions that were and are due to me relating to Settlement Agreement Rights that Siebert unconditionally confessed to owing me/ Couri Acquisition in 10-3-2003, and Issued to me and all affiliated parties a General Release at that time. All of which were sworn to and Notarized. These sums include my Agreed Share of Freedom Wireless that I researched and advised we retain the Shares and buy more. We possessed about 4% of the outstanding Shares and FW collected about $1Billion of Patent Infringement Claims. (see 2008 Jim Couri Complaint, Exhibit T).

107. Late 2014, 2015, when Diane Hendricks learned that Siebert's victims Filed charges with the WI Dept. of Safety and Professional Services, Diane knew that their

Investigation was going to terminate Siebert's Medical License in WI. Diane

"recruited" Gov. Scott Walker who intervened and aborted the Investigation and

"whitewashed" Siebert which saved the previously issued Chair for Siebert "a

pristine medical scientist and researcher".


108. Hendricks' scheme was to obstruct justice to protect her endowed UW Hospital

Chair on behalf of a doctor (Siebert) whose medical license was about to be

revoked, if it had not been for the intervention of Gov. Walker. So UW Hospital,

Hendricks, Walker and Siebert engaged in this scam and RICO enterprise scheme to

whitewash/hide Siebert's perverted activities and avoid my perjury complaint to the

NYC Appellate DIV 1st Dept., who issued 2 Orders falsely calling me a liar for

accusing Siebert as a convicted sex deviant, and struck Couri Acquisition's

Complaint (in connection with Settlement Agreement #1, (see Exhibit G ) in the

collection of the 2001 Payments Due to Couri Acquisition. On 9-2-2010 Judge

Wooten Dismissed this Case 107240/04 outright, see Exhibit O.


109. During my communications in support of Siebert's Medical License revocation,

Tiffany Hoff, inspector Dept. of Safety and Professional Service WI, admitted that

Scott Walker quashed the conviction of Siebert for Hendricks. A few months later,

Walker was given from Diane Hendricks, $5Million for Walkers 2016 Run for US

President.

110. Then when Medical Reporter John Fauber, of the Milwaukee Journal Sentinel

Newspaper, was crafting an Expose regarding Siebert's criminal acts, and his

frequent communications with Couri, Diane Hendricks again misused her clout to

intimidate Fauber and his Journal Sentinel to abort his Expose. After my

intervention, a watered down Expose was finally published. Meanwhile, with all the

Exposes that Scams Inc News has published, none have ever been denied by

Hendricks, Siebert or any other target as permitted by the site's published TERMS

OF USE.

111. Defendant DIANE Hendricks mislead and lied to Reporter FAUBER TELLING

HIM THAT SIEBERT'S SEX ACTS IN NY (RESULTING IN HIS REMOVAL

FROM FIVE NY HOSPITALS) WERE "INCONSEQUENTIAL".

112. Only a few months ago (Jan., 2019), Siebert and UW Hospital were sued in

Wisconsin Court by a UW Hospital Patient charging Siebert and UW Hospital with

sexual deviant conduct.

RICO DEFENDANTS SHAUN MURPHY ESQ, SBEMP ESQS.

113. DEFENDANTS SHAUN MURPHY ESQ. (Murphy), SBEMP ESQS. (SBE)

RESIDE AND CONDUCT BUSINESS IN PALM SPRINGS CA AND IN NYC.

114. The RICO enterprise created by Defendants Shaun Murphy Esq. and SBEMP Esqs. has been ongoing for about ten years and is a CLASSIC EXAMPLE OF THE PERVASIVE CRIMINAL ENTERPRISES PRESENTLY ONGOING IN MOST STATES IN AMERICA. Sadly the archaic and farcical State Court System of Judicial Appointments by Governors, are usually unvetted, lazy, negligent, and appointed at the behest of lawyers with ulterior motives. The whole State process is a disgrace to the US Constitution and American. Many Officials and State Judges are RECKLESS, RUTHLESS, LAWLESS, OFTEN CO-CONSPIRATORS BEING BRIBED BY THE "insiders" of the massive corruption. Please see former USDJ John Gleeson's critic re State Court Judicial Process.

115. In about 2002 I was a close friend of a now deceased Lawyer Dick Roemer, Sr. Partner of Roemer Harnik in Indian Wells CA. My conversations with Dick Roemer and my own investigations firsthand experiences led to my uncovering a criminal enterprise ongoing in Riverside County CA. To follow is the foundation of this enterprise.

116. Defendants Murphy and SBE were a small Office in Palm Springs; Best Best Kreiger were in Palm Desert and Joe Gibbs was in Palm Desert. These firms banded together to develop an unlawful enterprise perceived by SBE and Brian Harnik (a Brooklyn "wise-guy" who Dick Roemer was afraid of). Mary Gilstrap of Roemer Harnik recommended an Indio lawyer who had attended a mail-order un-accredited college law school, who was working at a two-man office chasing ambulances,

David M. Chapman. Gov Jerry Brown went along and Chapman, a malleable imperious bully, became a Sup. Court Judge.

117. Then these law firms and SBE selected James Latting an associate with Roemer. Latting soon became another Sup Court Judge. These firms then set up the Palm Springs Superior Courthouse and installed Judges Chapman and Latting. Fixes were orchestrated by Harnik, Murphy, Slovak, SBEMP, Gibbs, Gilstrap and all the Court Clerks went along with the stings.

118. Defendant Murphy has made a cottage industry of fixes. Murphy instigates herpes cases swindling millions from sex-starved fat cats, set-up by SBEMP with a Murphy whore with herpes who then they set up a phony case and use a fixed judge.

119. In 2010 Defendant Murphy engaged in forgery with a rented house in Indian Wells and a Company I was affiliated for my use during surgery and Murphy and his clients Tomas secreted that the fact that the house was full of illegal asbestos,. Murphy forged the lease, lied in court papers and used another fixed Judge Borik in Indio to say that I was a "Vexatious Litigant", (Murphy's usual tactic) which was a ludicrous scam, as all I did was show the Court a Licensed Asbestos Inspector findings that the house was full of asbestos and mold and unfit for human habitation. I told Tomas that I would sue them and Murphy for fraud in USDC and soon after I was given $3,500.00, an abatement of Rent and the right to break the Lease.

120. Murphy was forced to Vacate Borjk's silly Vexatious Litigant Charge. I have seen over and over again that these State Judges who get caught by a litigant who sees through their judicial scheme of depriving Due Process and Obstructing Justice will use "Vexatious" litigant claims, and or fabricate an order to Gag a litigant who attempt to expose their judicial larceny.

121. Defendant Murphy and SBEMP have been engaged in conspiring with corrupt DA Micael Hestrin to engage in mail and wire fraud to gag freedom of speech and by using interstate commerce to gag the truthful exposes as to the Riverside criminal enterprises.

122. I attach some evidence of Defendants Murphy-SBEMP criminal enterprise. Defendant Murphy, since 2011 has been engaged in a campaign to try to murder me in concert with mafia family Defendants Castigliones, steal my Rights to property in La Quinta CA, owned by the heirs of Lefty Castiglione, a crime boss with the Gallo and Persico Crime Family.

123. Defendants Murphy and SBE caused an illegal Eviction with Judge Chapman; who deprived my access to the Courts and Due Process, Obstructed Justice, engaged in forgery, fraud, and violated CCP170.3 and warred against the US Constitution, by issuing Orders that were false and were in direct violation of Issuing Rulings that are void per CCP170.3 and the Constitution. My attempt for a Stay was futile by judges who ignore the laws.

124. These RICO activities engaged by Defendants Murphy and SBE caused me injury, but also fortified my determination to expose these the judicial antics in depriving citizens their homes. In fact in Los Angeles CA, where many properties are owned by the Russian mafia, a tenant without a fixer lawyer will be evicted sua sponte, PERIOD. I exposed Neil Shekhter of NMS Properties in LA as a "front" for the Ukraine mafia and who is being sued by Gibson Dunn and Jim Fogelman in the LA Office as a RICO BUSINESS (NMS) who has looted the Client of Fogelman. In Federal Court and with Butross and Fogelman the chances are better for a fair trial.

DEFENDANTS RIVERSIDE COUNTY CA DA OFFICE,

DA MICHAEL HESTRIN, ADA GARRET BEHRENS

124. DEFENDANTS HESTRIN, DA OFFICE RIVERSIDE, ADA BEHRENS RESIDE IN RIVERSIDE COUNTY CA; ALL CONSPIRED TOGETHER TO RETALIATE AGAINST ME AND FURTHERED THEIR RACKETEERING ENTERPRISE. DEFENDANT DA HESTRIN, MISUSING THE POWER OF HIS DA OFFICE CONSPIRED WITH DEFENDANT MURPHY TO FILE A FRAUDULENT AND PERJURED CRIMINAL HARASSMENT COMPLAINT. - SEE EXHIBIT M COLLECTIVELY .

125. AS PART OF THEIR SCHEME, THEY USED A FALSE ADDRESS IN THE CRIMINAL COMPLAINT FILED ON 11-10-17, KNOWING THAT ON JUNE 23,

2017 I WAS EVICTED FROM THE ADDRESS BY A FRAUDULENT JUDGE

CHAPMAN ORDER, WHO WAS A PART OF THE CONSPIRACY. THEN A

NOTICE FOR A 12-12-17 ARRAIGNMENT WAS SENT BY THE HESTRIN DA

OFFICE TO THE WRONG ADDRESS (TO THE PROPERTY IN LA QUINTA

WHERE THE 6-23-17 DISPOSSESS WAS EFFECTED). I HAD NO NOTICE OF

THE CRIMINAL COMPLAINT OR THE ARRAIGNMENT.

126. MOST IMPORTANTLY, DEFENDANTS DA HESTRIN AND ADA BEHRENS

VERIFIED THE MURPHY COMPLAINT KNOWING THAT I NEVER MADE

ANY HARASSING CALLS TO DEFENDANT MURPHY.

127. AFTER I WAS SUBJECT TO A FALSE ARREST WARRANT OVER MY HEAD

FOR NOT APPEARING TO A HEARING THAT I HAD NO NOTICE OF AND

THAT WAS ILLEGALLY ISSUED BY ANOTHER RICO ACTOR JUDGE KARA

KLATCHKO, DEFENDANT MURPHY, ON 4-28-19, RECANTED AND

CONFESSED THAT THE PHONE HARASSMENT CHARGE WAS FALSE AND

THAT HE ADVISED DEFENDANTS DA HESTRIN AND ADA BEHRENS AND

THE DA OFFICE THAT COURI MADE NO HARASSING CALLS TO HIM OR

SBEMP.

128. ACCORDINGLY, ON TOP OF ALL OF THE OTHER DEFENDANT DA

HESTRIN'S WILLFUL CRIMES, HE AND DEFENDANT ADA BEHRENS

SIGNED OFF, UNDER PENALTY OF PERJURY, THAT THE MURPHY

CRIMINAL CHARGE THAT I HARASSED HIM BY PHONE WAS TRUE AND

DONE SO IN RIVERSIDE (I WAS IN NYC DURING THE RELEVANT

PERIOD).


129. I ATTACH HERE AS EXHIBIT M, COLLECTIVELY, THE DEFENDANT

MURPHY LETTER TO DEFENDANT DA HESTRIN OF 4-2019 RECANTING

AND ADMITTING THE FRAUD IN THE CRIMINAL CHARGE. EXHIBIT M

ALSO CONTAINS OTHER RELEVANT RECORDS IN SUPPORT OF

DEFENDANT DA HESTRIN'S CORRUPTION, RETALIATION, FRAUD, AND

REFUSAL TO EXPUNGE THE FRAUDULENT WARRANT AGAINST ME.

DEFENDANT DA HESTRIN IS A BAD APPLE, A BULLY, WHO USES THE

DA OFFICE AS HIS OWN UNLAWFUL ENFORCEMENT AGENCY TO

SHROUD THE RIVERSIDE CRIMINAL ENTERPRISE.


130. 2017, Defendants Murphy and SBEMP, as a ringleaders of the Riverside CA

criminal enterprise and in concert with Defendant DA HestrIn of Riverside County,

commenced a retaliation scheme to gag me, arrest me and extort me with sham

Court proceedings. Defendant Murphy in concert with Judge Chapman and

Defendant Castiglione compromised my daughter Lydia, via Defendants David

Fisher Esq. Then they caused Chapman to further violate Due Process and

CCP170.3, steal my Rights to 48625 Calle Esperanza where I paid Castigliones

$2.500.00 for a Purchase and Rental Option for five years in Dec 2016.

131. Here again, Defendant Murphy caused Judge Chapman to loot my Rights, cause Sheriffs to accost me in May and June 2017, trespass, stalk, break into property (Calle Esperanza) where I was using as a hospice with medical equipment, a large oxygen unit, a walker, etc. I was physically abused by Sheriffs Perez, Pina, Reynolds at orders of Sgt. Rentle of Indio Sheriff dept. and while Defendant Murphy was sitting outside in a car with Defendant Castigliones.

132. On 7-3-17, I Filed a Palm Spring Riverside criminal complaint against Murphy charging him with elder abuse and harassment. I supplied fully-supported evidence material with the Complaint. Nothing was done by DA Riverside. The enterprise choose to retaliate against me and Murphy on 11-9-17 Filed the afore mentioned Harassment Charge (PC653m) where he willfully used the wrong address for me. (Now admitted by Murphy to be false).

133. As a result of the abuse I endured, I was hospitalized at UCLA Medical Center and underwent in Sept 2017 a quad cardiac bypass. Defendant Murphy then began to write and call my doctors along with Defendants Kenneth Gomez and Siebert and engaged in intimidation of them, and in violation of HIPAA. The Acts of these persons has been depraved and resulted in serious harm to me.

134. Defendant Murphy's confession letter (re his false arrest warrant against me) took place on or about 4-30-2019 19, yet Defendant DA Hestrin refuses to vacate the

false arrest. DA Hestrin and his wife are now caught in a plot of international

Chinese terrorism, mail and wire fraud, extortion, and RICO.

DEFENDANTS MARIA, VINCENT, THERESA CASTIGLIONE

135. Castiglione Family all reside in Indio CA and they own and rent a condo in La

Quinta CA at 48625 Calle Esperanza, La Quinta CA (Property). Lydia Couri in 2011

rented the Property and I began to use it from time to time as a "hospice" after

cancer surgeries and treatments at UCLA and Eisenhower Hospitals. I or my wife

Marlene advanced the property Rent ($1,650.00 per mo) to Vincent and Theresa.

136. Maria, Theresa and Vincent Castiglione also conduct business in Torrence, Indio, La

Quinta CA. They are all relatives of mafia enforcer Lefty Castiglione, a mafia figure

whose "family" is a part of the Gallo and Persico Crime Families in NYC, Queens

and Brooklyn. Castigliones are gamblers and all part of organized crime as admitted

to me by Vincent Castiglione in 2006.

137. The Castigliones (Vincent and Theresa) gamble almost daily at Fantasy Springs

Casino located in Indio. They also often travel to Reno and Las Vegas to gamble

with their daughter Maria, a veterinarian.

138. On information and belief, I was advised that Maria transports dogs from Mexico

who are forced to swallow packs filled with cochane. Each dog can swallow over 12

such filled "bags" and on arrival to Maria's vet facility (Pacific Veterinary Group).

These dogs' stomachs are opened and the bags of cochaine removed and smuggled

into US for sales and distribution in Riverside and Beaumont CA.

139. In Dec. 2016, I negotiated and bought a five-year Option to buy the Calle Esperanza

Property at the then current market value ($275,000.00) and also an option to rent

before purchase at the current rent of $1,650.00. I paid $2,500.00 cash to Theresa

and Vincent (the listed owners of property). They have refused to deliver the Deed

per terms of the Option (Exhibit N).

140. By SBEMP Fraud on the Court, conspiracy, bribery and extortion, the Property was

embezzled from Lydia and I was illegally evicted without a shred of Due Process

and by Judicial (Chapman) fraud in concert with Sheriffs trespass, entering, and

perjury, fraud and racketeering. I have demanded the Option performance to no

avail.

141. Hestrin the DA enforcer, SBEMP-Murphy, and husband of Maria Castiglione, Dan

Angers, on information and belief, are all in on this drug scheme resulting in

millions in illicit income for the Italian and Mexican mobs and for the Riverside

criminal enterprise.

142. There are other illicit activities engaged in by these Riverside criminal enterprise

actors, including, but not limited to an enterprise known as SilverRock

Development, Old Town La Quinta, and their manipulation of the Desert Sun

Newspaper causing the publishing of untrue activities, involving these and other

RICO money laundering operations.

143. The Castigliones used me to provide them with supposed needed help as a result of

their (Vincent and Theresa) claimed losses at the Fantasy Casino.

144. They cheated me, used Lydia to turn on me and fed her with drugs; please see

Exhibit I, a pleading in this Court before Judge Grisea, where I Exhibit a sworn

Affidavit from Lydia's mother Carla and her step-mother Marlene which explains

the mental disorders and drug addiction of Lydia whom I love dearly but have been

victimized by as a result of her being contaminated by these RICO Actors Murphy,

Fisher, Folkenflik.

145. Murphy manipulated justice with Lydia in his "pocket" and with the aid of fixed

Judge Chapman, Castiglione, forged Records and violations of "Due-Process",

Obstruction of Justice, Chapman violations of CCP170.3, and fraud on the Court,

sheriff extortion and menacing and with the assistance of the Palm Springs FBI

Field Office, Field Agents Cindy Coppola and Catherine Oatis. The Property was

looted in violation of my due process rights and Right to a trial, in concert a Judge

Chapman,  Murphy and Castiglioni. On July 3, 2017 I filed a criminal complaint

charging Murphy re the above RICO acts, also filed with DA Hestrin, Riverside DA

and ignored.

146. Then Murphy Ex-Party caused Judge Chapman to file Judgements in Palm Springs

against me FBO Castigliones for over $65,000.00 for Legal Fees and another

$80,000.00 for Castiglione in supposed Rents that were paid and acknowledged by

Castigliones. They were paid in cash at their request to pay their gambling debts and

confirmed in writing, all ignored by Judge Chapman who Ruled in violation of

CCP170.3 and the Right to Due Process on taking of Property per US Constitution.


MISCELLANEOUS RELATED ISSUES


147. Then Murphy, conspiring with Judges Chapman, Latting and Klatchko Filed a sham

Complaint against me and my assistant (Stanley Wilson) out of the Palm Springs

fixed Courthouse suing us for $5Million in damages for "libel-slander", sewer

served and now trying to take a $5Million Default Judgement. Mr. Wilson was never

in California, does not know Murphy and Murphy was never slandered by me or

Wilson.


148. Scams inc Publications has TERMS OF USE since its inception in 2005 assuring

that no target can be slandered. Murphy, a lawyer, chose to in his desperation, to

extort me again. Here Judges Chapman, Latting and Klatchko have recently all

invoked CCP170.3 and resigned. Thus, Murphy is left with his bogus case and NO

JUDGE.

149. It is now affirmed that Judge Chapman was devoid of Judicial authority when I Filed and invoked CCP170.3, due process clause of the US Constitution, California Cannons of Judicial Ethics and the California Constitution; 2016 and in 2017 in two separate actions (Couri v Siebert and Couri v Castiglioni). See related Cases Summary. These cases are where Judge Chapman's Rulings were all Void as a direct result of Chapman's refusal to "stand down" after his AUTOMATIC DISMISSAL, per CCP170.3 where he has now finally recused himself pursuant to and under CCP 170.3 in the sham case filed by Murphy in 2018, falsely claiming that Murphy was slandered by Plaintiff and Mr. Stanley Wilson. Murphy again here engaged in sewer service, perjury, and fraud in order to attempt to secure another bogus judgement against me and Mr. Wilson, this time for $5Million. himself in case #3 that I was involved.

150. In or about Dec. 2017 SBEMP, Murphy, DA Hestrin orchestrated a misuse of the Riverside DA Office in order to gag freedom of Speech and Press. Hestrin using the "color of law" illegally, made fraudulent claims to GOOGLE, claiming that Couri and Scams Inc Publications were printing and publishing on Google fraudulent, false and harassing articles and exposes about Riverside, Murphy, Hestrin, etc. This was done illegally and by misuse of Riverside Employees.

151. All Exposes and Articles were verified as true and in full compliance with TERMS OF USE, Exhibit X.

152. Defendant DA Hestrin knowing he was violating the US Constitution and Rights of
Free Speech, with Murphy caused five Blogs to be voided by Google Blog
department until I learned of this conspiracy-scam. I caused Google to be informed
via Larry Page and the scam by Hestrin was foiled See attached Exhibit X, data and
letter to Google.

153. Defendant DA Hestrin has been engaged in illegal and immoral conduct acting
under color of law and violating not only Couri's Civil Rights, but also engaging in
Retaliation and vicious schemes to protect massive money laundering and RICO in
the SILVERROCK CRIMINAL ENTERPRISE, and the looting of millions by
Robert Greene Co. Mayor Linda Evans, La Quinta City Counsel all protected by a
Corrupt DA Hestrin and Riverside DA Office.

154. Defendants DA Hestrin, SBEMP and RICO enterprise are now rabid and seeking
retaliation by false arrest and murder. Murphy stated to Couri on or about March 10,
2019----"WE WANT YOU DEAD".

JUDICIAL DEFENDANTS:  JUDGE PAUL WOOTEN & JUDGE DAVID CHAPMAN

**155. I HAVE CONSIDERED THE LAW AND FACTS AS TO CHARGING A**
**JUDGE IN A SERIES OF COUNTS AS SET FORTH HERE  ALTHOUGH**
**THERE ARE COURT REFEREES (JACK SOUTER, AND JHO**
**GAMMERMAN ) AND OTHER JUDGES WHO HAVE PARTICIPATED IN**

THE RACKETEERING ENTERPRISE (JUDGE PETER MOULTON, JOAN MADDEN, LOUIS GONZALEZ AND OTHERS) THE SERIAL ACTS WILLFULLY ENGAGED IN BY JUDGES WOOTEN AND CHAPMAN AND DONE SO AFTER EACH OF THEM WERE AUTOMATICALLY DISQUALIFIED IN THE ADMINISTRATION OF CLAIMS INVOLVING COURI.  SUCH ACTS HAVE BEEN  WILLFUL ACTS OF DEPRIVING DUE PROCESS, OBSTRUCTION OF JUSTICE AND MANIPULATED TO GIVE SIEBERT, BURKE, PAVIA AND MURPHY, AND CASTIGLIONI MONEY BELONGING AND OR DUE TO ME AND/OR COURI ACQUISITION CORP., AND NOT DUE TO THE RICO ALLIES OF JUDGES WOOTEN AND CHAPMAN. THIS WAS DONE IN SERIAL FASHION IN MULTIPLE CASES AND SPANNING YEARS.

156. MOST SIGNIFICANT IS THE FACT THAT THESE ACTS TOOK PLACE AFTER THE STATUTORY "AUTOMATIC DISMISSAL".  ACCORDINGLY, THE ACTIONS ENGAGED IN BY JUDGES WOOTEN AND CHAPMAN WERE DONE BEYOND THEIR SCOPE OF THEIR MANDATED DAILY DUTIES AND NOT ACTIVITIES SHROUDED BY "JUDICIAL IMMUNITIES", AND THUS ACTIONABLE. THE US SUPREME COURT HAS FOUND THAT JUDGES WHO ACT AFTER THEIR DISQUALIFICATION ARE "WARRING AGAINST THE US CONSTITUTION" AND ARE THUS RIPE FOR BEING CHARGED IN LITIGATION.

**157. JUDGE WOOTEN IN HIS POST-REMOVAL FROM PART 7 AND NY COUNTY, AND HIS FORGERY OF PHONY JUDICIAL ORDERS LYING AS TO HIS POSITION, AND FABRICATING A $15MILLION JUDGEMENT AGAINST ME ARISING OUT OF A CLOSED-DISMISSED CASE (5 YEARS EARLIER) IS THE EPITOME OF JUDICIAL WARRING AGAINST THE US AND NY CONSTITUTIONS AND COURT MANDATES. IN FACT JUDGE WOOTEN IS NOY ONLY RIPE FOR CIVIL REPRISAL, HE SHOULD BE INDICTED AND REMOVED FROM THE NY BENCH AND DISBARRED AS WELL.**

158. Defendant WOOTEN--SEE EXHIBITS P and Q, collectively.

An unvetted Judge transferred to NY County in 2019 from Kings County on a mission to "FIX" the Siebert-Couri Case. Judge Wooten violated every Judicial Rule and law and refused to comply with "RULES OF CHIEF ADMINISTRATIVE JUDGE", PART 100, JUDICIAL CONDUCT.

159. Evidence and the Record proves that Judge Wooten willfully violated every cannon and Rule under Part 100. Wooten engaged in bias, engaged in ex-party meetings with Burke, deprived Couri access to the Courts and his conduct Ignored by the APP Div. 1st Dept. revealing that the FIX, as disclosed by Referee Jack Suter, was in place up to the Court of Appeals in Albany whose body Refused to Hear my Case.

160. Defendant Judge Wooten used his Office to enter illegal Orders after he was Removed for cause from NY County and Part 7. Wooten Forged Judicial Orders on Jan 20, 2016, swearing that he, Judge Wooten, was the presiding Judge in Part 7 when Judge Lebowitz was assigned to that Part and was sitting there on Jan 1, 2016.

161. Judge Wooten was removed to Kings County, NY (Brooklyn). Yet Judge Wooten Issued four illegal Orders in favor of Siebert granting Siebert a $15Million Judgement in his favor based on Siebert, Burke's fraud, perjury and in contravention to facts. Judge Wooten Issued Orders depriving me of my Rights, access to the Courts and accusing me to be a "Vexatious" litigant. (Three of the four illegal Orders were issued on a Case that was Disposed by WOOTEN himself five years earlier. See Exhibit O ).

162. CASE 107240-04 WAS ADMINISTERED BY JUDGE WOOTEN AND DISMISSED BY WOOTEN ON 9-2-2010. THIS IS THE CASE IN WHICH WOOTEN ON 1-20-16 GENERATED ILLEGAL JUDICIAL ORDERS GRANTING SIEBERT A BOGUS $15 MILLION JUDGEMENT AGAINST ME.

163. IT IS WORTHY OF DISCLOSING TO THE COURT THAT DURING A MEETING BETWEEN PLAINTIFF AND DEFENDANT MURPHY (DURING FEB 2019) MURPHY REVEALED TO PLAINTIFF THAT DEFENDANT SIEBERT PERSONALLY TELEPHONED MURPHY ON A NUMBER OF OCCASIONS, DURING 2017 AND 2018, SEEKING TO RETAIN MURPHY AND

SBEMP TO PURSUE ME FOR THE COLLECTION OF SIBERT'S

FRAUDULENT $15MILLION JUDGEMENT THAT WAS ISSUED ILLEGALLY

BY NY JUDGE PAUL WOOTEN. ACCORDING TO MURPHY, HE REJECTED

SIEBERT'S OVERTURES. BURKE ALSO WAVED ANY OBLIGATION TO

PURSUE THE COLLECTION OF THIS BOGUS AND ILLEGALLY FILED

JUDGEMENT BY A LAW FIRM WHO WAS NOT SIEBERT'S ATTORNEY OF

RECORD.

164.  IT IS CRITICAL TO ADVISE THE COURT THAT THE CASE IN WHICH

WOOTEN EXERCISES HIS ILLEGAL RULINGS WAS IN FACT DISMISSED

BY WOOTEN AND MARKED BY THE COURT AS "DISPOSED" ON SEPT. 2,

2010, THUS THERE WAS NO OPEN CASE FOR THE SHAM TO BE

INSTIGATED.

165. FURTHER TO THAT, JUDGE WOOTEN ISSUED OTHER ORDERS

DISMISSING JUDE LAW CHARGES AGAINST BURKE AND DISMISSING

CASE113512-08 (EXHIBIT T) on1-20-2016 after Wooten was removed from Part 7

NY County three weeks earlier; ALSO LYING THAT I FAILED TO ATTEND A

"STATUS CONFERENCE" WHERE NOT ONLY MY ASSISTANT (OF FIFTY

YEARS) STANLEY WILSON WAS IN THE COURTROOM, BUT I WAS ON

THE PHONE FROM HOSPITAL ARRANGED BY WOOTEN'S CLERK

WARREN RUBIO AND WOOTEN HIMSELF, WOOTEN WAS OBSERVED

LATER THAT DAY ENGAGED IN EX-PARTY MEETING WITH BURKE

LASTING ABOUT 45 MINUTES.

166. I have seen repeatedly that corrupt Judges who want to Gag and deprive legal access

to the Courts, will falsify the Vexatious Litigant Statute to deprive the Litigant from

exposing the improprieties of the Judge. My background and honest litigating speaks

for itself and the ilk of Judges Wooten and Chapman have clear motives to retaliate

against me.

167. Defendant Judge Wooten therefore warred against the Constitution and the Judicial

Cannons and as a result, all of the Wooten Fixed Orders are and should be void as

part of a RICO Enterprise.

168. WOOTEN ACTING FOR RICO ENTERPRISE ACTORS SIEBERT, BURKE,

PAVIA, GOMEZ CAUSED THE GRANTING OF FRAUDULENT

JUDGEMENTS NAMING COURI AS OBLIGOR TO SIEBERT AND IN

FURTHERANCE OF THE RICO ENTERPRISE AT COURI'S EXPENSE. See

Exhibits Q and P collectively.

169. DEFENDANT SUPERIOR COURT JUDGE DAVID CHAPMAN IN ADDITION

TO THE EXPOSES HEREIN,  REPEATEDLY VIOLATED CCP170.3 OF

CALIFORNIA CODES.

170. CCP170.3 was invoked by Couri in Cases before Judge Chapman three times and each time Chapman refused to "STAND-DOWN". His continuing to administer these Cases, mandates that all Rulings issued by Judge Chapman were to be Voided. Judge Chapman acted as a RICO enterprise "stooge" working at the behest of SBEMP, Murphy, Siebert, Pavia, Richardson, and Castiglionis in concert with DA Hestrin and others. Judge Chapman has used his position to falsify fraudulent obligations, falsify bogus money due to Murphy, defraud Couri out of Property Rights and deprive Couri of $Millions due from George and Antonia Pavia and steal for the RICO enterprise by Judicial Racketeering in California in concert with SBEMP, Murphy, Hestrin, Richardson, Sulmeyer/Kupetz and others. See Exhibits V and W collectively.

171. I BELIEVE THAT IF A JUDGE ENGAGES IN ACTS BEYOND THE DUTIES OF THE JUDICIAL OFFICE AND ENGAGES IN ACTS THAT CONSTITUTE CRIMES, THE IMMUNITY AFFORDED BECOMES VOID.

NON PARTY CO-CONSPIRATORS

171. NY County Judges Harold Beeler, Michael Stallman, Peter Moulton, Louis Gonzales, Estate of Ira Gammerman (JHO); Referee Jack Suter, Judge Joan Madden, Julia Cort (Madden law secy.), Judge Moulton law clerks, Warren Rubio, Part 7 Clerk, Referee Louis Crespo.

172. NYC: Pavia Harcourt Esqs., Shine & Company CPA; Brian Pecker, CPA

173. Riverside CA: Judges Kara Klatchko, R. Marquez; James Latting

174. Palm Spring/Riverside Court Clerks, Maggie Martinez, Letty Reyna, Marty Allen, Natasha Seltzer, "Jane" Conceptione

175. California Lawyers Brian Harnik Esq.,and Mary Gilstrap Esq.

176. Wisconsin: Karl Leo Esq.

177. Desert Sun Newspaper; Silverrock Development , Mayor Linda Evans La Quinta CA, Sherry Barkas Reporter, Mrs. Benilda Hestrin, wife of Riverside County DA Hestrin, Dan Angers (husband of Maria Castigliano) CA,  Riverside Deputy Sheriffs Pina, Perez, Reynolds,  Sheriff Sgt. Rentle, Officer Baron Lane, Riverside/Palm Springs Field Agent Coppola and Field Agent Catherine Oatis, DA Inspector Doyle, Elizabeth Crokin (Murphy client), John and Jane Does 1-15.


178. All  of these persons and entities have either accosted me and or engaged in mail and wire fraud, trespassed, vandalized, breaking and entering, looted Couri property played an active part in the RICO enterprise of money laundering, mail and wire fraud, RICO activities, grand larceny, murder plots and other Title 18 of US Codes infractions, Proximate Cause of use of and looting of money and property FBO the Rico enterprise and misuse of  collections of unlawful debt from Couri by Siebert, Burke, Pavias, Murphy, SBEMP, Gomez, and Castiglioni.


## FACTUAL ALLEGATIONS COMMON TO ALL  COUNTS

174. The following are verified and supported by documentary evidence are factual

allegations in support of the valid claims against RICO Defendants; Violations of Civil

Rights by Defendants and evidence of false claims made by RICO enterprise Actors

against Jim Couri and other RICO predicate acts, Civil Rights and constitutional

violations under color of law, including brutality, false arrest plots, retaliation, etc.

## RICO ELEMENTS

a. CULPABLE PERSON--The Person and Entity holding property belonging to me here

are the Pavias, who looted over $45Million in a Default Judgement filed and granted to

me in Aug 2016 and ILLEGALLY AND UNDERHANDEDLY disenfranchised by

Judge Chapman, violations of Due Process, CCP170.3 & US Constitution in concert

with Rico Actors George and Antonia Pavia, Burke, Richardson, Murphy, SBEMP.

Siebert, Sulmeyers Kupetz.

b. ENTERPRISE-- Consists of ALL Defendants herein as being a part of "THE

ENTERPRISE" under RICO Counts herein.

c. INTERSTATE COMMERCE (and possible Foreign)- Here the "interstate commerce

requirement" has been satisfied as the activity of this Enterprise and the predicate acts

of Racketeering has materially affected "interstate commerce"; inter alia by mail, wire

fraud; false Press releases; fraudulent newspaper articles by National Publications such

as the Desert Sun Newspaper, fraud claims to Google, etc. All Rico Defendants here

fall within this activity.

d. PATTERN OF RACKETEERING - Section 1961(5) defines "Pattern" of at lease two acts of Racketeering ........ the last of which occurred within 10 years after the commission of a prior act of racketeering activity. The acts must be related and continuous to form a Pattern of Racketeering.   Related are acts that have similar purposes, results, participants, victim(s), methods of commission, or otherwise interrelated by distinguishing characteristics and are not isolated events. Continuity can be shown by alleging a "closed-ended" scheme, consisting of related predicate acts extending over a substantial period of time or an "open-ended" scheme. In order to properly allege an open-ended scheme, the Plaintiff must establish the "threat of continuity". The two most important Factors in this alleging of the pattern and "Continuity" are (one)-Duration of alleged misconduct; and (two), a threat of continuing criminal conduct. Here again each Defendant has violated these patterns that constitute the serial Pattern of Racketeering.

e. RACKETEERING ACTIVITY - SEE SECTION 18 USC 1961(1) AS DEFINED Racketeering activity and involving Mail and Wire fraud engaged in by Rico Defendants, culpable Defendants to mail and wire fraud (18USC1341; 18USC1343; are set forth herein as to times, dates and contents to these frauds. essentially all Defendants.

f. INJURY - Couri has been irreparably injured and the material Factors have been satisfied, inter-alia, are: i, plaintiff must be a person; ii, who sustains injury; iii, to Plaintiff Couri's business or property; iiii, "by reason of" Defendants violation of

Section 18USC1962. Plaintiff "injury" re conduct constituting the violation, It is important for me to define and allocate each Section of Rico and the specific Injury grounds. Injury under USC1962(c), stems from the "Predicate Acts"; Injury under 1962(a) must Stem from the Investment of Racketeering Income"; Injury under 1962(b) must stem from the acquisition of an interest on or control over an Enterprise; and Injury under Section 1962(d) generally stems from the overt acts committed in furtherance of the Conspiracy.

g. All of these Factors are satisfied by the conduct of all RICO Defendants as generally outlined here.

175. **DEFENDANTS PAVIAS IN VIOLATION OF 18USC1962 LOOTED MY PROPERTY AND IN 2016 EMBEZZLED MY $45MILLION AND USED THE PROCEEDS OF THEIR RICO CRIMES TO BUY A $6MILLION CONDO HOME AT 580 PARK AVE UNIT 2B; AND USE THE INTERNET TO AID IN THE EMBEZZLING WITH GOMEZ BLOGS OF CHARACTER ASSASSINATION.**

176. **PAVIAS STOLE RENT STABILIZATION RIGHTS FROM ME BY FORGERY, BRIBERY AND THREATS AND THEN SOLD THE PROPERTY (18E 73ST, NYC) WHERE MY APARTMENT WAS STOLEN BY PAVIAS, GOMEZ AND A CORRUPTED COURT; SOLD BY THE PAVIAS FOR $20MILLION.**

177. SIEBERT AND HIS PC LOOTED MY CONTRACT RIGHTS AND MY INTERESTS IN FREEDOM WIRELESS BY SERIAL FRAUDS IN MULTIPLE VENUES AND LOOTED IN THE PROCESS VIOLATING 18USC1962 FOR OVER $100MILLION AS DEFINED HEREIN.

178. CASTIGLIONE, SBEMP, MURPHY AND ALL OTHER RICO ACTORS IN VIOLATION OF 18USC 1962-C ENGAGED IN THE LOOTING AND EMBEZZLING OF MONEYS DUE TO ME FROM 48625 CALLE ESPERANZA OPTION AND RIGHTS. AND JUDGE CHAPMAN GRANTING FRAUDULENT JUDGMENTS AGAINST ME FBO MURPHY, SBEMP AND CASTIGLIONES.

179. SIEBERT, RICHARDSON AND SULMEYER KUPETZ ENGAGED IN FURTHER COURTHOUSE FRAUDS AND USING MAIL AND WIRE AND VIOLATIONS OF 18USC1962, TO CONCOCT FALSIFIED MONEYS DUE TO SIEBERT FROM ME IN DIRECT CONTRAVENTION TO THE FACTS WHERE SIEBERT SWORE THAT HE OWES ME OVER $100MILLION IN OCT 3, 2003 CONTRACT RIGHTS AND OTHER DEFINED MONEY DUE TO ME AS PART OF THE RICO ENTERPRISE CRIMES.

### ALL DEFENDANTS ARE WILLFUL VIOLATORS OF 18 USC1962

180. STATUTE OF LIMITATIONS- --The Statute of Limitations on all Claims herein are all created by the acts of all RICO Actors within the 4 year period. The Deprival

of My Contract Rights, Releases, looting of my $45Million Judgment due from Pavias; Siebert Falsified Judgment in his favor by Wooten and the Conspiracy with all Rico Actors culminated in periods from 2016 to present. The activities of Pavia, Siebert, looting of my Money, fraud in concert with Diane Hendricks, whitewashing Siebert to permit his perjury, bribery and Fraud all have transpired within a 4 year period.

181. EQUITABLE TOLLING OF THE LIMITATIONS PERIOD--Defendants acted individually and in concert to fraudulently conceal information that I needed to be able to bring a RICO Claim. The RICO enterprise of Criminals (Defendants and un-charged co-conspirators) actively concealed the Enterprise and used political clout to discredit me by engaging in corrupt acts by lawyers, a billionaire (Diane Hendricks) and the Siebert-Pavia groups to embezzle my Rights by CHARACTER ASSASSINATION, and by mail and wire fraud and by 18USC1962 serial violations. I therefore could not have Discovered the required Facts despite my exercise of reasonable diligence.  My efforts as a Pro-se senior citizen has required years of my (Plaintiff) time, effort, money and health.

## FIRST CLAIM

## FEDERAL CIV. RICO, 18USC1962(c)

## (ALL DEFENDANTS)

182.  Plaintiff incorporates by reference all the proceeding Paragraphs of this Complaint and Exhibits, as if fully set forth herein.

183. Defendants violated RICO and Plaintiff was injured as a result.

184. Each Defendant is a "person" capable of holding legal or beneficial interest in property within the meaning of 18USC1961(3).

185. Each Defendant violated 18USC1962(c) by the acts described in the prior paragraphs, and as further described below.

186. THE ENTERPRISE - Defendants including and together with Judges Chapman, Wooten, Madden; DA Hestrin, ADA Behrens, Gov. Scott Walker, Diane Hendricks, various Sheriffs, Castigliones and Murphy formed an association-in-fact, for the common and continuing purpose described herein and constitute an enterprise within the meaning of 18USC1961(4) engaged in the conduct of their affairs through a continuing pattern of racketeering activity. The members of the enterprise functioned as a continuing unit with an ascertainable structure separate and distinct from that of the conduct of the pattern of racketeering activity. There may also be other members of the enterprise who are either scheduled in the category of un-charged co-conspirators or who are as yet unknown.

187. Alternatively, the Siebert and Hendricks controlled companies each constitute a separate enterprise within the meaning of 18USC1961(3), and all acting for a common Cause as outlined herein and the Exhibits related thereto.

188. Each enterprise has engaged in, and their activities have affected, interstate commerce.

189. PATTERN OF RACKETEERING ACTIVITY - Defendants, each of whom are persons associated with, or employed by the enterprise, did knowingly, willfully and unlawfully conduct or participate, directly or indirectly, in the affairs of the enterprise through a pattern of racketeering activities within the meaning of 18USC1961(1). 1951(5), and 1962(c). The racketeering activity was made possible by Defendants' regular and repeated use of the facilities and services of the enterprise. Defendants had the specific intent to engage in the substantive RICO violations alleged herein.

190. Predicate acts of racketeering activity are acts which are indictable under provisions of the US Code enumerated in 18USC1961(1)(B), as more specifically alleged below. Defendants each committed at least two such acts or else aided and abetted such acts.

191. The acts of racketeering were not isolated, but rather the acts of Defendants were related in that they have the same or similar purpose and result, participants, victim (Jim Couri), and method of commission. Further, the act of racketeering by Defendants have been continuous. There was repeated conduct during a period of time beginning in approximately 2004 and continuing to the present, and there is a continued threat of repetition of such conduct as engaged in by Defendants as recently as May 2019.

192. The association -in-fact enterprise and any alternative enterprises, as alleged herein, were not limited to the predicate acts and extended beyond the racketeering activity.

193. Factually, Defendants have engaged in violations of 18USC 1513; violations of 18USC2261A and engaged in the filing of false criminal charged against Plaintiff, by Defendant Murphy in concert with DA Hestrin; Riverside DA Office (California), Riverside Sheriff Office and Judge Kara Klatchko to engage in "Sewer Service" false address for Couri and filing a fraudulent Arrest Warrant to try and murder Plaintiff Couri in concert with all Defendants here.

194. Plaintiff specifically alleges that Defendants participated in the operation and management of the association-in-fact enterprise and any alternative enterprises by overseeing and coordinating the commission of multiple acts of racketeering as described below.

195. PREDICATE ACT: Use of Mails and Wires to Defraud Plaintiff Couri, in violation of 18USC1341 and 1343. Defendants committed acts constituting indictable offenses under 18USC1341 and 1343 in that they devised or intended to devise a scheme or artifice to defraud Couri and to steal over $100million millions of dollars from Couri by means of false or fraudulent pretenses, representations and other confidence games. Defendants in concert with Defendant Hestrin misused the power of his Office, engaged in filling false criminal charges in concert with Murphy using sewer service all to fabricate a false and illegally issued arrest warrant that Hestrin

refuses to vacate even though Murphy has recanted his criminal charges and

requested in writing (Exhibit ____) that Hestrin withdraw the false Murphy

Complaint and vacate the bogus arrest warrant being held over the head of Plaintiff

as a "sword of damocles" and thus thwarts Plaintiff travels. Hestrin has displayed a

course of conduct and retaliatory RICO activities that have been geared to

effectively irreparably Plaintiff for exposing the Riverside criminal enterprise. For

the purpose of executing their scheme, con, or artifice, Defendants caused delivery

of various documents and things by US Mail, FedEx, UPS etc. (private or

commercial interstate carriers),  or received such therefrom. Defendants also

transmitted or caused to be transmitted by means of Wire communication in

interstate commerce various writings, engineered to irreparably injure Plaintiff by

retaliation, brutality, threats and attempted murder. The acts of the Defendants set

forth above were done with knowledge that the use of the mails or wires would

follow in the ordinary course of business, or that such use could have been foreseen,

even if not actually intended. The acts were done intentionally and knowingly with

the specific intent to advance Defendants' scheme or artifice.


196. Defendants carried out their scheme in different States and could have done so

unless they used the US Mails or private or commercial interstate carriers or

interstate wires. In furtherance of their scheme as alleged herein, Defendants

communicated among themselves and with Plaintiff in furtherance of the scheme to

defraud Plaintiff. These communications were typically transmitted by wire (ie,

electronically) and/or through the US Mails or by private or commercial carriers.

197. Defendants used wire and or US Mail or commercial carriers to facilitate the payments of bribes to retaliate against Plaintiff, instigate sheriff stalking, brutality, trespass, breaking and entering, assaults, threats and extortion of Plaintiff.

198. Defendants caused the diversion of Plaintiff's funds for their own benefit by bribery of Judges Chapman, Wooten, Klatchko and Latting, and the compromising by Siebert and Hendricks of Gov Walker to abort Siebert's termination as a Wisconsin doctor.

199. Plaintiff reasonably and justifiably relied upon Defendants' false representations and promises, false pretenses and deceptive communications, and Plaintiff has been damaged as a direct and proximate result of Defendants' participation in such enterprise as alleged herein.

200. PREDICATE ACT - TRANSPORT AND RECEIPT OF STOLEN MONEY IN VIOLATION OF 18USC2314 AND 2315. Defendants committed acts constituting indictable offenses under 18USC2314 in that having devised or intended to devise a scheme or artifice to defraud Couri or to obtain money from Couri by means of false or fraudulent pretenses, representations or promises, Defendants transported or caused to be transported in interstate commerce money having a value of $5,000.00 or more, which was stolen, converted, or taken by fraud. Defendants also committed acts constituting indictable offenses under 18USC2315 in that they received money in excess of $5,000.00, which crossed a State or United Stated boundary after being stolen, unlawfully converted or taken. The act of Defendants set forth above were

done willfully and with knowledge that the money was stolen, converted or taken by fraud. These acts were done intentionally and knowingly with the specific intent to advance Defendants' scheme or artifice.

201. As part of the scheme as alleged herein, Defendants also facilitated the payment of bribes and other considerations (based upon fact and on information and belief) of Judges Wooten, Chapman, Klatchko, other Judges in NY Lower and Appellate Courts; Diane Hendricks, Gov. Scott Walker; Gomez, Burke; DA Hestrin, ADA Behrens, Benilda Hestrin, Riverside Courts Appellate part (Judge Marquez), in order to secure fraudulent Rulings so to cause Plaintiff's loot Plaintiff's Rights, money, property with a value of over $100Million due to Plaintiff and stolen by indictable acts of Defendants and others named here as "un-charged co-conspirators". Including the loss of Plaintiff's right of freedom of speech and interference in Plaintiff's family, medical care, and other Constitutional Rights, etc. On information and belief, Defendants Murphy, Siebert, Pavias, Richardson, Hendricks bribed Walker, Judge Chapman, Judge Wooten, DA Hestrin, ADA Behrens and Judge Marques to embezzle, loot, and convert millions (see Summary at end of Complaint) belonging to, and for the most part, unconditionally due Plaintiff from Defendants acting individually and in concert FBO the RICO enterprise.

202. CONTINUITY OF CONDUCT - Defendants' violations of state and federal law as set forth herein, each of which directly and proximately injured Plaintiff, constituted a continuous course of conduct spanning a period from approximately 2004 to present, which was intended to obtain money through false representations, fraud,

deceit, and other improper and unlawful means. Therefore, said violations were a part of a pattern of racketeering activity under 18USC1961(1) and (5). Also Defendants willfully violated 18USC1962(c) via a pattern of racketeering activity. Plaintiff seeks an award of damages in compensation for, among other things, the millions of dollars Defendants stole from Plaintiff.

203. Plaintiff accordingly seeks an award of three times the damages Plaintiff has sustained, and the recovery of costs, investigation fees and litigation expenses, as well as any other relief as authorized by statute.

## SECOND CLAIM

### (Conspiracy to Violate Federal Civil RICO 18USC1962(d))

### (All Defendants)

204. Plaintiff incorporates by reference all the proceeding paragraphs of this Complaint as if fully set forth herein.

205. In violation of 18USC1962(d), the Defendants and each of them, knowingly, willfully and unlawfully conspired to facilitate a scheme which included the operation or management of a RICO enterprise through a pattern of racketeering activity as alleged in paragraphs above.

206. The conspiracy commenced at least as early as 2004 and is ongoing.

207. The conspiracy's purpose was and is to divert money from Couri to Defendants own

benefit and to facilitate the payments of bribes in an effort to defraud Couri by

corruption, court extortion, retaliation, 18USC1513; 18USC2261A, and 42 USC

1983.

208. Plaintiff has been injured and continues to be injures by Defendants' conspiracy in

violation of 18USC1962(d). The unlawful actions of Defendants, and each of them

have directly illegally, and proximately caused and continue to cause injuries to

Plaintiff and his business or property. Plaintiff seeks an award of damages in

compensation for, among other things, the millions of dollars that Defendants stole

from Plaintiff.  Plaintiff further seeks an award of three times the damages plaintiff

sustained, and the recovery of all costs of investigation and litigation, as well as any

other relief as authorized.

## THIRD CLAIM

## (FEDERAL CIVIL RICO, 18USC1962(c))

## (Defendants Pavias, Siebert, Castiglione, Murphy, SBEMP, and Hendricks)

209. Plaintiff incorporates by reference all the preceding paragraphs of this Complaint as

if fully det forth herein.

210. Each Defendant is a "person" capable of holding legal or beneficial interest in

property within the meaning of 18USC1961(3)

211. Each Defendant violated 18USC1962(c) by the acts described in the prior

paragraphs, and as further described below.

212. THE ENTERPRISE - Defendants SBEMP, Murphy, Castiglione, Pavias, Hendricks

and others through their pattern of racketeering activity set forth herein infiltrated

Couri's claims and Judgments obtained by Default, stealing property rights, Options

and money. These and other Defendants, and Under Color of Law, used interstate

instrumentalities, mail and wire to embezzle Couri's Rights and moneys for

Defendants own benefit. SBEMP and Murphy used filing of fraudulent charges,

extortion, false arrest warrants, DA and Sheriff retaliation, brutality, stalking,

physical abuse, threats and extortion to embezzle millions by grand larceny.

213. PATTERN OF RACKETEERING ACTIVITY - Defendants, each of whom are

persons associated with or employed by SBEMP and Murphy, and did knowingly,

willfully and unlawfully conduct or participate, directly or indirectly, in Plaintiff

affairs through a pattern of racketeering activity with the meaning of

18USC1961(1), 1961(5), and 1962(c). The Racketeering activity was made possible

by Defendants' regular and repeated use of the facilities and personnel of SBEMP,

Riverside DA Office, Palm Springs Superior Courthouse, parts one and two, the

Courtrooms of Judges Chapman, Latting and with the complicity of Defendants

Murphy, DA Hestrin, ADA Behrens and SBEMP and its staff. Defendants had the

specific intent to engage in the substantive RICO violations alleged herein.

214. Predicate acts of racketeering activity are acts which are indictable under provisions of the US Code enumerated in 18USZC1961(1)(B), as more specifically alleged below. Defendants each committed at least two such acts or else aided and abetted such acts.

215. The acts of racketeering were not isolated, but rather that acts of Defendants were related in that they had the same or similar purpose and result, participants, victim and method of commission. Further, the acts of racketeering by Defendants have been continuous. There was repeated conduct during a period of time beginning in approximately 2004 and continuing to present, and there is a continued threat of repetition of such conduct which is continuing at present.

216. Plaintiff specifically alleges that defendants participated in the operation and management of the SBEMP-Murphy orchestration of bribes, obstruction of justice, extortion and grand larceny in concert with DA Hestrin, DA Riverside, Palm Springs and Riverside Sheriff brutality, retaliation and violations of 18USC 1513 and 18USC2261A.

217. PREDICATE ACT - Illegal payments to Court Officers, judges, law enforcement, deputy sheriffs, etc., in order to menace, harass, physically abuse, fabricate false claims, obstruct justice and deprive due process of Plaintiff while engaging in mail and wire fraud and other acts of racketeering targeting and injuring Plaintiff and interfering into his liberty.

218. Defendants engaged in violations of federal and state law as set forth herein, each of which directly and proximately injured Plaintiff, constituted a continuous course of conduct spanning a period of approximately 2004 to present, intended to obtain money through false representations, fraud, deceit, and other improper and unlawful means. Therefore, said violations were a part of a pattern of racketeering activity under 18USC1961(1) and (5).

219. On information and belief, Defendants have conducted and/or participated, directly and/or indirectly in the conduct of the enterprise's affairs through a pattern of racketeering activity as defined herein in violation of 18USC1962(c).

220. These acts were done intentionally and knowingly with the specific intent to advance Defendants' scheme or artifice.

221. Defendants' shared objective was and is to divert funds to their own benefit and to facilitate the payment of bribes in an effort to defraud Plaintiff Couri.

222. The unlawful actions of Defendants, and each of them, have directly. illegally. and proximately caused and continue to cause injuries to Plaintiff and in its personal and his business activities.  Plaintiff seeks an award of damages in compensation for, among other things, the millions of dollars Defendants defrauded from Plaintiff.

223. Plaintiff accordingly seeks an award of three times the damages plaintiff has

sustained, and the recovery of costs of investigation and litigation, as well as any

other relief as authorized by statute.


## FOURTH CLAIM

### (Conspiracy to Violate Federal Civ, RICO, 18USC1962(d))

### (All Defendants)

224. Plaintiff incorporates by reference all the proceeding paragraphs of this Complaint

as if fully set forth herein.


225. In violation of 18USC1962(d), the Defendants Pavias, Siebert, Gomez, Burke,

Richardson, Sulmeyer Kupetz, Murphy. SBEMP. Castigliones, DA Hestrin, ADA

Behrens, Riverside DA, Sheriffs, Judges Chapman, Klatchko, Wooten, UW

Hospital, Diane Hendricks, Hendricks Holdings, Siebert, Siebert PC, Benilda

Hesterin, ADA Behrens, and each of them knowingly, willfully, and unlawfully

conspired to facilitate a scheme which included the operation or management of a

RICO enterprise through a pattern of racketeering activity and as alleged in this

Complaint.


226. The conspiracy commenced as early as 2001, and even before, and is ongoing.


227. The conspiracy's purpose was and is to divert money from Plaintiff to defendants

own benefit and to facilitate the payment of bribes in an effort to defraud Plaintiff

Couri, retaliate against him and facilitate the murder plot of Couri by Siebert, Burke,

Hendricks, DA Hestrin, SBEMP, Murphy, ADA Behrens Riverside DA, Riverside Sheriffs Office and Deputy Sheriffs Perez, Pina, Reynolds and others yet unknown.

228. Each Defendant committed at least one overt act in furtherance of such conspiracy. These acts in furtherance of the conspiracy included misleading plaintiff by entering into Agreements that Defendants had no intention to honor or fulfill (ie: Siebert, Pavia, Chapman, Murphy, and Burke and Richardson).

229. Even if some Defendants did not agree to harm Plaintiff specifically, the purpose of the acts they engaged in was to advance the overall object of the conspiracy, and the harm to Plaintiff was a reasonably foreseeable consequence of Defendants' actions.

230. Plaintiff has been injured and continues to be injured in his business, property, health, reputation by Defendants' conspiracy in violation of 18USC1962(d). The unlawful actions of Defendants, and each of them, have directly illegally and proximately caused and continue to cause injury to Plaintiff in connection with his health, business, property. Plaintiff seeks an award of damages in compensation for, among other things, the millions of dollars that Defendants stole from Plaintiff.

231. Plaintiff further seeks an award of three times the damages Plaintiff has sustained to his property, money, health and the recovery of costs of investigation and litigation, as well as any other relief as authorized.

**FIFTH CLAIM**

**(FRAUD)**

**(ALL DEFENDANTS)**

232.  PLAINTIFF INCORPORATES BY REFERENCE ALL THE PROCEEDING
PARAGRAPHS OF THIS COMPLAINT AS IF FULLY SET FORTH HEREIN.

233. DEFENDANTS AS SET FORTH IN "FOURTH CLAIM", upon information and
belief, knowingly and intentionally misled plaintiff by failing to disclose that
Siebert, Pavia, SBEMP, Murphy have no intention of satisfying the Agreements and
contractual obligations due to Couri.

234. Defendants intentionally concealed the bribes paid to Judges Wooten, Madden,
Chapman, DA Hestrin, ADA Behrens, Sheriffs, and others including Gov. Walker to
quash investigations in order to whitewash Siebert's background and criminal
activities.

235.  Plaintiff justifiably relied on Siebert's Contractual "swearings" and the promises of
Pavias, Murphy, SBEMP, Castiglione Agreements, looting of moneys and the
undisclosed participation as organized crime family members.

236. Defendants conduct is willful, wanton, malicious , and oppressive.

237. Defendants' unlawful conduct has directly and illegally, and proximately caused and
continues to cause injuries to Plaintiff in his business and or property.

238. Accordingly, Plaintiff seeks an award of damages in compensation for, among other thing,s the millions of dollars that Defendants stole from Plaintiff. Further, Plaintiff seeks the imposition of punitive damages sufficient to deter Defendants from committing such unlawful conduct in the future period.

## FACTUAL ISSUE

239. I respectfully point out, so that there can be be no skulduggery by Defendants with regard to any smokescreen issues regarding Statute Of Limitations: As detailed with this Complaint, the RICO enterprise in earnest and their looting and embezzlement of moneys and falsifications of moneys due from me did not commence until on or about January of 2016.

240. Furthermore, it was impossible to connect all of the dots and assemble all the pieces in this puzzle without experiencing the actual acts and misconduct engaged in by all of these RICO Actors participating in the RICO enterprise, spanning from New York to California. My piercing, deflating and uncovering what these these RICO Actors desperately colluded/conspired to cover up while they retaliate against against me took time, money and tremendous effort.

## SUMMARY OF RICO DAMAGES

**Investigation Costs from 2011...........................$1,285,000.00**

### SUMMARY OF ACTUAL DAMAGES:          (treble damages)

**A. Castiglione Option value of Property..........$100,000.00.................$300,000.00**

**B.  Pavia embezzling ...............................$45,000.00....................$135,000,000.00**

**C. Conversion Med/Mal Settlement.........$230,000.00.................$690,000.00**

**D. Siebert theft of Settlement Agreement #2  ......$48Million.................$144Million**

**E. Siebert default in payment to Couri Freedom Wireless venture:**

**........................ $20Million.........$60Million**

**F. Burke conversion of Judiciary Law entitlements...$385,000.00............$840,000.00**

**G. Fraudulent filed Judgement .........$15million...........................$45Million**

**H. SBEMP/Murphy phony Judgements, frauds.......$5Million...........$15Million**

**I.  Castigliones phony Judgements......................$65,000.00..............$195,000.00**

**J. Referee Crespo/Burke wrongfully charging Plaintiff ...$5,000.00........$15,000.00**

**K. Shaun Murphy re PSC18 bogus case..............$5,000,000.00............$15,000,000.00**

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

A. Award compensatory, consequential , exemplary and Punitive Damages to Plaintiff in

an amount as set forth in the SUMMARY OF RICO DAMAGES  as set forth above.

B. Award Damages for injuries as sustained by violations of 42USC 1983 in

compensatory, and punitive damages to Plaintiff in an amount to be determined at

trial.

C. Vacate and expunge the illegally Ordered $15million Judgement in Siebert's favor

against Plaintiff in a case that was fully disposed and Dismissed on 9-2-2010.

D. Order Castigliones to comply with the terms and conditions of the Option as to

Purchase of property, and deliver said deed.

E. Vacate all bogus Judgements that were issued by Judge Chapman in violation of

CCP170.3, by conspiracy, fraud and racketeering (in sums yet unknown to me).

F. Enjoin DA Riverside from harassing and plotting to illegally arrest me or use false

harassment claim of Murphy as such claim was recanted and I was not and am not

within Riverside Jurisdiction.

G. Injunction against Riverside DA Office and DA Hestrin and reversing a bogus arrest

warrant and a Murphy Rescinded Criminal Harassment Complaint and a award of

Damages against DA Hestrin, the Riverside DA for Retaliation, Extortion and Issuing

Charges outside Riverside Jurisdiction.

H. Referral to The US Attorney the Criminal violations by Murphy, Hestrin, Behrens,

Murphy and SBEMP violations of 42USC1983, 18USC1513, and 18USC w2261A.

I. and for all other relief the Court deems just

Dated: May 28 2019                                JAMES COURI ( pro-se)

                                                      JAMES COURI

DEMAND FOR JURY TRIAL

Case_____

PLEASE TAKE NOTICE:

Plaintiff hereby requests a trial by Jury on all Counts/Claims herein

Dated: May 27 2019

JAMES COURI (pro-se)

JAMES COURI

**VERIFICATION**

**Case**_____

I, JAMES COURI, UNDER PENALTY OF PERJURY, RESPECTFULLY STATES AS

FOLLOWS:

1. I am the Plaintiff in the above Case in the USDC-SDNY.

2. I have completed the forgoing Complaint and know the contents thereof

3. With respect to the causes of action alleged by me, the same is true of my own

   knowledge, except as to those matters which are therein stated on information and

   belief, and as to those matters, I believe them to be true

4. I declare under penalty of perjury that the foregoing is true and correct.

Dated May____28____2019

JAMES COURI

---------------------------------------

JAMES COURI

SWORN TO ON THIS_____DAY,

_____2019

*See Attached Document*

NOTARY PUBLIC

**CALIFORNIA JURAT WITH AFFIANT STATEMENT**          GOVERNMENT CODE § 8202

☒ See Attached Document (Notary to cross out lines 1–6 below)
☐ See Statement Below (Lines 1–6 to be completed only by document signer[s], *not* Notary)

_____    _____
*Signature of Document Signer No. 1*       *Signature of Document Signer No. 2 (if any)*

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of Los Angeles

Subscribed and sworn to (or affirmed) before me
on this 28th day of May, 20 19
          *Date*        *Month*        *Year*
by
(1) James C Cour
(and (2)_____),
          *Name(s) of Signer(s)*

proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

Signature _____
          *Signature of Notary Public*

TIFFANY NEWTON
Notary Public - California
Los Angeles County
Commission # 2280687
My Comm. Expires Mar 12, 2023

*Seal*
*Place Notary Seal Above*

──────────── **OPTIONAL** ────────────
*Though this section is optional, completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**
Title or Type of Document: Uerification of Compaint USDC-SDNY Document Date: 05/28/2019
Number of Pages: 10 Signer(s) Other Than Named Above: None

©2016 National Notary Association • www.NationalNotary.org • 1-800-US NOTARY (1-800-876-6827)    Item #5910



**DEMAND FOR JURY TRIAL**

Case_____

PLEASE TAKE NOTICE:

Plaintiff hereby requests a trial by Jury on all Counts/Claims herein

Dated: May_____2019

JAMES COURI (pro-se)

_____

JAMES COURI

A

**AFFIRMATION**

SABA AL-HASHIMI, MD, hereby affirms as follows:

1. I am a medical doctor and surgeon at UCLA Medical Center, Stein Eye Institute.

2. My specialties are Cornea Opthalmology, and Uveitis

3. James Couri (James) has been my patient for a number of months and has been a patient of the Stein Institute for over two years.

4. James is under my professional care due to severe eye disease which includes macular degeneration, damaged cornea, and other eye debilitations.

5. His vision has been severely impaired to the extent that he is unable to drive an automobile, and unable to conduct his daily functions.

6. Clinically, he is classified as borderline blind at the present time.

7. If his condition does not improve with medication, he will require surgery which will include cornea transplant.

8. These conditions are further complicated as a result of James' other medical conditions and his treatment for stage four melanoma cancer.

9. In light of the forgoing, James is unable to participate in daily activities for the forceable future.

10. The forgoing is based upon my teaching, training and experience and the care of James Couri.

Dated: 7/30/2018

SABA AL-HASHIMI, MD



# AFFIDAVIT

STATE OF CALIFORNIA
COUNTY OF RIVERSIDE

Dr. Thomas F. Reynolds being duly sworn deposes and says under penalty of perjury:

1. I am a Diplomate, American Boards of Internal Medicine and Medical Oncology.

2. I am affiliated with Cedars Sinai Medical Center in Los Angeles, California and Eisenhower Medical Center, in Rancho Mirage, California.

3. James Couri has been my patient since 2006.

4. I make this Affidavit after evaluations of Mr. Couri's medical condition, physical examinations and consultations with Mr. Couri, and my review of Mr. Couri's recent medical, surgical and radiology records from UCLA Medical Center and other medical institutions; particularly, relative to Mr. Couri's Stage IV cancer, cardiac condition; and current gastro intestinal disorders.

## STAGE IV CANCER & IPILIMUMAB TREATMENT PROTOCOL

5. Mr. Couri was diagnosed with Level V, Stage III Melanoma Cancer in 2006 and confirmed lympovascular invasion. He underwent surgery at that time for the removal of the malignancy and approximately 17 lymph glands, some also with invasion of malignancy.

6. Thereafter, Mr. Couri has been actively monitored by me and Specialists affiliated with UCLA Medical Center in Los Angeles, CA, and other medical institutions.

7. On or about October 15, 2009, Mr. Couri was diagnosed with a recurrence of melanoma cancer, Stage IV, in his lung area and elsewhere. Mr. Couri also recently learned of his exposure to asbestos. This is medically significant in view of his fragile immune system, his illness, and ongoing treatments and immuno therapy.

8. Mr. Couri, in October 2009, underwent two surgeries at UCLA Medical Center. On December 15, 2009 at UCLA, Mr. Couri underwent major thorasic surgery for the attempted removal of the newly detected cancer sites.

9. Based upon subsequent PET-CT Scans and post-operative and pathology reports, etc., it was confirmed that Mr. Couri's cancer disease had not been fully removed. In fact, the PET/CT Scans of Mar. 21, 2010 and of Feb. 22, 2010 taken at UCLA revealed that the findings were consistent with active and progressive metastatic disease.

10. In 2010 Mr. Couri began undergoing in hospital medical and immuno therapy. In March, 2010, due to the gravity of Mr. Couri's condition, and his unresectable Stage IV cancer, UCLA Specialists proposed to Mr. Couri that he be considered for a 'Compassionate Use Research Program' Melanoma Cancer Protocol-CA 184-045, IPILIMUMAB, sponsored by Bristol-Meyers-Squibb, (BMY). This Investigational Drug Protocol was offered to Mr. Couri, by invitation, because he suffers from cancer that spread throughout his body.

11. In April 2010, Mr. Couri entered into a Consent to participate in this highly significant Protocol at UCLA. This Ipilimumab Protocol began on April 21, 2010 and spans an initial 4 Phases (12 Weeks), which includes frequent 90 minute in-Hospital Infusions of Ipilimumab. Thereafter the Protocol and Infusions continue in consecutive cycles of 12 weeks each, and continues thereafter in the same incremental cycles based upon Mr. Couri's condition and the determinations of the Specialists at UCLA, BMY, my office and others involved in this highly important cancer treatment. During this entire Protocol, Mr. Couri must undergo in-UCLA: Pt/Ct Scans, Vital Sign Management, Blood-Draws and numerous physical examinations by various Specialists at UCLA. If any adverse effects appear, Mr. Couri will be immediately hospitalized at UCLA.

12. This Drug Protocol also comes with very significant side effects and risks of which many can be life threatening. The Ipilimumab Drug was then not yet approved by the United States Food and Drug Administration (FDA). It was approved in February 2011.

13. Mr. Couri is also being prescribed potent medications for pain management. Mr. Couri is accordingly being carefully monitored and supervised daily, both in and out of UCLA Medical Center in Los Angeles California. Mr. Couri's condition is extremely serious and is now further complicated by the recent revelation that he is being evaluated for cardiac and intestinal surgeries.


## SEVERE CORONARY ARTERY DISEASE & PENDING OPEN HEART SURGERY

14. Mr. Couri continues to suffer from extensive and progressive coronary artery disease and chronic angina. He has undergone six angioplasty procedures to re-canalize some of his occluded arteries, which included the placement of eight stents implants and two unsuccessful attempts to re-canalize his occluded left anterior descending artery.

15. Mr. Couri is required to take multiple mood altering medications and is currently mandated to undergo testing for his cardiac disease, which is monitored by me, and Specialists at UCLA Medical Center, who are also involved in the Ipulimumab Protocol and the constant and complex care of Mr. Couri.

16. Mr. Couri has recently been diagnosed with a recurrence of persistent and severe congestive heart disease. Accordingly Mr. Couri is now undergoing testing and evaluations for his submitting to cardiac surgery in order to recanalize his totally blocked left descending artery and replacement of any impacted and blocked stents. This circumstance will mandate Mr. Couri to first undergo invasive in hospital Angiograms, and significant other testings before heart surgery, which will be conducted on Mr. Couri at UCLA Medical Center. Due to this chronic

angina, it is difficult for Mr. Couri to walk any significant length without experiencing severe angina, discomfort and pain.

## CHRONIC GASTRO-INTESTINAL DISORDERS AND PENDING SURGERY

17. Additionally, Mr. Couri suffers from persistent bowl, digestive and gastro intestinal disorders and obstructions. He was hospitalized for pancreatitis under my care. This condition is further complicated by the infusions of Ipilimumab and his recent finding that he has been unknowingly exposed to asbestos, bacteria, fungus and mold. In fact Mr. Couri has recently experienced intestinal pain, infections and disorders for which he is being medicated. Mr. Couri has been prescribed intestinal antibiotics and other medications in an attempt to control this condition. He is currently undergoing further exploratory, upper GI and other in hospital intestinal testing as well. Mr Couri was admitted on an emergency basis to the UCLA Hospital on August 19, 2011 due to a severe intestinal pain and obstruction, and is presently being treated for this condition. After consultations with surgeons, Mr. Couri is now being evaluated for intestinal surgery in order to resect and remove these intestinal obstructions and constrictions, etc. This proposed surgery is extremely risky and complex due in part to Mr. Couri's health, age and medical situation.

18. Mr. Couri underwent a transhiatal-esophagectomy for dysplasia in 1994 (removal of his esophagus). Mr. Couri therefore continues to suffer from digestive and gastro-intestinal complications for which he is prescribed numerous medications. As a consequence, Mr. Couri is mandated to undergo periodic endoscopic procedures and biopsies to monitor his esophageal condition for cancer and other complications, some of which have again spawned mandating surgery assessment of Mr. Couri's circumstances.

## ASBESTOS AND MOLD EXPOSURE

19. Mr. Couri's recently reported approximate two-year exposure to friable asbestos and airborne mold has significant consequences and complications to Mr. Couri's health care, particularly in light of his fragile immune system and health issues. Based upon my medical teaching and training as an oncologist and medical doctor, at the very least, Mr. Couri will now be required to undergo more frequent pet/CT, CT scans, x-rays, blood tests, and other tests for many years, in the hope of detecting any physiological changes in his lungs and elsewhere due to his exposure to friable asbestos.

20. Mr. Couri's exposure to mold also has significant consequences to his health care also in light of his fragile immune system. Mr. Couri has recently been diagnosed with Filamentary Keratitis by Dr. Greg Evans. Mr. Couri is relegated to a regime of antibiotic and other eye medications, including Tobramycin/Dexamethasone and Vigamox, to attempt to control this resilient eye infection.

21. Mr. Couri's recent diagnosis of a gastro-intestinal bacterial infection requires treatment with a Metronidazole and Xifaxan regimen. This current infection may have been

exacerbated by exposure to mold, fungus and bacteria. Mr. Couri is currently being tested for a recently discovered urological infection as well.

## SPINAL AND SKELETAL DISORDERS & RECENT HIP REPLACEMENT SURGERY

22. Mr. Couri continues to suffer from chronic and severe back pain, spinal inflammation and degenerative spinal disc and shoulder disease. Mr. Couri undergoes therapy and treatment, along with medical intervention to stabilize the pain Mr. Couri experiences related to these conditions. Mr. Couri has also been diagnosed with ankylosing spondylitis.

23. Mr. Couri underwent major surgery of a full hip replacement on March 11, 2011 at UCLA Medical Center.  He is in physical therapy at Eisenhower Medical Center and at UCLA in California.

## MR. COURI'S INABILITY TO TRAVEL OR ENGAGE IN STRESSFUL ACTIVITIES

24. Accordingly, in view of Mr. Couri's numerous, diverse and serious medical disorders, recent surgery, ongoing in hospital cancer treatments, required scans and other immuno-therapy protocols; as well as current evaluations for impending heart surgery, and intestinal surgery, Mr. Couri is mandated to remain in close proximity to my medical office and to the numerous Specialists at UCLA Medical Center in California involved in his medical care. Accordingly, because of the foregoing outlined treatments, impending surgeries, and the complexity and severity of Mr. Couri's medical conditions, (further complicated by his severe and debilitating heart condition), Mr. Couri is physically and mentally fragile, and cannot travel or resume conventional daily activities of any kind, under any circumstances.

25. Mr. Couri's cancer condition, the recurrence of his persistent angina, and his presently being actively tested and evaluated for additional surgeries which are further complicated by eight stents, and the highly toxic Ipilimumab Cancer Protocol he is involved, Mr. Couri requires in hospital and otherwise constant medical attention and supervision. Therefore, the foregoing circumstances mandates ongoing medical supervision and medical testing that Mr. Couri must partake in.  Most significantly, Mr. Couri is not physically able and cannot engage in any stressful activities whatsoever which will be life threatening. Any interruption of Mr. Couri's medical protocols will cause Mr. Couri severe injury. Such interferences would exacerbate his already extremely precarious condition and adversely impact his treatment and care. The current disclosure as to Mr. Couri's deteriorating heart condition, persistent angina and recurrence of gastro-intestinal blockages has caused additional negative ramifications to Mr. Couri's fragile health.

26.  Accordingly, Mr. Couri's active cancer and other healthcare and treatments, and impending cardiac and intestinal surgeries, mandate that he cannot travel under any circumstances. Mr. Couri must remain in daily physical contact and in close proximity to his healthcare providers and to UCLA Medical Center, in California where his ongoing treatments and testing has and are being conducted. Furthermore, in light of all of the forgoing, Mr. Couri cannot partake in any form of stressful or adverse activities whatsoever. Such circumstances will confront Mr. Couri to extreme risks to his life. If  Mr. Couri is confronted with adverse, hostile

or stress of any kind, same will have grave consequences to him, to his fragile health, and will be life threatening to Mr. Couri.

27. The foregoing is based upon my teaching, training, and experience, and the care of Mr. James Couri.

Thomas F. Reynolds MD FACP

Sworn to before me this 23rd Day of August 2011.

Notary Public

CECILIA M. DIAZ
Commission # 1884427
Notary Public - California
Riverside County
My Comm. Expires Mar 28, 2014

AFFIRMATION

STATE OF CALIFORNIA
COUNTY OF RIVERSIDE

Dr Andre M. de Leon being duly sworn hereby affirms as follows:

1. I am a Medical Doctor, Primary Care Physician at Eisenhower Medical Center in Rancho Mirage California. I am Board Certified in the speciality of Family Medicine.

2. James Couri is my patient and has been for approximately three years, and I am fully conversant with his various medical disorders, including Stage 4 Melanoma Cancer, COPD, cardiac disabilities, gastrointestinal issues subsequent to his undergoing a transhiatal esophegetomy, and other disorders. I reaffirm the contents of my prior Affirmations outlining Mr Couri's complex medical problems.

3. Over the next approximately 90 days, Mr Couri will be undergoing at UCLA medical Center in Los Angeles Ca, the following inpatient surgeries and procedures: Bladder, Lymphadenectomy; Pet-CT Scans: and outpatient every three weeks of Chemo-infusions of Kerytruda, a toxic Cancer drug; treatment for COPD. The recovery time for the lymph Surgery is about 5 weeks and the Bladder surgery about three weeks. Mr Couri's mobility post these surgeries and procedures is non existent. Mr Couri also requires oxygen therapy, and constant medical supervision.

4. Accordingly, Mr Couri can not under any circumstances travel or resume conventional daily activities for the foreseeable future. Additionally, Mr Couri can not engage in any emotionally or physically stressful activities whatsoever which will be life threatening as a result of his present health condition; and in particular during pre and post surgeries.

5. The foregoing is based upon my teaching, training and experience, and my attention to the care and attention to Mr Couri.

Dated: Jan. 13 2017

_____ M.D.
Dr. Andre M. de Leon

## AFFIRMATION

STATE OF CALLIFORNIA
COUNTY OF LOS ANGELES

Bartosz Chmielowski MD PHD being duly sworn deposes hereby affirms as follows:

1. I am Ass.stant Clinical Professor Division of Oncology at UCLA Medical Center in Los Angeles, CA. (UCLA).

2. James Couri has been my patient since 2009 regarding his Stage Four Melanoma Cancer.

3. Mr. Couri was first diagnosed with Melanoma Cancer with lympho-vascular invasion in 2006. The sites were resected at that time. Thereafter, with the recurrence of Melanoma Cancer in 2009, Stage Four, Mr. Couri has been closely monitored at UCLA.

4. Due to the 2009 diagnosis of Stage Four Melanoma Cancer, Mr. Couri was told he had limited life expectancy. Mr. Couri soon thereafter underwent three surgeries at UCLA.

5. Following this, Mr. Couri underwent a lengthy program of toxic Immuno Therapy at UCLA during 2010.

6. From that time, Mr. Couri has been undergoing PET-CT Scans every three months and monitored carefully by me and UCLA's Oncology Staff and the UCLA Cardiology Staff as well.

7. On June 2, 2014, Mr. Couri underwent a PET-CT Scan at UCLA, which revealed the recurrence/resurfacing of active Melanoma Cancer, Stage Four.

8. Mr. Couri will be required to undergo immediate surgery, and promptly thereafter begin a lengthy program of Immuno Cancer-therapy at UCLA.

9. The Immuno Therapy has many debilitating toxic side effects, including severe disorientation, dizziness, nausea, severe rash, cardiac difficulties and many other disabling conditions that require constant hospital attention.

10. The treatment of Mr. Couri mandates careful monitoring and medical supervision at UCLA.

11. Mr. Couri's cancer condition is further exacerbated by his other medical disorders including cardiac, gastro-intestinal and other conditions.

12. In view of the forgoing circumstances, and the debilitating effects of the toxicity of the cancer Immuno-Therapy Mr. Couri is required to undergo at UCLA, Mr. Couri will be both physically and mentally unable to participate in daily activities for the foreseeable future.

13. The forgoing is based upon my teaching, training and experience, and the care of Mr. James Couri.

Dated: June 25, 2014

_____
Bartosz Chmielowski, MD PHD

VERIFICATION

STATE OF CALIFORNIA
COUNTY OF RIVERSIDE

Dr Andres M. de Leon being duly sworn hereby affirms as follows:

1. I am a Medical Doctor, Primary Care physician at Banning Imperial Center in Banning Riverside County. I am Board Certified in the specialty of family medicine.

2. James Creel is my patient and has been my patient for several years, and I am fully conversant with his various medical disorders, including Stage 4 Idiopathic Chronic COPD, cardiac disabilities, deterioration of bones subsequent to his undergoing a sustained cardiopulmonary, and other disorders. I confirm the accuracy of any prior information outlining Mr Creel's complex medical problems.

3. Over the last approximately 60 days, Mr Creel will be undergoing at UCLA medical Center in Los Angeles Ca, the following important tests and procedures including: bronchoscopy, PulCT Scans and associated surgery three weeks of [illegible] of [illegible] a full Chest x-ray treatment the COPD. His recovery after further graph surgery hollers 3 weeks and the bladder surgery three three weeks. His Creel's inability post these surgical and immediate home surfaces, Mr Creel also requires regular therapy and constant medical supervision.

4. Accordingly, Mr Creel can not make any appearances in travel or assume any medical duty activities that he characterizes above. Additionally, Mr Creel can not engage in any undertaking to physically exert in [illegible] whatsoever which will [illegible] taxing on [illegible] result of this period health conditions and in particular during pre and post diagnosis.

5. The foregoing is based upon my handling, training and experience, and my attention to the care and attention to Mr Creel.

Dated: Jan __ 21   2017

_____
Dr Andres M. de Leon

AFFIRMATION

STATE OF CALIFORNIA
COUNTY OF LOS ANGELES

Dennis Chmielowski MD PHD, being duly sworn deposes and hereby affirms:

1. I am Clinical Professor Division of Oncology at UCLA Medical Center Los Angeles CA. (UCLA)

2. James Coad has been my patient since 2009 regarding his Stage 4 Melanoma Cancer.

3. Mr Coad was first diagnosed with Melanoma Cancer in 2006, with Inoperable/visible lesions.

4. Mr Coad has a extensive and complex medical history. He presently undergoes Cancer Infusions every three weeks at UCLA Infusion Center of cancer drug by Merck known as KEYTRUDA. Mr Coad is required to continue these infusions for the forseeable future and as long as his Cancer remains stable.

5. This Drug's cost is in excess of $15,000.00 plus Hospital administering costs each time Mr Coad undergoes the Infusion protocol. (Total of $24,000. per yr)

6. Medicare pays for a portion of these charges and any "secondary-payors" will pay for another portion of the costs and Mr Coad is financially responsible for any and all remaining balance.

7. Mr Coad undergoes over 17 such in Hospital Infusions yearly, and has been doing so since 2014, and will continue for years in the future, which is a necessary protocol of this life-saving drug, for Mr Coad.

8. The forgoing is based upon my treating, training and supervision, and the care of Mr James Coad for over eight years.

Dated: May 2, 2017

_[signature]_

Dennis Chmielowski, MD PHD

**AFFIRMATION**

STATE OF CALIFORNIA
COUNTY OF RIVERSIDE

Dr Andre M. de Leon being duly sworn hereby affirms under the Laws of the United
States of America as follows:

1. I am a Medical Doctor, Primary Care Physician at Eisenhower Medical Center in
Rancho Mirage California. I am Board certified in the specialty of Family Medicine.

2. James Couri is my patient, who is 77 years of age. I am fully conversant with his
medical health and complications, and I make this Affirmation after evaluation of Mr
Couri's current condition. Such findings involved physical examinations of Mr Couri
consultations with Mr Couri and careful review of Mr Couri's UCLA Medical Center
records. I have particularly focused on Mr Couri's current Stage Four Cancer Treatment
and current issues. First, I reaffirm the contents of my Affirmations dated 11-11-14,
2-19-15 and 10-5-15, as to the complex medical condition of my patient James Couri.

3. Mr Couri currently undergoes every three weeks, lifetime cancer-drug (Keytruda)
infusions at UCLA . This is  a toxic cancer treatment. He further submits at UCLA to
frequent Pet-CT Scans, to monitor any cancer progression, etc. The most recent Scan
taken on July 27, 2016 revealed a cancerous  invaded area in his left clavicle that
requires surgery.

4. Before this surgery can be conducted, Mr Couri will be required to undergo numerous
in and out patient pre-operative invasive screening, testing and evaluations.

5. Accorcingly, Mr Couri will not be able to engage in any business and court matters
until he completes these pre-op. testing and undergoes this surgery and experiences a
convalescing period which will mandate frequent visits to UCLA for removal of "drains"
wound management, etc. After such time his condition and prognosis will be reassessed
by me and by his Doctors at UCLA Medical Center in Los Angeles, CA..

6. Therefore,Mr Couri will be unable at this time and in the imminent future to engage in
any court proceedings or stressful matters.  By December 2016, Mr Couri's condition
will be reevaluated, by post surgery Pet-Ct Scans and other tests, which should
reasonably determine his ability to resume limited daily functions and activities.

7. The forgoing is based upon my teaching, training and experience and the care of
James Couri.

Dated: Aug. 9    2016

Dr Andre M. de Leon

**AFFIRMATION**

STATE OF CALIFORNIA
COUNTY OF RIVERSIDE

Dr. Andre M. de Leon being duly sworn hereby affirms as follows:

1. I am a Medical Doctor, Primary Care Physician at Eisenhower Medical Center in Rancho Mirage California. I am Board Certified in the specialty of Family Medicine.

2. James Couri is my patient. On Nov. 11, 2014 I signed an Affirmation regarding the Medical History and condition of Mr. Couri. I re-Affirm the contents of said Affirmation.

3. In view of Mr. Couri's complex medical issues and condition, cancer, cardiac and other treatment, required medical scans, PET-CT Scans, treatment for COPD, required oxygen therapy, and ongoing medical supervision mandated from me and various physicians at Eisenhower Medical Center and at UCLA Medical Center in Los Angeles, California,

4. Mr. Couri cannot under any circumstances travel or resume conventional daily activities for the foreseeable future. Additionally, Mr. Couri cannot engage in any stressful activities whatsoever which will be life threatening as a result of his health condition.

5. The forgoing is based upon my teaching, training and experience, and the care of Mr. Couri.

Dated: Feb  19   2015

Dr. Andre M. de Leon

The body text of this document is too faded and illegible to transcribe reliably.



**SEMEL INSTITUTE**
**UCLA**

Division of Geriatric Psychiatry
Jane & Terry Semel Institute for Neuroscience & Human Behavior

David A. Merrill, M.D., Ph.D.
Assistant Clinical Professor
Psychiatry & Biobehavioral Sciences
Associate Director of Geriatric Psychiatry Ambulatory Care

University of California, Los Angeles
760 Westwood Plaza, Rm 38-231
Los Angeles, CA 90024
Voice: (310) 267-0274
Fax: (310) 825-3910
dmerrill@mednet.ucla.edu

November 10, 2014

RE: Treatment and condition

TO: James Couri

This letter is to confirm that you under my clinical care. You have had a recurrence of your Metastatic melanoma, Stage Four. You were hospitalized at UCLA Medical Center from 10/17/24 to 10/24/14 for severe medical complications arising from Drug-Induced Colitis complicated by your COPD. You developed a hypercarbic/hypoxemic respiratory failure requiring transfer to the Intensive Care Unit for Altered Mental Status. This hospitalization further destabilized you physically and mentally to the point where you are no longer independent in even basic activities of daily living (e.g., dressing, bathing, toileting, transferring). You require ongoing intensive physical therapy, careful monitoring, and medical supervision at UCLA. Under the circumstances, you are not fit to travel or engage in stressful activities. To do so would risk great harm to your health.

Sincerely,

David Merrill, M.D., Ph.D.

 **Health**

COURI, JAMES C
MRN: ▮▮▮▮▮
Enc. Date: 12/27/16

12-27-16

## Medications and Orders (continued)
### All Current Medications (continued)

Villamor, Flora Lieganas, RN 5/10/2016 5:57 PM
Received from: External Pharmacy

**metronidazole (FLAGYL) 500 mg tablet**    Take 500 mg by mouth as needed for

Villamor, Flora Lieganas, RN 7/29/2015 9:38 AM
Received from: External Pharmacy

### Allergies as of 12/27/2016
No Known Allergies

### Smoking Status

| Smoking Status | Amount | Types |
|---|---|---|
| Former Smoker  (Quit Date: 8/21/1987) | 1 pack/day for 30 years | Cigarettes |

Smokeless Tobacco Status
**Former User**

### Problem List as of 12/27/2016
CAD (coronary artery disease)
Stented coronary artery
Dyslipidemia
Metastatic melanoma
COPD (chronic obstructive pulmonary disease)
Winged scapula
HTN (hypertension)
Lung metastasis
Metastasis to lymph nodes
SOB (shortness of breath)
Anemia
Nuclear sclerosis
Nonexudative senile macular degeneration of retina
Monoallelic mutation of BRAF gene
Pseudophakia OD Monofocal with AM target plano 1/12/16
Pseudophakia OS Monofocal with AM target plano 1/27/16
Weight loss

### All Standing Orders

| | Auth. provider | Ordered |
|---|---|---|
| CBC & Auto Differential [LAB293] | Cherry, Grace, NP | 06/21/16 |
| Comprehensive Metabolic Panel [LAB17] | Cherry, Grace, NP | 06/21/16 |
| LD [LAB96] | Cherry, Grace, NP | 06/21/16 |
| TSH with reflex FT4, FT3 [LAB5999] | Cherry, Grace, NP | 06/21/16 |

### All Future Orders

Couri, James C (MR▮▮▮▮▮) Printed at 12/27/16 10:42 AM

*Eisenhower Med Cente*
*9-23-16*

COURI, JAMES; DOB: 04/04/1939;

Office encounter on 11/23/2016

| | | |
|---|---|---|
| Patient: COURI, JAMES C (JAME) | Sex: Male | DOB: 04/04/1939 |
| Clinician of record: RITCHEY, JAMES C. | | Location: Eisenhower Argyros Family Medicine |

Encounter assessments: Calculus in bladder; Decreased testosterone level; Encounter for immunization; Encounter for preprocedural laboratory examination; Type 2 diabetes mellitus

**Nursing**

**Intake Note**
Room 10
  Fall Risk Screening: Patient states has not fallen in recent weeks, Has no difficulty walking, Does not have difficulty standing for brief periods, Does not use an assistive walking device, No Fall risk identified
  Learning Barrier: **Patient states wears glasses, Brought glasses today**, Patient states not hard of hearing, English is patient's primary language, No Learning Barrier Identified
  Abuse Screening: Patient states not living in an abusive situation
  Depression Screening: Has not felt down, depressed, or hopeless, Over past two weeks has not lost interest or pleasure in daily activities., Adult depression screening negative
  Medication Management: Discussed importance of keeping updated med list including OTC meds, Discussed importance of sharing med list with providers at each visit or for emergencies
**Depo Testosterone 200mg/ml**
**Given IM in Left Gluteal**
**Lot# N98738**
**Exp 03/2019**
**NDC# 0009-0520-01**
**Administered by JMartinez, LVN**
**Subjective**

**Chief Complaint/Reason For Encounter**
"1. Pre op clearance
2. Flu Vaccine
3. Testosterone injection
JMartinez, LVN"

**History of Present Illness**
**General**: Current Medication list reviewed, Family History Reviewed, Nursing Note Reviewed, Past Medical History Reviewed, Risk screenings reviewed, Social History Reviewed

**77 year old male with history of CAD with multi-vessel disease status post multiple stent placements, HLD, DM2 presenting to the clinic for Preop clearance as well as testosterone injection and influenza vaccine.**

**Planned Procedure: Bladder Stone Lithotripsy**
**Surgeon: Dr. Pantuck at UCLA**
Date of planned operation: 12/21/16

(high risk: vascular surgery. Intermediate risk: thoracic surgery, intracranial neurosurgery, major head and neck surgery, significant blood loss: gen surg, gyn onc, urology, ortho)

Pulmonary factors: COPD

Created from: Eisenhower Argyros Family Medicine, 45280 Seeley Drive, La Quinta, CA, 92263 (760)834-7920
Created on 12/20/2016 at 08:35                                                                      Page 1 of 10

*3*

COURI, JAMES; DOB: 04/04/1939; ID#:

Cigarette smoking: Prior use, 20 pack years, quit 30 years ago
Respiratory diseases: Yes
Morbid obesity: No
Age over 60: Yes

Cardiac factors
History of MI or unstable angina: Yes, s/p 8 coronary stent placements

History of Hypertension: No

History of Diabetes: Yes, last A1c 8/16 was 7.5

History of Chronic Kidney Disease (male Cr>2.0, female Cr>1.7): no recent Creatinine level at time of pre-op visit

History of Hyperlipidemia: Yes, taking Atorvastatin 80mg QD

History of prosthetic valves: No

History of Congestive heart failure: No

History of Arrhythmia: No

History of abnormal stress test: Peformed within the last 12 months months at UCLA

History of pacemaker: No

Currently on antiplatelet or anticoagulation therapy: Aspirin 81mg QD

GUPTA PER-OPERATIVE CARDIAC RISK SCORE: 0.27%

Functional Capacity/MET >4. Can walk up multiple flight of stairs without SOB, chest pain or lightheadedness.

Past Med/Surg History Problems
Abdominal pain (1); *First Visit*: Dec 24 2014, *Last Visit*: Dec 24 2014
Abdominal pain (1); *First Visit*: Jan 18 2016, *Last Visit*: Jan 18 2016
Blood in urine (1) - will cover with levaquin; *First Visit*: Jul 3 2015, *Last Visit*: Jul 3 2015
Chronic cough (2), *First Visit*: Feb 23 2015, *Last Visit*: May 5 2015
Chronic obstructive lung disease (10) - intolerant of inhaler medications, *First Visit*: Mar 25 2014, *Last Visit*: Jul 28 2015
Chronic obstructive lung disease (2) - intolerant of inhaler medications; *First Visit*: Nov 9 2015, *Last Visit*: Aug 24 2016
Chronic pain (1) - R. Shoulder; *First Visit*: Apr 22 2014, *Last Visit*: Apr 22 2014
Coronary arteriosclerosis (1) - s/p Stents x 8; *First Visit*: Mar 25 2014, *Last Visit*: Mar 25 2014
Depressive disorder (4); *First Visit*: Mar 25 2014, *Last Visit*: Nov 19 2014
Disorder of esophagus (1) - s/p Esophagectomy; *First Visit*: Mar 18 2015, *Last Visit*: Mar 18 2015
Disorder of esophagus (1) - s/p Esophagectomy; *First Visit*: Aug 24 2016, *Last Visit*: Aug 24 2016
Disuse muscle atrophy - R. Shoulder 2/2 nerve injury
Dyspnea on exertion (2); *First Visit*: Feb 23 2015, *Last Visit*: May 5 2015
Encounter for screening for malignant neoplasm of prostate (1); *First Visit*: Aug 9 2016, *Last Visit*: Aug 9 2016
Enlarged prostate with lower urinary tract symptoms (1); *First Visit*: Mar 8 2016, *Last Visit*: Mar 8 2016
Gastro-esophageal reflux disease with esophagitis (1), *First Visit*: Nov 9 2015, *Last Visit*: Nov 9 2015

COURI, JAMES; DOB: 04/04/1939; ID# ▮▮▮▮▮▮▮▮

Gastro-esophageal reflux disease without esophagitis (2); *First Visit*: Feb 19 2016, *Last Visit*: Feb 26 2016
Gastroesophageal reflux disease (3); *First Visit*: May 22 2014, *Last Visit*: Mar 18 2015
Hematuria, unspecified (2); *First Visit*: May 23 2016, *Last Visit*: Sep 4 2016
Hiatal hernia
Hyperlipidemia
Impacted cerumen, left ear (1); *First Visit*: Aug 3 2016, *Last Visit*: Aug 3 2016
Impotence of organic origin (3); *First Visit*: Mar 8 2016, *Last Visit*: Oct 25 2016
Incisional hernia - s/p Mesh placement -> Infection
Left lower quadrant pain (1); *First Visit*: May 23 2016, *Last Visit*: May 23 2016
Malignant melanoma of skin of trunk (2) - s/p Chemotherapy; *First Visit*: Mar 18 2015, *Last Visit*: Jun 2 2015
Malignant melanoma of skin of trunk (3) - s/p Chemotherapy; *First Visit*: Nov 9 2015, *Last Visit*: Aug 24 2016
Multiple joint pain (1); *First Visit*: Apr 28 2015, *Last Visit*: Apr 28 2015
Multiple nodules of lung (2); *First Visit*: Jul 28 2015, *Last Visit*: Aug 3 2015
Nerve injury - s/p & Central Line Placement
Other disorders of lung (2); *First Visit*: Oct 5 2015, *Last Visit*: Aug 24 2016
Other fatigue (1); *First Visit*: May 23 2016, *Last Visit*: May 23 2016
Other fatigue (1); *First Visit*: Aug 9 2016, *Last Visit*: Aug 9 2016
Paroxysmal vertigo (1), *First Visit*: Feb 19 2015, *Last Visit*: Feb 19 2015
Pneumococcal vaccination (1); *First Visit*: Feb 19 2015, *Last Visit*: Feb 19 2015
Pneumonia (2); *First Visit*: Jul 28 2015, *Last Visit*: Aug 3 2015
Pneumonia (2); *First Visit*: Oct 5 2015, *Last Visit*: Nov 9 2015
Pre-surgery evaluation (1); *First Visit*: Mar 18 2015, *Last Visit*: Mar 18 2015
Temporomandibular joint disorder, unspecified (1); *First Visit*: Oct 2 2016, *Last Visit*: Oct 2 2016
Type 2 diabetes mellitus
Type 2 diabetes mellitus (3), *First Visit*: Aug 9 2016, *Last Visit*: Aug 18 2016
Unspecified otitis externa, left ear (1); *First Visit*: Aug 3 2016, *Last Visit*: Aug 3 2016
Weakness of limb (2); *First Visit*: Nov 19 2014, *Last Visit*: Jan 6 2015
Xerosis cutis (1); *First Visit*: Jan 18 2016, *Last Visit*: Jan 18 2016

**Past Med/Surg History Procedures**
Coronary artery stent placement (1) - x 8 (including LAD)
EKG (1); *Last Performed*: 10/17/2014
Esophagectomy, partial (1)
Hernia repair w/mesh (1)
Repair incisional hernia (1)

**Health Maintenance Procedures**
Colonoscopy (1); *Last Performed*: 2011

**Health Maintenance Immunizations**

Flu vacc, split >4yrs, Preserv Free (Fluvirin); *Dates*: 11/23/2016
Flu vacc, split, IM, preserv free; *Dates*: 01/01/2013; 12/2014
Pneumococcal 13 conjugate vacc, Adult, IM(PREVNAR); *Dates*: 02/19/2015
Pneumococcal vacc, Adult, 23-valent,SC/IM(PNEUMVX); *Dates*: 2009

**Med List** *last modified Nov 23 2016 Reviewed: Nov 23 2016*
aspirin 81 mg tablet,delayed release, 1 tablet(s) by mouth daily taking
atenolol 25 mg tablet, 1 tablet(s) by mouth daily taking
atorvastatin 80 mg tablet, one-half tab(s) By Mouth Daily taking

COURI, JAMES; DOB: 04/04/1939; ID# ███████████

Lasix 20 mg tablet, 1 tablet(s) by mouth daily **taking**
meloxicam 7.5 mg tablet, 1 po bid prn pain with food., 20 **taking**
metronidazole 500 mg tablet, TAKE 1 TABLET BY MOUTH THREE TIMES DAILY UNTIL GONE, 30 Tablet **taking**
ProAir HFA 90 mcg/actuation aerosol inhaler, 2 puffs po PO q4h PRN or 30 mins before radio show., 17 gm **taking**
testosterone cypionate 200 mg/mL intramuscular oil, 200mg/mL once a month per Dr. A De Leon 09/21/2016 **taking**
venlafaxine 75 mg tablet, 1 tab(s) By Mouth Daily **taking**
ciprofloxacin 500 mg tablet, 1 tablet(s) by mouth every 12 hours, 14 tablet(s) **discontinued**
metformin 500 mg tablet, 2 tab(s) By Mouth Daily, 180 tablet(s) **discontinued**
tamsulosin ER 0.4 mg capsule, extended release 24 hr, 1 capsule(s) by mouth daily **discontinued**

**Preferred Pharmacy**
Walgreens ██████████████████████████████████████████████████████

**Allergies** *Reviewed: Nov 23 2016*
NKA

**Family History** *last modified Feb 23 2015 Reviewed: Nov 23 2016*
Positive Family History for:
Prostate cancer: Father

**Social History** *last modified Feb 23 2015 Reviewed: Nov 23 2016*
**Tobacco Use** Former smoker; **Tobacco comments** 1988; **Tobacco reviewed with patient** 11/23/2016
**Alcohol Use** Non-drinker
**Caffeine Use** Uses caffeine; Type: coffee, and soda
**Diet/Nutrition** Good diet
**Exercise** Sedentary; **Comments** Secondary to R. shoulder/back neuropathy
**Additional comments** *Wife: Marlene *Retired: Investments *Lived majority of adult life in Manhattan

Personal: *Ethnicity*: null; *Religion*: GREEK ORTHODOX; *Primary language*: English; *Marital status*: Married; *Occupation*: SELF; *Employer*: COURI COMPANIES

**Brief Review of Systems**: No fatigue, No fever, No nasal congestion, No sore throat, No cough, No dyspnea, No chest pain, No abdominal pain, No nausea, No vomiting, No dysuria, No skin rash, No headache, No dizziness, No weakness

**Review of Systems**
**Constitutional**: No chills
**Eyes (R,L)**: No blurred vision, No reduced vision, No eye pain
**Ears (R,L)**: No ear pain, No hearing loss
**Cardiovascular**: No palpitations, No arrhythmia, No edema
**Gastrointestinal**: No loss of appetite, No change in bowel habits
**Hematologic, Lymphatic**: No swollen glands, No lymph node tenderness
**Musculoskeletal**: No neck pain, No back pain, No muscle pain
**Skin**: No skin lesion, No pruritus
**Neurologic**: No lightheadedness
**Endocrine**: No polyphagia, No polydipsia, No polyuria

**Objective**

COURI, JAMES; DOB: 04/04/1939; ID#:

**Vital Signs**
Temp: 97.9°F (Skin) [36.7°C] HR: 76 bpm RR: 16 PulseOx: 97% on room air at rest Blood Pressure: 112/72
mmHg (L arm sitting adult-std cuff)
Height: 72 in [182.88 cm] Weight: 223 lb 4 oz lbs [101.264 kg] BMI: **30.3 BSA: 2.232
Pain Scale: 0/10 (Numeric)
Date/Time: Nov 23 2016 08:26
BMI: 27.2

**Physical Exam**
Constitutional: Appears well
Mental Status: Alert, Oriented
Eyes (R,L): Conjunctiva normal, Eyelid normal, Sclera normal, Pupil size and shape normal
Ears (R,L): Ear canal normal, Tympanic membrane normal
Nose, Throat: Oral mucosa normal, Throat examination normal
Neck: No neck mass, No thyromegaly
Respiratory: Respiratory effort normal, Breath sounds normal, No rales, No rhonchi, No Wheezing
Cardiac: Heart rate abnormal, Heart rhythm normal, Heart sounds normal
Vascular: No leg edema, No pedal edema
Gastrointestinal: Abdomen soft, No abdominal tenderness, No abdominal mass
Lymphatic: No cervical lymphadenopathy
Musculoskeletal: Gait normal
Skin: Skin color normal, No skin rash, No skin lesion
EKG: My EKG Interpretation, Other: Pre-op, EKG Rate 58, EKG Rhythm Sinus Bradycardia, Other: Right
bundel branch block, EKG PR Interval Normal, EKG QT Interval Normal, Comparison to prior EKG Unchanged,
Additional Comments: No changes from prior EKG performed 11/16/15

**Assessment**

**Assessments**
Calculus in bladder : chronic, not controlled (N21.0)
Decreased testosterone level : chronic, controlled (R79.89)
Encounter for immunization (Z23)
Encounter for prep procedural laboratory examination (Z01.812)
Type 2 diabetes mellitus : chronic, controlled (E11.9)

**Billing Detail**
Review and/or order of lab tests; Review and/or order of test in the medicine section of CPT

**Plan**

**Plan Details**

Pre-Procedure Exam for stone in bladder
- see scanned document, UCLA Health Preo-op, for additional information
- recieved pre-op paperwork by fax during visit
- EKG today unchanged from prior EKG
- labs ordered including CMP, CBC, Urine culture
- requested patient have most recent cardiology visit and stress test sent to our clinic for review.
Informed patient this paperwork is required prior to completion of his pre-op work-up being
completed.

**Diabetes**

COURI, JAMES, DOB: 04/04/1939; ID# ▓▓▓▓▓▓▓

- patient states controlled with lifestyle modifications
- will order A1c for monitoring today as last A1c was done over 3 months ago (7.5) and patient is no longer taking metformin

**Low Testosetrone**
- order Testosterone Injection and Testosterone level today for monitoring therapy

**Vaccination**
- Flu vaccine given today

**Lab Orders**
Complete Blood Count (CBC) (Resulted - Calculus in bladder; Encounter for preprocedural laboratory examination)
Complete Metabolic Panel (CMP) (Resulted - Calculus in bladder; Encounter for preprocedural laboratory examination)
Culture: Urine (Accessioned - Calculus in bladder, Encounter for preprocedural laboratory examination)
Hemoglobin A1C (Accessioned - Type 2 diabetes mellitus)
Testosterone, Total (Resulted - Decreased testosterone level)

**Procedure Orders**
EKG Routine w/Interp and Report (Performed - Encounter for preprocedural laboratory examination)
Depo Testosterone 200mg IM (Performed - Decreased testosterone level)

**Immunization Orders**
Flu vacc, split >4yrs, Preserv Free (Fluvirin) (Closed - Encounter for immunization)

**Preventive Care**
Immunizations : Recommended annual influenza vaccine

Patient Education: The patient understands and agrees with plan as discussed

Follow Up: Return to clinic prn

*[signature]*

Electronically signed by RITCHEY, JAMES C. on 11/23/2016 at 20:00

Cosigned by Montgomery, MD Anne on 11/25/2016 at 12:08

B



*Republican* *Senatorial*

*Medal of Freedom*

*NRSC Chairman*
Senator Bill Frist, M.D.

*Inner Circle Chairman*
Senator Sam Brownback

*Medal of Freedom Recipients*
Ronald Reagan
Margaret Thatcher
H. Norman Schwarzkopf

March 13, 2002

Mr. James C. Couri
Fl. 10
575 Madison Ave.
New York, NY  10022

Dear Jim:

I am proud to present you with the Republican Senatorial Medal of Freedom -- the highest and most prestigious honor the Republican members of the United States Senate can bestow on an individual.

The Republican Senatorial Medal of Freedom signifies that you stand apart from other Americans, and it is presented in recognition of your commitment to our Party and our nation. I should also note that this is the first presentation of the Republican Senatorial Medal of Freedom in nearly three years.

I truly wish I had the opportunity to present your Medal in person, because it would offer me the chance to convey my thanks, and those of all my Republican Senate colleagues, for your continued commitment to the values, principles and ideals we all share.

Through your support of the Republican Senatorial Inner Circle, you have stood by us in our legislative and political battles. When we faced our greatest challenges. you stepped forward to serve. And today, your help continues to play a critical role in our battle to return a Republican Majority to the U.S. Senate.

<u>Few Americans take on such responsibility or play such a personally active role in America's government.  Indeed. that is why you are one of only a few individuals in New York to be recognized as a Republican Senatorial Medal of Freedom recipient.</u>

It is a great honor for me to present you with this specially commissioned 2002 Medal of Freedom.  In recognition of this historic time in our nation's history, I had the ribbon on your Medal changed from its traditional royal blue to red, white and blue and I am pleased that the enclosed Medal bears the symbolic colors of our nation's flag.  Even if you are a past Medal of Freedom recipient, I think it's important for you to have this special edition Medal.

RONALD REAGAN REPUBLICAN CENTER

<u>WHO IS JIM COURI: Why was he involved in this Project? Take a Look</u>
<u>(By the way, Jim is not a lawyer)</u>



**Jim Couri**

## Introduction

Jim's background and life experiences caused him to decide to perceive and aid in the creation of this unique Website. Jim acted as a consultant to SCAMRAIDERS, working for one dollar a year and resigning in 2009, in order to help victims of all forms of scams, corruption, and fraud, by educating and using his life-training and personal 'messes' to assist our website. His input showed how to, and what to look for, and how to put a stop to abuse, fraud, tampering and cover-ups. Jim's goals encompassed unmasking the corrupt, the swindlers, the shady, including the malleable courts, corrupt lawyers, and the compromising of court officers, referees, judges, as well as the corrupting of any others in control of our destiny or our everyday lives. Jim believed 'scams' must be exposed and 'disrobed' for all to see, thus, SCAMRAIDERS.

## Boys From Brooklyn


Born in 1939, Jim lived in Bay Ridge, Brooklyn. Growing up he observed the political antics surrounding his father. From about age 5 from his home on Shore Road he saw it all. Jim's dad was an

important orchestrator of the Kings County Political Machine, then controlled by John R. Crews, the Boss Tweed of the 1940's. Crews ran the town, controlled courts, businesses, even gas rationing during wartime and virtually everything else including all


**Bill O'Dwyer**

political and judge appointments. Jim watched and listened to these maneuvers orchestrated by Crews and a kaleidoscope of others. Tom Dewey, Governor of New York; Leonard Hall, Republican National Chairman; L. Judson Morehouse, Republican State Chairman; William O'Dwyer, before, during and after becoming New York City Mayor; dozens of judges; Crews' ADC Tony Durso;


**John Crews, Center, with Gov. Tom Dewey**
Police Commissioners; and Marty Epstein;


**Len Hall**

New York State Liquor Chairman and many others. (These politicos met with Jim's dad at his home 3-4 times a week) Jim's father was soon to be Commissioner of US Customs compliments of President Eisenhower and Crews. When Crews spoke, all listened. Most judges even Mayors were beholden to Crews & Company. "From a court fix to a city contract to help with the Gambinos or Anastasia, Crews was the man to see." Jim took it all in.


## Roy M. Cohn and Pals


**Roy Cohn**

In 1957, when Jim was 18 years old, he met and became pals with Roy M. Cohn, at the fabled Stork Club in New York City, run by impresario Sherman Billingsley. Through Billingsley while at the Stork, Jim met and became a friend of Walter Winchell the celebrated columnist who made his night-time office at the Stork Club


**Cohn & McCarthy**

while preparing his power-house syndicated daily column for press. Jim often would sit with Winchell in the Cub Room at the Stork and absorb all of the 'goings on' and who Winchell was going to 'pick or pan'. Roy Cohn was already well known as Senator Joe McCarthy's aid and as a prosecutor, and by that time an attributed rival of now New York DA Robert Morgenthau, who still runs an unusually efficient law enforcement office in Manhattan. Roy and Jim remained pals until Roy died. Roy always said, "I don't need to know the case, I need to know the judge." Jim watched for years Roy dispense 'brown paper bags' to many at 60 Centre Street (Courthouse). Roy had more judges in his pocket than Don Corleone the Godfather. Critics of Roy Cohn's fault him for some of his reported activities, but Jim states that the judges on Roy's 'pad' were not forced to be bought. They wanted the money and dispensed their corrupt 'justice' grounded on their larceny and greed and to 'make their bones' for the 'old-boys' who put them in their robes in the first place. These judges and their 'sponsors' all paid homage to Roy at his annual birthday parties held usually in ballrooms in grand hotels in NYC. Jim saw firsthand how 'malleable' the New York Courts were by watching and listening to John R. Crews, Roy and others. Roy's


**Roy with Joseph McCarthy**

client list spanned from the Gambinos and John Gotti to the rich and famous.



**The Stork Club**

Jim traveled to the Unified New York Courts with Roy on numerous occasions when Roy was to argue clients' motions. Roy, revealed to Jim that, "this group in black robes have the integrity of a cobra farm". In any event, with great aplomb, Roy entered each



**From left: Billingsley, Winchell, Runyon**

courtroom crowded with other litigants (the 'brown bag' was previously in place). To the front of the line Roy strutted, and after greetings from the bailiff, "Good morning Mr. Cohn," blurted the justice.



**Walter Winchell**

When the sucker adversary began to dig in his heels -- as they say, money talks and BS walks --



**The Stork Club, NYC**

"No need to argue, I've read the papers, you will get my order in the mail" said the judge and onto the next court Jim and Roy went. Each was the same, except the judge was a different name, all recipients of Roy's 'Brown Bags'. Roy had no respect for the

Unified Court players because he was able to put them in his pocket and pay for the access. They took his money and when he got sick, they went after the hand that fed them.



**Sidney Korshak**

Through Roy and friends Jim met Sidney Korshak and Greg Bautzer, both Beverly Hills lawyers. Their M.O. was a west coast version of 'Citizen Cohn' in NYC. Korshak was the legal 'front' for 'the boys' in Vegas and also had many judges in LA in his pocket. What Jim did not learn from Roy, he learned from this guy.

## L Judson Morehouse Playboy Club Martin Epstein



**Jud Morehouse, far left**

By 1960 Jim's dad had become Commissioner of Customs appointed by President Eisenhower, thanks to Johnny Crews. His dad soon formed a business with L. Jud Morehouse, the Republican State Chairman who helped put Nelson Rockefeller into the governorship of New York. They had political connections 'ad nauseum'; opening doors for the many who needed and paid for "access", from



**Bill Zeckendorf**

Bill Zeckendorf on down. They selected crony Martin Epstein to become State Liquor Authority Chairman with the blessing of Crews. Marty was 'in like Flynn'. Soon Gay Bars in New York City, which had a 'lid' on them, proliferated and were run by Gambino and Genovese who were dancing in the streets thanks to Epstein's new tune.



**Jud Morehouse, 2nd from right**

When Hugh Heffner (Playboy Club) wanted a liquor license for the soon to open Playboy Club in NYC, 'Epstein to the rescue'.



**Hugh Heffner**

Epstein went to Jud, and a payoff was made. Enter Frank Hogan, then Manhattan District Attorney who bugged the Morehouse and Jim's dad's office, and opened a case on a "tip". All were called to the Grand Jury. Later Morehouse was tried and convicted, but before he served nary a day in the pokey, Nelson to the rescue and commuted Morehouse's sentence, Epstein got off also. Jim watched these acts of abuse of power and position as most courts sat on their hands. Yet again, Jim's father came out pure and clean.

## "Boy Wonder of Wall Street" Edward M. Gilbert



**Eddie Gilbert**



During 1975, Jim met Eddie Gilbert through Gilbert's daughter Robin. Eddie was a cunning, shrewd, yet likable fellow who, according to an analysis by famous lawyer Edward Bennett Williams Esq. who later represented Jim in this matter, said, "Gilbert can hide behind a corkscrew". Gilbert, aka Edgar Ginsberg, who had previously served time for a prior swindle, had a deal an hour. Gilbert offered one of his 'deals' to Jim and Johnny Revson of Revlon, a partner of Jim's at the time in an investment company. Sadly, Eddie had his own plans. While promoting



**Johnny Revson**

Conrac, a promising New York Stock Exchange listed Company to Jim and Revson, Gilbert was dumping the shares while artistically and cleverly manipulating the price. After a while, the SEC came calling. Jim went to Milton Gould Esq. of Shea Gould. This law firm was during the 1950's through the 1980's was one of the most formidable in New York. Gould saw a clandestine opportunity. Milton made a 'deal with the devil', and manipulated to secure Couri's testimony for the SEC, tank Gilbert, and get off the hook a few of his Shea-Gould cronies who were involved in another unrelated swindle. A scheme lawyers still do often: serve up a dope client to get off a bigger fish or even 'tank' a client for bigger bucks. Jim's SEC testimony lasting many days, became front page on the Wall Street Journal several times,                    and was a cornerstone of Gilbert's ultimate persecution by the US Attorney's office in New York. A careful analysis reveals that if it hadn't been 'perpetrator Gilbert', the Government

would never have become involved. The case was otherwise a pittance, but the powers at the US Attorney wanted to put Gilbert in the pokey. Why? Who knows? Politics once again? Or maybe because Gilbert was a 'bad guy' and a target. Jim retained Lawyer Edward Bennet Williams, and reluctantly became a key Government witness, entered a plea to a matched trade and false statement to a Bank (had he held out, the Prosecutor admitted later, Jim would have been given full Immunity). Jim testified against Gilbert for about 21 days straight in Federal Court SDNY.



**Floor of the New York Stock Exchange**

Gilbert was convicted on all counts. Jim successfully served a short probationary period and paid a fine of about $40,000. Jim learned how the Securities and Exchange Commission, the US Attorneys Office, and the Government functioned, front row. Gould surely sold Jim and Gilbert down the river, and Jim learned a valuable lesson. Don't trust any lawyer and "watch your pockets". Jim reports that Gilbert was a brilliant, resourceful man who wasted his, Jim's, and Revson's talents on Conrac activities. Since the Gilbert Case, or before it, Jim has never been charged with any criminal felony or misdemeanor, whatsoever.

**Single Parent**

After all of this, by about 1982, Jim confirmed that his then wife Carla was a chronic alcoholic. He also learned while he was seeking custody of his 6 year old daughter, the very US Attorney who Jim aided in the prosecution of Gilbert had recruited his sick wife. "Wired her up" to try and illicit various admissions from Jim. The absurd scheme failed. Jim then persevered and obtained sole custody of his daughter while before JSC Sandra Miller in White Plains, NY Unified Family Court. Jim explains that Judge Miller, now in the Appellate Division in Brooklyn, NY, exhibited a unique, fair and keen understanding; and after JSC Miller ordered about a dozen evaluations by psychiatrists, psychologists, etc. of Jim and his wife and child, the court issued an Order appointing Jim Sole Custodial Parent to care for his daughter. The 6 year old is now 30, has graduated high school, college, and obtained Masters Degrees, all with honors. Jim points out that are a few judges who really try to administer fair

and proper justice within a cesspool of injustice, bias, corruption, and greed. Roy Cohn's description that the Unified Court System is like a cobra farm seems to be right on the money.

## US Bankruptcy Judge Howard Schwartzberg



Jim in about 1990 was a large creditor of a Corporate Debtor. Another creditor attempted to buy the Estate of this debtor, which Jim opposed vigorously by oral argument before the Court. <u>Jim is not a lawyer.</u>



**U.S. Bankruptcy Court Building**

Judge Schwartzberg was impressed by Jim's legal presentations and tenacity and appointed him Trustee in the case (calling the non-lawyer appointment 'Sole Representative'). Jim learned how to write legal pleadings, litigate and make motion after motion, the foundation of Bankruptcy Litigation. After 4 years Jim secured about twenty fold, for the benefit of the Estate, of what it would have been sold for. This is where Jim learned how, as a non-lawyer, to write pleadings and argue motions, by trial, error, and persistence. Jim reports that Judge Schwartzberg was a superlative Justice, fair and unbiased, who has now passed away and who administered the Texaco bankruptcy case from beginning to end.



**Pro se Litigation**

Jim learned the ropes in the courthouse and used his tenacity and life-training to pursue his rights in various of his own court cases on his own behalf and as an assignee. He applied his knowledge of experiencing firsthand court antics, manipulation, corruption, and his ability to present facts in court formats. Armed with his storehouse of knowledge and facts spanning from John Crews, Roy Cohn and others from Brooklyn and NYC, Jim began to observe and assemble patterns of conduct perpetuated by lawyers, prosecutors, Courts, judges, referees and others involved in the court systems

and in law enforcement. It painted a picture that is not for the faint of



heart.  As an example, many lawyers deal in intimidation, tampering extortive acts, bribery, abuse and corruption. One lawyer, Jay Itkowitz, casually calls it "Gamesmanship". The name of the legal game is 'win at all costs and cheating in ok'.

As certain litigations developed Jim began, because of these experiences, to see curious patterns of bias, manipulation of facts, intimidation, and certain Courts ignoring Statutes, the law, due process, and worse. Many Courts at first perceived Jim as a "lowly pro-se" non-lawyer, who could be pushed around and manipulated, but he endured and watched and built an arsenal of data, of corrupt and suspicious activities, spanning from Westchester to Brooklyn and New York. The Courts and underlying evidence supports that litigants are being abused and manipulated and that the Courts are tainted. If you get to the right guy (an 'expediter', a 'rabbi', a 'facilitator', a 'Crews'), you own all of them as they are linked together like a chain gang. Remember, as Roy Cohn said, "I need only to know the judge." Sadly, most judges are stooges for the 'Machine'-the 'Old Boys' who put them in the 'black robes', and most have chosen 'the almighty buck instead of Almighty God'. After a few weeks of Judge School the new appointees are 'good-to-go' to their respective Courtrooms ready to follow the orders of the John Crews's of the day. Honor succumbs to greed and corruption. Jim is also quick to point out that while corruption is rampant in the New York Unified Courts, as he and others have documented for years, there have been and are many judges that are fair, just, and honorable, and who will not partake in these corrupt schemes. Jim confirms that the materials he has assembled comprise New York Unified Courts, and not Federal Courts where Jim has found thorough and correct administration. Regretfully a proper judge in State Courts usually succumbs, or end up like Serpico, the NYC cop who was almost murdered for 'blowing the lid' off NYC corruption during the 1950's.

**Value to Law Enforcement**

Over the past 30 years, Jim has also helped Law Enforcement and the Criminal Division of the Internal Revenue Service in developing and prosecuting numerous cases. During the 1980s, Jim aided in the development of the New York City Park Violations Bureau scandal, Bernard Sandow, Michael Burnett, Queens Commissioner Mannes and others. Jim uncovered along with others, the corrupt activities of Brooklyn's Surrogates Court and Judge Michael Feinberg and his "activities" with attorney Seth Rubenstein, and

others. Feinberg's bias ███████████ and corrupt decisions involving Jim and his Aunt's Estate, represented by Rubenstein, spawned Jim's interest. Feinberg was also coincidentally observed by Jim buying tens of thousands of dollars (cash) in fancy duds at Bergdorf-Goodman often weekly with a salesman who was a friend of Jim's. This conduct didn't help Feinberg, a now disbarred Judge, and a documented crook. Jim's activities also have aided the uncovering of corrupt lawyers engaged in criminal activities, bribery and even murder (i.e., Howard Krantz and Michel Burnet). Jim also uncovered and spawned a major Criminal Internal Revenue investigation into Leona Helmsley's Carlton House on Madison Avenue and 62nd Street where an illegal gambling casino was actively operating, day and night on the 9th floor of that building; and protected by Helmsley Enterprises' 'fancy', larcenous lawyers, and others being paid off to 'shut-up'. The CID of The Internal Revenue Service "staked-out" the gambling casino and the Carlton House for months based upon the information provided to them by Jim. Additionally, Jim has been involved in various other investigations and prosecutions involving the corrupt, scam-artists, tax evaders, and other wrongdoers; some are still active.

**Summary**

All of the foregoing forged Jim's unique insight into human

behavior ███████████ and its' frailties, even his own. Now age seventy, Jim has lived through tremendous life-lessons. In addition to the above, he started his work career at age 15 with a photography business. At about age 20, in 1959, after

working on Wall Street while attending Columbia University at night, Jim formed his own investment and consulting company. Jim was a founder of numerous companies, including during the 1960's creating and financing International Duty Free Corp and Duty Free International Corp, with his father. During his career



Jim                          has also been the recipient of many accolades, including the Senatorial Medal of Freedom, and the Republican Congressional Committee Medal of Distinction. Moreover, he has assisted in various forms of Tax Reformation. In 2006, Jim attended coordinated classes and became a Court Appointed Special Advocate (CASA), for the aid of foster children.

Currently, though fighting health issues, Jim's focus is keenly directed to "using my life experiences to assist and teach others", and to "bring to light and to eliminate the loopholes that have allowed corrupt activities, not just in the Courts, but wherever injustice flourishes; and to expose the unethical".



- James Couri Awarded Republican Senatorial Medal of Freedom
- James Couri Honored as 2006 Businessman of the Year
- James Couri Appointed to Congressional Business Comission
- New York Times Article
- James Couri Appointed to Presidential Business Commission

Letter of Appriciation from President Richard Nixon to Jim Couri



Letter to Congressman Tom Delay from Couri re: IRS/Debt Collection

*The Chairman and Executive Committee*

*hereby appoint*

## James Couri

*of*

## New York

*to the*

*Presidential Business*

*Commission*

*in recognition of extraordinary leadership and input in moving*

*the President's initiative forward and promoting a pro*

*business agenda in Washington.*



National Republican
Congressional Committee.

Majority Whip

9/9/81

Hon. Morris E. Lasker

   In the late spring of 1980, when the Government was in a position to obtain an indictment of Couri, Couri agreed to plead guilty and cooperate. A copy of his letter agreement, dated June 18, 1980, is submitted herewith as Exhibit A.

   Cooperation. Couri's cooperation with this Office has been extensive and of great value to law enforcement. In anticipation of testifying in the grand jury and in two trials, he has given a tremendous amount of time on weekdays, weekends and evenings. He has endeavored, we believe successfully, to testify truthfully and to the best of his ability. Virtually every important aspect of Couri's testi- mony has been corroborated in great detail, by reference to testimony of other witnesses or to myriad trading records and other documents. In the trial of Edward Gilbert, Couri testified for slightly more than five days. In the subsequent trial of John Revson and Ludwig Caerhat (Gilbert's principal broker), Couri testified for more than ten days. As noted above, Gilbert was convicted and sentenced to four years imprisonment. Revson and Caerhat were acquitted. Despite grueling, hostile and at times perhaps abusive cross-examina- tions,* in the Government's view, Couri did his best to answer each question properly and accurately. In short, Couri's cooperation in the Conrac case has been excellent, though it has been taxing in terms of the pressures it has imposed on him.

EXCERPT

* It should be noted, however, that the cross-examina- tions in the Revson trial were made more difficult for Couri

                    Respectfully submitted,

                    JOHN S. MARTIN, JR.
                    United States Attorney

                    By: _____
                    JEFFREY E. LIVINGSTON
                    Assistant United States Attorney
                    Telephone: (212) 791-0047

cc: Williams & Connolly



U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

ZWC:VC:RAN
F.# 9502897
couri1.ltr

*United States Courthouse*
*225 Cadman Plaza East*
*Brooklyn, New York 11201*

October 27, 1995

Mr. James Couri
The Couri Group
575 Madison Avenue
New York, N.Y. 10022

Re:    United States v. Burnett
       No. 95 CR 272 (JG)

Dear Mr. Couri:

This letter is to confirm the substance of our telephone conversation of earlier this morning. As I informed you, Mr. Valenti, an investigator for this office, contacted you because, at the time of the arrest of Howard Krantz, your client file at Mr. Krantz's office was turned over to government investigators and became the subject of scrutiny by me as the Assistant U.S. Attorney assigned to determine what portion of the Krantz files were subject to disclosure to the government and counsel for Mr. Krantz's co-defendants because of their relevance to the above-referenced case and because of their exclusion from the protection of the attorney-client privilege. Some information in my possession suggested that your file might be subject to disclosure.

I appreciate your diligence in responding to Mr. Valenti's message by calling this morning. Further, I wish to thank you for your willingness to discuss with me the circumstances of your association with Mr. Krantz. Based on your representations to me and on further inquiries by me to the Assistant U.S. Attorney Margaret Giordano and the case agents, I have concluded that there is no reason why your file should not be subject to the continued protection of the attorney-client privilege. As a consequence, I am recommending to the Court that the contents of that file not be disclosed to counsel for the government and for Mr. Krantz's co-defendants at this time. Mr. Krantz, of course, has the right to review the file. Despite your assent to the disclosure of the letter alluding to Michael Burnett, dated September 14, 1990, which I read to you in relevant part, I am recommending that all of the contents of the file remain private unless you make an explicit request to the contrary.

2

I have requested leave from the Court to disclose your address and telephone number to Ms. Giordano and the case agents from this office and to counsel for Mr. Krantz's co-defendants, including Mr. Burnett, based on your candid disclosure of your contact with Mr. Shargel's office. If you have any objection to such a disclosure, please advise me accordingly. Furthermore, if you have any additional questions regarding this matter, please feel free to call me.

Thank you.

Respectfully submitted,

ZACHARY W. CARTER
United States Attorney

By: Ruth A. Nordenbrook
Ruth A. Nordenbrook
Senior Litigation Counsel

cc: The Honorable John Gleeson



COUNTY OF NEW YORK
ONE HOGAN PLACE
New York, N.Y. 10013
(212) 553-9000

BERT M. MORGENTHAU
District Attorney

May 3, 1984

Mr. James C. Couri

122 East 42nd Street
New York, NY 10168

        Re:  People v. Gregory Hipps
             Ind. No. 5114/83

Dear Mr. Couri:

        On December 6, 1983 the defendant pleaded guilty to the crime of Burglary in the Third Degree. He was sentenced on January 24, 1984.

        Your cooperation was very important to the successful prosecution of this case and I would like to thank you on behalf of this Office and the citizens of the community.

        Assistant District Attorney Karen Greve was in charge of the prosecution of this case. If you have any questions concerning this case, or if you need any further assistance, you may contact the Witness Aid Services Unit (553-9478) or Assistant District Attorney Greve (553-9506).

                    Very truly yours,

                    Robert M. Morgenthau

                    Robert M. Morgenthau



# THE WALL STREET JOURNAL

© 2001 Dow Jones & Company. All Rights Reserved

## IRS Mulls Using Debt Collectors for Back Taxes

Via Fax: 202-225-5241

May 21, 2001

Congressman Tom DeLay
House Majority Whip
US House of Representatives
Washington, D.C.

Dear Congressman:

As you know I am a member of the Republican Senatorial Inner Circle and I also serve as a member of the Business Advisory Council.

I write to you to respectfully share with you certain interesting aspects in that I became apprised of a few years ago, that if accurate, can have a significant and positive impact upon the Republican agenda towards lower taxes and prosperity.

Some time ago I became acquainted with a Special Agent in the Criminal Investigation Division of the Internal Revenue Service, located in Brooklyn, New York, who was at the time engaged to social friend.

During a number of social conversations with this Special Agent, I learned that there were, according to this Special Agent, hundreds of millions of dollars in uncollected federal tax judgments against multitudinous corporations and individuals, held by the IRS, that at the time, no significant effort was being made by the IRS to effect collection. Upon my further questioning this Special Agent, he further revealed to me that in his district, there simply was not enough qualified manpower in order to properly, or at all, pursue collection or settlement of these uncollected judgments, etc.

Being curious, I queried other Agents in the Brooklyn, NY District with whom I became acquainted. They all further confirmed this curious situation.

Accordingly, it might be a meaningful effort for you to cause a careful and independent review of this circumstance, as if this information is correct, the negotiation and collection of some or all of these judgments, and collection of significant windfall of revenue, and as a result could further help in aiding in the important tax reform effort.

Accordingly, if you wish any further information regarding the above matters, please do not hesitate communicate with me.

With best regards.

Respectfully,

[signature]

JCC:vec



CASA FOR RIVERSIDE COUNTY, INC.

COURT APPOINTED SPECIAL ADVOCATES

This certificate is awarded to

*James C. Couri*

Has successfully completed training for appointment as a
Court Appointed Special Advocate
to represent the best interest of abused and neglected children in the juvenile court.

Courtkainer Robert Nigby

Marc Harpert, Executive Director

10/28/06

10/24/06
10/28/06



July 20, 1970

Dear Mr. Couri:

The enclosed memento from President Nixon
and me is a token of our appreciation for
your service to the Nation.

We felt that nothing could be a more
fitting expression of our gratitude than
this philatelic portrayal in honor of the
historic Apollo XI moon landing one year
ago today.

With warm regards, I am

Sincerely,

Winton M. Blount

Mr. James C. Couri
122 East 42nd Street
New York, New York

# Certificate of Merit

**B**e it known to all who bear witness that
This highest honor which may be bestowed by
The RNC Presidential Victory Team has been awarded to

## Mr. James Couri

A recognized leader in
**New York**
on this
29th day of November
in the year 2002

for

## Dedication, Sacrifice and Commitment

To the Republican Party and GOP candidates at all levels of government.



Fred Meyer
Chairman, RNC Presidential Victory Team

George W. Bush

C

**Kroll**
The Kroll Consulting Company

TO:        James Couri

FROM:      Kroll Associates

SUBJECT:   Dr. John W. Siebert

DATE:      October 19, 2001

Kroll Associates was retained to conduct an asset search of Dr. John W. Siebert. The objective of the investigation is to identify any undisclosed assets held by this individual, including real estate, automobiles, boats, aircraft, securities, and other businesses. This report summarizes the main findings of the investigation to date.

*This report is strictly confidential and is intended solely for the private and exclusive use of personnel of The Couri Group, Inc.*

## DESCRIPTION OF THE INVESTIGATION

The investigation was comprised of a search of local, national and industry media sources, a nationwide database search of corporate records and d/b/a listings, and an on-site investigation of public records in the appropriate jurisdictions of New York and Connecticut. The on-site field investigation was conducted in the following locations:

- **New York**
  U.S. District Court for the Southern District of New York (civil and criminal indices)
  U.S. Bankruptcy Court for the Southern District of New York
  Supreme Court of the State of New York, New York County
  Manhattan Civil Court

  **Connecticut**
  U.S. District Court, District of Connecticut
  U.S. Bankruptcy Court, District of Connecticut
  Stamford-Norwalk Superior Court

Securities & Exchange Commission records were also searched for any actions. None were found.

CONFIDENTIAL



*Property*

**799 Park Avenue**
**New York, NY 10021**

New York County property records showed that 799 Tenants Corp. owns this building where Siebert has his office. The building is 21 stories tall with 79 units and the land use is described as an "elevator cooperative." In 2000, the total market value was $15,500,000 and the total assessed value was $6,975,000.

**14 Pecksland Road**
**Greenwich, Connecticut 06831**

Fairfield County property records showed that Siebert bought this single-family house on September 2, 1993 for $1,725,000. He received a mortgage from Emigrant Savings Bank for $1,550,000. The due-date was October 1, 2023. On January 31, 1995, Siebert received a non-purchase money mortgage from Champion Mortgage Company for $147,000. The due date was January 2010.

The records also showed that on August 1, 1997, John W. Siebert and his wife Kimberly A. Siebert sold this house to Robert B. Calhoun, Jr. and Jean N. Calhoun. The sale price was $2,000,000. Edmund M. Carpenter and Mary L. Carpenter currently own the house.

**56 Clapboard Ridge Road**
**Greenwich, Connecticut 06830**

Fairfield County property records showed that John W. Siebert and Kimberly A. Siebert bought this single-family house from Anthony T. Cope, Steven Vollweiler, Peter E. Spreadbury, and Diane C. Spreadbury, trustees. The date of the sale was August 29, 1997 and the sale price was $5,200,000. A note to the mortgage deed indicates that the Siebert's received a loan from Frank J. Gilbride II for $3,500,000 (see Appendix B) and another loan from Anthony T. Cope, Steven Vollweiler, Peter E. Spreadbury, and Diane C. Spreadbury, trustees, for $1,180,000 (see Appendix C). The due date on the $3,500,000 loan was August 29, 1999. The due date on the $1,180,000 loan was February 28, 1999.

Mortgage records for Fairfield County showed the following:

    **Bank Audi**
    On December 15, 1997, Siebert received a $2,500,000 non-purchase money mortgage from Bank Audi. The due date was December 15, 2002 (see Appendix D).

    **First Union**
    Fairfield County property records also showed that on February 9, 2000, the Sieberts borrowed $900,000 from First Union National Bank. The due date on the promissory note was February 9, 2001. (see Appendix E)

3
CONFIDENTIAL



On April 7, 2001, the Sieberts borrowed an additional $904,500 from First Union National Bank, but this loan was from a different branch. The due date was July 7, 2001. (see Appendix G)

**Fleet Bank**
Fairfield County mortgage records showed that on October 19, 1998, Siebert received a non-purchase money mortgage from Fleet Bank for $5,015,000. The due date was November 1, 2028. (see Appendix F)

**Frank J. Gilbride II, Trustee**
Mortgage records from Fairfield County showed that on December 19, 1997, the Sieberts received a loan from Frank J. Gilbride, II, trustee in the amount of $2,225,000. The maturity date was February 19, 1999. The mortgage was discharged by Gilbride on October 16, 1998. (see Appendix H)

Fairfield County property records showed that on February 28, 2001, the Siebert's conveyed the house at 56 Clapboard Ridge Road to Thomas P. Spellane, who was the trustee of the 56 Clapboard Ridge Road Trust. The Siebert's claimed that no tax was due because the conveyance was exempt under Connecticut law. Spellane is a member of the firm Gilbride, Rusa, Last & Spellane in Greenwich. (see Appendix I)

On May 3, 2001, Thomas P. Spellane, as trustee of the 56 Clapboard Ridge Road trust, sold the house to Mark E. Jennings and Lisa Jennings for $6,700,000. (see Appendix J)

45 William Street
Greenwich, Connecticut 06830

This is John W. Siebert and Kimberly A. Siebert's current address, but they do not own the property. Fairfield County property records showed that Sir Williams Court, LLC owns the house. The mailing address of Sir Williams Court, LLC is care of Gilbride, Tusa, Last, Spellane LLC in Greenwich, Connecticut.

*Litigation*

*Richard Jacobs vs. John Siebert*
Court:        Stamford Superior Court
Case#:        CV010185788S
Date Filed:   September 17, 2001
According to the complaint, on January 12, 1999, Siebert entered into a promissory note to borrow $400,000 from Jacobs. The due date on the loan was February 27, 1999. The complaint stated the loan taken by Siebert was for "contractual obligations undertaken for business purposes. The transaction was not a consumer transaction." According to the complaint, Jacobs asked for payment, but Siebert failed to make payments. Jacobs then filed a lawsuit in Cuyahoga County Court of Common Pleas in Cleveland, Ohio. On April 26, 2001, the court entered a

**Kroll**
The Risk Consulting Company

judgment in Jacobs' favor and awarded him $400,000 plus 10% post-judgment interest. Jacobs filed this action in Connecticut to enforce the judgment. The matter is pending.

No mention was made of Siebert's Connecticut-based counsel. He was represented in Cleveland by Alan P. Digirolamo of Buckingham, Doolittle & Burroughs.

In New York, Dr. Siebert has been involved in the following medical malpractice cases:

*Nancy Kenny vs. John Siebert, M.D., Charles H. Thorne, M.D., Lawrence Brecht, M.D., and New York University Medical Center*

| | |
|---|---|
| Court: | New York County Supreme Court |
| Case #: | 109604-1998 |
| Date Filed: | December 22, 1998 |
| Status: | Active |

*1*

*George Cueter vs. John W. Siebert, M.D.*

| | |
|---|---|
| Court: | Kings County Supreme Court |
| Case #: | 018260-1998 |
| Date Filed: | October 7, 1998 |
| Status: | Disposed on March 12, 1999 |

*2*

*Barbara Paolucci vs. John Siebert, M.D. and NYU Medical Center*

| | |
|---|---|
| Court: | Kings County Supreme Court |
| Case #: | 048282-1997 |
| Date Filed: | July 16, 1998 |
| Status: | Disposed/Motion Pending |

*3*

*Roshan Aliza vs. John Siebert, M.D., P.C., New York University Medical*

| | |
|---|---|
| Court: | New York County Supreme Court |
| Case #: | 100557-1997 |
| Date Filed: | January 10, 1997 |

*4*

*Grey Jeryl, John Siebert, P.C., and Weinhouse vs. NYC Medical Center*

| | |
|---|---|
| Court: | New York County Supreme Court |
| Case #: | 100247-1997 |
| Date Filed: | January 6, 1997 |

*5*

*Ann Addiego, et. al. vs. American Hospital Supply Corp., et al., including New York University Medical Center and John A. Siebert*

| | |
|---|---|
| Court: | New York County Supreme Court |
| Case #: | 115890-1995 |
| Date Filed: | June 23, 1995 |

*6*

The middle initial "A" is a typo. This case involved breast implants.

5
CONFIDENTIAL



*Eva Friedlander vs. Applied Silicone Corp., et al., including Dow Chemical Co., Down Corning Wright NY University Medical Center ad John A. Siebert, M.D.*

Court:       New York County Supreme Court
Case #:      119385-1993
Date Filed:  January 7, 1994
Status:      Active

The middle initial "A" is a typo. This case involves breast implants. The case was first transferred to the U.S. District Court for the Southern District of New York and then transferred to the U.S. District Court for the Northern District of Alabama. The Alabama court then sent the case back to New York. The case was closed on November 30, 2000.

*Patricia Akromas, et al. vs. Dow Corning Corporation and John W. Siebert, et. al.*

Court:       New York County Supreme Court
Case #:      033649-1992
Date Filed:  January 7, 1994

*Raysa Ofer and Moshe Ofer vs. John W. Siebert, M.D., New York University Medical Center, et al.*

Court:       New York County Supreme Court
Case #:      033648-1992
Date Filed:  April 22, 1993
Status:      Disposed on May 29, 1997

*Richard Landolfi vs. N.Y.C. Health and Hospitals Corporation, Staten Island University Hospital, et al., including John Siebert*

Court:       New York County Supreme Court
Case #:      032646-1992
Date Filed:  December 11, 1992
Status:      Disposed on December 7, 1998. Verdict for defendant.

*Howard Levine and Carol Levine vs. New York University Medical Center, et al., including John Siebert*

Court:       New York County Supreme Court
Case #:      009645-1992
Date Filed:  December 9, 1992
Status:      Disposed on December 3, 1993. Settled in preliminary conference.

*Barbara Sullivan vs. New York University Medical Center and John W. Siebert, M.D.*

Court:       New York County Supreme Court
Case #:      020755-1991
Date Filed:  September 25, 1991
Status:      Disposed on March 8, 1995. Verdict of defendant.

CONFIDENTIAL

## Liens & Judgments

| | |
|---|---|
| Court: | Greenwich Town Clerk |
| Debtor: | John W. Siebert and Kimberly A. Stewart |
| Creditor: | Internal Revenue Service |
| Amount: | $371,903.42 |
| Number: | 60183193 |
| Date Filed: | June 5, 2001 |
| Status: | Paid as of August 1, 2001 |

| | |
|---|---|
| Court: | New York County Clerk |
| Debtor: | Barbara Sullivan |
| Creditor: | John Siebert |
| Amount: | $950 |
| Number: | 20755/91 |
| Date Filed: | April 3, 1995 |

| | |
|---|---|
| Court: | Monroe County, Pennsylvania Prothonotaries' Office |
| Debtor: | Jean M. Orleski |
| Creditor: | John W. Siebert, M.D. |
| Amount: | $3,537 |
| Number: | 65B-1994 |
| Date Filed: | March 17, 1994 |

| | |
|---|---|
| Court: | Manhattan Civil Court |
| Debtor: | Myrna Tasman |
| Creditor: | John W. Siebert |
| Amount: | $4,965 |
| Number: | 6001890 |
| Date Filed: | March 25, 1991 |
| Status: | Paid as of August 18, 1994 |

### Uniform Commercial Code Filings

| | |
|---|---|
| Debtor: | John W. Siebert |
| Secured Party: | Benjamin Ossman |
| Number: | 01PN37971 |
| Date Filed: | September 25, 2001 |
| Collateral: | Cooperative Shares |
| Status: | Initial Filing |

NoTE
Secured UCC current
UCC attached
here from
NY Dept State

7

**CONFIDENTIAL**



**Kroll**
The Risk Consulting Company

| | |
|---|---|
| Debtor: | John W. Siebert, M.D., P.C. |
| Secured Party: | RW Professional Leasing Services |
| Number: | 01120066 |
| Date Filed: | June 21, 2001 |
| Collateral: | Computer Equipment |
| Status: | Initial Filing |

| | |
|---|---|
| Debtor: | John W. Siebert, M.D., P.C. |
| Secured Party: | Fidelity Leasing |
| Number: | 01090816 |
| Date Filed: | May 10, 2001 |
| Status: | Initial Filing |

| | |
|---|---|
| Debtor: | John W. Siebert, M.D., P.C. |
| Secured Party: | RW Professional Leasing Services, People's Bank (assignee) |
| Number: | 01PN21878 |
| Date Filed: | May 7, 2001 |
| Collateral: | Equipment |
| Status: | Continuation |

| | |
|---|---|
| Debtor: | John W. Siebert, M.D., P.C. |
| Secured Party: | Citibank Small Business Lending Corporation |
| Number: | 01PN16015 |
| Date Filed: | April 3, 2001 |
| Collateral: | Accounts |
| Status: | Initial Filing |

| | |
|---|---|
| Debtor: | John W. Siebert, M.D., P.C. |
| Secured Party: | Citibank Small Business Lending Corporation |
| Number: | 01060673 |
| Date Filed: | March 29, 2001 |
| Status: | Initial Filing |

| | |
|---|---|
| Debtor: | John W. Siebert, M.D., P.C. |
| Secured Party: | Republic Leasing |
| Number: | 01PN00640 |
| Date Filed: | January 5, 2001 |
| Collateral: | Equipment |
| Status: | Initial Filing |

| | |
|---|---|
| Debtor: | John W. Siebert, M.D., P.C. |
| Secured Party: | Republic Leasing |
| Number: | 00246839 |
| Date Filed: | December 26, 2000 |
| Status: | Initial Filing |

8

CONFIDENTIAL

A

B

(

Debtor:              John W. Siebert, M.D.
Secured Party:       Citibank Vendor Finance, Inc.
Number:              00PN60821
Date Filed:          December 14, 2000
Collateral:          Equipment
Status:              Initial Filing

Debtor:              John W. Siebert, M.D.
Secured Party:       Citicorp Vendor Finance, Inc.
Number:              00235938
Date Filed:          December 8, 2000
Status:              Initial Filing

Debtor:              John W. Siebert, M.D.
Secured Party:       Citibank, N.A.
Number:              00PN57456
Date Filed:          November 21, 2000
Collateral:          Equipment
Status:              Continuation

Debtor:              John W. Siebert, M.D., P.C.
Secured Party:       Keybank National Association
Number:              99PN01678
Date Filed:          January 13, 1999
Status:              Initial Filing

Debtor:              John W. Siebert, M.D., P.C.
Secured Party:       Keybank National Association
Number:              99006441
Date Filed:          January 11, 1999
Status:              Initial Filing

Debtor:              John W. Siebert
Secured Party:       Chase Manhattan Bank
Number:              98PN53786
Date Filed:          October 9, 1998
Collateral:          Cooperative Shares
Status:              Continued

Debtor:              John W. Siebert
Secured Party:       Chase Manhattan Bank
Number:              98PN50766
Date Filed:          September 23, 1998
Collateral:          Cooperative Shares
Status:              Initial Filing

9
CONFIDENTIAL

**Kroll**
The Risk Consulting Company

| | |
|---|---|
| Debtor: | John W. Siebert, M.D., P.C. |
| Secured Party: | Citibank N.A. |
| Number: | 97PN06719 |
| Date Filed: | February 12, 1997 |
| Collateral: | Equipment |
| Status: | Continuation |

| | |
|---|---|
| Debtor: | John W. Siebert, M.D. |
| Secured Party: | Citibank, N.A. |
| Number: | 97023883 |
| Date Filed: | February 4, 1997 |
| Status: | Continuation |

| | |
|---|---|
| Debtor: | John W. Siebert |
| Secured Party: | Citibank, N.A. |
| Number: | 95PN54508 |
| Date Filed: | December 20, 1995 |
| Status: | Continued |

| | |
|---|---|
| Debtor: | John W. Siebert and Kimberly A. Siebert |
| Secured Party: | Chemical Bank |
| Number: | 93PN53336 |
| Date Filed: | October 27, 1993 |
| Collateral: | Cooperative Shares |
| Status: | Continued |

| | |
|---|---|
| Debtor: | John W. Siebert and Kimberly A. Siebert |
| Secured Party: | Chemical Bank |
| Number: | 93PN53337 |
| Date Filed: | October 27, 1993 |
| Collateral: | Cooperative Shares |
| Status: | Continued |

| | |
|---|---|
| Debtor: | John W. Siebert and Kimberly A. Siebert |
| Secured Party: | Citibank, NA |
| Number: | 93TN02207 |
| Date Filed: | March 10, 1993 |
| Collateral: | Cooperative Shares |
| Status: | Terminated |

| | |
|---|---|
| Debtor: | John W. Siebert |
| Secured Party: | Benjamin Ossman |
| Number: | 93026423 |
| Date Filed: | February 5, 1993 |
| Status: | Initial Filing |

CONFIDENTIAL

**Kroll**
The Risk Consulting Company



| | |
|---|---|
| Debtor: | John W. Siebert |
| Secured Party: | Benjamin Ossman |
| Number: | 93PN05643 |
| Date Filed: | February 3, 1993 |
| Collateral: | Accounts |
| Status: | Initial Filing |

| | |
|---|---|
| Debtor: | John Siebert, M.D. |
| Secured Party: | Citibank NA |
| Number: | 92086045 |
| Date Filed: | April 29, 1992 |
| Status: | Initial Filing |

| | |
|---|---|
| Debtor: | John Siebert, M.D. |
| Secured Party: | Citibank, NA |
| Number: | 91046121 |
| Date Filed: | March 7, 1991 |
| Status: | Terminated |

| | |
|---|---|
| Debtor: | John W. Siebert, M.D. |
| Secured Party: | Benjamin Ossman |
| Number: | 91075142 |
| Date Filed: | April 15, 1991 |
| Status: | Initial Filing |

CONFIDENTIAL

D

A-452

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------X

JAMES COURI,

                     Plaintiff,

       --against--

JOHN SIEBERT, JOHN SIEBERT, MD, PC

                    Defendants.

-------------------------------------------------------------X

AFFIDAVIT IN
SUPPORT OF MOTION

INDEX: 107240/04

STATE OF NEW YORK    )
                      : ss.:
COUNTY OF NEW YORK   )

    I, James Couri, being duly sworn, deposes and says:

1.    I make this Affidavit in Support of this Motion.

2.    I am pro se and suffer from serious medical issues (see Exhibit I, collectively). I suffer from cancer (Level 5, stage 3 melanoma) for which I am undergoing surgery on or before mid-June 2008 for removal of three growths in my chest. I also have severe and chronic cardiac disease. I have undergone multiple surgeries for cancer and heart disease and am scheduled for open heart surgery, if I can sustain it following evaluation (see Exhibit I). My doctor's Affirmations disclose that I am not to engage in stressful acts which can be life-threatening. I will be in treatment for the next several months as well.

3.    I therefore request that due to my grave medical condition, and the fact that I am Pro Se, all of these proceedings be stayed until my medical condition permits me to proceed. I am Pro Se and of necessity not desire as I do not have adequate funds to retain counsel. My cancer condition and cardiac issues must be resolved in order to permit me to engage in this bitterly contested matter. Notwithstanding the foregoing, I have attempted to withstand the onslaught of the despicable conduct of defendants' and Joe Burke's violation of law, fraud, perjury and misuse of my files to commit tax evasion. Now I am subjected to a series of bizarre events emanating from Referee Jack Suter (Suter) which are not only alarming, but divisive, and look like a

A-453

scheme to hijack my rights and documented money due me and deprive me of my rights under the law and the Constitution of the United States. Suter's acts and verbal assault displays bias, prejudice and failure to discharge his administrative responsibilities fairly and competently.

4.    JSC Stallman directed all disclosure in this case to Referee Suter in an Order issued January 14, 2008.

5.    Suter, although asked by Plaintiff, has steadfastly refused to even conduct a conference call, or a face-to-face meeting, directing defendants to produce documents as ordered by JSC Stallman (Exhibit A), Referee B. Fields (Exhibit B), JSC Heitler (Exhibit C), over the past *eighteen months*, thereby systematically depriving Couri of due process, legitimate disclosure, and as demanded by Couri as far back as *October 2004*.

6.    Suter was recently directed by the Court to open and inventory tax returns produced by IRS and NYS Disclosure to Couri, per Authorizations, and delivered by the IRS and NYS Disclosure, directly to the Stallman Court for Couri. On May 21, 2008, Plaintiff and Joe Burke (lawyer for Siebert) appeared at Office of Referee Suter at 80 Centre Street, Room 472, and all such production was inventoried (in bulk) by Suter, in full compliance by Couri with the Court's Order. Noteworthy, this was the result of the third group of Authorizations, produced by Couri and a duplication of most of the tax returns produced by Couri in 2006.[1] The tax returns were not reviewed in detail by Referee Suter or Couri. Referee Suter simply counted same and identified the year and taxpayers. All were in order and in compliance with the Court Order of January 14, 2008.

7.    Referee Suter, on Couri's application to return the original tax returns to Couri, refused. After discussion, Referee Suter gave the original returns to Burke to copy forthwith and return the tax returns to Couri, on or about May 23, 2008. Burke agreed and Referee Suter again, over Couri's objection, removed Couri's returns from Referee Suter's possession. Evidence reveals

---

[1] The May 21, 2008 appearance was originally scheduled for May 14, 2008, but due to cancer testing, Couri requested an adjournment. Suter refused at first (in an abusive manner) and only after Couri called Chambers did Suter relent.

-2-

A-454

that Burke and Siebert have previously tampered with Plaintiff's files and records, thus the opportunity has been created now allowing for the altering, tampering and doctoring of these tax returns prior to Plaintiff Couri's having the opportunity to review them in detail before turning them over to anyone.

7. Burke faxed to Couri on May 22, 2008, stating that the copies were being made (Exhibit E), and that the Kinko cost was $100.00, later amended to $800, then in-house copies. Couri agreed. Since that time to the present (June 3, 2008), no returns have been returned, although I called and faxed Burke on a number of occasions (Exhibit D, collectively). No production has been received, as promised. I advised Referee Suter of these defaults, but he has refused and failed to intervene (Exhibit F). In fact, Suter sarcastically mocked my request.

8. Finally, on May 30, 2008, I called Referee Suter to request a conference call so that Referee Suter would direct Burke's compliance. At approximately 2:00 P.M. on May 30, 2008, I called Referee Suter who answered his phone and the following conversation was transcribed.

Couri:      Hello, Referee. It's Jim Couri.

Suter:      Yes, what can I do for you?

Couri:      Well, Burke has not returned my tax returns as you ordered and promised by May 23, 2008 and now it's May 30, 2008.

Suter:      Well, why do you want them?

Couri:      What do you mean? They are my returns and you directed them returned to me.

Suter:      Go to the IRS and get them. You can do that.

Couri:      Sir, this was not the proposition. I am entitled to my returns. Why should I go to the IRS again for my returns.

Suter:      Look. Your Complaint was thrown out. Why don't you pay this guy some money so he will leave you alone.

Couri:      My Complaint was struck by the Appellate Division on the false representation I did not produce tax returns, which I had done, but the Appellate Division was misled. It has been cured now, all returns have again been produced, and the striking of my Complaint was without prejudice, not with an Order of finality and not on Merits.

-3-



A-455

After extensive research as to case law and CPLR 205(a) and *Deluxe v. Sottile*, I found I was within my rights to file a new action, based upon the same transactions and claims. I also filed another case on an Agreement between Siebert and me individually (October 8, 2003) for fees due me and as yet unpaid. In sum, the Appellate Division Order did not bar commencement of second action, as there was no preclusion.

Suter:      Ha! Ha! Ha! You're all wrong. You're out. You're finished. It's up to me to decide this and I say you're out and finished. Forget it. Stop the BS. Pay the guy something. You have plenty of money. Your suit is worth more than my whole closet and your haircut is expensive. Pay the guy to get off your back.

Couri      Sir, your comments are shocking and revealing. This is outrageous. Siebert owes me a fortune for signed defaulted notes, over six Settlement Agreements, Releases, Guarantees, and never complained until he repeatedly defaulted. When I sued, he asserted bogus counterclaims. You're telling me that CPLR 205 and case law doesn't matter, and that I should be defrauded out of my legitimate claims, so that Burke will get off my back. I won't be shaken down or extorted by these crooks and I won't be swindled either.

Suter:      Look. You may be judgment proof but Burke will chase you and make you miserable and sicker than you are. Pay him something. You've got money. PAY HIM SOMETHING SO HELL. GO AWAY!

Couri:      Sir, I took an assignment from the companies involved that Siebert owed money to because we had no money to pay lawyers. If I had the money, do you think I would be pro-se. We would have a lawyer. Your comments are absurd and bizarre.

            I'll pay him zero, not a red cent. Siebert owes me and will pay me all he owes me. This conversation is outrageous. I have been financially ruined by this crook, Siebert. I may be judgment proof but not by design, but because I am broke. The fact I have a nice suit is no criteria to be extorted. I have admitted to and documented claims, evidenced by Siebert's admissions, settlement agreements, releases, notes and other commitments. Siebert has nothing except smoke and mirrors, hersay and outright fraud. His counterclaims have been released also.

Suter:      Look. Had crooks can win. Don't you get it.

Couri:      Yes, I get it. Am I a victim of a fix, or scheme?. Maybe this will be exposed. You may be surprised. I see now what is up here more clearly. Thanks.

Suter:      I have to go. [HANGS UP]

9.      After consulting with two attorneys and reporting the foregoing, I called Referee Suter back and left a message on his voice mail telling him: (a) that his comments about the reinstatement of my Complaint is wrong, and (b) his comments are violative of law and my civil right to due process, etc.

-4-

A-456

10.   I forwarded Referee Suter the following e-mail (Exhibits G and H).

11.   Meanwhile, Referee Suter has refused to direct Burke to return my tax returns, which I am now
forced to spend additional sums to obtain true copies from the IRS and NYS Disclosure.

12.   Accordingly, this type of activity, abusive and threatening remarks, and conduct from a Court
Referee is unfair, unfounded, shocking, and deprives me of enforcing my rights and collecting
money agreed to by Siebert *ad nauseam*. It is also a bizarre and alarming display and cannot be
condoned from a court officer. Why I am being targeted is most curious, but Referee Suter's
comments reveal highly irregular undercurrents and bias, at best, and mandate his removal from
this matter forthwith, and an inquiry as to how and why I am being disenfranchised from
money due to me pursuant to Agreements, notes and other documented obligations, signed by
Siebert and his PC.

## ADMISSIONS AFFIRMING PLAINTIFF'S CASE AND ESTABLISH DEFENDANTS' COUNTERCLAIMS ARE FALSE, RELEASED & WITHOUT LEGAL FOUNDATION

13.   On May 5, 2008, Plaintiff served on Burke by FedEx "Request for Admissions" per CPLR
3123. On May 6, 2008, Plaintiff served by Hand on Burke "Request for Admissions" (Exhibit
J, collectively). Response denying the genuineness or efficacy of the documents (151) in the
request was required within 20 days (i.e., by May 26, 2008). Although demanded and
promised, defendants failed to timely, or at all, deny or object under oath as required by CPLR
3123 (a)(b)(c).

14.   Accordingly, all documents scheduled and exhibited (see Exhibit J) are undisputed per CPLR
3123 and admitted, including but not limited to Releases, Settlement Agreements, Notes,
Guarantees and other obligations, duly executed by Siebert and Siebert PC, many notarized by
various licensed notaries. Accordingly, the foregoing is further evidence that there is no basis,
in fact or law to even remotely entertain Siebert's and Burke's barred counterclaims, continued
lies, deceptions, and legerdemain as their counterclaims are without legal foundation, in fact or
law. There is no further reason why I and other legitimate creditors should be cheated by
Siebert, his PC and Burke any longer.

-5-

A-457

It regrettably appears that based on the foregoing activity I simply cannot hope for fair due process and a level playing field here pray for fair rights o due process under the Constitution of the United States and the laws of this State. It seems that I am left with only recourse of Federal court intervention. These entire four years have been a lesson for legal scholars to review. It is simply outrageous.

THEREFORE, the relief requested here must be granted in all respects, as well as a stay of these proceedings to permit Court to deal with his cancer, cardiac issues, surgery and treatment (see Exhibit L as involve)

James Couri
Plaintiff, Pro Se
575 Madison Avenue
New York, NY 10022
(212) 605-0277

Sworn to before me this
_____ day of June, 2008

NOTARY PUBLIC

HERBERT J. MAREK
Notary Public, State of New York
No. 24-4853282
Qualified in Nassau County
Commission Expires July 7, 20__

TO:     RUSSEL BURKE
        600 Third Avenue
        New York, NY 1001

        Hon. Michael Stallman
        Supreme Court
        111 Centre Street
        New York, NY 10007

        Referee Jack Spier
        Supreme Court
        80 Centre Street, Room 472
        New York, NY 10007

        M. Birnbaum
        Chief Court Attorney
        Law Department
        67 Centre Street
        New York, NY 10007

-6-

A-458

EXHIBIT D TO COURI REPLY AFFIDAVIT -
(I) VARIOUS EX PARTE E-MAILS [A-458-A-472]

600 Third Avenue
New York, New York  10016
212-557-9600, Ext  115 (phone)
212-557-9610 (fax)

This e-mail is intended only for the use of the individual to whom it is addressed.  It
may contain information which is privileged, confidential, and exempt from disclosure.
Any unauthorized review, use, disclosure or distribution is prohibited.  If you are not
the intended recipient, please contact the sender by reply e-mail and destroy all copies
of the original message.  Thank you.

-----Original Message-----
From: Jack Suter [mailto:JSUTER@courts.state.ny.us]
Sent: Wednesday, September 10, 2008 8:59 AM
To: jcouri@q-rep.com, jburke@russoandburke.com
Subject: today's deposition

Mr. Burke, I am sitting at my computer drafting an order precluding Couri.  Do you want
to be heard regarding sanctions against Couri?

*Ex Partie*
*Collusion*
*In Burke & Suter*

E

*Note: No Receivable listed of Mgmy Due for Coeri as Asse or any Company Lys in Siebert Counte* [handwritten note across top]

# U.S. TRUST

FOR U.S. TRUST USE ONLY
DATE RECEIVED _____
OFFICER INITIALS _____

UNITED STATES TRUST COMPANY

## PERSONAL FINANCIAL STATEMENT

CLIENT(S) _John W. Siebert, MD._
DATE OF THIS STATEMENT _10/15/02_

### BALANCE SHEET
(IN $000)

| ASSETS | | LIABILITIES | |
|---|---|---|---|
| Cash Accounts — Sch. A (Incl. Money Market Accounts, Checking & Term Deposits) | $ 72,000 | Bank Debt — Sch. F (Excl. mortgages) *Business Loans* | $ 1,145,000 |
| U.S. Government Securities — Sch. B | | | |
| Fully Marketable Securities — Sch. B | | Margin Debt Due to Brokers | |
| Non-readily Marketable Securities — Sch. C (Incl. Restricted Stock, Private Partnerships, Hedge Funds and Stock Options) | 15,000,000 | | |
| Cash Value of Life Insurance | | Loans Against Life Insurance | |
| Personal Residence(s) (Est. market value) — Sch. D | 350,000 | Mortgage Debt — Sch. D | 250,000  300,000 |
| Real Estate Investments (Est. market value) — Sch. D | 900,000 | | |
| Other Investments | | Notes due to Partnerships | |
| Loans or Other Receivables | 250,000 | Loans from Others (Itemize): | |
| IRA, Keogh & Other Vested Retirement Assets — Sch. E | | | |
| Other Assets (Itemize): *Plastic Surg. Practice* | 2,000,000 | Other Liabilities (Itemize): *Richard Jacobs* | 400,000 |
| | | *Citibank (Credit Line)* | 50,000 |
| | | *Misc. (Credit Cards, etc)* | 80,000 |
| | | Total Liabilities | $ 2,225,000 |
| | | Net Worth (Assets - Liabilities) | $ 16,347,000 |
| Total Assets | $ 18,572,000 | Total Liabilities & Net Worth | $ 18,572,000 |

### CONTINGENT LIABILITIES

| | (If none, so state) | Description and Terms |
|---|---|---|
| Letters of Credit | $ | *Citibank 9% Credit Line Pd down to 50,000* |
| Guarantees | | |
| Leases (Annual Liability) | 72,000 | *6,000/mon Rent on Home* |
| Contracts | | |
| Partnership Obligations | | |
| Other Liabilities as Endorser or Co-Maker | | |
| Total | $ 72,000 | |

1

## ESTIMATED INCOME & EXPENSES (IN $000's)

For the year ending _2002_

| INCOME | | EXPENSES ( excluding cost of any proposed additions to debt ) | |
|---|---|---|---|
| Salary | $ 1,200,000 | Income Tax (include state & local) | $ 300,000 |
| Cash Bonuses & Commissions | | Co-op or Condominium Maint. | 25,000 |
| Partnership Distributions | | Mortgage Payments | 60,000 |
| Dividend Income | | Other Current Loan Payments (principal & interest) | 110,000 |
| Interest Income | | Real Estate Taxes | 10,000 |
| Rental Income | | Rental Payments | 72,000 |
| Cash Income from other Investments | | Insurance | 20,000 |
| Realized Capital Gains | 1,000,000 | Tuition | 60,000 |
| Alimony, Child Support or Other Maintenance Payments (Need not be reported if you do not wish to have it considered as a basis for repaying this obligation) | | Alimony, Child Support, Maint. | |
| | | Medical Expenses | 5,000 |
| | | All other Living Expenses   CAR LEASE | 18,000 |
| Deferred Compensation Other Income (describe): | | Other Expenses (describe) | |
| Total Income | $ 2,200,000 | Total Expenses | $ 680,000 |

Attach W-2 or Pay Stub and latest IRS return if you are applying for credit at U.S. Trust for the first time.

Total Actual Gross Income last Two Calendar Years  $ _1,600,000_ 2000
$ _1,420,000_ 2001

## SCHEDULES

### SCHEDULE A — CASH ACCOUNTS

| Name & Address of Deposit Institution | Type of Acct. (Checking, Savings, CD, Money Mkt.) | Owner (Applicant, Co-Applicant, Joint) | Current Balance | Est. Avg. Bal. Past 12 Mos. |
|---|---|---|---|---|
| US TRUST | CHECKING BUSINESS | | $ 60,000 | $ 40-50,000 |
| CHASE MANHATTAN | CHECKING | Kimberly Ann | 10,000 | 10,000 |
| CITIBANK | CHECKING | | 2,000 | |
| | | | | |
| | | | | |
| | | | | |

### SCHEDULE B — U.S. GOVERNMENTS & OTHER FULLY MARKETABLE SECURITIES
(Attach Broker Statement if Applicable)

| Number of Shares or Face Value of Bonds | Issue | Owner (Applicant, Co-Applicant, Joint) | Where Held | Current Market Value | Margined or Pledged to Others? (Yes/No) |
|---|---|---|---|---|---|
| | | | | $ | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

Approximate Cost or Tax Basis of Portfolio: $ _____



## SCHEDULE C — NON-READILY MARKETABLE SECURITIES

| No. of Shs. | Description (include explanation of restrictions) | Owner (Applicant, Co-Applicant, Joint) | Estimated Value | Vesting Date |
|---|---|---|---|---|
| 3% of Company | FREEDOM WIRELESS | Ready To Emerge Shortly | $ 10,000,000 (min.) | BEFORE 2003 |
| | (1) Licensed Partner Nextwave Telecom | | | |
| | (2) Holds Patents on Pre-Paid Cellular Wireless Technology | | | |
| | Litigation T 13/14 Largest Wireless Carriers | | $ 5-10,000,000 | Winter 2003 |
| | And Boston Comm. Group Inc -Federal Court | | (min) | |

## SCHEDULE D — REAL ESTATE & MORTGAGES

| Address & Type of Property | Title In Name of | % of Owner-ship | Gross Annual Income Produced if Any | Date Acquired | Cost | Est. Mkt. Value | Mtg. Held By: | Bal. of Mtg. | Mtg. Maturity |
|---|---|---|---|---|---|---|---|---|---|
| **Personal** | | | $ | | $ | $ | | $ | $ |
| 631 Bascom Hill Rd. Baraboo, WI | John And Kimberly | 100 | | 4/01 | 315,000 | 350,000 | Chase | 250,000 | |
| | | | | | | | | | |
| **Investment** | | | | | | | | | |
| 799 Park Ave Medical Co-op office | | 100 | | '96 | 600,000 | 900,000 | Chase | 300,000 | |

## SCHEDULE E — RETIREMENT ACCOUNTS (401-K, IRA, other)
### (Attach Statements if Applicable)

| Type | Description | Owner (Applicant, Co-Applicant, Joint) | Where Held | Est. Market Value |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

## SCHEDULE F — BANK DEBT (Excluding Mortgages)

| Name & Address of Lender | Borrower (Applicant, Co-Applicant, Joint) | Total Avail. Under Line of Credit | Current Unpaid Balance | Final Due Date | Estimated Annual Principal & Interest Expense | Collat. (yes/ |
|---|---|---|---|---|---|---|
| US Trust | John J. Sussman MD | | $ 500,000 | | | No |
| CIT Small Business Loan | | | 315,000 | | | yes |
| EPI | | | 120,000 | | | yes |
| FTA | | | 95,000 | | | yes |
| CitiCapital | | | 45,000 | | | yes |
| Fidelity | | | 70,000 | | | No |

include unused credit facilities

## SCHEDULE G — LIFE INSURANCE

| Name of Insurance Co. | Owner of Policy | Beneficiary | Face Amount | Policy Loans | Cash Value |
|---|---|---|---|---|---|
| | | | $ | $ | $ |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

Are You Covered By Disability Insurance? _____ Amount $ _____

## PERSONAL INFORMATION

| | Applicant | Co-Applicant (If Joint Statement) |
|---|---|---|
| Employer | John W. Siebert MD PC | |
| Address | 799 Park Ave NY, NY | |
| Title (If applicable) | | |
| Number of Years with This Employer | 13 | |
| Previous Employer | | |
| Business Phone & Fax No. | (212) 737-8300 | |
| Home Phone | (203) 869-9301 | |
| Home Address (Principal Residence) | 45 William St. Greenwich, CT 06830 | |
| Social Security No. | 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 | |
| Citizenship | USA | |
| Date of Birth | 2/8/55 | |
| College | Wheaton College | |
| Graduate School | Univ. of Wisconsin Medical School | |

**PLEASE ANSWER THE FOLLOWING QUESTIONS:**

Name, address & phone number of account manager at your bank if other than U.S. Trust: _____ LEY-NEY 1/15/02 TRANS UNION

Name, address & phone number of your accountant: Brian Pelker @ Shia 9 E 40th St NY, NY (212)

Name, address & phone number of your securities broker or investment advisor: Garry Day (602) 664-1065 cell (60 .rg-3204 ___ .com Wire

Name, address & phone number of your attorney: Tom Spellane 31 Brookside Dr. Green (203) 622-9360

Name, address & phone number of the executor(s) named in your will: Frank Gilbride, Esq. 31 Brookside Dr. Greenwich, CT (203) 622-9360 Year your will was drawn: 2001

Are you involved in any legal actions? yes If yes please describe (include monetary implications): ___
① NextWave Supreme CT. (US Federal) = Federal Const. Patent Litigation Freedom Wirel

Income tax returns filed through (date): 2002

Are any returns currently being audited? No If yes, what year(s)? ___

Have you ever been declared bankrupt? No If yes, please give date: ___

Are you the beneficiary of any trust that is currently funded but which is not yet available for your use? No

If yes, please describe: ___

Directorships: ___

Name of dependents (excluding spouse) and ages: Ashley 19 ; Christopher 12

The information contained in this statement is provided to induce you to extend or to continue the extension of credit to the undersigned or to others upon the guarantee of the undersigned. The undersigned acknowledge and understand that you are relying on the information provided herein in deciding to grant or continue credit or to accept a guarantee thereof. Each of the undersigned represents, warrants and certifies that the information provided herein is true, correct and complete. Each of the undersigned agrees to notify you immediately and in writing of any change in name, address, or employment and of any material adverse change (1) in any of the information contained in this statement or (2) in the financial condition of any of the undersigned or (3) in the ability of any of the undersigned to perform his/her (or their) obligations to you. In the absence of such notice or a new and full written statement, this should be considered as a continuing statement and substantially correct. You are authorized to make all inquiries you deem necessary to verify the accuracy of the information contained herein, and to determine the credit-worthiness of the undersigned. This can include obtaining my (our) report in the files of consumer credit reporting companies. Each of the undersigned authorizes you to answer questions about your credit experience with the undersigned. The undersigned agrees that this statement is the property of U.S. Trust.

Applicant Signature _____    Co-Applicant Signature _____

Date 10/15/02    Date _____

UST 1611 (REV. 7/97)    4

F

## SPECIAL MEETING OF THE
## BOARD OF DIRECTORS AND STOCKHOLDERS
## OF KINDERVEST PLANNING CORPORATION

### January 28, 2000

Special Meeting of the Board of Directors and Stockholders
of Kindervest Planning Corporation, ("Kindervest"), held on
January 28, 2000 at 575 Madison Avenue at 5:30 p.m., present
were John Siebert, ("Siebert"), and James Couri, ("Couri").

**WHEREAS:** Siebert has failed to satisfy his commitments
pursuant to the Kindervest Goldfish Consulting Agreement, and
has failed to timely satisfy the August 2, 1999
promissory note, and other commitments and obligations, etc.,
resulting in loss of various corporate opportunities, and injury
to Kindervest.

**WHEREAS:** All of the shares of Kindervest in Siebert's name
have been sterilized, and are subject to cancellation, pursuant
to Kindervest Resolutions of November 29, and December 8, 1999,
etc.



JWS 0

WHEREAS:  Siebert has requested that Kindervest, and Goldfish Enterprises, Ltd., ("Goldfish"), (Kindervest's controlling shareholder), do not cancel Siebert's Kindervest shares, and that they consider unsterilizing, and reinstating, the Kindervest common and preferred shares issued to Siebert, (i.e. 47 common shares and 60 preferred shares), (see schedule attached, hereto), under mutually acceptable terms as setforth herein.

WHEREAS:  Siebert requests as part of the understanding, that Kindervest tender to him the additional 120 common shares of Kindervest, (Certificate CA7), (copy hereto), being held in escrow, _inter alia_. pending Siebert's fulfilling his obligations to pay and satisfy, a) promissory note dated August 2, 1999, in the sum of $1,200,000.00 plus interest, b) other obligations Siebert herewith acknowledges, and c) Siebert's guarantee pursuant to the Goldfish-Kindervest Consulting Agreement.

WHEREAS:  Couri and Kindervest have performed valuable services for Siebert, which Siebert herewith acknowledges, and they have not been compensated by Siebert for such services.

WHEREAS:  The parties hereto wish to, settle their differences, and, a) enlarge the net worth of Kindervest, and b)

wish to eliminate various kinds
and Goldfish, as setforth herein, under certain conditions
herein.

WHEREAS:  The parties hereto desire Kindervest to engage in
trading in marketable securities, and also to pursue other
potential business ventures,

WHEREAS:  The parties wish to reapprove all payments made
by Kindervest to, Goldfish, Couri Acquisition Corp.
("Acquisition"), and Couri representing fees, expenses, and
payments of notes, and loans, and wish to reaffirm that all
Kindervest Common and Preferred Shares issued to Goldfish and
Acquisition are all unconditionally and validly issued, and are
all fully paid, and non assessable.

WHEREAS:  The parties wish to approve a Kindervest
donation to NY Medical Center, pursuant to letters to Colby
Collier, attached hereto, to be made for the account of
Kindervest.

WHEREAS:  Siebert unconditionally confirms and acknowledges
that, as result of his misrepresentations, personal activities



and other reckless acts, he has caused the Kindervest shareholders, embarrassment, loss, interference, damages, and other difficulties, as well as loss of revenue, and loss of opportunities in the purchases of marketable securities, etc. Siebert also unconditionally acknowledges his negligence and frivolous activities, and his failures to honor his commitments, guaranties, and other obligations to Kindervest.

WHEREAS: Siebert acknowledges that Couri and Kindervest have been of great value to him, and they have performed valuable and important services for Siebert, in connection with Siebert's other activities, obligations, finances, and his medical practice, etc. Siebert acknowledges his negligence and interference into Kindervest activities and reputation.

WHEREAS: Siebert acknowledges that his misconduct, and his reckless failure to satisfy his commitments and obligations to Kindervest, has resulted in significant loss and damage to Kindervest, and to its shareholders.

WHEREAS: Siebert acknowledges that he has misrepresented and defrauded Kindervest and its Officers and Shareholders.



RESOLVED: Siebert unconditionally releases, cancels, and discharges, any and all claims, whatsoever for any and all, notes, debts, exchanges, etc., that may be due to Siebert, from any Party to these Resolutions, including their respective shareholders, directors, officers, etc., relating to any transaction or agreement whatsoever.



RESOLVED: It is irrevocably and unconditionally agreed to by Siebert, and all parties hereto, that all Kindervest common and preferred shares, (as well as options and warrants), issued to Goldfish and Acquisition, are all unconditionally and validly issued, fully paid, and nonassessable., i.e.: 5,994 common shares issued to Goldfish, 540½ Kindervest preferred shares issued to Goldfish, and 500 Kindervest common shares issued to Acquisition, plus options and warrants.  See attached Schedule, and Kindervest Resolutions,

RESOLVED: Siebert herewith releases and discharges any and all Parties to these agreements and Resolutions, and all their respective officers, directors, and stockholders, heirs, assigns, subsidiaries and transferees, from any and all claims of any kind relating to any Kindervest Resolution whatsoever, as

well as, and any and all other claims and causes of action, as

acts of any kind, any and all debts, notes, and sums of money,

of any kind, arising out of, or referring, or relating to, a)

any and all obligations, and promissory notes, b) issuances of

Kindervest common and preferred shares to Goldfish, Acquisition,

or Couri, or their transferees, assigns, officers, directors,

stockholders, c) any and all agreements and/or, any Resolution

that Siebert is a party to, except for the rights and

obligations of the November 19, 1998 Goldfish-Consulting

Agreement, the March 23, 1999 Amended Shareholder Agreement, and

the February 22, 1999 Agreement.  This Release by Siebert is

intended to be, and is, final and binding.


RESOLVED:  Siebert fully indemnifies and holds harmless,
all Parties to these Resolutions, and their officers, directors,
stockholders, and assigns, from any and all claims and cause of
actions, asserted, or that can be asserted, by any other party,
relating to any action by Siebert, or any action by Kindervest,
relating to these Resolutions, or otherwise.


RESOLVED:  It is further irrevocably agreed to by the

Parties hereto, in particular Siebert, that all fees and

expenses, due to Goldfish, pursuant to the terms and conditions

setforth in the Goldfish-Kindervest Consulting Agreement

JWS 0050

personal guarantee, secured by all of the assets

and further secured by a Security Agreement in favor of Goldfish

(Secured Party), Kindervest (Debtor), and a UCC-1 Financing

Statement, (i.e.:  Goldfish, secured party, Kindervest Debtor),

duly filed with the New York Secretary of State, and the County

Clerk of New York County.


RESOLVED:  Siebert again promises and confirms that he has

not, and will not transfer, pledge or otherwise encumber, in any

way, any and all of the Kindervest common and preferred shares

held in his name.  Siebert acknowledges that any such transfer

or encumbrance would be fraudulent, and in direct violation of

the Kindervest Amended Shareholder Agreement, and these

Resolutions.  Siebert confirms that any violation by him of the

terms of the Kindervest Shareholder Agreement, or any other

Agreement, commitment, or understanding, between Siebert and

Kindervest or its Shareholders, well result in immediate

cancellation of all of the common and preferred shares in

Siebert's name, as well as other monetary penalties, and

immediate termination of the Siebert-Kindervest Consulting

Agreement, and termination of Siebert as a Director and Officer

of Kindervest.

RESOLVED:  Couri is authorized, singly, for Goldfish, to execute any and all agreements, documents, notes, share issuance and share cancellations, bills, receipts, cancellation of notes, dissolution documents, etc., to effect these Resolutions, and Agreements, and to effect the possible restoration of Siebert's Kindervest common and preferred shares referred to herein; or alternatively, the cancellation of all Kindervest shares issued to Siebert, if necessary.  Couri is also authorized, singly, for Kindervest, and for Goldfish, to take any act, or action, in order to fulfill any and all of the agreements, terms, and conditions, etc. as setforth herein, for Kindervest and/or Goldfish.

RESOLVED:  All of these Resolutions, and the Agreements within, are all, valid, binding, and enforceable upon the parties hereto, and are all unconditionally agreed to by the Parties hereto, and are all in the best interest of the Parties hereto.

RESOLVED:  All funds referred to herein, paid or to be paid to Kindervest, can be used by Kindervest for any and all general corporate purposes, loans, fees, exchanges, investments of any kind, and for payments of any kind, as well as for any and all fees, including legal, accounting, consulting fees, etc.

JWS

**RESOLVED:** There being no further business to come before the meeting it was adjourned.

Dated: January 28, 2000

_____
Secretary -
Kindervest Planning Corporation

AGREED & CONSENTED TO:

_____
Director - John Siebert

By: _____
John Siebert

_____
Director - James Couri

By: _____
James Couri

_____
John Siebert, Stockholder of
Kindervest Planning Corp.

By: _____
Kindervest Planning Corp.

_____
Goldfish Enterprises, Ltd.
Stockholder of
Kindervest Planning Corp.

By: _____
Goldfish Enterprises, Ltd.

_____
Couri Acquisition Corporation
Stockholder of
Kindervest Planning Corp.

By: _____
Couri Acquisition Corporation

**ANNUAL MEETING OF THE SHAREHOLDERS
OF KINDERVEST PLANNING CORPORATION, AND
SPECIAL MEETING OF THE BOARD OF DIRECTORS**

**February 22, 2000**

Annual Meeting of the Shareholders of Kindervest Planning Corp., ("Kindervest"), for the year 2000, was held on February 22, 2000 at 575 Madison Avenue, 10th Floor, New York, New York 10022 at 5:00 p.m., present are the following Shareholders:

Goldfish Enterprises, Ltd., ("Goldfish"):

Couri Acquisition Corp., ("Acquisition"):

John Siebert, ("Siebert"):

The Meeting was called to order by James C. Couri, ("Couri"), the President of Kindervest, and Couri acted as Secretary of the Meeting. Present were shareholders, a) John Siebert, ("Siebert"), representing himself, b) Goldfish Enterprises, Ltd. ("Goldfish"), and, c) Couri Acquisition Corp., ("Acquisition"), by their representative, and President, Couri.

1

Couri declared that a quorum was present, Meeting was duly organized, and that the Meeting was convened pursuant to due Notice.

Upon motion, duly made and seconded, the following resolutions were unanimously adopted, after review of all relevant Kindervest:  agreements, tax returns, promissory notes, reconciliations, subscriptions for common and preferred shares, bank statements, stock brokerage statements, expenses, and Siebert resignation as a Director and Secretary of Kindervest, etc.

RESOLVED, that all actions heretofore taken by the Board of Directors and officers of Kindervest are all unconditionally approved, ratified, and confirmed, and are all in the best interest of Kindervest and all of its Shareholders, including but not limited to the following acts, and transactions, which are all confirmed, ratified, and approved, and are all in the best interest of Kindervest, and all of its shareholders:

1.  Kindervest Consulting Agreements, with, a) James Couri, b) John Siebert, c) Goldfish Enterprises, Ltd.

2.  Kindervest Shareholder Agreement, dated March 23, 1999.

3. All Agreements between Couri, Goldfish and Acquisition, for the periods 1997, 1998, 1999, and 2000 (to date), and all Kindervest Resolutions for periods 1996 to date.

4. All Kindervest cash disbursements for periods 1996, 1997, 1998, 1999, and 2000 (to date).

5. All fees and expenses, etc. paid to Goldfish, Couri Group Inc., Acquisition, and Siebert, for the years 1996, 1997, 1998, 1999, and 2000 (to date).

6. All Kindervest common and preferred shares issuances to, a) Goldfish, b) Acquisition, and c) Siebert. All such Kindervest shares issued to Goldfish, Acquisition, and Siebert, are all fully paid and non-assessable. Siebert is the owner of 167 common shares and 60 preferred shares of Kindervest. All Kindervest shares issued to Goldfish including in lieu of fees, etc., are fully paid, and valid by issued.

7. Any and all Kindervest promissory notes, issued to Goldfish, Siebert, or Acquisition for periods 1996, 1997, 1998, 1999, 2000 (to date).

8. All Kindervest payments of Promissory Notes made to, Goldfish, Siebert, or Acquisition, for periods 1996, 1997, 1998, 1999, and 2000 (to date).

9. Dissolutions of Kindervest ~~~~~~~~~~~~~~ Corp., Guardian Financial Planning Corp., and ~~~~~~~~~ Venture Corp.

10. Dissolution of Road Runner Properties Corp.

11. Any and all transactions and Agreements, entered into by Kindervest with: a) Goldfish, b) Siebert, c) Couri, d) Tangerine, e) Acquisition, f) Guardian Financial Planning Corp., g) Couri Capital Corp., h) Tangerine Venture Corp., and any other Entity, or third Party.

12. The Kindervest 1996, 1997, and 1998 Federal, City, and State, tax returns, (as amended, reference the 1998 Kindervest returns).

13. All Loans made by Kindervest with Siebert, evidenced by promissory notes, issued by Kindervest to Siebert, and guaranteed by Goldfish and Acquisition in the sums of: a) $225,000, b) $124,750, c) $200,000, d) $600,000, e) $247,500, f) $250,000, g) $600,000, h) $500,000, i) $450,000.

14. All Legal and Accounting fees paid by Kindervest during 1997, 1998, and 1999, and 2000 (to date).

15. Issuance 100 common shares of Kindervest to Siebert on January 1§, 2000, for a total of $450,000, deducted from Siebert's loans to Kindervest, as per Subscription executed by Siebert.

16. Issuance of 41 Kindervest preferred shares to Siebert for $1,030,000, as per Subscriptions dated December 29, 1999 and January 12, 2000 executed by Siebert. Said sums deducted from Siebert loans to Kindervest.

17. Fees for services rendered to Siebert, per invoice.

18. Real Estate Venture Agreement dated August 2, 1999, and transactions terminations.

19. Marketable stock transactions, at Punk Ziegel & Company.

20. Any and all other acts, agreements, and actions of the Kindervest Board of Directors and Officers for periods 1996, 1997, 1998, 1999, and 2000 (to date).

21. Siebert Resignation as a Director and Secretary of Kindervest, on February 3, 2000.

RESOLVED, James C. Couri is unanimously elected as the sole Director of Kindervest.

RESOLVED: The undersigned, being the sole Director of Kindervest, a New York Corporation, hereby notes that Siebert has resigned as a Director and as Secretary of Kindervest, on February 3, 2000, and that it is necessary to replace Siebert in the Office of Secretary. Couri is willing to serve as Secretary,

pending the selection and appointment of another person to fill

that office.   Couri and Shareholder therefore consent to the

adoption of the following Resolution:


RESOLVED:  that the following person is herewith unanimously

nominated for the following offices of the Corporation:


President: James C. Couri

Secretary: James C. Couri


RESOLVED:  that the forenamed person Couri, be and is,

unanimously elected to the offices set opposite his name, to

assume the duties and responsibilities fixed by the Bylaws and/or

by the Board of Directors of Kindervest, and to serve until such

time as his successor(s) be duly appointed and qualified.


RESOLVED:  Couri is unconditionally authorized to execute,

singly, for Kindervest, any and all:  documents, agreements,

checks, leases, disbursements, contracts, promissory notes, share

issuances, etc.  Couri is further authorized, singly, for

Kindervest, to engage in any acts, or transactions, whatsoever,

that Couri deems appropriate, for the account and risk of

Kindervest, including but not limited to:  securities

transactions, real estate transactions, as well as any and all

other investments, ventures, or coventures, or any kind anywhere.

RESOLVED: There being no further business to come before the meeting it was adjourned.

Dated: February 22, 2000

_____
Secretary
Kindervest Planning Corporation

The foregoing are all
Agreed & Consented to:

By:_____
John Siebert - Shareholder

By:_____
James Couri, Sole Director and
Sole Officer of Kindervest

_____
Sole Director - James Couri

By:_____
Kindervest Planning Corp.

By:_____
John Siebert, Stockholder of
Kindervest Planning Corp.

By:_____
Goldfish Enterprises, Ltd.
Controlling Stockholder of
Kindervest Planning Corp.

By:_____
Goldfish Enterprises, Ltd.
Shareholder

By:_____
Couri Acquisition Corporation
Stockholder of
Kindervest Planning Corp.

By:_____
Couri Acquisition Corporation
Shareholder

Agreement, dated February 22, 1999, among John Siebert ("Siebert") whose address is 799 Park Avenue, New York, NY, 10021 and Kindervest Planning Corp. ("Kindervest"), James Couri ("Couri"), Tangerine Venture Corp. ("Tangerine"), whose addresses are at 575 Madison Avenue, New York, NY, 10022.

WHEREAS, James Couri and Goldfish have performed services that have been of great value to Siebert and Kindervest, and have performed valuable services for the best interest of Siebert and Kindervest.

WHEREAS, Siebert and Kindervest wish to further secure the payments of fees and expenses due to, and that become due to Goldfish, pursuant to the non-cancellable Goldfish-Kindervest November 1998 Consulting Agreement, (Copy attached, hereto.)

WHEREAS, the parties hereto wish to further confirm and ratify the terms and conditions of Siebert's unconditional and irrevocable personal guarantee of all of the payments of fees and expenses due to Goldfish under the November 1998 Goldfish-Kindervest Consulting Agreement, ("The Consulting Agreement"), and the effects of any default by Siebert, related thereto.

WHEREAS, various Kindervest Resolutions, and The Consulting Agreement, between Goldfish and Kindervest, have set forth, confirmed and memorialized, Siebert's guarantee of all Kindervest payments by fees and expenses due to Goldfish, pursuant to The Consulting Agreement.

EXHIBIT
TO
COMPLAINT
CASE# 113512-08

NOW THEREFORE, in consideration of the mutual covenants and good and valuable considerations, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.   Siebert unconditionally and irrevocably guarantees to Goldfish, all of the sums of money that are due and payable, or that will become due and payable to Goldfish, pursuant to the terms and conditions of the Goldfish-Kindervest November 1998 Consulting Agreement, ("The Consulting Agreement").   This guarantee includes, but is not limited, to all fees, expenses, and all other moneys due, or that becomes due, to Goldfish under The Consulting Agreement.

2.   Siebert herewith irrevocably releases and discharges Couri, Kindervest, Goldfish, Tangerine, from any and all claims and causes of actions, arising out of any agreement, matter, cause, or thing, from the beginning of the world, up to and including the date of this Release, and Agreement.   Siebert irrevocably herewith releases, discharges, and relinquishes   any and all defenses to any claim or cause of action arising out of this Agreement, or the Guarantee, that may be asserted against Siebert, by any party to this Agreement.

3.   Siebert unconditionally and irrevocably consents and agrees that, in the event of Kindervest's failure to fulfill any of its obligations pursuant to The

- 2 -

Consulting Agreement ... Goldfish, Siebert will pay all fees due to Goldfish, pursuant to The Consulting Agreement, and in the manner and amounts as prescribed by The Consulting Agreement. Siebert will satisfy and pay in full all fees and expenses due to Goldfish, pursuant to The Consulting Agreement, for the life of The Consulting Agreement. Any and all past due fees and expenses due Goldfish pursuant to The Consulting Agreement, if any, will be satisfied by Siebert immediately upon demand by Goldfish.

4. Siebert unconditionally and irrevocably consents and agrees that in the event Siebert defaults and fails to satisfy any of the terms of this Agreement, The Consulting Agreement, or the Guarantee, any and all Kindervest and/or Tangerine Common and Preferred Shares of Stock presently owned, or hereafter acquired by Siebert, shall be immediately voided, and cancelled by Kindervest and Tangerine, and returned to the Treasury of Kindervest and Tangerine; and any and all rights Siebert may have had thereunder as a Stockholder, will be terminated entirely. Also all such Common and Preferred Kindervest and Tangerine Shares owned by Siebert will be immediately offered for sale, and sold, pursuant to the terms of sale as set forth in the Kindervest and Tangerine Stockholder Agreements, respectively, both of which Siebert is a signatory, and a party to, and which Siebert's Kindervest and Tangerine Shares are subject to. In the event of any default in Siebert satisfying or

- 3 -

fulfilling said Guarantee, and
all of his rights as a Stockholder of
Tangerine, including but not limited to, loss by
Siebert of any and all rights to vote such Shares,
receive dividends, etc.

5.   The proceeds of any sale of Siebert's Kindervest and
Tangerine Common and Preferred Shares to satisfy the
Guarantee, and pursuant to this Agreement, will be
forthwith paid to Goldfish, and applied towards the
deficiency under The Consulting Agreement which is
subject to Siebert's Guarantee.  Siebert will
thereafter continue to be responsible to Goldfish for
any and all deficiencies, and all remaining sums due
to Goldfish under The Consulting Agreement, and
pursuant to this Guarantee, and Agreement.

6.   In the event of such default by Siebert, it is
unconditionally and irrevocably agreed that Siebert
will be forthwith removed as an Officer and Director
of Kindervest and Tangerine.  Siebert herewith
irrevocably consents to his removal as Officer and
Director of Kindervest and Tangerine, pursuant to this
Agreement, and its terms.

7.   It is further irrevocably agreed that all of the fees
and expenses due to, or that become due to Goldfish,
pursuant to The Consulting Agreement, shall be secured
by all of the assets of Kindervest, pursuant to a
Security Agreement, and a UCC1 Filing, (i.e.:
Goldfish as "Secured Party", Kindervest as "Debtor").

- 4 -

<u>Notices</u>.  All Notices, demand[...]
shall be deemed properly given, if sent by[...]
the parties at their respective addresses as above [...]

<u>Binding Effect</u>.  This Agreement shall be binding upon, and
inure to the benefit of the parties hereto, and their respective
heirs, executors, administrators, successors, and assigns.

<u>Miscellaneous</u>.  This Agreement shall be construed in
accordance with, and shall be governed by, the laws of the State
of New York.

IN WITNESS WHEREOF the parties hereto have duly executed
this Agreement on the date first above written.

Dated:     February 22, 1999

Agreed & Consented to:

_____
John Siebert

_____
Kindervest Planning Corp.

_____
James Court

_____
Tangerine Venture Corp.

16agreement

- 5 -

To Whom It May Concern:

I hereby fully indemnify and hold harmless, (including any and all expenses and attorney fees), Couri Acquisition Corp. and Subsidiaries, (collectively, "Acquisition"), and all Acquisition, Officers, Directors, Employees, and Shareholders, and James Couri, for any and all liabilities and or causes of actions, that they may incur arising out of any involvements, audits, or claims, etc., regarding any aspect of any of my personal, or my "PC" tax matters or returns, and/or any of my, (or my PC), tax obligations, liabilities, etc.

John Siebert

Dated:

9/12/02

**JOHN SIEBERT**
799 Park Avenue
New York, NY 10021

March 1, 2002

Kindervest Planning Corporation
575 Madison Avenue
New York, NY 10022
Att:  James C. Couri

Dear Mr. Couri:

This letter will confirm the following:

1.   I have made numerous loans and advances to Kindervest Planning Corp., ("Kindervest"). As of June 30, 1999 my loans made to Kindervest totaled $2,200,000.  All such loans made by me to Kindervest were guaranteed by Goldfish Enterprises, Ltd., ("Goldfish"), and Couri Acquisition Corp., ("Acquisition"), and all such loans were evidenced by various Promissory Notes issued to me by Kindervest.

2.   I have also made several payments to Kindervest in satisfaction of Subscription Agreements executed by me for the purchase of Kindervest Common and Preferred Shares.

3.   I also became a Director and Secretary of Kindervest on September 10, 1997.  I resigned those positions on February 3, 2000.

4.   All of my loans and advances to Kindervest have been satisfactorily resolved and disposed of by Agreements among me, Kindervest, Goldfish, et al.

By: _____
John Siebert

Date:  March 4, 2002

ACKNOWLEDGEMENT:

John Siebert, personally known to me, came before me on March 4, 2002 and acknowledged that he executed this document, and that he affirms its contents.

By: _____
Notary Public

Gloria A. Rivera
Notary Public, State of New York
No. 01RC5743541
Commission Expires August 28,

Ex H

3839jkind

January 26, 1998

By Hand

John Siebert
Park Avenue
New York, New York  10021

Re:  Stock Certificates,
Kindervest Planning Corpor
("Kindervest")

Dear John:

Enclosed herewith are the Kindervest Planning Corporation certificates of Common and Preferred Stock, issued in Your Name, duly Legended, as per the Stockholder Agreement, dated January 1998, and Corporate Resolutions, related thereto.

As you have been told, these Securities and investments therein, (in Kindervest), involve a high degree of risk, and there can be no assurance of the ultimate success of the Kindervest Programs, plans, or other activities.  Kindervest will remain in preoperational phase, for as long as practical, and until Kindervest, and its Board of Directors and the Majority of Kindervest Stockholders are comfortable and able, to launch Kindervest, via Infomercial, and other media, etc., to the public, etc.

Kindervest Planning Corporation

_____
Authorized Signatory

Accepted and Agreed and
Acknowledged Receipt of Shares

_____
Stockholder

1024SIEB.LTR

G

FRANK J. GILBRIDE
CHARLES TUSA
BENNETT K. LAST
THOMAS P. SPELLANE
JOHN P. TUSA, P.C.
DAVID MOLINELLI
DAVID CRYSTAL II
JAMES P. DONOHUE, JR.
FREDERIC P. INGLES

THEODORE L. BRADLEY
KENNETH M. GABRIEL, JR.
CLER J. MOORE
JONATHAN M. WELLS

• ADMITTED IN NEW YORK ONLY
• ALSO ADMITTED IN NEW JERSEY AND VIRGINIA
• ALSO ADMITTED IN MASSACHUSETTS
• ADMITTED IN NEW YORK AND WISCONSIN ONLY

P.O. BOX 656
GREENWICH, CONNECTICUT 06836

(203) 622-9360
FACSIMILE (203) 622-9392

# Facsimile Cover Sheet

**To:** James C. Couri

**Company:**

**Phone:** 212-605-0277

**Fax:** **212-605-0222**

**From:** Thomas P. Spellane, Esq.

**Company:** Gilbride, Tusa, Last & Spellane LLC

**Phone:** 203-622-9360

**Fax:** 203-622-9392

**Date:** December 12, 2002

**Pages, including this cover page:**

**Re:** John W. Siebert, M.D.

**Operator:** Susan

I, too, want to bring closure to this matter and, as you know, am meeting with Dr. Siebert tomorrow afternoon to discuss the proposed settlement and other arrangements. I appreciate your time schedule and plan on calling you at the conclusion of tomorrow's meeting. I thank you for your time and cooperation in attempting to resolve this matter.

*[handwritten annotations]*

This communication is intended for the addressee. It may contain information that is privileged and confidential. If the recipient of this communication is not the addressee, you are hereby notified that any dissemination and/or copying of this communication is prohibited. If you have received this communication in error, please notify us immediately by telephone and return the original communication to us by mail. Thank you.

*Case 107240-04*

T 225—General Assignment.                                    JULIUS BLUMBERG, INC., LAW BLANK PUBLISHERS

# Know all Men by these Presents,

THAT
of   Coeri Acqusn Corp, Kindret Plan Corp, Goldph Ent, Tangene Ventr Corp
and affilated Companie.
575 Madison Ave NYC NY 10022 (10th fl)

                                                                    assignor(s),

in consideration of $ 10,001 *to The Conductors*, the receipt whereof is hereby acknowledged, has sold and by these presents
does grant, assign and convey unto   James Coeri (Coeri)

of  575 Madison Avenue NYC NY 10022 (10th fl)
                                                                    assignee(s)

the following James Coeri Has no benficial interest in these Claims as Subct this
Assignor herewith assign to Coeri (for litigation purposes only), any
and all Claims + Causes of actions of any kind belonging to Assignor against
John Siebert and John W Siebert MD PC. Coeri will Commence a litigation
assignor's Claims against Siebert + his PC for Moneys Due to assignors
form Siebert + his PC (as assignee only) FBO assignors, asserting
Retain + Continue to fund this Litigation. Assignor do not have the liquid funds to
expenses = The Claims that will be asserted belong solely to
Assignor and any + all recovery will be remitted to Assignor less
any expenses not yet actually assigns or to Coeri.

TO HAVE AND TO HOLD the same unto the said assignee(s) executors, administrators and assigns forever,
to and for the use of the assignee(s), hereby constituting and appointing said assignee(s) true and lawful
attorney(s) irrevocable, in assignor's name, place and stead, for the purposes aforesaid, to ask, demand, sue for,
attach, levy, recover and receive all such sum and sums of money which now are, or may hereafter become due,
owing and payable for, or on account of all or any of the accounts, dues, debts, and demands above assigned, and
giving and granting unto the said attorney(s) full power and authority to do and perform all and every act and
thing whatsoever requisite and necessary, as fully, to all intents and purposes, as assignor's might or could do
if personally present, with full power of substitution and revocation, hereby ratifying and confirming all that
the said attorney(s) or attorney's substitute shall lawfully do, or cause to be done by virtue hereof.

    IN WITNESS WHEREOF, the undersigned has hereunto set *his* hand(s) and seal(s) the *18*
day of  *March    2004*

SIGNED, SEALED AND DELIVERED
IN THE PRESENCE OF

                                        by  *JM* assignee ....................... L.

                                        ....................... L.

*[handwritten notations across top of page]*

## SETTLEMENT AGREEMENT

This Agreement is made as of December 19, 2002 by and among James C. Couri, Couri Group, Inc., Couri Acquisition Corp., Guardian Financial Planning Corp., Couri Holdings Corp., Couri Ventures, Ltd., Couri Assets Corp., Couri Capital Corp., Tangerine Venture Corp., Kindervest Planning Corp., Goldfish Enterprises, Ltd., Road Runner Holdings Corp., Road Runner Properties Corp., Marlene Couri Trust, and Lydia A. Couri Trust, (referred to collectively herein as the "Group 1 Parties") and John Siebert, and John Siebert, PC, (collectively referred to herein as "Group 2 Parties").

WHEREAS, the parties hereto wish to settle and resolve any and all differences, claims, and causes of actions that the Group 1 Parties claim may be asserted against John Siebert ("Siebert") and John Siebert, PC ("PC"), for various indemnities, guarantees, promises, agreements, contracts, and commitments, and

WHEREAS, all of the parties hereto, while each denying any obligation to the others, and denying any allegations of wrongdoing of any kind, desire to resolve their differences without the necessity for vexatious, expensive and time-consuming litigation;

WHEREAS, the above Group 1 Parties except Couri Assets Corp. were all the parties involved as stockholders or otherwise participating in the Kindervest Planning Corp.'s activities.

NOW, THEREFORE, in consideration of the mutual promises contained herein, all of the parties hereto agree as follows:

1

1.  On execution of this Agreement Siebert and PC will execute a Promissory Note, ("the Note"), in the form annexed hereto, payable to Couri Acquisition Corp., in the amount of $1,400,000.00, with interest of 4% per year, payable as follows:

*Defunct*

Principal:

> $15,000.00 upon execution and delivery of the Note;
> $15,000.00 on the first day of each month for 5 months, through and including May 1, 2003;
> $12,500.00 on the first day of each month for 7 months, through and including December 1, 2003;
> $15,000.00 on the first day of each month for the following 6 months, through and including June 1, 2004;
> $20,000.00 on the first day of each month for the following 6 months, through and including December 1, 2004;
> $25,000.00 on the first day of each month for the following 12 months, through and including December 1, 2005

The remaining balance of the Principal Sum, plus all accrued and unpaid interest, shall be due and payable on January 16, 2006.

Interest:
Accrued interest on this Note shall be payable in semi-annual installments. The first installment shall be payable on August 30, 2003.  The second installment of interest shall be payable on December 30, 2003.  Thereafter, installments of interest shall be paid on June 30 and December 30 of each year except that all  interest accrued but unpaid on January 16, 2005 shall be paid on that date.  Group 1 Parties will advise Siebert and PC, by facsimile, of the computation of interest due, 15 days before due dates of said interest payment.

Prepayment:
Principal due under this Note may be prepaid at anytime and from time to time without penalty but with interest through the date of prepayment.  Any partial prepayments shall be applied against installments of principal due hereunder in inverse order of maturity.

2. On execution of this Agreement the parties hereto will execute and deliver releases in the forms annexed hereto.

3. (A) It is expressly and unconditionally agreed that if Siebert and/or PC default in any payment of principal, and/or interest, pursuant to the payment schedule set forth herein and in the Note, and such default is not cured within fifteen days after notice of said default, the entire unpaid principal sum, and all accrued interest thereon, shall become immediately due and payable by Siebert and PC, jointly and severally, to Couri Acquisition Corp., as provided in the Note. Siebert and PC hereby waive presentment, demand, protest, notice of protest, notice of demand and of dishonor and non-payment and all other notices to which they otherwise might be entitled. With respect to any action brought to collect the amount due under the Note, Siebert and PC agree not to assert against Couri Acquisition Corp. any defense, setoff or counterclaim which they may have, including, without limitation, any defense based on the statute of limitations, laches, waiver or estoppel. Siebert and PC hereby waive the right to trial by jury in any action or proceeding on or related to this Agreement and/or the Note. Siebert and PC hereby consent to the in personal jurisdiction of the state and federal courts located in the state of New York. In the event that Couri Acquisition Corp. brings any action or suit in any court to enforce any or all liabilities of Siebert and/or PC hereunder or set forth in the Note, service of process may be made by mailing a copy of the summons to Siebert and PC at the address set forth in paragraph 22 below.

(B) On execution of this Agreement, James C. Couri will cause to be delivered to John Siebert an option to purchase stock in the company known as Desert Holdings Corporation in the form annexed hereto, (the "Option"). The Option may be exercised in accordance with its terms, provided that as of the exercise date Siebert and PC have made all payments required by the

3

Note, and have fully complied with all other material obligations set forth herein. In the event that, prior to the date of exercise of the Option, Siebert and/or PC default in making any payment required by the Note, and such default is not cured within 15 days of notice of the nonpayment, or are in breach of any other material obligations set forth herein, then the Option will be rendered null and void, and Siebert will immediately return the Option to James C. Couri or his designee.

(C)  Any securities issued pursuant to the Option, and paid for in full, shall be held in escrow by Group 2 Parties Attorney Thomas Spellane, Esq. (Escrow agent) pursuant to an Escrow Agreement acceptable to Group 1 Parties until Siebert and PC have made all timely payments required by the Note and have fully complied with all other materials obligations set forth herein, when said securities shall be delivered to Siebert by the Escrow agent.

(D)  In the event that, prior to the date the Note is paid in full, Siebert and/or PC default in making any payment required by the Note, and said default is not cured within fifteen days of notice of said default, or if Siebert and PC are in material breach of any other obligations set forth herein, or upon the occurrence of any of the events set forth in suparagraph (F) below, then any securities issued pursuant to the Option shall be returned by the designee of the Group 1 Parties to Desert Holdings Corporation, which shall have the right, at its sole option, to cancel all such securities.

(E)  In the event securities are returned to Desert Holdings Corporation pursuant to subparagraph B, C or D above, then all payments made with respect to the securities issued pursuant to the Option shall be applied to payments owed under the Note, first to the payment of accrued but unpaid interest  due pursuant to the Note, and the remainder, if any, shall be applied

4

to the unpaid Principal Sum. Any such payments not required to satisfy the obligations under the Note shall be returned to the party who made any such payments.

(F) Additionally, it is agreed that the Option shall be rendered null and void, and shall be returned to James C. Couri, or, if securities have been issued pursuant to the Option, said securities shall be returned to Desert Holdings Corporation, which shall have the right, at its sole option, to cancel all such securities, if any of the following events occur:

Entry of a judgment in any state or federal court of the United States against either Siebert or PC, which remains unsatisfied, unsecured, or unbonded for 15 days;

Entry of a decree or order by a court adjudging either of Seibert or PC a bankrupt or insolvent, or approving as properly filed a petition seeking reorganization, arrangement, adjustment or composition of or in respect of either of Siebert or PC under the Federal Bankruptcy Code or any other applicable Federal or state law, or appointing a receiver, liquidator, assignee, trustee, (or other similar official) of either of Siebert or PC or of any substantial part of his/its properties, or ordering the winding up or liquidation of his/its affairs; or

Either of Siebert or PC shall: (i) apply for or consent to the appointment of a receiver, trustee or liquidator of either of Siebert or PC of any of his/its properties or assets; (ii) admit in writing his/its inability to pay his/its debts as they mature; (iii) make a general assignment for the benefit of his/its creditors; or (iv) file a voluntary petition in bankruptcy or have a bankruptcy proceeding brought against him/it and such involuntary proceeding is not dismissed within fifteen (15) days of its commencement.

4. Group 2 Parties unconditionally agree that if any Group 2 party receives any inquiry, bill, audit, or other request, from any taxing authority, referring or relating to Siebert, or PC, on the one hand, and any issue referring or relating to any Group 1 Party, the Group 2 Parties will,

forthwith, advise the Group 1 Parties of such inquiry, with by forwarding a copy of such inquiry, bill, etc., to Group 1 representative James Couri, or his designee, by facsimile, and federal express.

5.  The Group 2 Parties represent that they have not discussed, written about, exhibited documents relating to, or otherwise communicated with respect to the Group 1 Parties or any matter relating to the Group 1 Parties business with any person or entity other than John Carberry, Esq.  The Group 1 Parties represent that they have not discussed, written about, exhibited documents relating to or otherwise communicated with respect to the Group 2 Parties or any matter relating to the Group 2 Parties with any person or entity, other than John Carberry, Esq.

6.  Except as required by law, none of the Group 1 Parties will  make any statement to any person or entity with regard to any aspect of Group 2 Parties' business or other activities.

7.  Except as required by law, none of the Group 2 Parties will make any statements to any person about any of the Group 1 Parties' activities, business enterprises and otherwise.

8.  Except as required by law, the Group 1 Parties shall not publicly disparage or encourage or induce others to publicly disparage the Group 2 Parties.  For the purposes of this paragraph, the term "disparage" includes, without limitation, any comments or statements to any individual or entity with whom any of the Group 2 Parties has a personal or business relationship which could adversely effect in any manner the business or personal reputation of the Group 2 Parties.

9.  Except as required by law, the Group 2 Parties shall not publicly disparage or encourage or induce others to publicly disparage the Group 1 Parties.  For the purposes of this paragraph, the term "disparage" includes, without limitation, any comments or statements to any

6

individual or entity with whom any of the Group 1 Parties has a personal or business relationship which could adversely effect in any manner the business or personal reputation of the Group 1 Parties.

10. The Group 1 Parties hereby undertake not to write, telephone or otherwise communicate with any person, corporation, or other entity concerning Group 2 Parties, except as may be necessary to enforce the terms of this Agreement, or as may be required by law.

11. The Group 2 Parties hereby undertake not to write, telephone or otherwise communicate with any other person, corporation, or entity concerning Group 1 Parties, except as may be necessary to enforce the terms of this Agreement, or as may be required by law.

12. The Group 1 Parties and the Group 2 Parties mutually covenant, warrant and represent that they will not engage in any acts, directly or indirectly, which would interfere with any business activities of the others, and will not discuss the business of the Group 1 and/or the Group 2 Parties with any third party for any reason whatsoever.

13. The Group 1 Parties and the Group 2 Parties mutually covenant, warrant and represent that should any of them receive any communications from any person or entity referring to or concerning any of the parties hereto, they will immediately forward such communication to the party referred to in said communication via facsimile and Federal Express to James Couri or his designee for the Group 1 Parties, and to Thomas Spellane, Esq. for the Group 2 Parties.

14. The Group 1 Parties agree that they have no knowledge that the Group 2 Parties have violated any federal, state or municipal laws, rules or regulations. The Group 2 Parties agree that they have no knowledge that the Group 1 Parties have violated any federal, state or municipal laws, rules or regulations.

7

15.  It is agreed that damages at law for the violation of the provisions of this Agreement shall not be an adequate or proper remedy for such violation and that the party who is the subject of such violation shall therefore be entitled to both temporary and permanent injunctions against the violating party prohibiting any such violation and directing the violating party to cease or refrain from committing such violation.  The existence of this right will not preclude any other rights and remedies at law of the party who is the subject of the violation.

16.  Each of the parties hereto agrees to execute any additional documents that may reasonably be required to fulfill his or its obligations under this Agreement, or to carry out the reasonable intent of this Agreement.

17.  The parties agree that the execution and conditions of this Agreement shall remain confidential, and will not be disclosed to any outside parties, except as required by law.

18.  This Agreement is complete, and all promises, representations, understandings, warranties and agreements with reference to the subject matter hereof, and all inducements to the making of this Agreement relied on by any of the parties have been expressed herein.

19.  This Agreement shall be construed, interpreted and enforced in accordance with the laws of the State of New York, without reference to the principles of conflicts of laws.

20.  This Agreement may not be waived, modified, amended or eliminated except by the mutual written consent of the parties hereto.

21.  This Agreement shall be deemed to have been jointly drafted by the parties.  Any uncertainty or ambiguity shall not be construed for or against any party based on attribution of drafting to any party.  This Agreement shall be enforced, interpreted and construed in its entirety according to its fair and logical meaning.  If any part of this Agreement is found to be

8

unenforceable, the remaining provisions hereof shall nevertheless remain valid and be carried into effect.  Each party shall bear his or its own legal fees.

22.  Notice of any matter relating to this Agreement shall be addressed to and sent by overnight mail to each of the parties hereto as follows: The Group 1 Parties: c/o James C. Couri, 575 Madison Avenue, 10th Floor, New York, New York 10022 and to Jon Paul Robbins, McLaughlin Stern, LLP, 260 Madison Avenue, New York, NY  10016, and to the Group 2 Parties:  John Siebert, MD 799 Park Avenue, New York, NY  10021 and Thomas Spellane, Gilbride, Tusa, Last & Spellane, LLP, 31 Brookside Drive, Greenwich Connecticut  06830.

23.  This Agreement may be executed in two or more counterparts, each of which shall constitute an original, and all of which together shall constitute one Agreement.


WHEREFORE, the parties have executed this Agreement on December 19, 2002

_____
James C. Couri

Couri Acquisition Corp.
By _____

Couri Capital Corp.
By_____
James C. Couri

Couri Group, Inc.
By_____
James C. Couri

Guardian Financial Planning Corp.
By_____
James C. Couri

Kindervest Planning Corp.
By_____
James C. Couri

9



Couri Ventures Ltd.
By_____
    James C. Couri

Couri Holdings Corp. Corp.
By _____
    James C. Couri

Road Runner Properties, Corp.
By_____
    James C. Couri

Road Runner Holdings Corp.
By_____
    James C. Couri

Tangerine Venture Corp.
By_____
James C. Couri

Goldfish Enterprises, Ltd.
By_____
    James C. Couri

Couri Assets Corp.
By_____
    James C. Couri

Marlene Couri Trust
By_____
    James C. Couri, Trustee

Lydia A. Couri Trust
By _____
    James C. Couri, Trustee

_____
John Siebert

John Siebert PC
By_____

10

STATE OF NEW YORK          )
                          )ss.:
COUNTY OF NEW YORK    )

           On the 19th Day of December, 2002, before me, the undersigned, a Notary Public in and for the State of New York, personally appeared James C. Couri , personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument, and who acknowledged to me that he/she/they executed the same in his/her/their capacity (ies), and that by his/her/their signature(s) on the instrument, the individual(s) or the person on behalf of which the individual(s) acted, executed the instrument.

                                       **NOTARY PUBLIC**

STATE OF NEW YORK          )
                          )ss.:
COUNTY OF NEW YORK    )

           On the 19th Day of December, 2002, before me, the undersigned, a Notary Public in and for the State of New York, personally appeared John Siebert, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument, and who acknowledged to me that he/she/they executed the same in his/her/their capacity (ies), and that by his/her/their signature(s) on the instrument, the individual(s) or the person on behalf of which the individual(s) acted, executed the instrument.

                                       **NOTARY PUBLIC**

4214cont

11

*See PG 4 PG 12*

## PROMISSORY NOTE

$1,400,000.00                                                    December 19, 2002

FOR VALUE RECEIVED, John Siebert ("Siebert") and John Siebert, P.C. ("PC") (Siebert and PC shall be referred to herein collectively as "Obligors"), with offices at 799 Park Avenue, New York, New York, promise to pay to the order of Couri Acquisition Corp. (the "Holder"), at 575 Madison Avenue, New York, New York 10022, or any such other address as may be designated by the Holder, the principal sum of One Million Four Hundred Thousand Dollars ($1,400,000.00) (the "Principal Sum"), together with interest thereon at the rate hereinafter provided, in accordance with the following:

1.    <u>Interest</u>.        Commencing as of the date hereof and continuing until the entire principal sum is paid to Holder, the unpaid Principal Sum shall bear interest at an annual rate of Four Percent (4%).

2.    <u>Payments</u>.        Siebert and PC shall make the following payments to Holder:

<u>Principal:</u>
$15,000.00 upon execution and delivery of this Promissory Note;
$15,000.00 on the first day of each month for 5 months, through and including May 1, 2003;
$12,500.00 on the first day of each month for 7 months, through and including December 1, 2003;
$15,000.00 on the first day of each month for the following 6 months, through and including June 1, 2004;
$20,000.00 on the first day of each month for the following 6 months, through and including December 1, 2004;
$25,000.00 on the first day of each month for the following 12 months, through and including December 1, 2005

The remaining balance of the Principal Sum, plus all accrued and unpaid interest, shall be due and payable on January 16, 2006.

<u>Interest:</u>
Accrued interest on this Note shall be payable in semi-annual installments. The first installment shall be payable on August 30, 2003. The second installment of interest shall be payable on December 30, 2003. Thereafter, installments of interest shall be paid on June 30 and December 30 of each year, except that all interest accrued but unpaid on January 16, 2005 shall be paid on that date.

1

Prepayment:

Principal due under this Note may be prepaid at anytime and from time to time without penalty but with interest through the date of prepayment. Any partial prepayments shall be applied against installments of principal due hereunder in inverse order of maturity.

3.    Events of Default.    The occurrence of any one or more of the following events shall constitute an event of default (individually, an "Event of Default" and collectively, the "Events of Default") under the terms of this Note and upon the occurrence of an Event of Default the entire unpaid Principal Sum, plus all accrued and unpaid interest, shall at the option of the Holder, become immediately due and payable:

(a)    The failure of the Obligors to pay to the Holder any installment of principal or interest due hereunder within fifteen (15) days after notice from the Holder that such installment is past due; or

(b)    Entry of a judgment in any state or federal court of the United States against either Siebert or PC, which remains unsatisfied, unsecured or unbonded for 15 days.

(c)    Entry of a decree or order by a court adjudging either of the Obligors a bankrupt or insolvent, or approving as properly filed a petition seeking reorganization, arrangement, adjustment or composition of or in respect of either of the Obligors under the Federal Bankruptcy Code or any other applicable Federal or state law, or appointing a receiver, liquidator, assignee, trustee, (or other similar official) of either of the Obligors or of any substantial part of his/its

2



properties, or ordering the winding up or liquidation of his/its affairs; or

      (d)    Either of the Obligors shall: (i) apply for or consent to the appointment of a receiver, trustee or liquidator of either of the Obligors or any of his/its properties or assets; (ii) admit in writing his/its inability to pay his/its debts as they mature; (iii) make a general assignment for the benefit of his/its creditors; or (iv) file a voluntary petition in bankruptcy or have a bankruptcy proceeding brought against him/it and such involuntary proceeding is not dismissed within fifteen (15) days of its commencement.

      7.    <u>Joint and Several Liability</u>.   The liability of each of the Obligors with respect to this Note shall be joint and several.

      8.    <u>Remedies</u>.    Upon the occurrence of an Event of Default, the Holder shall have all of the rights, powers, and remedies available under the terms of this Note and all applicable laws. The Obligors hereby waive presentment, protest and demand, notice of protest, notice of demand and of dishonor and non-payment of this Note.

      9.    <u>Notices</u>.    Notices of any matter relating to this Note shall be addressed to and sent by overnight mail to each of the parties hereto as follows: To Holder: c/o James C. Couri, 575 Madison Avenue, 10th Floor, New York, New York 10022 and to Jon Paul Robbins, McLaughlin Stern, LLP, 260 Madison Avenue, New York, NY 10016; To John Siebert, and John Siebert, P.C.: John Siebert, MD 799 Park Avenue, New York, NY 10021 and Thomas Spellane, Gilbride, Tusa,

3



Last & Spellane, LLP, 31 Brookside Drive, Greenwich Connecticut 06830.

10.    Miscellaneous.        Each right, power and remedy of the Holder as provided for in this Note or now or hereafter existing under any applicable law or otherwise shall be cumulative and concurrent and shall be in addition to every other right, power, or remedy provided for in this Note or now or hereafter existing under any applicable law.  No failure or delay by the Holder to insist upon the strict performance of any term, condition, covenant, or agreement of this Note or to exercise any right, power or remedy upon a breach thereof shall constitute a waiver of any such term, condition, covenant, or agreement or of any such breach, or preclude the Holder from exercising any such right, power, or remedy at a later time or times.  By accepting payment after the due date of any amount payable under the terms of this Note, the Holder shall not be deemed to waive the right either to require prompt payment when due of all other amounts payable under the terms of this Note or to declare an Event of Default for the failure to effect such prompt payment of any such other amount.  No course of dealing or conduct shall be effective to amend, modify, waive, release, or change any provisions of this Note.

11.    Governing Law.        The provisions of this Note shall be construed, interpreted and enforced in accordance with the laws of the State of New York, without reference to the principles of conflict of laws.

12.    Waiver of Trial by Jury and Consent to Jurisdiction.  The Obligors hereby waive the right to a trial by jury in any action or proceeding on or related to this Note and do further expressly waive any and every right to interpose any counterclaim in any such action or proceeding.  This

4

waiver is knowingly, willingly and voluntarily made by the Obligors.

The Obligors hereby consent to the personal jurisdiction of the state and federal courts located in the state of New York. In the event that the Holder brings any action or suit in any court to enforce any or all liabilities of the Obligors hereunder, service of process may be made by mailing a copy of the summons to the undersigned at the address set forth on the first page hereof.

13.    Expenses.    The Obligors promise to pay the Holder on demand by the Holder all costs and expenses incurred by the Holder in connection with the collection and enforcement of this Note, including without limitation, all reasonable attorneys' fees and expenses and all court costs.

14.    Partial Invalidity.    In the event any provision of this Note (or any part of any provision) is held by a court of competent jurisdiction to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision (or remaining part of the affected provision) of this Note; but this Note shall be construed as if such invalid, illegal, or unenforceable provision (or part thereof) had not been contained in this Note, but only to the extent it is invalid, illegal, or unenforceable.

15.    Assignment.    The Holder of this Note may assign this Note or the right to receive any part of the payments due hereunder.



16.    <u>Captions</u>.    The captions herein set forth are for convenience only and shall not be deemed to define, limit, or describe the scope or intent of this Note.

Dated:  December 19, 2002

_____
John Siebert

John Siebert, P.C.

By: _____
John Siebert, President

4215note

6

*To all to whom these presents shall come or may concern, know that* John Siebert and John Siebert, P.C.., collectively referred to as RELEASOR, in consideration of the sum of Ten Dollars ($10.00), and other valuable consideration, received from James C. Couri, Couri Group Inc., Couri Acquisition Corp., Guardian Financial Planning Corp. Couri Holdings Corp., Couri Ventures, Ltd., Couri Assets Corp., Couri Capital Corp., Tangerine Venture Corp., Kindervest Planning Corp., Goldfish Enterprises, Ltd., Road Runner Holdings Corp. and Road Runner Properties Corp., Marlene Couri Trust and Lydia A. Couri Trust collectively referred to herein as RELEASEE, receipt whereof is hereby acknowledged, releases and discharges the RELEASEE, RELEASEE'S heirs, executors, administrators, successors, assigns, subsidiaries, agents, employees, officers, directors, stockholders and trustees from all actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims, and demands whatsoever, in law, admiralty or equity, which against the RELEASEE, the RELEASOR, RELEASOR'S heirs, executors, administrators, successors and assigns ever had, now have or hereafter can, shall or may, have for, upon, or by reason of any matter, cause or thing whatsoever from the beginning of the world to the day of the date of this RELEASE, except for the obligations set forth in the Settlement Agreement executed by the RELEASOR AND RELEASEE as of December 19, 2002.

The words "RELEASOR" and RELEASEE" include all releasors and releasees under this RELEASE.

This RELEASE may not be changed orally.

*In Witness Whereof*, the RELEASOR has hereunto set RELEASOR'S hand and seal on the 19th day of December, 2002

*In presence of*

_____
John Siebert

John Siebert, PC
By_____

STATE OF NEW YORK    )
                     )ss.:
COUNTY OF NEW YORK   )

On the 19th Day of December, 2002, before me, the undersigned, a Notary Public in and for the State of New York, personally appeared John Siebert, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and who acknowledged to me that he/she/they executed the same in his/her/their capacity (ies), and that by his/her/their signature(s) on the instrument, the individual(s) or the person on behalf of which the individual(s) acted, executed the instrument.

_____
NOTARY PUBLIC

4217rele                                          5/26/04

SUPREME COURT: NEW YORK COUNTY
-----------------------------------------------------------------

GOLDFISH ENTERPRISES, LTD.

       -against-

JOHN SIEBERT
-----------------------------------------------------------------

AFFIDAVIT FOR CONFESSION OF
JUDGMENT

Index No.

STATE OF NEW YORK   )

COUNTY OF NEW YORK )

JOHN SIEBERT, being duly sworn, deposes and says:

    1. I have an office for the transaction of business at 799 Park Avenue, New York, New York 10022.

    2. I confess judgment in this Court in favor of Goldfish Enterprises, Ltd., 575 Madison Avenue, New York, New York 10022, for the sum of $1,500,000, less any sums paid in satisfaction of the Agreement entered into as of September 28, 2000 by and among myself, James C. Couri, Kindervest Planning Corp. and Goldfish Enterprises, Ltd. I hereby authorize Goldfish Enterprises, Ltd. and its successors and/or assigns to enter judgment against me for that sum.

3. This confession of judgment is for debts justly due to Goldfish Enterprises, Ltd., arising out of a promissory note executed and delivered on August 2, 1999, a Guaranty executed and delivered on November 19, 1998, an Agreement dated as of February 22, 1999, and an Agreement dated January 28, 2000.

4. This Affidavit of Confession of Judgment is not for the purpose of securing the plaintiff against a contingent liability.

John Siebert

Sworn to before me,

Sept 28      , 2000

Notary Public

**Gloria A. Rodriguez**
**Notary Public, State of New York**
No. 01RO5048511
Commission Expires August 29, 20__

3258

9

H

We, John Siebert & John W Siebert M.D P.C ("Siebert") collectively here(in)
unconditionally agree as follows:

1. In consideration for the withdrawl of suit Couri v Siebert
Index #17494/03 without prejudice and other good & valuable
considerations which are here the acknowledged;

2. I and my PC will unconditionaly Pay to Couri acquisition Corp
&/or James Couri Seven Hundred thousand Dollars ($700,000.o)
on or before six months from the date of this agreement
Plus interst at 5 % per annum.

3. I & my PC will Pay to Couri acquisition Corp &/or James Couri
an additional Two Hundred thousand Dollars ($200,000.oo)
on or before six months from the date of this agreement
representing agreed sums in additional damages, losses
& expenses incurred by James Couri & Couri acquisition Corp.
as a result of my failure to fulfil my contractual
obligations to them.

4. I & my PC here(in) reaffirm & ratify as valid
binding and enforcable all of my obligations
Pursuant to the December 19, 2002 Agreement.

5. If I & my PC fail to pay and satisfy
the aforementioned Sums totaling $900,000.00
Plus interst six months from the date hereof, I
Consent to Couri bringing suit against me & my
PC, and waive any defense, for the collection
of all Sums that I guaranteed under agreement
dated February 22 1999,

6. I reaffirm all of my obligations and the
validity in connection with the February 22, 1999
Agreement, Confidentality agreent & Covenant Not to Sue.

7. I here(in)(& my PC) issue a general release in
favor of James Couri & others.

Wherefore, I & my PC unconditionally & irrevocably agree to
all of the conditions & commitments herein, and this Agreement
superceeds all prior agreents & understandings between & among
me, my PC, James Couri & Couri acquisition corp, etal.

Dated: 10-8-03

Agreed to:
By:

By: John Siebert

Exhibit A

Sworn to before me this
8th day of October 2003

Gloria A. Rivera
Notary Public, State of New York

## RELEASE

*To all to whom these presents shall come or may concern, know that* John Siebert and John Siebert, P.C., as RELEASOR, in consideration of the sum of Ten Dollars ($10.00), and other valuable consideration, received from James C. Couri, Couri Group Inc., Couri Capital Corp., Couri Acquisition Corp., Couri Ventures Ltd., Couri Assets Corp., Kindervest Planning Corp, Goldfish Enterprises Ltd., collectively referred to herein as RELEASEE, receipt whereof is hereby acknowledged, releases and discharges the RELEASEE, RELEASEE'S heirs, executors, administrators, successors, assigns, agents, employees, stockholders, directors and officers, from all actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims, and demands whatsoever, in law, admiralty or equity, which against the RELEASEE, the RELEASOR, RELEASOR'S heirs, executors, administrators, successors and assigns ever had, now have or hereafter can, shall or may, have for, upon, or by reason of any matter, cause or thing whatsoever from the beginning of the world to the day of the date of this RELEASE.

The words "RELEASOR" and "RELEASEE" include all releasors and releasees under this RELEASE.

This RELEASE may not be changed orally.

*In Witness Whereof,* the RELEASOR has hereunto set RELEASOR'S hand and seal on the 8 day of October , 2003

In presence of

_____
John Siebert

By: _____
John Siebert, P.C.

STATE OF NEW YORK      )
                      ) ss.:
COUNTY OF NEW YORK )

On the 8 day of October , 2003 before me, the undersigned, a Notary Public in and for the State of New York, personally appeared John Siebert, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and who acknowledged to me that he executed the same in his capacities, and that by his signatures on the instrument, the individual or the person on behalf of which the individual acted, executed the instrument.

_____
NOTARY PUBLIC

Gloria A. Rivera
Notary Public, State of New York
No. 01RO5048511
Commission Expires August 28, 20

4041release

Exhibit B

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

JAMES COURI,

                                    Plaintiff,

        -against-

JOHN SIEBERT and JOHN W. SIEBERT, MD, PC,

                                    Defendants.

**AFFIDAVIT IN
OPPOSITION TO
PLAINTIFF'S MOTION
FOR SUMMARY
JUDGMENT**

Index No. 107240/04

STATE OF NEW YORK    )
                     )
COUNTY OF NEW YORK)  ss.:

        JOHN W. SIEBERT, being duly sworn, deposes and says:

        1. I and my medical practice are defendants in the above-captioned action. I submit this affidavit in opposition to plaintiff's Motion for Summary Judgment dated April 17, 2008. I am fully familiar with the facts and circumstances relating to this action and the claims asserted by plaintiff.

## I. I DID NOT SIGN THE OCTOBER 8, 2003 AGREEMENT AND RELEASE.

        2. Plaintiff's lawsuit and motion for summary judgment is based upon an agreement and release that plaintiff says I signed. Plaintiff claims that on October 8, 2003, I signed an agreement in which I (i) agreed to pay plaintiff $900,000, (ii) released all my claims against him and his companies, and (iii) waived all claims or defenses that I may have to plaintiff's collection of funds due under a so-called "Consulting Agreement." (See, Exhibit 2 annexed to the moving Affidavit of James Couri, sworn to April 4, 2008. ("Couri Aff.").)

3. I never signed any such agreement or release. My dealings with plaintiff ended with the payment of $600,000 to plaintiff in August 2003. Since that time, I have never met with Couri and I certainly did not sign, nor would I ever have signed, the agreement or the release that he now claims I signed in October 2003. As of August 2003, I had paid plaintiff in excess of $7.8 million in connection with his scam business ventures. I had no intention of paying him a penny more.

4. Moreover, the terms of the October 8 agreement are outrageously one-sided. With the $600,000 payment that I made in August 2003, I had paid plaintiff more than $7 million. Yet, the October 8 agreement provides in Paragraph 5 that if I do not pay the $900,000 required by the agreement, I would be liable to him not just for the $900,000 but for "all sums that I guaranteed under agreement dated February 22, 1999." The amount due under that so called "Consultant Agreement" was approximately $13,000,000. There was no way that I would ever agree to such an obligation - - especially after what I had paid and endured to get out of plaintiff's clutches.

5. I find it curious that in all the years that this litigation has been going on, and all the complaints that plaintiff has filed against me (4, not including the two new actions) containing multiple causes of action, not once did plaintiff claim that I had breached the October 8 Agreement.

6. When plaintiff filed this action in June 2004, I filed counterclaims seeking the return to me of the $7 million that I had paid him from 1996 through 2003. If I had signed any agreement in which I had agreed to waive any defenses or claims, there is no doubt that plaintiff would have brought forth the October 8, 2003 agreement and file a motion to dismiss the counterclaims based upon the agreement. Plaintiff did not do so.

7. Similarly, if I had signed a release in October 2003, as plaintiff now claims, plaintiff would have asserted the release as a bar to my counterclaims. Plaintiff did not do so.

8. I understand that plaintiff has stated that I met with him at his office on October 8, 2003 and signed the agreement and release before a notary. I unequivocally state that (i) I did not meet with plaintiff on October 8, 2003 and (ii) I did not sign the agreement or release - - at plaintiff's office or anywhere else - - at any time.

9. I am informed by my attorneys that plaintiff has been requested to produce the originals of the agreement and release and that he has failed to do so. I am also informed by my attorneys that plaintiff claims that I stole the originals of these documents. This statement is so patently false, that I have difficulty even crediting it with a response. I will say this however: throughout my dealings with plaintiff, he was always the keeper of the documents. It was a matter of course with plaintiff that whenever I asked for copies of documents, he would say that he would get them to me, but in the meantime they were save with him at his office on Madison Avenue.

II. PLAINTIFF CONTINUES TO HARASS ME AND MY FAMILY BY THE FILING OF LAWSUITS AND HARASSING TELEPHONE CALLS.

10. In addition to bringing more lawsuits against me, plaintiff continues to call me and my wife at all hours of the day, always disguising his voice, saying "Is this Dr. Siebert's residence. It is? Is he in jail yet?" Needless to say this is most disturbing to my wife and me. He also places similar calls to my hospitals in New York and in Wisconsin.

11. Plaintiff also continues to allege that I am a pedophile, that I have abused my patients and that I am a "swindler." (For example, "Siebert is a documented swindler. He

is listed in the National Database as a pedophile who was investigated three times by the Connecticut Children's and Families [sic] . . . . He was accused by a nice woman . . . of assault and abuse." See Couri Aff. ¶ 34.)

12. As many times as he has been asked, indeed ordered, to cease his conduct, plaintiff continues on without a shred of remorse or a drop of restraint. I am informed that courts and justices have chastised plaintiff for his conduct, but from personal experience I can say that it has not had any effect on him whatsoever.

13. Plaintiff has the temerity to complain that he is not being treated fairly. ("As a citizen of the United States I am entitled to fair due process." See Couri Aff., ¶ 34.) I ask this Court to please put a stop to plaintiff's harassing conduct and direct him not to file any more lawsuits against me or my medical practice and to stop calling me, my wife, my home, my offices or my hospitals.

John W. Siebert

Sworn to before me this

28th day of April 2008

JOSEPH M. BURKE
Notary Public, State of New York
No. 5006339
Qualified in Westchester County
Commission Expires 12/28/10

# AFFIDAVIT

STATE OF PENNSYLVANIA          )
                               :ss.:
COUNTY OF MONROE               )

Gloria Rivera, being duly sworn, deposes and says:

1.    I have been a Notary Public licensed in New York State Notary #01R05048511.

2.    I was an employee of World Wide Business Centres (WWBC) until I resigned at or about July 2007 and relocated to Pennsylvania with my family.

3.    James Couri (Couri) maintained, through companies he was affiliated, office space as tenant, at WWBC located at 575 Madison Avenue, New York, NY 10022 on the 10th Floor.

4.    I was often called upon by Couri to notarize documents that he executed.

5.    At or about mid-1999 I met John Siebert (Siebert), who would frequently visit Couri at WWBC.  On various occasions Couri would call upon me to notarize documents that Siebert executed in my presence.

6.    Couri was always present when I notarized Siebert's signature and would always request Siebert produce his photo ID to me for identification, usually Siebert's driver's license.

7.    On October 8, 2003, I was called by Couri to come to the WWBC conference room for my notary services.

8.    Present at the time were Siebert and Couri.  Siebert presented me with an Agreement, handwritten, (Exhibit A), and asked me to notarize his signature, thereby signifying Siebert's agreement to the terms of the October 8, 2003 Document.  Siebert produced his photo ID and, thereafter and in my presence, Siebert duly executed said Agreement

(Exhibit A) on October 8, 2003. At Couri's request, Siebert swore to his accord and consent to the Agreement's terms and conditions. I thereafter signed the Agreement as Notary Public, and affixed my Notary Stamp to it in the form hereto as Exhibit A, thereby acknowledging that Siebert executed and swore to the Agreement and to its terms and conditions in my presence.

9.    I was then asked by Siebert to notarize a Release, which Siebert also executed in my presence, on two signature lines, in the Release (Exhibit B), once in Siebert's individual capacity, and the second as "PC."

10.    Thereafter I signed the Release as Notary Public, and affixed my Notary Stamp to it in the form hereto as Exhibit B, acknowledging Siebert executed said Release.


_Gloria Rivera_
Gloria Rivera


Sworn to before me this
_10_ day of March, 2008

NOTARY PUBLIC

Commonwealth of Pennsylvania
NOTARIAL SEAL
NICHOLAS J. CASCONE, NOTARY PUBLIC
MIDDLESMITH FIELD TOWNSHIP, COUNTY OF MONROE
MY COMMISSION EXPIRES MAY 27, 2010

We, John Siebert + John W Siebert MD PC ("Siebert") collectively herewith unconditionally agree as follows:

1. In consideration for the withdrawal of suit Couri v Siebert Index # 117494/03 without prejudice and other good & valuable considerations which are herewith acknowledged:

2. I and my PC will unconditionally pay to Couri acquisition Corp +/or James Couri Seven Hundred thousand Dollars ($700,000.00) on or before six months from the date of this agreement Plus interest at 5% per annum.

3. I + my PC will pay to Couri acqusit Corp +/or James Couri an additional Two Hundred thousand Dollars ($200,000.00) on or before six months from the date of this agreement representing agreed sums in additional Damages, losses + expenses incurred by James Couri + Couri acqusit Corp. as a result of my failure to fulfil my contractual obligations to them.

4. I + my PC herewith reaffirm + ratify as valid binding and enforceable all of my obligations pursuant to the December 19, 2002 agreement.

5. If I + my PC fail to pay and satisfy the aformentioned sums totaling $900,000.00 plus interest six months from the date hereof, I consent to Couri being suit against me + my PC, and waive any defense, for the collection of all sums that I guaranteed under agreemt dated February 22 1999,

I reaffirm all of my obligations and the validity in connection with the February 22, 1999 agreemt, Confidentiality agreemt + Covenant not to Sue.

7. I herewith (+ my PC) issue a general release in favor of James Couri + others.

Wherefore, I + my PC unconditionally + irrevocably agree to all of the conditions + commitments herein, and this agreemt supersedes all prior agreemts + understandings between + among me, my PC, James Couri + Couri acqusit Corp, et al.

Dated: 10-8-03

Agreed to:

By:

By: John Sult

Exhibit A

Sworn to before me this 8 day of October 2003

Gloria A. Rivera
Notary Public, State of New York
No. 01RO5048517

# RELEASE

*To all to whom these presents shall come or may concern, know that* John Siebert and John Siebert, P.C., as RELEASOR, in consideration of the sum of Ten Dollars ($10.00), and other valuable consideration, received from James C. Couri, Couri Group Inc., Couri Capital Corp., Couri Acquisition Corp., Couri Ventures Ltd., Couri Assets Corp., Kindervest Planning Corp, Goldfish Enterprises Ltd., collectively referred to herein as RELEASEE, receipt whereof is hereby acknowledged, releases and discharges the RELEASEE, RELEASEE'S heirs, executors, administrators, successors, assigns, agents, employees, stockholders, directors and officers, from all actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims, and demands whatsoever, in law, admiralty or equity, which against the RELEASEE, the RELEASOR, RELEASOR'S heirs, executors, administrators, successors and assigns ever had, now have or hereafter can, shall or may, have for, upon, or by reason of any matter, cause or thing whatsoever from the beginning of the world to the day of the date of this RELEASE.

The words "RELEASOR" and "RELEASEE" include all releasors and releasees under this RELEASE.

This RELEASE may not be changed orally.

*In Witness Whereof,* the RELEASOR has hereunto set RELEASOR'S hand and seal on the 8 day of October , 2003

In presence of

_____
John Siebert

By: _____
John Siebert, P.C.

STATE OF NEW YORK    )
                     ) ss.:
COUNTY OF NEW YORK )

On the 8 day of October , 2003 before me, the undersigned, a Notary Public in and for the State of New York, personally appeared John Siebert, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and who acknowledged to me that he executed the same in his capacities, and that by his signatures on the instrument, the individual or the person on behalf of which the individual acted, executed the instrument.

_____
NOTARY PUBLIC

Gloria A. Rivera
Notary Public, State of New York
No. 01RO5048511
Commission Expires August 23, 2005

4041release

Exhibit B

## RUSSO & BURKE

ATTORNEYS AT LAW

600 THIRD AVENUE

NEW YORK, N.Y. 10016

(212) 557-9600

FAX (212) 557-9610

WWW.RUSSOANDBURKE.COM

JOSEPH M. BURKE
WILLIAM J. RUSSO

MATTHEW B. ABRAMS

* ALSO ADMITTED IN CALIFORNIA

JOEL L. HECKER
LEONARD P. HORAN*
OF COUNSEL

October 7, 2009

Ms. Gloria Rivera
RR 6 Box 6640
East Stroudsburg, PA 18302-9141

Re:    James Couri v. John Siebert

Dear Ms. Rivera:

I represent John Siebert in a number of lawsuits filed by James Couri in New York County. Enclosed is an affidavit that appears to signed by you before Nicholas J. Cascone, a Pennsylvania notary, on March 10, 2008.

Is that your signature on the affidavit? Did you appear before Nicholas J. Cascone on March 10, 2008? Enclosed is the October 8, 2003 agreement referred to in your affidavit.

Please call me to discuss. Thank you.

Sincerely,

Joseph M. Burke

Enclosure

October 15, 2009


Russo & Burke
Attorneys at Law
600 Third Avenue
New York, NY 10016

    Re:   James Couri v. John Siebert

Dear Mr. Burke:

    In response to your letter dated October 7, 2009 I would state that yes the signature on the affidavit is mine and that I did appear before Nicholas J. Cascone on March 10, 2008 to have it notarized.


            Sincerely,

            Gloria Rivera

To: Mr. James Couri
c/o Krenkos — (P) 760-779-0321
(f) 760-776-8205

From: Gloria Rivera

Date: 10-17-09

Re: Copies you requested

Pages: 6 incl. cover sheet

I

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC# _____
DATE FILED: 10 14 14

---

**LYDIA ALEXANDRA COURI,**

          **Plaintiff,**

    -against-                 **CASE: 12-CV-2220 (TPG)**

**MCLAUGHLIN STERN LLP AND**
**JON PAUL ROBBINS ESQ.,**

          **Defendants.**

---

**DISCLOSURE AFFIDAVIT OF JAMES COURI**
**FATHER & ATTY IN FACT OF PLAINTIFF,**
**WITH EXHIBITS**

---

**JAMES COURI,**

**Pro Se**

**78365 Highway 111**
**La Quinta, CA 92253**
**760-346-2808**


RECEIVED
OCT 1 4 2014
PRO SE OFFICE

# JAMES COURI

78365 Highway 111, Suite 322, La Quinta, CA 92253 . 760-346-2808

Office of The Clerk                    Oct 11, 2014
U.S District Court SDNY
500 Pearl Street
NYC NY 10007

                                       Re Case #
                                       12-CV2220
                                       J Couri v McHugh Stern &
                                       Paul Robbins.

                                       Ref: Disclosure Aff with
                                       Exhibits from James Couri

Dear Clerks Office!
    Enclosed please find James Couri Aff &
Exhibits and Aff of Service regarding the above
Case (Original Document)
    Please be kind enough to File the Aff &
Exhibits, Post on Pacer and "Stamp" the
Enclosed Copy of the Cover Page + Return to
Me in the Enclosed PrePaid Envelope.
All parties have been Served (See Aff of Mail)
                                       Thank You

Enclosure

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Lydia Alexandra Couri,
                    Plaintiff                              12-CV-2220 (TPG)

                - against -                                DISCLOSURE AFFIDAVIT OF
                                                          JAMES COURI, FATHER & ATTY
McLaughlin Stern LLP and                                  IN FACT OF PLAINTIFF, WITH
Jon Paul Robbins Esq.,                                    EXHIBITS
                    Defendants.

_____

STATE OF CALIFORNIA

COUNTY OF RIVERSIDE

James Couri (Couri) being duly sworn deposes and says:

1. After careful review of the true facts surrounding this Case, and the gravity of my medical

condition, in part due to the recurrence of Stage Four Melanoma Cancer, revealed after PET-CT

Scans taken at UCLA on 6-2-14, I have determined to present to this Court the chicanery,

Extrinsic Fraud, Perjury. Suborning of Perjury, extortion, and manipulation of my daughter

Lydia Alexandra Couri (Alex), by lawyer Max Folkenflik (Max) and his "partner" in this Case

David Fisher Esq. (Fisher).  I believe that I have assembled proof that Fisher and Max recruited

Alex to discredit me, malign me, deprive me of any right to defend myself, refuse to depose me,

and then lie to this Court in order to achieve their extortion scheme. In the process, Records have

been illegally used in violation of IR Code 7216 and the law. In a nutshell, the Complaint is a

sham, replete with made up fantasy belied by documentary evidence. Max and Fisher simply

recruited Alex a mentally unstable drug addict in a scheme to shakedown unjust rewards and

Defendants Insurer Ace.

## MY GRAVE MEDICAL CONDITION

2. Exhibit A is an Affirmation from UCLA Oncologist Professor dated 6-25-14. The name is redacted as in the past these lawyers (MAX and others) have harassed my healthcare providers. The Document is self explanatory and reveals the gravity of my health situation. Also please see Exhibit B the 6-2-14 Scan, and Exhibit C, UCLA Reports of 7-15-14 regarding my condition which includes "lung metastasis, lymph nodes metastasis, coronary artery disease, etc. Also see Exhibit D Affidavit dated 5-23-06 from Oncology Surgeon Michael Schafir who resected the first finding of Melanoma in 2006. Also please see Exhibit E, Affidavit from Dr. Thomas Reynolds outlining in detail my medical situation.

3. I am undergoing highly toxic Chemo-Immuno treatments now and have undergone two more surgeries since June 2, 2014 related to Stage Four Cancer. Although I am fighting for my life, I want to put facts and evidence before this Court which will establish that Max has lied and caused Alex to lie by secreting evidence or tampering with evidence illegally obtained and illegally used.

## BACKGROUND

4. Alex was born 11-20-1978. Her natural mother is Carla Totero (Nations). Unbeknownst to me at that time and later confirmed when Carla entered The Smithers Institute in 1982 for Drug abuse in NYC, Carla was confirmed and admitted to being a drug addict since she was about fourteen years old. I have all of the Smithers Records that reveal, in Carla's own hand that she was involved in years of bad acts, thefts, sexual misconduct and rampant drug and alcohol abuses. Carla submitted an Affidavit here Sworn-to by her 5-14-12, Exhibit F. Carla reveals a series of bizarre acts engaged in by Alex and witnessed by Carla.

5. In 1986 the situation with Carla became impossible after she disappeared wit Alex, and I then filed for Divorce and Sole and Permanent Custody of Alex, in White Plains NY. After months of Psychiatric evaluations and interviews, Judge Sandra Miller awarded me Sole Custody of Alex, on consent in Court by Carla and Alex. See Exhibit J, excerpt of that Order. Soon after Carla totally disappeared and remained so for over six years.

6. I devoted my life and time to Alex. I enrolled her into Greenwich Academy, and then Miss Porters School. I spent a fortune on her lifestyle. In 1988 I married Marlene, my present wife, who was a successful businesswoman. Marlene gave to Alex love, affection and money.

7. While at Miss Porters, Alex began to exhibit characteristics of Carla. In or about 1997 Alex was caught by Miss Porters staff using marijuana and other drugs on Campus along with a Sarah Ball. Alex was expelled and sent home. I intervened and implored Headmistress Burch Ford and others to give her another chance. After about a week of consideration the School did just that.

8. Alex asked me to try and find Carla. I hired an investigator and found her in Texas, married to a Dan Nations. Alex wanted to visit with Carla. Again, I devoted time and money meeting with them and securing Agreements and promises that Carla and Dan were "drug-free". This was a lie. Soon after, in 1997 Alex began to visit with Carla and during each visit I had Alex and Carla's assurance that all was "well". After three years I came to learn by Alex Confession that she had been engaged in  a sexual relationship with Dan Nations for over three years while lying to me and Marlene. Further they were all engaged in not only sex but drug and alcohol abuse as well. I could not face how my daughter lied to me about this horrible situation, and I was still unable to face the truth that Alex was then and is now a drug abuser, a liar and without integrity.

ALEX CONSTANTLY SEEKING A "BAIL-OUT" AND "FREE-RIDE"

9. During the relevant times I did everything to protect and secure Alex. I respectfully refer the

Court to Exhibit O, my letter to my brother John Couri dated 12-12-13 relating to the

background leading up to the creation of the LA Couri 1989 Trust. All of this is well documented

but hidden by Alex's charlatan lawyers. The money was owed to me by my brother and I, in

1989, assigned it to Alex and the paid Attorney Robbins to sue John on behalf of Alex.


10. Thereafter, I wanted to be sure that Alex Taxes were paid and her bills paid so I became her

Attorney-in-Fact pursuant to a Durable POA Exhibit H and a POA at Chase Bank Exhibit I. I

paid all of Alex CPA bills and all her taxes that were due. I signed all her checks. All of this she

welcomed and thanked me for. For the Record, neither of these POA's have ever been

terminated according to law by Alex. Alex is now simply a puppet and stooge for Max and

Fisher. I append an Affidavit from Marlene Couri as Exhibit G further outlining the unstable and

bizarre acts of Alex. A careful review of the Carla Aff and Marlene's Aff reveals that Alex is a

unstable person, a drug abuser, a liar and highly irresponsible, and in need of rehabilitation. Alex

is incapable of making significant decisions on her own based upon her history. Alex has caused

herself to be involved in reckless acts of over spending, filing false Unemployment Insurance

Tax forms, buying thousands of dollars in Skin Care products from Sonia Dankar without money

in the Bank to pay for the items. I had to bail her out again.


DAVID FISHER ESQ. OF FISHER AND WOLFE ESQS.

11. The first I ever heard of David Fisher Esq. (Fisher) was in or about mid 2009. Alex called me

and read me a letter from Fisher and Wolfe Esq.s to Alex, signed by Fisher. The letter accused

Alex of "Theft" of David Desinctis credit cards and thefts of thousands in unauthorized charges

for a diet program, handbags, woman's shoes, dresses, etc. The letter further accused Alex of

hacking into Desinctis computer and hacking and tampering with Desinctis Emails. Fisher

threatened to file charges and file suit. Alex claimed that the claim was a lie. She begged me to

call Fisher, which I did. Fisher began a diatribe of threats, abuse and extortion. I reminded Fisher

that Alex and Desinctis were emotionally involved and had traveled together to Asia. I also

reminded Fisher that Desinctis was being charged as a "Art Thief". That was the last I heard

about that Fisher scam.


12. I later learned that Alex was doing part-time work for Fisher. Alex invited me to Fisher's

house where she was "house-sitting. In my own eyes I saw drug-paraphernalia in Fisher's

bedroom. Alex admitted to me much about Fisher early on. Putting it bluntly Fisher is a fraud, a

shakedown artist and a liar.

                                            FACTS

13. A careful reading of Exhibit N points to a very different picture than Max wants the Court to

see or know about. The complaint is a Poster-Child of Extrinsic and Intrinsic Fraud. The

Complaint falsely states that Couri Acquisition Corp is a "Shell" Corporation without assets.

This is blatant fraud. I append as Exhibit N, the Couri Acquisition 1999 first page of the Federal

Tax return of that year, and during the relevant time. The return reveals on its face over

$6Million in net assets at year-end 1999 and Income in excess of $1,100,000.00 for that year.

Hardly a "Shell Corporation. For the Record I refer the Court to Exhibit K collectively, which

includes various awards and accolades about me. I have been of "Great Value to Law

Enforcement", I was awarded the Senate Medal of Freedom and others.


14. Further to the forgoing fraud orchestrated by Max and Fisher is the false and absurd claim

that in or about Dec 2010, I confessed to Alex (on my death-bed) that I and Robbins "stole her

trust money".

15. First, by Dec. 2010 I was in partial Remission from Stage Four Melanoma Cancer and we were all elated.

16. Second, The money placed in the trust was mine that I assigned to Alex in the first place. See my letter to John Couri, Exhibit O.

17. Third, the post Dec 2010 actions of Alex prove that the alligation is absurd and belied by the facts.

THE FEB 25, 2011 ESCALADE CAR LEASE

18. To further show the previous closeness of my relationship with Alex in Feb. 2011, Alex offered to lease a new car for me knowing I had to travel weekly from the Desert to UCLA in Los Angeles, a two-hour drive each way. She decided on a new 2011 Escalade. On Feb. 25, 2011 Alex appeared at Jessup Cadillac with her then associate Tim Fleming and executed the Car Lease through Ally Financial for a 39 month lease at a rate of $656 per month. See Exhibit L collectively. It is worthy of note that the address Alex used for the lease and the DMV Registration was my office address in Palm Desert, CA. Further the Insurance was on my Policy also listing Alex.

19. From Feb. 2011 Alex never contributed a "red-cent" towards lease payments, maintenance, insurance or otherwise. It is clear as to what happened. When Max and Fisher were told about this by Alex they told her if she pays this car lease her case will be in the toilet. She was also told not to talk to me. Alex revealed this to Marlene.

20. I, Marlene and Marlene's daughter Pam helped make these payments thus building equity in the Lease. When I became ill in 2013 Ally sent Alex a Default-Termination. All the mail was

sent to Alex to my office. See Exhibit M. I worked it out with Ally and brought the Account

current.

21. In June 2014 when I was told of the resumption of Stage Four Melanoma Cancer, I advised

Alex, asking for her help as a daughter.

22. My reward was a call from a police officer that I returned from the Chemo-Center at UCLA.

The officer told me that Alex and her lawyer Fisher told her that if I did not return the Escalade

that they gave instructions to list the car as stolen on the Stolen-Car Data-Base. The officer said

that whoever is driving the vehicle would be mandated to be arrested. I asked him if Alex gave

that direction and he said yes, she and her lawyer did.

23. Under those circumstances and undergoing Chemo, I could not cause Marlene to be in that

situation so I told the officer tat I would deliver the Escalade to Jessup Cadillac. I did so that

afternoon although the payments were current and no "default' had occurred.

24. As can be seen I became a victim of theft and extortion by Fisher misusing a Police officer to

rob the Equity in the Car. I was working an arrangement to buy the car as I, Marlene and Pam

had paid about $28,000 in lease payments, not to mention new tires.

25. The more shocking is how a daughter can take such vicious and unconscionable acts on a

father that she knows is terminally ill. I later have learned that Alex forged the name on my XM

Satellite Account in the Escalade that I had just paid in full and she deviously cancelled the

Account and had the money paid to herself.  It's sad to see my daughter now willing to do

anything to her hands on money.

26. The proof here was the act of Alex in Feb 2011. If I had told her I stole her money why would she be leasing a car for me? Interestingly, I helped Alex buy and finance an Audi for her at about the same time.

## SUMMARY

27. Sad as it is I have had to face much about my only daughter, who is willing to be manipulated by fraud and corruption to steal a few bucks by abusing the Court System. Alex needs medical care, not money. Please see Exhibit P, one of over 50 loving Notes and Cards from Alex to her Dad. Sadly, the call from the police about the Escalade forced me to face the truth as to what others at Betty Ford, Hazelton and other Rehabilitation Hospitals, and even Carla have stressed for years. Alex ix sick and a danger to herself and to society. I am too weak and distraught to do any more for her except to pray for her.

James Couri
78365 Highway 111, suite 322
La Quinta, CA 92253
Tel: 760-346-2808

Sworn to before me this 11th day
of October OCT 2014

Notary Public

NAYAN P. GHELANI
COMM. #2000011
Notary Public-California
RIVERSIDE
My Commission Expires Dec. 31, 2016

UNITED STATES DISTRICT COURT

CASE: 12-CV-2220  (TPG)

Lydia Alexandra Couri,
                        Plaintiff,

AFFIDAVIT OF MAIL

            - against -

McLaughlin Stern LLP and
Jon Paul Robbins Esq.,
                        Defendants.

_____

STATE OF CALIFORNIA
COUNTY OF RIVERSIDE

M. COURI being duly sworn deposes and says:  I am not a party to this case.

On Oct. _11_, 2014, I placed in a Depository controlled by Federal Express JAMES COURI'S

DISCLOSURE AFFIDAVIT & EXHIBITS to:

    (a)  USDJ Thomas Griesa - Chambers
        US Courthouse
        500 Pearl Street
        New York, NY 10007


    (b)  Cozen O'Connor
        Patrick Sardino Esq.
        45 Broadway
        16th Floor
        New York, NY 10006


    (c)  Max Folkenflik Esq.
        Folkenflik McGerety
        1500 Broadway
        21st Floor
        New York, NY 10036



M. COURI

Sworn to before me this
day of  Oct. 2014.

_____
Notary Public

NAYAN P. GHELANI
COMM. #2000011
Notary Public-California
RIVERSIDE
My Commission Expires Dec. 31, 2016



## **AFFIRMATION**

STATE OF CALLIFORNIA
COUNTY OF LOS ANGELES

REDACTED    being duly sworn deposes hereby affirms as follows:

1. I am Assistant Clinical Professor Division of Oncology at UCLA Medical Center in Los Angeles, CA. (UCLA).

2. James Couri has been my patient since 2009 regarding his Stage Four Melanoma Cancer.

3. Mr. Couri was first diagnosed with Melanoma Cancer with lympho-vascular invasion in 2006. The sites were resected at that time. Thereafter, with the recurrence of Melanoma Cancer in 2009, Stage Four, Mr. Couri has been closely monitored at UCLA.

4. Due to the 2009 diagnosis of Stage Four Melanoma Cancer, Mr. Couri was told he had limited life expectancy. Mr. Couri soon thereafter underwent three surgeries at UCLA.

5. Following this, Mr. Couri underwent a lengthy program of toxic Immuno Therapy at UCLA during 2010.

6. From that time, Mr. Couri has been undergoing PET-CT Scans every three months and monitored carefully by me and UCLA's Oncology Staff and the UCLA Cardiology Staff as well.

7. On June 2, 2014, Mr. Couri underwent a PET-CT Scan at UCLA, which revealed the recurrence/resurfacing of active Melanoma Cancer, Stage Four.

8. Mr. Couri will be required to undergo immediate surgery, and promptly thereafter begin a lengthy program of Immuno Cancer-therapy at UCLA.

9. The Immuno Therapy has many debilitating toxic side effects, including severe disorientation, dizziness, nausea, severe rash, cardiac difficulties and many other disabling conditions that require constant hospital attention.

10. The treatment of Mr. Couri mandates careful monitoring and medical supervision at UCLA.

11. Mr. Couri's cancer condition is further exacerbated by his other medical disorders including cardiac, gastro-intestinal and other conditions.

12. In view of the forgoing circumstances, and the debilitating effects of the toxicity of the cancer Immuno-Therapy Mr. Couri is required to undergo at UCLA, Mr. Couri will be both physically and mentally unable to participate in daily activities for the foreseeable future.

13. The forgoing is based upon my teaching, training and experience, and the care of Mr. James Couri.

Dated: June 25, 2014

REDACTED

B

Auth Prev: 
Auth Prov Phone:
Auth Prov Fax:

## UNIVERSITY OF CALIFORNIA, LOS ANGELES

### Imaging Result

Name:
**Couri, James C**
Procedure(s) Performed:
**PET CT Body w Contrast**

DOB:
4/4/1939
Exam Date:
**06/02/2014**

Patient Class:
Outpatient
Reason for Exam:
The patient with metastatic melanoma with lymph node metastasis, the last scan showed mildly avid left supraclavicular lymph node, palpated on the exam, restaging scan, schedule in June 2014

UCLA ONCOLOGY IMAGING

EXAMINATION DATE: 2014-06-02 09:53:00

COMPARISON: PET/CT March 4, 2014

PURPOSE OF PET/CT:   Subsequent Treatment Strategy

CLINICAL HISTORY: 75 year old man with history of metastatic melanoma, nodal metastases, concern for left supraclavicular lymph node on prior examination. Chemotherapy completed 4 years prior.

REFERRING PHYSICIAN:

TECHNIQUE:
Imaging was performed on a Siemens Biograph 64 PET CT Scanner.  A single volume non-contrast CT of the upper abdomen was acquired in quiet breathing.  After the administration of intravenous contrast, volumetric CT scan of the chest was obtained in full suspended inspiration, and reconstructed at 1, 3 and 5 mm. Thereafter, volumetric CT was acquired from the base of the skull to the proximal-thighs during shallow breathing at 3 mm. After a standard uptake period following FDG injection, PET images were acquired, using multiple positions along the same length of the patient's body as the CT.  Iterative methods were used to reconstruct the PET images with a slice thickness of 2 mm.  The CT images were used for attenuation correction.

FDG Uptake Period: 47  minutes
FDG DOSE: 15.8 mCi F-18 Fluoro-Deoxy-Glucose
GLUCOSE: 113 mg/dl
Thoracic DFOV 43 cm

Oral Contrast: YES
IV Contrast: 115 cc, Omnipaque 350, Contrast Reaction: No

DOSE ESTIMATE:
The patient received the following exposure event(s) during this study, and the dose reference values for each are as shown (CTDIvol in mGy, DLP in mGy-cm). Note that the values are not patient dose but numbers generated from scan acquisition factors based on 32 cm (body, "a") and/or 16 cm (head, "b") phantoms and may substantially under-estimate or over-estimate actual patient dose based on patient size and other factors.

CT Abd wo (22a, 909); CT LungAbd w (26a, 1234); CT WB (23a, 2248);

PET FINDINGS:

ONCOLOGIC FINDINGS:
Previously visualized left supraclavicular lymph node has increased in size and FDG avidity, now with SUVmax of 3.8, previously 3.4. An additional left lateral supraclavicular lymph node has increased in size, with now moderate FDG avidity, max SUVmax 2.2. Subcentimeter left level 2 lymph node demonstrates new moderate FDG avidity.  These findings are highly concerning for nodal metastases.



NON ONCOLOGIC FINDINGS:

Chest:
Status post right upper and right lower lobe wedge resection.  Slightly increased atelectasis of the right lower lobe adjacent to gastric pull through. FDG avidity is visualized at the right supraclavicular joint, degenerative in nature.

Abdomen/Pelvis:
No abnormal FDG activity is identified. There is no significant FDG avidity of the partially calcified, stable appearing mesenteric mass. Physiologic FDG uptake is noted in the visualized portions of the abdominal solid organs, gastrointestinal tract, both kidneys, ureters and the urinary bladder.

Musculoskeletal System:
There is no focus of abnormal FDG activity in the bones to suggest metastatic disease.

For SUV reference:
SUVmean/max liver: 3.4/3.8   (fused series 5  - image 201)
SUVmean/max mediastinal blood pool (measured at the descending thoracic aorta) 2.7/3.3 (fused series 5  - image 244)

CT FINDINGS:

ONCOLOGIC FINDINGS:
Slight interval increase in size of left supraclavicular lymph node, currently measuring 8 x 15 mm (5-265). A 5 mm (5-271) lateral left supraclavicular lymph node appears grossly unchanged in size however demonstrates new FDG avidity.



U C L A Health

# UCLA MEDICAL CENTER
## Clinical and Pathology Laboratories
### Department of Pathology and Laboratory Medicine

10833 LeConte Avenue
Los Angeles, CA 90095

Phone:(310) 825-8947
Fax:(310) 206-4382

Jonathan Said, M.D.
Laboratory Director

# SURGICAL PATHOLOGY REPORT

Patient:    **COURI, JAMES C**
Patient ID#:    W3901564
DOB/Sex:    04/04/1939  M
Physician(s):

Specimen #:    **S14-16100**
Collected:    06/27/2014
Received:    06/27/2014
Resident:    Christopher Kim, M.D.

Specimen(s):    A. LEFT SUPRACLAVICULAR LYMPH NODE        Other:

## CLINICAL INFORMATION:
75 y/o male w/ hx of metastatic melanoma treated with Ipilimunab.  Please send for BRAF.  Need bx of L supraclavicular LN #4 for melanoma.  ICD-9 Code: 172.9

## FINAL DIAGNOSIS:

LYMPH NODE, LEFT, SUPRACLAVICULAR (LYMPHADENECTOMY):
- Metastatic melanoma
- Immunostains are confirmatory

COMMENT: BRAF mutational analysis has been sent and will be reported separately in an addendum.

### GENERAL IMMUNOHISTOCHEMISTRY REPORT

BLOCK:    A1
FIXATIVE:    Formalin

| ANTIBODY/PROBE: | RESULT/COMMENT |
| --- | --- |
| HMB45 | positive |
| MART1 | positive |
| SOX10 | positive |
| Tyrosinase | positive |

INTERPRETATION: Consistent with metastatic melanoma

C



▲ Health

COURI, JAMES C
MRN:
Enc. Date.07/15/14

...ctions (continued)

Orders

Treatment condition 02 [NUR876 Custom]
Nursing communication 22 [NUR1012 Custom]
Nursing communication 24 [NUR1014 Custom]

ECG 12 lead [ECG1 Custom]                                                      9/20/2014
Transthoracic Echo Adult Complete [ECH10                                     8/7/2014
Custom]
NM Myocardial Rest and Stress                                                   9/17/2014
Pharmacologic Perfusion SPECT [IMG418
Custom]
NM Stress Pharmacologic [ECH5065                                            9/17/2014
Custom]
Spirometry [PFT2 Custom]                                                       10/25/2014
Diffusing Capacity, Carbon Monoxide [PFT6                                  10/25/2014
Custom]
MRI Brain w wo Contrast [IMG271 Custom]                                     7/10/2015

Problem List as of 7/15 2014
CAD (coronary artery disease)
Stented coronary artery
Dyslipidemia
Metastatic melanoma
COPD (chronic obstructive pulmonary disease)
Winged scapula
HTN (hypertension)
Anxiety
Lung metastasis
Metastasis to lymph nodes

Vital Signs (Least 3 and one Last Recorded)
122/72          62          37.2 °C (99 °F) (Oral)          18          1.854 m (6' 1")          113.399 kg (250 lb.)

32.99 kg/m2                                                                                          Page

Couri, James C (MR...

▲ Health

*UCLA* (handwritten)

COURI JAMES C.
MRN:
Enc. Date: 7/15/14

**cations and Orders**

**Current Medications**

spirin 81 mg EC tablet
tenolol (TENORMIN) 25 mg tablet
torvastatin (LIPITOR) 80 mg tablet
zithromycin (ZITHROMAX) 250 mg tablet
iprofloxacin (CIPRO) 500 mg tablet
otrimoxazole DS (BACTRIM DS) 800-160
ng tablet
dexamethasone 0.1% ophthalmic solution
dutasteride (AVODART) 0.5 mg capsule
famotidine (PEPCID) 40 mg tablet
fluticasone-salmeterol (ADVAIR) 250-50
mcg/dose diskus
hydrocodone-acetaminophen (NORCO) 5-
325 mg tablet
ibuprofen (ADVIL, MOTRIN) 800 mg tablet
metformin (GLUCOPHAGE) 500 mg tablet
oxycodone 5 mg tablet
ranolazine (RANEXA) 1000 mg 12 hr tablet
tamsulosin (FLOMAX) 0.4 mg capsule
tiotropium (SPIRIVA) 18 mcg/act inhalation
capsule

Take 1 tablet (81 mg total) by mouth daily.
Take 1 tablet (25 mg total) by mouth daily.
Take 1 tablet (80 mg total) by mouth daily

*Current Drugs Taken now 7-15-14* (handwritten)

Take 1 capsule (0.5 mg total) by mouth daily

Inhale 1 puff two (2) times daily.

Take 1 tablet (500 mg total) by mouth two (2) times daily with meals.

Take 1 tablet (1,000 mg total) by mouth two (2) times daily.
Take 0.4 mg by mouth at bedtime.
Place 18 mcg into inhaler and inhale daily

**Facility Administered Medications 7/15/2014**
ipilimumab (Yervoy) 335 mg in sodium
chloride 0.9% 177 mL IVPB

Inject 335 mg into the vein

Allergies as of 7/15/2014

Immunizations administered on date of encounter - 7/15/2014

Result Summary

Visit Disposition

Sign Up for MyChart
myUCLAhealth allows you to send messages to your care team, view your test results, renew your
prescriptions, schedule appointments, and more. To sign up, log on to http://my.UCLAhealth.org. Once you
are logged on, click on the Sign Up Now link and you will access the new member sign-up page. Enter your
myUCLAhealth Activation Code exactly as it appears below to complete the sign-up process. If you do not
sign up before the expiration date, you must request a new code.

myUCLAhealth Activation Code:
**Expires: 6/27/2015  4:54 AM**

If you have questions, call our Patient Support Line at 855-364-7052. Remember myUCLAhealth is NOT to

# IMPORTANT SAFETY INFORMATION ABOUT YERVOY (ipilimumab)

**YERVOY can cause serious side effects in many parts of your body which can lead to death. These serious side effects may include: inflammation of the intestines (colitis) that can cause tears or holes (perforation) in the intestines; inflammation of the liver (hepatitis) that can lead to liver failure; inflammation of the skin that can lead to severe skin reaction (toxic epidermal necrolysis); inflammation of the nerves that can lead to paralysis; inflammation of hormone glands (especially the pituitary, adrenal, and thyroid glands) that may affect how these glands work; and inflammation of the eyes.**

**These side effects are most likely to begin during treatment; however, side effects can show up months after your last infusion. Your healthcare provider should perform blood tests, such as liver and thyroid function tests, before starting and during treatment with YERVOY. Your oncologist may decide to delay or stop YERVOY.**

**Call your healthcare provider if you have any signs or symptoms or they get worse. Even seemingly mild symptoms can lead to severe or even life-threatening conditions if not addressed. Do not try to treat symptoms yourself.**

**SERIOUS SIDE EFFECTS MAY INCLUDE:**

- **Inflammation of the intestines (colitis) that can cause tears or holes (perforation) in the intestines.** Signs and symptoms of colitis may include:
  - diarrhea / loose stools, or more bowel movements than usual
  - blood in your stools or dark, tarry, sticky stools
  - stomach pain (abdominal pain), or tenderness

- **Inflammation of the liver (hepatitis) that can lead to liver failure.** Signs and symptoms of hepatitis may include:
  - yellowing of your skin or the whites of your eyes
  - dark urine (tea colored)
  - nausea or vomiting
  - pain on the right side of your stomach
  - bleeding or bruise more easily than normal

- **Inflammation of the skin that can lead to severe skin reaction (toxic epidermal necrolysis).** Signs and symptoms of severe skin reactions may include:
  - skin rash with or without itching
  - sores in your mouth
  - your skin blisters and/or peels

- **Inflammation of the nerves that can lead to paralysis.** Symptoms of nerve problems may include:
  - unusual weakness of legs, arms, or face
  - numbness or tingling in hands or feet

Please see accompanying Full Prescribing Information, including **Boxed WARNING** regarding **immune-mediated side effects**, and Medication Guide, for YERVOY.

4

# D

MICHAIL SHAFIR, M.D., F.A.C.S.

SURGICAL ONCOLOGY

CLINICAL PROFESSOR OF SURGERY
MOUNT SINAI SCHOOL OF MEDICINE
DERALD H. RUTTENBERG CANCER CENTER
1021 PARK AVENUE  NEW YORK, NY 10028

TELEPHONE: (212) 534-6900

May 23, 2006

AFFIRMATION

State of New York
County of New York

Dr. Michail Shafir a physician duly licensed in the State of New
York hereby affirms upon penalty of perjury:

1.  I am an Oncologic Surgeon in New York City and also at
    Mount Sinai Medical Center.

2.  James Couri is my patient who has been diagnosed with
    malignant melanoma, confirmed after numerous tests located
    in his right arm.

3.  I am also evaluating if the malignancy has spread to other
    of Mr. Couri's organs, bones, etc. which requires further
    and continuing testing, ongoing now.

4.  Mr. Couri's surgery took place at Mt. Sinai Hospital on
    May 17, 2006 for removal of the malignant melanoma and
    various lymph nodes.

5.  After the surgery Mr. Couri will require post operative
    care, convalescence, medications, care and treatment, the
    extent of which will be determined based upon the surgical
    results and his prognosis, after surgery.  Mr. Couri may
    also require further surgery for this malignancy.

6.  The aforementioned outlined prognosis and conditions of
    Mr. Couri are in addition to his cardiac and other medical
    issues.  Accordingly, Mr. Couri will not be able to resume
    his normal activities, and work, and/or conduct trials,
    depositions etc. until all of the foregoing is completed,
    and his condition is fully and satisfactorily resolved,
    and it is determined that the cancer malignancy is
    removed operatively.

7.  The forgoing evaluations etc. are based upon my medical
    teaching, training, and experience, and my treatment of
    James Couri.

Michail Shafir, M. D.

MS/sc

E

F

May-14-2012 09:53 AM US Bank 4178878506

05/12/2012   10:15    2180000008                        2A                         PAGE  02/04

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Lydia Alexandra Couri,
                              Plaintiff,

                  - against -                                          CASE 12-CV-2220

                                                          AFFIDAVIT OF A. CARLA NATIONS
McLaughlin Stern LLP,                                     NATURAL MOTHER OF LYDIA
Jon Paul Robbins Esq. et al,                             ALEXANDRA COURI
                              Defendants.

_____

STATE OF MISSOURI
COUNTY OF GREENE

A. CARLA NATIONS being duly sworn deposes and says:

1. I am the natural mother of Lydia Alexandra Couri (Alex).

2. I am a recovering substance abuser having gone into rehabilitation thanks to my former husband James Couri's (James) persistence and tenacity, which resulted in an Intervention in 1982 and subsequent treatment at Smithers Institute in New York City and other facilities resulting in my sobriety for more than 17 years.

3. I consented to James Sole Custody of Alex in 1986 and concentrated for about 7 years on my recovery.

4. I reside in Springfield Missouri having remarried and now separated.

5. I resumed contact with Alex in or about 1996.

6. I have functioned as a substance abuse counselor, including at Care Unit Hospital, Fort Worth, Texas and am fully familiar with Alex and her activities since 1996.

7. I regret this Affidavit, but I am desperately attempting to cause Alex to obtain treatment for her addictions and mental disorders at a qualified treatment facility such as Hazelton, Betty Ford, or The Meadows.

8. Accordingly, I set forth some of my experiences with Alex (from 1996 through 2011) that confirm her substance abuses and addictions.

May-14-2012 09:53 AM US Bank 4178878506

05/12/2012 10:15    2100000000    2A    PAGE 03/04

9.   While Alex was visiting me in Missouri, an argument ensued which resulted in Alex physically attacking me at my home in my bedroom.  This conduct spawned by Alex's substance abuse.

10.   Thereafter, in my desire to try to continue to maintain and develop a closeness to Alex, I traveled from Missouri to California to visit with her.  On the last two occasions, Alex became abusive, nasty, demanding, and argumentative sufficiently to a point that the situation became unbearable and frightening to me.  As a result, I was forced to promptly depart and return to Missouri.

11.   Further, Alex engaged in very inappropriate and sexual conduct with my now estranged husband Dan behind my back.

12.   On one occasion, when Alex was visiting me on a Christmas holiday while I was separated from my husband Dan, Alex went to a bar and picked up and brought to my home a total stranger in the middle of the night while Alex was intoxicated apparently seeking a sexual encounter.  I demanded the man leave.  At that time, I begged Alex to seek substance abuse treatment.  She refused.

13.   Alex also again admitted to substance abuse to me, relating an incident while Alex was under the influence in the Ivy Restaurant in Los Angeles in the presence of her then boyfriend David DeSanctis and his parents.

14.   In Aspen Colorado where I had paid for Alex's airfare and hotel, Alex became intoxicated and ordered a $400 steak in the presence of others forcing me into a corner of not being able to reject her selection.  I paid the tab.

15.   As recently as July 2011, I had just arrived for what was planned as a four-day visit with Alex in Los Angeles.  Soon, after my arrival, Alex became more than abusive, acting irrational, glassy eyed and hyper (telltale signs of drug abuse).  This incident was at the home of David R. Fisher Esq.  Alex began out of the blue, a diatribe verbally attacking and accosting me in such a manner that I became terrified and alarmed.  As Alex continued and her rant escalated I became shaken and scared.  I decided for my safety and based on her behavior and threatening utterances, it was best that I promptly depart for a hotel.  Thereafter, I secured a taxi, went to the Sunset Tower Hotel and left the next morning for my home in Missouri.  Since that time, I have not seen or spoken to Alex.

16.   Some time ago, I personally secured a $500,000.00 life insurance policy on my life with Alex as beneficiary; done so out of my love for my daughter.  As a result of Alex's continued pattern of horrible activities, substance addictions, and her unwillingness to allow us to aid her to seek help, I decided to terminate this insurance policy, which I recently have done.

May-14-2012 09:55 AM US Bank 4178878500

05/12/2012  10:15  2100000000                           2A                                   PAGE  04/04

17. I also wish to disclose that after agreement with Alex's Father James, I paid approximately $160,000 towards Alex's tuition at Washington University (1997 - 2001). I also, along with James, expended for Alex's lodging and other college expenses. Furthermore, I spent and paid to and for Alex additional sums for her expenses and lifestyle, clothing, and other tangibles from time to time during the periods 1996 to 2011.

18. There is no question, based on my training and first hand knowledge of substance abuse and addictions, my observation and interaction with Alex reveal that she regretfully inherited my genetic makeup. Alex is sadly addicted to substances and alcohol. I have observed Alex while she was under the influence of drugs and/or alcohol, conduct that I am regretfully fully familiar with. Alex's behavior (under the influence) is not dissimilar to mine while I was an addict. Alex, as I could during my addictions, is able abstain for brief periods and falsely appear normal. Please do not be fooled: she is not.

19. I make this Affidavit with a heavy heart and love for my only daughter Alex. I hope and pray that this Court will take steps to seek Alex's evaluation and prescription records, as without that and prompt treatment in an accredited facility, I fear for Alex's wellbeing and life.



A. Carla Nations

Sworn to before me this 14th
day of May 2012.

Notary Public

CYNTHIA M. CREWS
Notary Public
Greene County
My Commission Expires
Jan. 15, 2015
Commission #1056182

cc: All Parties

# G

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

                                                            CASE: 12-CV- 2220

Lydia Alexandra Couri,
                    Plaintiff,

                                                    AFFIDAVIT OF MARLENE COURI

            - against -

McLaughlin Stern LLP,
Jon Paul Robbins Esq. et al,
                    Defendants.

_____

STATE OF CALIFORNIA
COUNTY OF RIVERSIDE

MARLENE COURI being duly sworn deposes and says:

    1. I am the wife of James Couri (James), married March 5, 1988.


    2. At the time of our marriage James had obtained (in 1986) Sole and Separate Custody of his daughter Lydia Alexandra Couri (Alex) by Court Order in the Unified Court, White Plains, New York (Judge Sandra Miller). Alex was 8 years old and lived with James.


    3. At the time, Alex's natural mother, Carla, had no contact with her daughter and had in fact disappeared for about the first 7 years of our marriage, due to her substance addictions and inability to care for Alex.


    4. After our marriage, although I did not adopt her legally, I virtually became Alex's mother, which is what she wanted to call me and I gladly accepted. I was determined to help her since I could see she was an emotionally unstable child. Alex was a very clingy, needy child, who often threw tantrums and was extremely demanding and bossy. I took this responsibility seriously as I had just raised two of my biological daughters on my own who were adults. I thought with time and lots of love she would settle down and become stable.


    5. During the first weeks of living with Alex, she boasted to me that she knew how to get whatever she wanted from her father James by throwing a fit or making him feel guilty. I prayed this was not a sign of her underlying personality. I noticed the leather front cover of Alex's baby book that Carla had filed out was boldly printed in Alex's earliest handwriting stating "I Love Me - Alex" in ink. I also read a Court document from the Custody proceedings, where the Court ordered Psychiatrist "Dr. Bloomingdale" Evaluation of Alex. The Report stated that Alex was "self-centered" and predicted that Alex would grow up to be a "manipulator and game player".

6. I find it unfortunate to lay out in this Affidavit some of Alex's background of her difficult and unstable behavior. I'm still hoping to help her now, as always, realizing the troubled adult she has grown into.

7. We molded our lives around Alex. She attended Greenwich Academy in Greenwich Ct., and we resided, for the benefit of Alex's schooling (a day student), in Rye New York and commuted to New York City during weekdays driving back and forth for James business activities. During our marriage, we never carried on a "New York social life". Our life was centered around Alex.

8. I became a full time mother to Alex having stopped working when I married James and sold my business in or about 1988, a prominent modeling agency and school for a substantial sum of money. I am now a proficient artist (website: marlenecarrollcouri.com).
I advanced and paid for many of Alex's expenses out of my own funds, including various payments for Greenwich Academy, Miss Porters School, Buck's Rock Camp, Sorbonne in Paris and many of Alex's personal expenses, until as recently as 2011; although under no obligation to do so. I have never at any time used any funds from the LAC i989 Trust (Trust) for my personal benefit. My dear father never needed or received any financial support from me or James, and surely not from the Trust. Any "furs or jewelry" I paid for with my own money. I attended Alex's numerous school activities, including Mother's Day. I took her to ballet and art classes, orthodontic and pediatric doctors appointments, as well as driving her to school (one-hour round trip) when she frequently missed the school bus. These activities and services paid for by me and James.

9. During her school years at Greenwich Academy, a large group of classmates would no longer have anything to do with Alex because of her demanding, difficult behavior and she had to make other friends. Alex always was scholastically very bright, but emotionally difficult and unstable to friends and family.

10. Alex attended Miss Porters as a boarding student from her freshman through senior year, again paid for by me and James. James and I visited Alex almost every weekend (4 hours round trip). There came a time that the Head Mistress at Miss Porters was ready to expel Alex when Alex was found on campus using marijuana with other students, including Sarah Ball (who Alex is still associated with). Her father James intervened and convinced the school to only suspend Alex for ten days and placed her on school probation.

11. Upon visiting Alex's dormitory at Porters we would discover that Alex took items from our home without ever asking. Alex has always had an irrational sense of entitlement. Through her adult years as well, we have discovered that items were missing from our home after Alex visited, including narcotic drugs prescribed for James, post many surgeries.

12. Alex tearfully revealed to me that she had a sexual relationship with her mother Carla's husband years after the events. Alex explained that Carla was hospitalized and was on "suicide watch" upon learning of this betrayal.

13. Alex also confided that she had an inappropriate sexual relationship with her married employer, Michael Kohn; as well as difficulties with other staff members and was placed on "warning".

14. Alex has had a history of computer hacking, including the recent bogus email presented by Max Folkenflik to this Court. Then there is the incident with Alex's ex-boyfriend (David DeSanctis) that Alex's father James intervened again as her Attorney in Fact to quash a potential lawsuit for computer and email invasion; DeSanctis was represented by lawyer David R. Fisher Esq., who is now a part of this insane Courthouse charade. Additionally, Alex bragged to me that DeSanctis didn't realize that she was using DeSanctis's credit to continue ordering for herself home delivered diet meals from an expensive diet program.

15. In about 2009, while Alex was unemployed, Alex came to her father and I and confessed that she signed a contract at Sonya Dakar Skin Salon for about $2,500.00 worth of skin treatments that she had no means of paying. Again, as her Attorney in Fact, Alex asked her Dad to intervene for her and somehow cancel this compulsive decision and thoughtlessly signed document. James again swooped in and aided his daughter. Just as James also did the following year when Alex's landlord was unfairly keeping her security deposit when she vacated her apartment; Attorney-in-Fact-Dad came to her rescue.

16. Upon a visit to Alex's apartment a couple of years ago, I notice a green moss-like clump laying on her table and she quickly picked it up, implying that a friend of her must have left it behind. She admitted it was marijuana. A family member has revealed to me that Alex uses medical marijuana and has observed her doing so. We were told Alex has a bogus prescription for marijuana. Alex has talked about her use of xanax, Zoloft, Adderall, and she has taken from our home painkillers such as oxycodone, vicadin, and other narcotics; which is not normal. Alex has needed a registered Emotional Support Dog for traveling on airlines, which requires psychiatrist verification in writing revealing the patient has a mental illness.

17. Alex also received emails from the new girlfriend of another Alex ex-boyfriend (Ian Midgley) warning Alex to stop her bizarre and unwanted phone calls, emails and stalking of Ian. Alex had an extremely difficult time letting go of Ian. Most all of Alex's boyfriends have been the one to end the relationships with her.

18. Alex confided in me that she had fraudulently filled Unemployment records so she could receive more unemployment funds than she legally had a right to. Alex has been fired and rehired again and again by Kim Light and Tim Fleming, both of whom I have been told by Alex are substance abusers.

19. Late summer 2011, Alex appeared at our home looking like she had not bathed, was very disheveled, glassy eyed and acting erratic. She was clearly on some form of drugs and was screaming and hysterically threatening, using her auto to threaten running over her father.

20.   Alex's adult life and activities seem to reveal that her unstable childhood behavior and substance abuse has blossomed into a very troubled and addicted adult.  Sad as it is to point out to this Court what I've observed and/or been told by Alex, it is necessary to get her some professional help in a competent facility for addiction.  Until last year when Alex turned on her own family, I had a close relationship with her, with often daily contact, by phone, email and in person.

21.   Over the years, I have not only been a loving mother to Alex, I have financially advanced a substantial sum of money to support and help her.  The November 2010 Agreement was not solicited by me.  The terms of that Agreement were willingly agreed to by Alex in my presence and negotiated by her father on my behalf.  I appreciated the gesture and was pleased to see that Alex knew it was the right thing to do since she owed me a large sum representing loans and advances to and for her, much during her adult years.  Thereafter, during 2011, Alex, as part of her obligations, entered into and signed other commitments, etc.

22.   Additionally, I wish to confirm to the Court that I am James Couri's "Sole Caregiver".  He is very ill and suffers from multiple disorders, as confirmed by Dr. Reynolds Affidavit.  Among many other duties, I take James by car to UCLA, a over 2 hour drive from our home in the Coachella Valley, sometimes daily, for medical care and treatment.  Accordingly, neither James nor I can travel.

_Marlene Couri_

Marlene Couri

State of California
County of RIVERSIDE
Subscribed and sworn to (or affirmed)
before me on this 11th day of MAY
2012 by MARLENE COURI
proved to me on the basis of satisfactory
evidence to be the person(s) who
appeared before me.

_____
Signature

Sworn to before me this _____
day of May 2012.


_____
Notary Public

NAYAN P. GHELANI
Commission # 1825490
Notary Public - California
Riverside County
My Comm. Expires Dec 31, 2012



cc: All Parties

# H

# DURABLE GENERAL POWER OF ATTORNEY
## NEW YORK STATUTORY SHORT FORM

### *THE POWERS YOU GRANT BELOW CONTINUE TO BE EFFECTIVE SHOULD YOU BECOME DISABLED OR INCOMPETENT*

**Caution:** This is an important document. It gives the person whom you designate (your "Agent") broad powers to handle your property during your lifetime, which may include powers to mortgage, sell, or otherwise dispose of any real or personal property without advance notice to you or approval by you. These powers will continue to exist even after you become disabled or incompetent. These powers are explained more fully in New York General Obligations Law, Article 5, Title 15, Sections 5-1502A through 5-1503, which expressly permit the use of any other or different form of power of attorney.

This document does not authorize anyone to make medical or other health care decisions. You may execute a health care proxy to do this.

If there is anything about this form that you do not understand, you should ask a lawyer to explain it to you.

THIS is intended to constitute a DURABLE GENERAL POWER OF ATTORNEY pursuant to Article 5, Title 15 of the New York General Obligations Law.

I, Lydia Alexandra Couri, 575 Madison Avenue, New York, New York  10022 do hereby appoint:

*(insert your name and address)*

James C. Couri, 575 Madison Avenue, New York, New York  10022

*(If 1 person is to be appointed agent, insert the name and address of your agent above)*

xxxxxxxxxxxxxxxxxxxxxxx

*(If 2 or more persons are to be appointed agents by you insert their names and addresses above)*

my attorney(s)-in-fact TO ACT
*(If more than one agent is designated, CHOOSE ONE of the following two choices by putting your initials in ONE of the blank spaces to the left of your choice:)*

[        ] Each agent may SEPARATELY act.
[        ] All agents must act TOGETHER.
*(If neither blank space is initialed, the agents will be required to act TOGETHER)*

IN MY NAME, PLACE AND STEAD in any way which I myself could do, if I were personally present, with respect to the following matters as each of them is defined in Title 15 of Article 5 of the New York General Obligations Law to the extent that I am permitted by law to act through an agent:

(DIRECTIONS: Initial in the blank space to the left of your choice any one or more of the following lettered subdivisions as to which you WANT to give your agent authority. If the blank space to the left of any particular lettered subdivision is NOT initialed, NO AUTHORITY WILL BE GRANTED for matters that are included in that subdivision. Alternatively, the letter corresponding to each power you wish to grant may be written or typed on the blank line in subdivision "(Q)", and you may then put your initials in the blank space to the left of subdivision "(Q)" in order to grant each of the powers so indicated.)

[ LAC ] (A) real estate transactions;
[ LAC ] (B) chattel and goods transactions;
[ LAC ] (C) bond, share and commodity transactions;
[ LAC ] (D) banking transactions;
[ LAC ] (E) business operating transactions;
[ LAC ] (F) insurance transactions;
[ LAC ] (G) estate transactions;
[ LAC ] (H) claims and litigation;
[ LAC ] (I) personal relationships and affairs;
[ LAC ] (J) benefits from military service;
[ LAC ] (K) records, reports and statements;
[ LAC ] (L) retirement benefit transactions;

[ LAC ] (M) making gifts to my spouse, children and more remote descendants, and parents, not to exceed in the aggregate $10,000 to each of such persons in any year;
[ LAC ] (N) tax matters;
[ LAC ] (O) all other matters
[ LAC ] (P) full and unqualified authority to my attorney(s)-in-fact to delegate any or all of the foregoing powers to any person or persons whom my attorney(s)-in-fact shall select;
[ LAC ] (Q) each of the above matters identified by the following letters: A,B,C,D,E,
G,H,I,J,K,L,M,N,O,P,Q——————

*(Special provisions and limitations may be included in the statutory short form durable power of attorney only if they conform to the requirements of section 5-1503 of the New York General Obligations Law.)*

This Durable Power of Attorney shall not be affected by my subsequent disability or incompetence.

If every agent named above is unable or unwilling to serve, I appoint *(insert name and address of successor*

MARLENE COURI, 575 Madison Avenue, New York, New York
to be my agent for all purposes hereunder.

**To induce any third party to act hereunder, I hereby agree that any third party receiving a duly executed copy or facsimile of this instrument may act hereunder, and that revocation or termination hereof shall be ineffective as to such third party unless and until actual notice or knowledge of such revocation or termination shall have been received by such third party, and I for myself and for my heirs, executors, legal representatives and assigns, hereby agree to indemnify and hold harmless any such third party from and against any and all claims that may arise against such third party by reason of such third party having relied on the provisions of this instrument.**

This Durable General Power of Attorney may be revoked by me at any time.

**In Witness Whereof,** I have hereunto signed my name this 23 day of December 1999

(YOU SIGN HERE:) ➤ *(Signature of Principal)*
LYDIA ALEXANDRA COURI

ACKNOWLEDGMENT IN NEW YORK STATE (RPL 309-a)                    ACKNOWLEDGMENT OUTSIDE NEW YORK STATE (RPL 309-b)

State of New York                          | ss.:       State of                                  | ss.:
County of New York                                     County of

On Dec 23, 19 99   before me, the undersigned,     On                      before me, the undersigned.
personally appeared                                 personally appeared
    LYDIA ALEXANDRA COURI
personally known to me or proved to me on the basis of satisfac-     personally known to me or proved to me on the basis of satis-
tory evidence to be the individual(s) whose name(s) is (are) sub-    factory evidence to be the individual(s) whose name(s) is (are)
scribed to the within instrument and acknowledged to me that        subscribed to the within instrument and acknowledged to me
he/she/they executed the same in his/her/their capacity(ies), and   that he/she/they executed the same in his/her/their capacity(ies),
that by his/her/their signature(s) on the instrument the individ-   and that by his/her/their signature(s) on the instrument, the indi-
ual(s), or the person upon behalf of which the individual(s) acted,  vidual(s), or the person upon behalf of which the individual(s)
executed the instrument.                                            acted, executed the instrument, and that such individual made
                                                                    such appearance before the undersigned in

*(signature and office of individual taking acknowledgment)*        *(insert city or political subdivision and state or county or other place acknowl-*
                                                                    *edgment taken)*

Gloria A. Rodriguez                                                 *(signature and office of individual taking acknowledgment)*
Notary Public, State of New York
No. 01RO5042311
Commission Expires August 22, 2001

*Publisher's Note: This document is printed on 50% cotton paper. Unlike ordinary photocopy paper, this stock resists turning brittle and brown with age. Insist on genuine Blumberg forms to ensure the longevity of this important document.*
*The publisher maintains property rights in the layout, graphic design and typestyle of this form as well as in the company's trademarked logo and name. Reproduction of blank copies of this form without the publisher's permission is prohibited. Such unauthorized use may constitute a violation of law or of professional ethics rules. However, once a form has been filled in, photocopying is permitted.*

LYDIA ALEXANDRA COURI

TO

JAMES C. COURI

DURABLE

**Power of Attorney**

Statutory Short Form

Dated December 23, 1999

I

OF AGENT(S): **LYDIA ALEXANDRA COURI**

(PRINCIPAL)

**James C Couri**

(AGENT)

below, to be my agent to do the things listed below for me. I also authorize to sign any
. The Chase Manhattan Bank (the "Bank") concerning the acts and things listed below.

ENT(S):

1.   TO OPEN, maintain and to reconcile bank accounts (including retirement benefit
my name or otherwise with the Bank.

2.   TO DEPOSIT with the Bank for my account or otherwise, money, checks, drafts,
s and other instruments or orders for the payment of money; also, to endorse and deliver,
ection, or otherwise, any such instruments or orders; to accept statements from the Bank,
s of demands to honor or pay instruments, notices of refusal to honor or pay, and notarized
uch refusal. The Bank may accept documents from anyone for any of the purposes listed in
whether or not these documents are endorsed. The Bank may accept endorsed documents,
hom endorsed and whether they are endorsed by rubber stamp impression or otherwise.

3.   TO SIGN and deliver checks, drafts, promissory notes and other instruments or orders
: of money at or by the Bank, and to give other orders to the Bank for the disposition of money.
honor all such orders even if they would cause an overdraft, and even if they benefit the agent.
o duty to concern itself with the disposition of any money paid at my agent's request.

4.   TO PROMISE to honor (accept) drafts, bills of exchange or other orders for the pay-
y drawn on me or the agent, made payable at the Bank or directing payment by the Bank.

5.   TO SELL to the Bank commercial paper, bills or accounts receivable, promissory notes,
instruments or orders for the payment of money. To endorse and deliver them.

6.   TO BORROW money and renew loans from the Bank, with or without security.

7.   TO PURCHASE or acquire an interest in property from or through the Bank.

8.   TO DELIVER my property or any interest in it to the Bank for safekeeping or other rea-
pledge and mortgage it to secure my present or future debts to the Bank. To give the Bank
the handling of any of my property.

9.   TO DEMAND, receive and dispose of any of my property held by or under the control
To give orders concerning the disposition of any such property.

10.  TO APPLY for letters of credit and other forms of credit and to direct the Bank to

11.  TO SIGN and deliver receipts to the Bank.

12.

13.  TO DO anything and sign anything the agent believes appropriate in furtherance of
and powers given him in this Power of Attorney. If a lawsuit arises out of any of the matters
r of Attorney in which the Bank and I are on opposite sides, both the Bank and I waive a trial
s waive my right to bring any claim I may have against the Bank into a lawsuit between us.

TION OF AGENT(S)' ACTIONS:

I approve and confirm everything the agent or anyone he designates shall do under this
torney.

UPON POWER OF ATTORNEY:

The Bank may rely on this Power of Attorney until it receives written notice of its termina-
n, death. The Bank will incur no liability to me, my heirs or legal representatives by relying on it
uthority of the agent(s). I agree for myself and for my heirs and legal representatives to protect
m any claim and to reimburse the Bank for any loss it may suffer by relying upon this Power of
upon the authority of the agent(s), or on the authority of anyone the agent(s) designates, before
ses notice of termination of the Power of Attorney or of my death. I have made arrangements
s to be notified promptly when I die.

The handwriting and form of signature to be used by (each of) the agent(s) are as

_Lydea Alexandra Cocci_

_____

_____ (AGENT)    By: _____
                              (AGENT)

...ONS BY TWO OR MORE AGENTS:

-If I have appointed two or more agents, they may act as follows:

____ out    (a)    Each may act alone.

...opriate    (b)    Any_____ or more may act together.

            c)

...'S RIGHT TO REQUIRE PRINCIPAL'S CONFIRMATION:

The Bank may at any time require written confirmation by me of any orders or
...s of the agent or of any one he designates to act for him before it relies upon or takes any
... upon the agent's or his designee's orders or actions. The Bank shall, however, have no duty at
...time or in any circumstances to ask me for a written confirmation.

...VAL OF POWER OF ATTORNEY:

This Power of Attorney will survive any other power or authority I shall give to the
...s or any of them, except to the extent that I expressly restrict or revoke any of the powers or
...ces I grant. This Power of Attorney shall not be affected in the event that I become disabled
...competent.

_____
(SIGNATURE OF PRINCIPAL)

... _New York_ )
                ) ss.:
... OF _New York_ )

On this __23__ day of __Dec__, 19__99__

...me personally came _Lydia Alexandra Cocci_
...nown and known to me to be the individual described in and who executed the foregoing
...ment and acknowledged to me that he/she executed the same.

_Gloria A. Rodriguez_

Gloria A. Rodriguez
Notary Public, State of New York
No. 01RO5048511
Commission Expires August 28,
                                    20c

...FICATION BY AGENT(S):

I am the agent named in this Power of Attorney. In order to induce the Bank to act
...nce upon this Power of Attorney, I agree to make good any loss the Bank or anyone who takes
...ace may suffer, or liability it or anyone who takes its place may incur, by honoring or paying any
...ment signed or endorsed by me or the Principal or for any acts done by me. This includes acts
...ne both before and after the Bank has received notice of the death of the Principal or of the
...ation or termination of this Power of Attorney. If the Bank and I become involved in a lawsuit
...out of this Power of Attorney or my actions under it, we both waive a trial by jury. I also waive
...ght to bring any claim I may have against the Bank into a lawsuit between us.

_____
(SIGNATURE OF AGENT)

_____
(SIGNATURE OF AGENT)

... OF _New York_ )
                ) ss.:
... OF _New York_ )

On this __23__ day of __Dec__, 19__99__

...me personally came _James Cocci_
...nown and known to me to be the individual(s) described in and who executed the foregoing
...ment and acknowledged to me that he/she/they executed the same.

_Gloria A. Rodriguez_

Gloria A. Rodriguez
Notary Public, State of New York
No. 01RO5048511
Commission Expires August 28, 20c

J

At a Term of the Family Court of
the State of New York, held in
and for the County of Westchester
at the Courthouse thereof, 111
Grove Street, White Plains, New
York, on the $25$ day of August,
1986.

P R E S E N T :

       Hon. Sondra Miller,
          Judge.

-----------------------------------x
                    :
In the Matter of a Proceeding   :   Docket Nos. V-686-86
Under Article 6 of the Family    :            O-867-86
Court Act.                   :
                    :
CARLA COURI,               :
                    :
      Petitioner/Respondent, :     PERMANENT
                    :   ORDER OF CUSTODY
       -against-        :
                    :
JAMES COURI,              :
                    :
      Respondent/Petitioner. :
-----------------------------------x

      The instant matter having come on before this Court

(Miller, J.) by Order to Show Cause, Petition for Custody,

Cross-Petition for Custody and Petition for an Order of Pro-

tection on         , 1986; and Carla Couri having appeared

personally and by her attorney, Barry Goldstein, and James Couri

having appeared personally and by his attorney, Peter Alkalay,

and Alexandra Couri having appeared by her attorney, Lucille Oppenheim; and all parties having consented thereto;

NOW, THEREFORE, it is hereby

ORDERED, ADJUDGED and DECREED that the father, James Couri, shall have custody of Alexandra Couri; and it is further

ORDERED, ADJUDGED and DECREED that the mother, Carla Couri, shall have the right to visit with Alexandra Couri one weekend per month, commencing at 10:00 AM on Saturday and terminating at 7:30 PM on Sunday (hereinafter the "weekend visitation"), with the following provisions:

(i) such visitation may take place at a hotel within New York or Westchester County selected by Carla Couri, subject to the approval of James Couri, which approval shall not be unreasonably withheld;

(ii) in the event the weekend visitation takes place at a hotel, James Couri shall be responsible for the cost of a single room with double occupancy, as well as

-2-

K

*Republican*        *Senatorial*

*Medal of Freedom*

*Medal of Freedom Recipients*
Ronald Reagan
Margaret Thatcher
H. Norman Schwarzkopf

*Chairman*
Bill Frist, M.D.

*Circle Chairman*
Sam Brownback

March 13, 2002

Mr. James C. Couri
Fl. 10
575 Madison Ave.
New York, NY 10022

Dear Jim:

I am proud to present you with the Republican Senatorial Medal of Freedom -- the highest and most prestigious honor the Republican members of the United States Senate can bestow on an individual.

The Republican Senatorial Medal of Freedom signifies that you stand apart from other Americans, and it is presented in recognition of your commitment to our Party and our nation. I should also note that this is the first presentation of the Republican Senatorial Medal of Freedom in nearly three years.

I truly wish I had the opportunity to present your Medal in person, because it would offer me the chance to convey my thanks, and those of all my Republican Senate colleagues, for your continued commitment to the values, principles and ideals we all share.

Through your support of the Republican Senatorial Inner Circle, you have stood by us in our legislative and political battles. When we faced our greatest challenges, you stepped forward to serve. And today, your help continues to play a critical role in our battle to return a Republican Majority to the U.S. Senate.

Few Americans take on such responsibility or play such a personally active role in America's government. Indeed, that is why you are one of only a few individuals in New York to be recognized as a Republican Senatorial Medal of Freedom recipient.

It is a great honor for me to present you with this specially commissioned 2002 Medal of Freedom. In recognition of this historic time in our nation's history, I had the ribbon on your Medal changed from its traditional royal blue to red, white and blue and I am pleased that the enclosed Medal bears the symbolic colors of our nation's flag. Even if you are a past Medal of Freedom recipient, I think it's important for you to have this special edition Medal.

L

**LEASE AGREEMENT**
**GMAC SmartLease — Monthly Payment**

LESSEE (and CO-LESSEE) ("You") name and address, including county

LYDIA A COURI
72968 FRED WARING DR
PALM DESERT CA 92260 RIVERSIDE

LESSOR (Retailer)

JESSUP AUTO PLAZA
68-111 E PALM CANYON DR.
CATHEDRAL CITY CA 92234

**THE VEHICLE YOU ARE LEASING**

| New/Used | Year | Make & Model | Body Style | Vehicle # | Mileage | License # | Primary Use |
|---|---|---|---|---|---|---|---|
| NEW | 2011 | CADILLAC SEDA-DE | 4T | 1G6DA5EY0B0247243 | 23 | | |

**FEDERAL CONSUMER LEASING ACT DISCLOSURES**

... document largely illegible ...

Signed & Dated 2-25-11 by
L A Couri for her Dad.

Case 1:12-cv-02220-TPG-FM   Document 1-14   Filed 10/14/14   Page 1 of 2

1. Total amount due ...

6. Excess Wear and Use. ...  $9.25  per mile.

... $ 33272.80 ... plus official fees and taxes.

11. ITEMIZATION OF AMOUNT DUE AT LEASE SIGNING
   a. Agreed upon value of the vehicle     $ 55109.80
   b. Agreed upon value of any other optional equipment that
      Lessee agrees to add to the vehicle they lease signing
      (Describe) _____  +  $   N/A
      (Describe) _____  +  $   N/A
      (Describe) _____  +  $   N/A
   c. Sales tax/use tax                    +  $  795.04
   d. License/registration fees            +  $  765.00
   e. Title fee                            +  $  731.50
   f. Other (Describe) _____ N/A          +  $   N/A
   g. Other (Describe) _____      +  $   N/A
   h. Other (Describe) _____      +  $   N/A
   i. Other (Describe) _____      +  $   N/A
   j. Other (Describe) _____      +  $   N/A
   k. Other (Describe) _____      +  $   N/A
   l. CA TIRE FEE                          +  $   8.75
   m. Other (Describe) _____      +  $   N/A
                         Gross Capitalized Cost  $  56000.40

12. THE VEHICLE YOU ARE TRADING
   (year) _____ (model) _____
   Gross trade-in value                   =  $   N/A
   Agreed payoff                          —  $   N/A
   Net trade-in value                     =  $   N/A

13. OFFICIAL FEES AND TAXES. You will pay all government license, title, registration, testing,
   and inspection fees for the vehicle. You will pay all taxes on the lease or on the vehicle that the
   law says we must pay (except any required purchase income taxes). We may charge you monthly
   for these fees or taxes at the end of the lease or when they are due.

14. TOTAL AMOUNTS YOU MUST PAY DURING LEASE
   The amount of the actual taxes may be higher or lower depending on tax rates in effect at the
   vehicle's registered address.
   a. _____                $  5415.55
   b. _____                $   N/A
   c. Registration charge                 $   N/A
   d. License fee/other                   $  2566.54
   e. Subtotal (taxes including agreed capitalized cost reduction)  $  2935.20
   f. Excise taxes                        $   N/A
   g. Property taxes                      $   N/A
   h. Other (Describe)                    $   N/A
   i. CA TIRE FEE                         $   8.75
   j. Other (Describe) _____ N/A          $   N/A

15. MILEAGE
   Base mileage allowance     [X] Low mileage 10,000 miles/year   Lessee (and
      [ ] 12,000 miles/year   [ ] Low mileage 12,000 miles/year
      [ ] Medium duty truck (describe) 15,000 miles/year
      [ ] Heavy duty truck (describe) 25,000 miles/year

   Extra Miles. You are buying _____ N/A _____ extra miles at $ N/A per mile. If this lease ends
   after the last scheduled payment is due, we will credit you with $ N/A per mile for
   each unused extra mile. This credit will be no credit if the lease ends early, you buy the
   vehicle, or the vehicle is a total loss.

   Total Allowed Mileage on the Odometer at Lease End is   32570   miles.
      Starting odometer mileage                        —   53   miles
      Base mileage allowance                           +  32526  miles
      Purchased extra miles                            +  8/3   miles

   Excess Mileage Charge. The excess mileage charge is $ 8.25 per mile for each mile
   beyond the total allowed miles, plus tax. If the lease ends early and the vehicle is not a total
   loss, any excess mileage and wear charge will be more than residual value minus the
   vehicle sale price. There is no excess mileage charge if you buy the vehicle.

   IF DEALER CANNOT ASSIGN THE LEASE TO AN ASSIGNEE COMMONLY USED BY THE DEALER ON TERMS ACCEPTABLE TO DEALER,
   DEALER MAY RESCIND (CANCEL) THIS LEASE BY GIVING LESSEE NOTICE WITHIN 10 DAYS OF SIGNING THE LEASE.
   UPON RECEIVING NOTICE, LESSEE SHALL IMMEDIATELY RETURN THE VEHICLE TO DEALER IN AS-DELIVERED CONDITION,
   REASONABLE WEAR ACCEPTED; DEALER WILL THEN RETURN TO LESSEE ALL CONSIDERATION RECEIVED FROM LESSEE.
   LESSEE TO BE SUBJECT TO ALL TERMS OF THIS LEASE UNTIL VEHICLE IS SO RETURNED.   Lessee ___

   THERE IS NO COOLING OFF PERIOD
   California law does not provide for a "cooling-off" or other cancellation period for vehicle leases. Therefore, you cannot later cancel this lease simply because you change your mind,
   decided the vehicle costs too much, or wish you had acquired a different vehicle. You may cancel this lease only with the agreement of the lessor for legal cause, such as fraud.

---

15. LATE CHARGE. If you are not paid monthly payment in full within 30 days after it is due,
   you will pay a late charge of 2%.

16. CHARGE FOR FINES. If the government places a fine on the vehicle and you do not pay it
   promptly, we may pay it. Each time we pay a fine, you will pay us the fine plus $20.

17. SCHEDULED LEASE END. This lease is scheduled to end on   05/24/2015
   (month)   (day)   (year)
   You are scheduled to return the vehicle on this date.

18. LEASE END DAILY EXTENSION CHARGE. $ 52.04 per day (plus tax), beginning on
   the day after the scheduled lease end date.

19. REQUIRED VEHICLE INSURANCE INFORMATION. You affirm that liability and physical damage policies
   that meet our requirements for the other side are in force on the date of this lease as follows:

   Insurance company name:   HARTFORD UNDERWRITERS
   Insurance agency name: _____
   Agency Address:   1 HARTFORD PLAZA, HARTFORD, CT 06155
   Agency Phone no.   1 (877) 985-9918
   Agent's name: _____
   Policy no.   55MHR677322                [X] Liability  [X] Physical damage
   Deductibles: Collision $   500   Comprehensive $   500

   Insurance company name:   N/A
   Insurance agency name:   N/A
   Agency Address: _____
   Agency Phone no.   N/A
   Agent's name: _____
   Policy no.   N/A                         [ ] Liability  [ ] Physical damage
   Deductibles: Collision $   N/A   Comprehensive $   N/A

20. OPTIONAL LIFE AND DISABILITY INSURANCE. We are not requiring life or disability
   insurance. If you buy this insurance, we will only pay all the coverage(s) checked for the lease term. We will include
   the premiums in total monthly payment. A table that would show the coverages and the premiums are shown here
   separately. The insurance may not cover taxes and other amounts in the base monthly payment.
   Insurer name: _____
   Address: _____

   [ ] Life insurance  [ ] Lessee  [ ] Co-Lessee  [ ] Both       Premium  $   N/A
                                                     Coverage limit  $   N/A
   [ ] Disability insurance (Lessee only)                          Premium  $   N/A
                                                     Monthly coverage limit  $   N/A

   LESSEE SIGNATURE:  X _____   Age ___
   CO-LESSEE SIGNATURE:  X _____   Age ___

21. WARRANTY INFORMATION—LIMITED WARRANTY. You have the benefit of any warranty checked below:
   [X] Standard manufacturer warranty

   Warranty papers that are separate from this lease state any coverage limits.
   The law gives you a warranty that the vehicle conforms to the description on this lease.
   THERE ARE ALSO NO OTHER EXPRESS WARRANTIES ON THE VEHICLE.

   This warranty applies only to this lease, is not primarily for personal, family, or household
   purposes. WE MAKE NO IMPLIED WARRANTY OF MERCHANTABILITY. THERE IS NO
   WARRANTY THAT THE VEHICLE IS FIT FOR A PARTICULAR PURPOSE.

22. OPTIONAL SERVICE AND MAINTENANCE CONTRACTS.
   Name N/A _____  Term N/A months, N/A miles
   Name N/A _____  Term N/A months, N/A miles
   Name N/A _____  Term N/A months, N/A miles

   If you are buying a service or maintenance contract now, you may pay for it at lease signing. If
   you do not, the price will be in the capitalized cost and you will pay rent charges on the price.

SEE OTHER SIDE FOR OTHER IMPORTANT AGREEMENTS.

# APPLICATION FOR
## REGISTRATION OF NEW VEHICLE

STOCK #:
11-2132

21961533

| | | | | | |
|---|---|---|---|---|---|
| MAKE CADILLAC | YEAR MODEL 2011 | BODY TYPE UT | MOTIVE POWER G | NUMBER OF AXLES 2 | |

VEHICLE IDENTIFICATION NUMBER
1GYS4FE5BR247283

COUNTY OF RESIDENCE
RIVERSIDE

(1) VAULT FOR ALLY OR COLT, LSR (LESSOR)

(2) COURT, LYDIA A (LESSEE)

72960 FRED WARING DR          PALM DESERT          92260

PO BX 8128          COCKEYSVILLE          21030

02/25/2011          X

02/25/2011

A — Cost of vehicle purchased as a complete vehicle          02/25/2011          $56154.00

## ODOMETER DISCLOSURE STATEMENT

| DATE | SIGNATURE | PRINT NAME | ADDRESS |
|---|---|---|---|
| 02/25/2011 | | JESSUP AUTO PLAZA | |
| 02/25/2011 | | VAULT FOR ALLY OR COLT,LSR | |

— DMV copy —

## NEW VEHICLE DEALER NOTICE

21961533

| MAKE CADILLAC | BODY TYPE UT | VEHICLE IDENTIFICATION NUMBER 1GYS4FE5BR247283 | |
|---|---|---|---|
| DATE FIRST SOLD AS A NEW VEHICLE 02/25/2011 | | DEALER'S NUMBER 2102 | SALESPERSON'S NUMBER 656176 |

SOLD TO:   VAULT FOR ALLY OR COLT,LSR (LESSOR)
LYDIA A COURT

PO BOX 8128 COCKEYSVILLE MD 21030
72960 FRED WARING DR  PALM DESERT CA 92260

**A Public Service Agency**

## VEHICLE/VESSEL TRANSFER AND REASSIGNMENT FORM

*This form is not the ownership certificate. It must accompany the titling document or application for a duplicate title.*

**INSTRUCTIONS ON REVERSE SIDE     ALL SIGNATURES MUST BE IN INK     PHOTOCOPIES NOT ACCEPTED**

### SECTION 1: Vehicle/Vessel Description

| IDENTIFICATION NUMBER | YEAR MODEL | MAKE | LICENSE PLATE/CF # | MOTORCYCLE ENGINE # |
|---|---|---|---|---|
| 1GYS3AEFSBR247293 | 2010 ESCALADE | CADILLAC | | |

### SECTION 2: Bill of Sale

I/We JESSUP AUTO PLAZA                                    sell, transfer, and deliver the above vehicle/vessel
(PRINT SELLER'S NAME(S))

VAULT FOR ALLY OR COLT, LSR (LSR)

to LYDIA A COURI (LSE)     on 02  25  11  for the amount of $ VALUE RECVD
(PRINT BUYER'S NAME(S))       MO  DAY  YR                      (SELLING PRICE)

If this was a gift, indicate relationship: ___ N/A ___     (e.g., parents, spouse, friend, etc.)     $ N/A
(GIFT VALUE)

### SECTION 3: Odometer Disclosure Statement (Value/Mileage is Needed when Trade-in)

Federal and State Law requires that you state the mileage upon transfer of ownership. Failure to complete or providing a false statement may result in fines and/or imprisonment.

The odometer now reads [ ][ ][ ] , [ ] [5] [3] [ ] (no tenths) miles, and to the best of my knowledge reflects the actual mileage *unless one of the following statements is checked.*

**WARNING—ODOMETER DISCREPANCY**

☐ Odometer reading is NOT the actual mileage     ☐ Mileage exceeds the odometer mechanical limits

Explain odometer discrepancy: _____

### SECTION 4: Buyer and Seller (MUST complete applicable sections; date and sign this section)

**BUYER**

I acknowledge the odometer reading and the facts of the transfer. I certify (or declare) under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

| PRINT NAME | SIGNATURE | DATE | DL, ID OR DEALER # |
|---|---|---|---|
| VAULT FOR ALLY OR COLT, LSR (LESSOR) | X | 02/25/11 | X 2 |
| LYDIA A COURI (LESSEE) | | 02/25/11 | D 8 6 2 4 9 0 9 |
| | X | | |

MAILING ADDRESS: 72960 FRED WARING DR   CITY: PALM DESERT   STATE: CA   ZIP: 92260   DAYTIME PHONE #: (323)851-7530

**SELLER**

I certify (or declare) under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

| PRINT NAME | SIGNATURE | DATE | DL, ID OR DEALER # |
|---|---|---|---|
| JESSUP AUTO PLAZA | X | 02/25/11 | 21 0 0 |
| | X | | |
| | X | | |

MAILING ADDRESS: 68-111 E PALM CANYON DR.   CITY: CATHEDRAL CITY   STATE: CA   ZIP: 92234   DAYTIME PHONE #: (760)328-2571

### SECTION 5: Power of Attorney

I/We LYDIA A COURI (LSE)                appoint JESSUP AUTO PLAZA
VAULT FOR ALLY OR COLT, LSR (LSR)
(PRINT NAME(S))                                   (PRINT NAME(S))

as my attorney in fact, to complete all necessary documents, as needed, to transfer ownership as required by law.

| Signature required by person appointing Power of Attorney | DATE |
|---|---|
| X | 02/25/2011 |
| Signature required by person appointing Power of Attorney | DATE |
| X | |

M



P.O. BOX 380902
BLOOMINGTON MN 55438-0902

LYDIA A COURI
78365 HWY 111 #322
LA QUINTA CA 92253

December 27, 2013

PHONE: 1-888-925-2559



## NOTICE OF RIGHT TO CURE DEFAULT
### Re: Account Number : 061916951043

Dear LYDIA A COURI,

January 10, 2014 is the LAST DAY FOR PAYMENT.

$2,007.79 is the AMOUNT NOW DUE.

You are late in making your payment(s).  If you pay the AMOUNT NOW DUE (above) by  the LAST DAY FOR PAYMENT (above), you may continue with the lease.  If you do not pay by this  date, we may exercise our rights under the law.

If you pay and are late again in making your payments,  we may exercise our rights without sending you another notice like this one even though we may have accepted late payments from you in the past.

Remember  that  another  payment of $646.43 becomes due on January 25, 2014.  That amount is not included in the  AMOUNT NOW DUE shown above.

We may have alternatives to help resolve your situation.  If there is a misunderstanding regarding the amount that you owe us or some other special problem, please contact us at the number below Monday through Friday from 8:00 AM to 6:00 PM ET.

Sincerely,
Ally Financial
1-888-925-2559



TRD

N

Case 1:12-cv-02220-TPG-FM    Document 118-1    Filed 10/14/14 Page 18 of 87

# U.S. Corporation Income Tax Return

**Form 1120**
Department of the Treasury
Internal Revenue Service

For calendar year 1999 or tax year
beginning _____, ending _____

**1999**

**A** Check if a:
1 Consolidated return (attach Form 851) [X]
2 Personal holding co. [ ]
Personal service corp (as defined in Temp. Regs. sec. 1.441-4T) [ ]

**Use IRS label. Otherwise, print or type.**

Name
COURI ACQUISITION CORP. & SUBSIDIARIES

Number, street, and room or suite no. (If a P.O. box, see page 5 of instructions )
575 MADISON AVENUE

City or town, state, and ZIP code
NEW YORK, NY 10022

**C** Date incorporated
05/11/1998

**D** Total assets (see page 5 of instructions)
6,017,448.

**E** Check applicable boxes: (1) Initial return (2) Final return (3) Change of address

| Income | | | |
|---|---|---|---|
| 1 a Gross receipts or sales 25,581. b Less returns and allowances | c Bal ▶ | 1c | 25,581. |
| 2 Cost of goods sold (Schedule A, line 8) | | 2 | |
| 3 Gross profit. Subtract line 2 from line 1c | | 3 | 25,581. |
| 4 Dividends (Schedule C, line 19) | | 4 | 15,667. |
| 5 Interest | | 5 | 20,431. |
| 6 Gross rents | | 6 | |
| 7 Gross royalties | | 7 | |
| 8 Capital gain net income (attach Schedule D (Form 1120)) | | 8 | 1,132,298. |
| 9 Net gain or (loss) from Form 4797, Part II, line 18 (attach Form 4797) | | 9 | |
| 10 Other income (attach schedule) | | 10 | |
| 11 Total income. Add lines 3 through 10 | ▶ | 11 | 1,193,977. |

| Deductions | | | |
|---|---|---|---|
| 12 Compensation of officers (Schedule E, line 4) | | 12 | |
| 13 Salaries and wages (less employment credits) | | 13 | |
| 14 Repairs and maintenance | | 14 | 2,960. |
| 15 Bad debts | | 15 | |
| 16 Rents | | 16 | 79,250. |
| 17 Taxes and licenses | | 17 | 98,290. |
| 18 Interest | | 18 | 45,230. |
| 19 Charitable contributions | | 19 | 700. |
| 20 Depreciation (attach Form 4562) | 20 | 44,966. | |
| 21 Less depreciation claimed on Schedule A and elsewhere on return | 21a | 21b | 44,966. |
| 22 Depletion | | 22 | |
| 23 Advertising | | 23 | |
| 24 Pension, profit-sharing, etc., plans | | 24 | |
| 25 Employee benefit programs | | 25 | |
| 26 Other deductions (attach schedule) SEE CONSOLIDATED INCOME AND DEDUCTIONS | | 26 | 739,478. |
| 27 Total deductions. Add lines 12 through 26 | ▶ | 27 | 1,010,874. |
| 28 Taxable income before net operating loss deduction and special deductions. Subtract line 27 from line 11 | | 28 | 183,103. |
| 29 Less: a Net operating loss (NOL) deduction | 29a | 59,897. | |
| b Special deductions (Schedule C, line 20) | 29b | 29c | 59,897. |
| 30 Taxable income. Subtract line 29c from line 28 | | 30 | 123,206. |
| 31 Total tax (Schedule J, line 12) | | 31 | 31,300. |

| Tax and Payments | | | |
|---|---|---|---|
| 32 Payments: a 1998 overpayment credited to 1999 | 32a | | |
| b 1999 estimated tax payments | 32b | | |
| c Less 1999 refund applied for on Form 4466 | 32c | d Bal ▶ | 32d |
| e Tax deposited with Form 7004 | | 32e | 17,000. |
| f Credit for tax paid on undistributed capital gains (attach Form 2439) | | 32f | |
| g Credit for Federal tax on fuels (attach Form 4136) | | 32g | |
| | | 32h | 17,000. |
| 33 Estimated tax penalty. Check if Form 2220 is attached ▶ [X] | | 33 | 1,510. |
| 34 Tax due. If line 32h is smaller than the total of lines 31 and 33, enter amount owed | | 34 | 15,810. |
| 35 Overpayment. If line 32h is larger than the total of lines 31 and 33, enter amount overpaid | | 35 | |
| 36 Enter amount of line 35 you want: Credited to 2000 estimated tax ▶ Refunded ▶ | | 36 | |

**Sign Here**
Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

Signature of officer _____  Date 9-12-00  Title PRESIDENT

**Paid Preparer's Use Only**
Preparer's signature _____  Date  Check if self-employed [ ]  Preparer's SSN or PTIN 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
Firm's name (or yours if self-employed) and address  STRAUSS ROSEN COMAS & MODANSKY LLP
462 SEVENTH AVENUE
NEW YORK, NY
EIN ▶ 13 4038358
ZIP code ▶ 10018

911801  IWA  ▶ See Instructions for Paperwork Reduction Act Notice.

1

TC 59U 14



# JIM COURI

78365 Highway 111, Suite 322, La Quinta, CA 92253 . 760-346-2808

John Couri
162 Ramapoo Road
Ridgefield, Ct. 06877



Via: 1st Class Mail & Email

Dated: 12-12-13

John:

I recently came upon a photo of you on the internet by accident. It was taken during 2012 at a Founders Hall Anniversary Reception. I spent a few minutes pondering it, and what came to my mind is the fact that you are clueless as to the damages that you caused many as a result of your immoral acts of lies, greed and obsessions. This photograph of you reveals to me by your appearance that we are both near our final chapter. A phenomenon that we are all confronted, but for you, what you have done is in my mind the worst anyone can do---lie and cheat family. I am going to take this time to outline your despicable acts commencing when we were kids and right up to the present.

You should finally face your hypocrisy and that of Elaine, your wife. If you think you have fooled people by your supposed "charitable ways", look again. If you see yourself honestly in the mirror, you will face the reality that the only money you have is what you stole from family. So this will be easy for you to comprehend, I will outline your "bad acts", beginning when you were a kid at Camp Hawthorne and at the Miller School, when you were about 6 years old. Yes, your resentments and neurosis began then.

So in a nutshell, and since you and your wife will have to answer for the damage and injury that you caused by your greed and dishonesty I provide you with the list of your villainous conduct. This greed and lies and manipulations of your family has unjustly enriched you at the expense of family members that trusted you, supported you, cared for you, gave you a job, gave you a college education and financed you when you were broke. Remember what Dad said about "Ill gotten gains."

You betrayed and cheated our father, you conned and manipulated our mother, you cheated and ruined the lives of Mitchell and Virginia Habeeb, you lied and cheated me, and you cheated my daughter Alex.

It was me and Mitch who put our cash into DFI, because of our trust and love of Dad. Mitch and his wife trusted me, but they told Dad in my presence that they did not trust you. They were right. I also devoted years of time assisting DFI in its growth, doing so while you were plotting to steal my investment. My error was trusting family. It seems that your pathetic brain tells you that you won, having cheated and stolen. You have won nothing. You have a scheming wife and a son who has no regard for you, looks at you with disdain and who you bought and paid for from Columbia because you were not qualified for adoption in USA. Why? Because of your background of beating-up your former wife Pat Davis resulting in your arrest.

Well, sad and pathetic as it is, here is a list of your bad acts, dishonesty, thefts, misrepresentations, fraud, looting, obsessions and abusive conduct, establishing that you are a man without conscience, a sociopath, and a fraud; causing pain, suffering, loss and injury to others all for the unjust enrichment of yourself. I may have left some out, and our Dad is gone and cannot attest to the contents. Here is the real John Couri:

John Couri                                                                    Page 2

Expelled from the Miller School (6yrs)
Asked to leave Camp Hawthorne (10yrs)
Stabbed me with a fork (12yrs)
Repetitively concocted false incidents about me to Dad.
Breaking into Brunswick Prep School's various professor's offices
Stealing test questions and cheating at Brunswick
Lying to Brunswick Headmaster Alfred Everett when confronted
Your expulsion from Brunswick
Dad used political connections to get you into Syracuse
I gave Dad the cash to pay for most of your Syracuse tuition
You physically assaulted Pat Davis Couri your first wife
You were charged with spousal abuse
You had no job until our uncle hired you as a salesman
I gave $350K to Dad for DFI investment, you invested zero
I advanced another $25K for DFI legal assistance
Your cousins Mitch and Virginia Habeeb gave their life savings of $50K to Dad and you for DFI
investments
You looted Habeeb's money
You falsely accused me to Dad and DFI of stealing DFI cash from the safe at Kennedy, when I
was in NYC, and you had access to the safe yourself.
You and your wife Elaine interfered into my marriage with Carla, depriving her treatment for
admitted substance abuse. Your lies were proved by your phone records
You, Harold Boboroff and Elaine abused and manipulated Dad when he had brain cancer and ill
to sign-over my and the Habeeb's DFI shares to you and Elaine via a phony Trust while you
destroyed records.
You manipulated our mother who had mental disorders and forged her name aided by others
You engaged in perjury when I sued you for Alex
You forged and secreted documents and records to shore-up your theft
You conspired with Ken Gomez in order to injure me
When I left property at your home hoping that you would change, you stole it
You concocted an Affidavit to malign me and forged Mom's name to it. The affidavit is your
words not our mother's.
You have given money to charities that you have stolen from me, the Habeebs and Alex.

John, I could go on for many more pages but I wont. To be sure, I can prove anything I have
alleged here. You have done everything in your power to injure me and my family as part of
some demented obsession and greed. I tried to reach out to you on 3 separate occasions, hoping
and praying that you would recognize your demented acts of theft and fraud and correct it. You
hide behind a guise of respectability, but in reality you are a fraud. There is nothing worse than
betrayal/thefts from family.

It is not Paul Robbins who has stolen from Alex, it is you and your wife. You caused the
Habeebs severe loss and injury by your looting their life savings of $50K because they trusted
me and Dad and invested it in DFI. This caused them severe injury before they passed away.
Virginia in Nov 2008 and Mitchell in Jan 2009. Because of your looting you have therefore
disenfranchised Rickey Habeeb and 5 other of Mitchell's nephews. Your acts of greed have
caused pain and suffering for these fine people as well.

John Couri                                                                          Page 3

For a number of years after Dad passed, your robbing me of my DFI shares and my money was "put on the back burner" in my hope that you would recognize your transgressions and make things correct. I was foolish. Does your brain not ask why I, your brother, did not contest Dad's Will and the conversion of my property leaving Dad with an Estate of only $500--. The fact is I waited and hoped, but to no avail. Finally, I assigned my claims to Alex and I sued you.

Your cheating ways were evident to many including Federal Judge Briant. Your cheating, lying and robbing my money has caused irreparable injury to me, Alex and Marlene. You continue to meddle, lie and cheat, but like all psychopaths you can't tell the truth. Your wife Elaine admitted your mentally imbalanced ways.

I have said my piece. I am suffering with Stage 4 Cancer, Heart Disease, and numerous other medical disorders. I am anxious to remain alive in order to see you come forward and repay the family members and their assigns that you robbed by your deceit, dishonesty and fraud. This should include repaying the Habeeb's Estates and their respective Heirs.

John, your photo taken of you about one year ago speaks for itself, but you still have time to right your wrongs and to rectify the hurt, loss and injury you and Elaine have caused Alex, Marlene and me and the Habeeb heirs. The hypocrisy that you have been living and the false front you are displaying is not fooling many. Only some suckers and yourself. You are not fooling me and you are surely not conning God. You should realize that you are in a "glass-house". You may be surprised at what many say about you, Elaine and your son. You can only fool some of the people, and not for long.

Only you are to be blamed as to the horrible situation involving the Case brought in Federal Court by Alex. She is a sad neophyte. The Complaint is a shamble but the premise spawns from your theft of my money. Had you not engaged in amoral acts ripping off Dad and me, this Case would not have started. Your sickness and larceny have again caused irreparable harm to family.

Dad always said: "There is a time to dance and a time to pay the fiddler".

Accordingly, as your older brother I can only suggest that you and your wife promptly come forward and make-right your transgressions of thefts from family who cared and supported you. Remember our Dad's words about "ill-gotten gains". None of you, nor your adopted son "Chris" and his kids, are entitled to the money you and your wife have systematically looted and stolen, and they should not want it because what comes with the secreting of stolen money no one should want for their family. This is not lawyer talk, it is Family.

Your Brother
Jim


cc: All Parties

# P



February 16 14

Dad,

I love you so much and I know that nothing is going to happen to you → you will be fine. It really scares me that something might happen to you because you are the most important person in my life, thank you so much for everything you have done for me, even though I don't act like it. I really appreciate you. The day that Lucinda's feather died I cried for the whole day because I was scared that something may happen to you which everything will be ok. It didn't because everyone they'll love you will be forever I love you and will always ♡ Alex

It's just nature's way of helping your doctor make his car payments!

GOOD LUCK!

I ♥ U SO MUCH♡

J



NEW YORK STATE                    DEPARTMENT OF HEALTH
STATE BOARD FOR PROFESSIONAL MEDICAL CONDUCT

IN THE MATTER                                    STATEMENT

OF                                                        OF

JOHN SIEBERT, M.D.                                    CHARGES

JOHN SIEBERT, M.D., the Respondent, was authorized to practice medicine in New York State on or about April 8, 1986, by the issuance of license number 165821 by the New York State Education Department.

## FACTUAL ALLEGATIONS

A.    Respondent, a plastic surgeon, treated Patient A, [patients identified in appendix attached] from on or about January 2000 through and including July 2008. Respondent treated Patient A at his private offices at 799 Park Avenue, New York, NY and 50 East 71st Street, New York, NY and performed multiple surgeries on Patient A at Manhattan Eye, Ear, & Throat Hospital and Institute of Reconstructive Plastic Surgery, New York University Medical Center.

   1.   Between on or about June 2006, through on or about December 2008 Respondent engaged in an inappropriate intimate relationship with Patient A.

## SPECIFICATION OF CHARGES

### FIRST SPECIFICATION
### MORAL UNFITNESS

Respondent is charged with committing professional misconduct as defined in N.Y. Educ. Law § 6500(20) by engaging in conduct in the practice of the profession of

judiciary   agree to be bound by the Consent Order, and I ask that the Board adopt this Consent Agreement.

I understand and agree that the attorney for the Department, the Director of OPMC and the Chair of the Board each retain complete discretion either to enter into the proposed agreement and Consent Order, based upon my application, or to decline to do so. I further understand and agree that no prior or separate written or oral communication can limit that discretion.

DATE_____5/29/2013                     REDACTED

                                        JOHN SIEBERT, M.D.
                                        RESPONDENT

6

Subject Number 046-647

Page 1 of 1

New York   State   ≡ State Agencies

Search NY.GOV

Workers' Compensation Board

New York State
**Workers' Compensation Board**
OFFICE OF THE CHAIR
328 State Street  Schenectady, New York 12305



Governor Andrew M. Cuomo

Subject No. 046-647

### Temporary Suspension of Dr. John Siebert's Authorization to Treat Injured Workers Effective October 8, 2013

Authorization No. 165821-0W

Date: October 23, 2013

Pursuant to Workers' Compensation Law Section 13-d(4), the Chair of the New York State Workers' Compensation Board has exercised his authority to temporarily suspend Dr. John Siebert's authorization to treat injured workers within the New York State workers' compensation system effective October 8, 2013. *Dr. Siebert's last known business address is Univ. of Wisconsin Hospital, 600 Highland Avenue, Madison WI 53792.*

The Chair's designee's investigation has revealed that the Department of Health, Bureau of Professional Medical Conduct (BPMC) has issued BPMC Order # 13-168, wherein, Dr. Siebert did not contest the charge of engaging in conduct which evidences moral unfitness. His license has been suspended for three years, *stayed with probation for 36 months*, and he has a permanent license restriction, whereby, he may only examine and/or treat female patients in the presence of a chaperone. Therefore, the Chair believes that Dr. Siebert may be guilty of misconduct.

Dr. Siebert is prohibited from rendering treatment and care to injured workers while his authorization is temporarily suspended. Reports submitted by Dr. Siebert for services rendered prior to October 8, 2013, are valid, but are invalid for any services rendered on or after that date. Requests to cross-examine Dr. Siebert for services rendered prior to October 8, 2013 should not be denied due to the suspension of his authorization.

This suspension remains in effect until further notice. Any questions regarding the authorized lists should be referred to the Medical Director's Office at 1 (800) 781-2362.

Robert E. Beloten
Chair

K

FAX NO. 912128427410          P. 02



**Date:** Fri, Jul 2, 2010 11:23 am

On this day, June 29, 2010, I, Diane Lori Kleiman, the undersigned authority, being of sound mind, have prepared the following statement voluntarily and without duress. I hereby affirm, under penalty of perjury that the information contained herein, is truthful and accurate to the best of my knowledge and recollection.

I have prepared this statement after being contacted and subsequently personally interviewed by Abby Gordon, an Investigator employed by The New York State Department of Health (also known as "The DOH") who is conducting an investigation of Dr. John Weston Siebert, a Plastic and Reconstructive Surgeon licensed to practice medicine in the State of New York. Dr. Siebert is also employed by New York University Hospital and has operating privileges from New York Eye and Ear Hospital.

I'd like to begin this statement by giving a brief overview of my background. I graduated from the University of Rochester in 1983 receiving a Bachelor of Arts Degree with Distinction (Special Honors), majoring in History. I then spent the next three years attending John Marshall Law School in Chicago, graduating in 1986 with a Doctor of Jurisprudence (JD) degree. I returned to New York after graduation and immediately took the New York State Bar in July, 1986, which I passed on the first shot and scored in the top percent in the nation on the multi state section of the Bar Exam. I spent some time on Wall Street working with my father at a stock brokerage firm. I then was appointed as a Special Agent with the Treasury Department, The Bureau of Alcohol, Tobacco and Firearms (ATF) and received specialized training in Glynco, Georgia. In December, 1989, I was sworn in as an Assistant District Attorney in Queen's County and served as an ADA for 6 years, resigning in September, 1995 after serving under the leadership of 2 District Attorneys, John Santucci and Richard Brown). Not long afterward, I was contacted by the US Treasury Department, specifically, The US Custom's Service, and was offered an appointment as a Special Agent with Customs, which I accepted. I was sworn in as a Special Agent in March, 1998, attending a 16 week training course in Glynco Georgia where I received a special Sharpshooter Award. When I returned from training, I was assigned to JFK International Airport. After working at JFK for a few short months, I investigated and developed a case and within approximately 5 weeks thereafter, I made one of the largest drug arrests in the Airport's history. But what made this case that much more significant was it involved the smuggling of drugs into JFK with the assistance of a large group of Airline employees, most of whom worked the most secure areas of the airport, that being the ramps, posing a grave security risk to the American Public.

On or about September, 1993 I called the Office of Dr. Michael Hogan, a prominent Plastic and Reconstructive Surgeon, practicing in the State of New York, to schedule an appointment for a consultation to discuss having him perform a breast uplift on me. The receptionist who answered the phone stated in her salutation, in sum and substance. that "This is the Office of Dr. Hogan. How may I help you today?" No mention was ever made as to any other surgeons working for or with Dr. Hogan or operating out of that office. I set up an appointment with Dr. Hogan at that time for a date shortly thereafter.

On the date of my appointment, I arrived as scheduled to Dr. Hogan's Office, located at 799 Park Avenue, where one, and one alone, metal plate with Dr. Hogan's name engraved thereon, was prominently affixed to the outside of his office. I was greeted by the receptionist was given papers to fill out and then was led to an examining room. After getting undressed and putting on a patient robe, I sat down on the examining table, which faced a wall filled to capacity with awards and degrees Dr. Hogan had received from prominent universities and societies from all over the world. (Dr. Hogan's name appeared on these awards as the recipient). I was very nervous but after viewing all these awards from such prestiges organizations, my mind was more at ease, knowing I was in the office of one of the finest Plastic Surgeons in the world. It was at that moment that I knew that I would have Dr. Hogan perform my surgery.

Shortly thereafter, a man entered my room and introduced himself as Dr. John Weston Siebert, telling me that he is the PARTNER of Dr. Hogan, announcing that he would be seeing me that day because Dr. Hogan was on vacation in Australia. I was shocked that Dr. Hogan was not present because I had made it clear to the receptionist who had answered the phone the day I made my appointment that I had done alot of research, including speaking with other professionals in the medical community, and that Dr. Hogan was the ONLY surgeon I would allow to operate on me, given his fine reputation and expertise.

I started to get dressed telling Dr. Siebert that my appointment was with Dr. Hogan, that he would be performing my surgery, that there was no need to be examined by him and that I would simply reschedule my appointment with Dr. Hogan after he returned. Dr. Siebert was extremely aggressive in having me consent to him examining me stating that he would be operating alongside Dr. Hogan and would have to be examined by him first before Dr. Hogan would see me, as per Dr. Hogan's office policy. I consented to the examination which Dr. Siebert performed without incident. Afterwards, Dr. Siebert led me to his office where we spoke about why I wanted the surgery, what look I was hoping to achieve, basically routine questions that I believe any other Plastic surgeon would have asked a new patient. However, I was in his office a very long time, minimally an hour, and the conversation became a little more personal in nature. Dr. Siebert is from the midwest, was outgoing but soft spoken and has a certain charm that made me feel that he really cared about me and was looking out for my best interests. I had told him my father had recently passed away unexpectedly from a massive heart attack in my presence, that I was ALWAYS "Daddy's Little Girl", that I felt responsible for his death and somehow should have done something more that would have helped him to survive, that I felt a deep void in my life because besides missing him dearly, he did everything for me, that his dream was for me to get married and have children, and that the reason why I wanted the breast lift was to make myself more desirable and hopefully meet and marry my Prince Charming, which would make my father proud. After about an hour, I got up to leave his office and Dr. Siebert hugged me telling me I had nothing to worry about , that he would take good care of me. Before leaving, I set up another appointment to see Dr. Hogan only, and a date was scheduled for a few week's later, by the receptionist, assuring me of Dr. Hogan's presence and promising to call me should Dr. Hogan not be available for that appointment.

A few weeks later, the day before my next scheduled appointment with Dr. Hogan, I received a call from the receptionist confirming the appointment for the following day. I specifically asked her if Dr. Hogan would be present to examine me and she told me to come in, everything was fine. The next day, I arrived at Dr. Hogan's office as scheduled and sat down in the waiting room. I realized I was the only patient there and remembered that the same circumstances existed on my previous visit as well. This seemed odd especially for a surgeon of Dr. Hogan's stature and prominence, who was always in high demand, with patients waiting upwards of 2 months just to get an appointment.

Finally, the receptionist led me back to the same examining room as my last visit, with all the awards on the wall, gave me a gown, told me to undress and the doctor would be in shortly to see me. I did as requested and a few moments later, the doctor arrived to perform my examination. To my dismay, it was Dr. Siebert again, not Dr. Hogan. I asked him if Dr. Hogan was there and he told me that Dr. Hogan was still in Australia, had gotten ill but was expected to return shortly. I started to get dressed and expressed how annoyed and angry I was feeling because his staff had lied to me. Dr. Siebert turned on his mid western charm, speaking in a very warm and gentle manner, put his arm around me and said that as long as I was already there, he may as well examine me. I didn't understand why I needed to be re examined by him but was too worn out to argue. I also was afraid that if Dr. Siebert perceived me as a problem patient, he would convey his concerns to Dr. Hogan, thus convincing Dr. Hogan not to take me on as a patient.

During this examination, Dr. Siebert spent quite a bit of time examining and manipulating my breasts. He told me that a simple uplift would not yield a good result because although my breasts would be lifted, he would be removing the surrounding loose skin, minimizing my breasts to a size not in proportion to the rest of my body. However, he said I could have perfect, model like breasts with an uplift IN ADDITION TO the new saline breast implants that had just gone on the market, assuring me of their safety. I was not an advocate of breast implants and told him I wasn't interested but he persisted, trying to get me to change my mind. He further told me that since I was having my breasts done, I should also consider some lipsuction on my hips, thighs, and buttocks as well as an eyelift, explaining that I had bags under my eyes that were making me look much older than my years. I began to feel very anxious and upset because I didn't realize there were so many things wrong with the way I looked. I told him I would consider his recommendations and discuss them with Dr. Hogan on my next visit.

Again, I made another appointment to see Dr. Hogan before exiting the office and again told the receptionist that if Dr. Hogan would not be available to see me personally, to call me and cancel the appointment. I was adamant about that because there was no point in speaking with Dr. Siebert anymore since it was Dr. Hogan who was going to operate, not Dr. Siebert. On the next scheduled appointment, when again, Dr. Hogan was not present after being assured he would be, I had decided to go elsewhere and relayed that information to Dr. Siebert. Dr. Siebert started calling my home, expressing concern for my well being, was very charming and engaging, gradually manipulating me to trust him to do the surgery, offering me a large monetary discount to do so. He convinced me that he normally doesn't do that for any other client but that he cared about me, thought I was beautiful, felt we had a special connection and he was only looking out for my best interests, which was to make

me look and feel beautiful.

After months of visits and long phone calls with Dr. Siebert, I had let my guard down and started to trust him. He had such a warm, caring way about him, the tone of his voice, always knowing the right things to say, that I finally agreed to have him perform my surgery and a date was scheduled on or about February, 1994. As the date approached, I started to have second thoughts as to whether I should continue to wait for Dr. Hogan to return or allow Dr. Siebert to operate. As Dr. Siebert once stated in one of our many conversations, if he wasn't an excellent surgeon with a stellar reputation, Dr Hogan would never have asked him to join his practice nor would he have had the confidence to let Siebert take charge of his office and patients while away in Australia for so long had he not thought the world of him.
However, the day before the surgery I felt very uneasy and cancelled. For the next several weeks, I endured endless phone calls from Dr. Siebert, Carol, a nurse who had worked for Dr. Hogan for many years and was now working with Dr. Siebert, Nilsa, the office manager & other staffers to reschedule the surgery. A new operating date was arranged for March, which is when Dr. Siebert performed the first of many surgeries on me.

After many months of pressuring me to have breast implants in addition to the breastuplift, I finally agreed. I also agreed to have some liposuction on my legs and buttocks region. I underwent the surgery at NYU Hospital, which lasted much longer than Dr. Siebert had told both my mother, who remained in the hospital for the duration of the surgery, and me. When I awoke, I was in agorizing pain. I knew something was horribly wrong. I was admitted to NYU hospital for several days and placed on very high doses of pain medication. However the day I was released, I watched as the nurses removed the bandages to clean the areas. When the bandages were removed, I was absolutely horrified. Dr. Siebert had butchered me and he did not comport to what we had agreed upon. Specifically, Dr. Siebert and I agreed that the implants would be no larger, under any circumstances, than a size C cup. He was obsessed with humongus breasts. I was not. The implants he inserted were larger than a size Double D AND he NEVER performed the uplift. As such, the heaviness of the huge implants with no elasticity of the surrounding skin, caused my breasts to hang all the way down to my belly button, stretching and putting so much pressure on the skin, causing massive pain. Furthermore, instead of having a few slits on my thighs and hips, from the liposuction machine, Dr. Siebert had made incisions on the inner thighs of both legs that began approximately 2 inches above the knee and extended up to and into the groin, with more stitches running the full length of the vaginal area, extending deep into the buttock from behind and extending about 3 inches up past the vagina in the front. Seeing the incisions in the vaginal area, which caused severe disfigurement in that my outer lips have been completely pulled back, stretched to the point where they have completely disappeared, caused me to go into a state of hysteria. I felt like I was having a nightmare and that this could NOT be happening. That once I awoke, everything would be just fine. Unfortunately, that's not how this story ends.

I immediately had Dr. Siebert paged and when he arrived, he was all chipper, his usual charming self. When I showed him my wounds and confronted him as to what he did and why, he stated that if he placed larger implants into my breasts, he could avoid doing an uplift because they would fill out the area more. I told him his thinking was off, because common sense dictates that by placing a larger, heavier implant into a breast where the surrounding skin was loose because most of the elasticity in the skin was gone, would cause the heavy object to sink as far as it could go, which in my case was my belly button. It was not just the appearance that was shocking, you cannot imagine the pain the implants caused. Wearing a bra full time would be my only option. As for my legs which he clearly admitted he had no permission or authority to perform, he stated that he felt I would get better results if he simply removed the excess skin by cutting it off as compared to the liposuction, which is what we had agreed upon. However, it was apparent that no skin had been removed, that all he did was slice open my legs and sew them back together, not even in a clean line but zig zagging. He put the stitches into the vagina and buttock because he really didn't know what to do to keep the skin together at the groin. He was afraid that gravity would pull the stitches right out causing the skin to rip apart. However, he told me to calm down and that in 3 weeks, he would reoperate on me at New York Eye and Ear Hospital and "FIX" everything.

3 weeks later, I did if fact undergo surgery at New York Eye and Ear and he was supposed to remove the implants completely and simply give me an uplift, which is all I ever wanted. He also told me he would clean up the incisions on my legs. When I awoke, again, to my horror, he had ignored everything we discussed, left these huge implants in my body but performed an uplift. He did absolutely nothing with my thighs because he didn't have enough time. Again, I was in agonizing pain. He told me he would perform yet another surgery in 3 months to again correct the problems.

I need to address one other MAJOR issue before I continue. Prior to my first surgery with Dr. Siebert, I never used drugs. Once in a blue moon I'd be prescribed a painkiller for something like dental surgery or a broken leg, but even then, my father would have to force me to take it because I don't like the way it made me feel. After

the first surgery, Dr. Siebert was prescribing large doses of narcotics to me, telling me to take them regularly, whether in pain or not saying that the medication would be less effective if I waited until the pain was severe before taking it. For the three weeks between the first and second surgery, I followed his directions and was taking large doses of a variety of narcotics regularly, Even with such high doses of medication, I was still in agonizing pain. It also affected my thinking, suffered from severe depression, was very anxious and panicky because I couldn't see how he would be able to fix the mess he created. I also immediately started seeing other Prominent Plastic Surgeons in Manhattan who I later learned are colleagues and friends with Dr. Siebert, who told me to go back to Siebert and allow him to complete the surgery.No other Plastic Surgeon would touch me.I was limited in how many doctor's I could see because I was suffering from horrible pain but one after the other, they all refused to operate. As such, I had no choice other than to return to Dr. Siebert and allow him to operate again.

After the uplift in March, the heaviness in my breasts caused them to drop once again. As each day passed, the pain grew in intensity. Dr. Siebert continued to prescribe large doses of narcotics increasing the dosages regularly to get the effect needed to reduce the pain. I didn't know anything about addiction but when I addressed my concerns of becoming addicted to these narcotics with Dr. Siebert, he assured me that would not happen because they were being legally prescribed by a physician. As irrational as that sounds now, at that time, when my body and brain were intoxicated with these drugs,his answer made perfect sense.

From the time of my first surgery, Dr. Siebert was having me come to his office 1-2 times a week, every week.And phone conversations were plentiful. He became the focal point of my existence. We spent a lot of time together simply talking, not just in his office but when he called my home. By the summer of 1994 I was in such agony that I told him I would cut the implants out myself if he didn't remove them. It was then that he explained that he couldn't remove them because when he had originally put them in, instead of placing the implant either over or under the breast muscle, he essentially dug everything in that area out, removing the muscle completely. He stated if he removed the implants, I would have no breasts whatsoever and would be horribly disfigured. However, he suggested I have a Tram Flap Operation, where he would remove the implants, cut the stomach muscle in half, using one half to create new breasts. He told me he had done hundreds of these surgeries which I later learned to be a lie and that these surgeries were routinely performed on breast cancer survivors to recreate their breasts, which I also learned later to be a lie.. I was in such agonizing pain that I would have consented to anything.

In the summer of 1994, I endured yet another 6-7 hour operation,described immediately above, removing the implants and undergoing a Tram Flap procedure. This surgery took place at NYU hospital and I was admitted thereafter for almost 3 weeks. It was this surgery that is now causing me serious health issues that are threatening my life. I will be going to the Mayo Clinic in Minnesota shortly to be assessed and find out what, if any, are my options other than surgery to correct my stomach and colon problems, directly caused by Siebert's irresponsible surgeries..

Here again, I was told one thing by Siebert prior to surgery but upon awakening thereafter, realized he had done something completely different. In this operation, he performed a tummy tuck but left gaping bulges of skin on my sides telling me he would repair it in a few months.

I went through so many surgeries with Siebert that if I covered every one of them in this affidavit, it would be a complete novel The basic facts were as follows:

-From the time of my first surgery in March,1994. until approximately September, 1996, I was prescribed massive doses of narcotics from Dr. Siebert, who was directing me to take them every day every 4 hours, whether I felt I needed them or not, and I became physically addicted to them. In 1995, when I felt I wanted to try not using the painkillers, Siebert told me to simply stop taking them. I followed his direction and within a matter of hours, I began suffering from symptoms of drug withdrawal. Since I knew nothing about drugs and since I stupidly believed Siebert when he told me years before t iat I couldn't become addicted to these pills since they were being prescribed for pain management by a doctor, I was convinced I was having a massive heart attack. I called Siebert immediately and with absolutely no concern in his voice told me to go to the hospital and just dry out for a while. "No Biggie". He refused to recommend any hospital or place to go who specializes in withdrawal. He directed me to not use his  name. Once I got off all the medication, I avoided seeing and speaking with Siebert. Since I was still having problems pop up that Siebert had to correct, such as my recurring hernia, he was insistant I see him or he would threaten not to operate on me anymore nor would anyone else. By this time he was a big part of that close knit inner circle of Plastic surgeons at NYU that all cover and protect each other.Therefore, I took his threat about not being able to find another surgeon very viable. Of course, when I would go to his office to see him, the same sexual behavior happened. I think worst of all, since he knew I had become addicted to the

painkillers and just got out of the hospital, he continued to prescribe and actually pushed or pressued me to take the pain medication convincing me it would be beneficial to my healing by calming me down.

-Dr. Siebert directed me not to go to the same pharmacies to fill the prescriptions advising me how many days I should wait between each visit.

-Dr. Siebert MADE himself the focal point of my life for two and a half years, having me come to his office at least once a week and regularly calling me at home.

-Dr. Siebert increasingly began telling me how beautiful I was, how much he cared about me and that he would always take care of me.

-I endured another major surgery in December, 1994 another 6 hour surgery, requiring another 2 and a half week stay at NYU. Dr. Siebert was supposed to make more corrections on my legs and further, smooth out the skin on my sides. However, when I awoke, I learned he had performed a full body lift, had further mutilated my vaginal area and "threw in as a present" removing the bags around my eyes and giving me a deep acid peel on my face, which we never discussed nor did I want.

-That approximately 8 months after first meeting Siebert and after several surgeries, I felt that Siebert's examinations of me were taking on a sexual tone. Since he was operating on my breasts and vaginal area by his own doing, not mine, his examination would include him touching me on my sexual organs. However, he seemed to take longer examining my body, adding a few gestures such as flicking or playfully touching my nipples, doing the same thing to my clitoris when examining the incisions. I just blew this off as an over active imagination.

-Siebert was becoming more inquisitive about who, if anyone, I might be dating. He was very adament that I not have sex, even when I was feeling better.

-While examining me, he started pressing his crotch right up against my body, rubbing his genitals along my body as he examined me.

-Dr. Siebert's conversations started to take on a very sexual tone, which made me uncomfortable.

-At times, he discussed his family with me which I felt was inappropriate particularly when he was critical about his wife.

-Approximately one year after first meeting him, I was at his office at NYU, was completely naked under a hospital gown and had been examined by Siebert. Siebert seemed particularly aroused during this exam and I could feel how hard he was because he continually pressed his groin onto my hand. When I shifted positions, so did he. After the exam, I was sitting on the examining table with the opening of the gown in front but completely closed. Dr. Siebert sat across from me and told me how much I meant to him, that he cared deeply for me, and things of that nature. Between the drugs and not really wanting to know what he was saying, I played dumb. Finally, he walked over to me, opened up the front of my gown and started fondling my nipples. As he went to sit back where he originally was seated, he pulled me back toward him. He said that he is not allowed to come onto me sexually because that would go against the Medical Canon of ethics. However, if I kissed him first, then it would be me who initiated the sex and that was OK. I still didn't do anything so with his hands still holding the collar of the hospital gown, he drew me towards him and started kissing me, tongue and all. He was so aroused that he didn't seem to care that we were in his NYU office and that there were other doctors and patients outside the door. He still had a grasp on my robe, was pressing his crotch against me and with one hand, opened the crotch area on his scrubs exposing himself for the first time to me. I was a little surprised because for such a skinny white guy, his penis was rather large. He pushed me very hard backwards and practically lifted me off my feet and onto the examining table with him right on top of me. Because of all the weight on the examining table, the table flipped backwards, actually breaking, which made a very loud crashing noise. It seemed like everyone in the office came running to the door to find out what happened. Unbeknownst to me, Siebert had locked the door and nobody could get in. He told them everything was fine but that the table collapsed during my examination and told them to go back to work. He took my hand and made me fondle him for a few moments, as well as perform oral sex, but only for a few seconds because it sounded like people were still outside the door. He had a toothbrush in his pocket which shocked me, brushed his teeth and thoroughly washed his hands. Then before leaving, he told me when to come to his office next. He also told me to come toward the end of the day so we could be there alone and to not bother calling his secretary. This was the beginning of an ongoing pattern of sexual touching between Siebert and me. He pushed very hard to have intercourse with me. I didn't want to and told him that when he finished up with the surgeries, then I would sleep with him. I started believing that he was purposefully botching up some aspect of each surgery in order to ensure I continue to come back. Every time he operated on me, something small always seemed to go wrong so I had to keep coming back to him. He would call me at home, feither from his family home in Connecticut, because I could hear his dog bark in the background and once his wife had inadvertently walked into the room where Siebert was located, telling her to go back to bed During these calls, I could clearly hear him masturbating as he spoke in a sexual manner. He did the majority of the talking and I just listened. He sometimes called me from a 212 number and wanted me to come over to his apartment, someplace near NYU Hospital between 32nd and 34 th Street, and have sex with him. He'd get angry when I said no. Whenever he felt I was defiant, he would threaten to cut off my narcotic supply, an addiction which he was responsible for creating.

- my body started falling apart from all the surgery he performed, I developed a stomach hernia which he is not equipped to fix. However, he insisted on performing this hernia, not just once but 2-3 more times after his surgery failed and the hernia reappeared. He told me that he would ALWAYS be in my life, that he has resectioned my whole insides that even when I give birth, he would have to be there. He took some sort of sick pride in saying that no ,am will ever know me as intimately as he does and that we would always have this special connection. He took me I could no live without him, "THAT HE CREATED ME"

-Siebert had me regularly going to his office particularly after hours and would aggressively force me to perform oral sex with him. It was only after I did as told that he woud give me the prescriptions I needed.

-No one can seriously question my veracity s nce I've seen Siebert's body naked, and can identify certain marks. For example, He had ripped off his  scrub for one day and I noticed a decent size scar. I inquired about it and he stated that when in medical school, he suffered a collapsed lung and the scar was where they had operated on him to fix the problem

-During the summer of 1995, Siebert had me come to his office at 799 Park Avenue almost EVERY weekend to perform surgery in his back office , which bordered on barbaric. Because he had done so many surgeries on the same parts of my body, one of my buttock cheeks collapsed. Siebert did NOT want anyone to know he was performing these surgeries so he secretly had me come to his Park Avenue office on the weekend, with only he and I present, and he would perform surgery on the buttock WITHOUT anaesthesia. The room he used to perform the surgery was not properly equipped for surgery and as I already stated, no one else was present in case of an emergebcy. He gave me a bunch of painkillers, through a syringe, which got me high, andgave me a few shots of a numbing substance in the area where the surgery was to be performed. He told me he would have to go deep and when the pain became unbearable, I should let him know and he would shoot me up with more drugs. The procedures lasted approxiamtely an hour. They were excruciating, had to be constantly stopped to administer dangerously high doses of medication and usually, he would tell me simply to grin and bear it for the last 10 minutes or so, fearing that injecting me with any more drugs could cause an overdose. I could feel and hear him cutting, the pain being so horrible that I could barely keep still. I was moaning and crying and Siebert would usually stick a bunch of gauge in my mouth to muffle the sounds of my cries. I told him on several occasions I thought I was having a heart attack to which he responded that I was being overly dramatic. He would turn music on and sing, hum or whistle, anything to muffle the sounds of my pain. Within hours and if I was lucky maybe a day of each surgery, I would either sit down or move a certain way and I could feel every stitch rip out.It felt like my buttock was on fire, the pain enormous, bleeding profusely from the wounds and you could see the inside of my leg because the skin was completely ripped open. I had to go to the emergency room of hospitals other than NYU on several occasions to have the wounds attended to since Siebert ordered me not to go to NYU. This same scenerio continued for the duration of the summer. This area, along with every other area Siebert operated on, eventually had to be fixed by another Reconstuctive surgeon I found in 2003, undergoing about 6-7 more serious and long surgeries outside the New York area.

-Dr. Siebert became a very scary man to me. To the world, he was loved for his kindness and caring. But to me, when alone, he became more and more sexually aggressive. He never hit me but he was so aroused that he would hurt me by either shoving his penis into my moth and on a number of occasions, attempting to have intercourse with me after I repeatedly told him NO. He told me that I was playing games and that he knew that I really wanted it. Thank G-d we never had intercourse.

-Before any major surgery, I donated a few pints of blood to be held in abeyance fior me should I need a transfusion during or after surgery. Siebert and I both had A negative blood. After one of my major surgeries, while recuperating in the hospital, Siebert informed me that we were now one, that I had his blood now pulsating in my body and that he would always be a part of me. I NEVER consented to him giving me blood and my blood was readily available if needed. So there was absolutely no reason for this.I felt so disgustingly dirty after being told this and still shake when I think about it.

-There are so many more things that transpired that I could probably write another 20 pages but in closing, I'd like to say a few things:

After the first surgery, which was cosmetic and I paid for in full, I was never charged again by anyone, neither the hospital nor Siebert. Ant bills that I did receive Siebert told me to give to him. He told me that he was taking no fee for performing any of the other surgeries and that he had worked out a deal with NYU for my hospital stays that he was taking care of. However, right before I want to NYU for a hearing in my complaint against Siebert, I learned that Siebert had falsified my whole medical chart, that he had portrayed to my insurance carrier that I was extremely heavy, lost in excess of 100 pounds requiring the removal of massive amounts of hanging skin and I believe he might have told them I had breast car cer. For all the surgeries I thought he was performing for free, in the end, he actually billed my insurance carrier and collected personally at a minimum, a quarter to half a million dollars. NYU Hospital was probably paid closer to three quarters to a million dollars. As such, Siebert had committed fraud for many years collecting money he was not entitled to as well as NYU hospital.

-Finally, when my body really started breaking down,approximately in 2002, I called Dr. McCarthy and all the

other prominent plastic surgeons at NYU and begged them to help me. They all declined with McCarthy being the most abusive. I finally made a complaint with the NYU Board or the Head of the hospital. I believe it was the end of 2002, I went to a hearing at NYU, which was attended by Lynn Lowey(attorney for NYU), Dr. Max Cohen, Dr. Raikow and several other doctors from NYU including I believe 2 psychiatrists. I was there with my attorney at the time, Mark Conrad, and the hearing was taped. However, I was not permitted a copy of the tape. I showed the Board evidence, had a tape recording between Siebert and I clearly portraying a very personal relationship, I showed them pictures of the mutilations, etc. As a matter of fact, I had several cards that Siebert directed me to make for him as one of many sick games he used to play. Siebert had me create cards and place coupons in the card that he could use at will, with each coupon depicting a different sex act. These sex acts were not made up by me, rather Siebert told me what to write on each coupon. I was surprised Siebert was sloppy enough to keep those cards in my file but it just strengthens my belief that he knew he was so heavily protected by the NYU administration that nothing would ever happen to him. And nothing ever did. I had the hearing, spoke with Lynn Lowey several times thereafter and nothing did happen except Siebert ictimized numerous other women. I have come to learn that there were other people who made compalints to NYU similar to mine and to this day, they continue to protect him. Any statements they make at this point is to protect themselves from liability. Had they not been publicly exposed, they still would be covering for him. Not only do I believe that Dr. Siebert should have his medical license revoked no less go to jail, I believe NYU is just as if not more culpable because they knew what he was doing, at least certainly after I met with them and showed them all my proof, and they continued to allow him to engage in these predatory behaviors without any regard for the patients because it was in their best interests monetarily.

I also later learned that when I first met Siebert in 1993, he had never had any affiliation with Dr. Hogan. He didn't even know him. He bought Dr. Hogan's medical practice, Hogan moved to Australia and knew nothing that was going on and Siebert lured clients to his office by saying he was an associate of Hogan, which was a complete lie. By buying Hogan's practice, Siebert bought his way into the elite of the medical world in New York and became a well insulated member of the NYU family. The fact that he was destroying the lives of patients who went to NYU for treatment or surgery because of it's fine reputation and instead, had their lives destroyed by Siebert was of no consequence to them. He was a great money maker and money talks.

Aside from Siebert, I have nothing but disdain for NYU and the officials who allowed Siebert to remain in their institution, using their hospital to commit crimes, rape and destroy women's lives. He sure has destroyed mine. I am always ill and I don't have 2 dimes to rub together to try to seek out any form of treatment that may help me. I never sued NYU or Siebert. I begged Siebert for treatment and they couldn;t care less. To conclude, there isn't a day that goes by that I am not in terrible pain and there are naby a night that I pray G-d will take me quietly so I won't have to endure it anymore. He has ruined my life, bankrupted my family yet he thrives. NYU should be ashamed of themselves.For as much disdain I have for those who continue to cover up for Siebert, I still wouldn't wish what Siebert did to me on them because I have what they should have, and that's empathy.

Diane Kleiman
Diane Kleiman
7/2/2010

State of New York
County of New York
Sworn to before me this 2nd day of July 2010

_Notary Public_

ANNA SEDRO...
Notary Public, State of New York...
No. 01SE5041212
Qualified in Richmond County
Commission Expires March 27, 20 11

# *Doctor John W. Siebert*

## *"heal thy patient, do no harm"*

His office has a prestigious address which is indicative of his success. The walls are adorned with certificates and diplomas, attesting that he is one of the top doctors in the field of plastic and reconstructive surgery. After taking a moment to read testimonials and accolades bestowed upon him, you feel that by his education and achievements you have chosen the right doctor.

When it is your time, you are directed to his private office where he greets you. He is respectable, he displays his charismatic personality to make you comfortable, he is in a position of power. she is reaching out for his help, and she has a personal problem that represents personal pain. She is vulnerable, he is in a position of power, she is not. This is how it begins when an attractive female patient goes to see the prestigious doctors associated with the best hospitals in New York City. This scenario repeats itself throughout the city on a daily basis with most doctors knowing their boundaries and respecting the rights of the patient and their family.

Dr. John Siebert is one of these prestigious doctors with offices in New York City and Madison WI. He is continually voted one of America's best plastic surgeons. His YouTube Bio boasts that he has a gift to visualize the outcome of the surgery he performs and has performed more facial micro surgical contours than any other doctor in the world.

She feels very comfortable with Dr Siebert, telling him her personal concerns, they discusses what she believes are her visible faults caused by the natural aging process. The conversation is very personal, one that she will not discuss with her spouse or her closest girlfriend. They are developing a very personal doctor patient relationship built on trust. This relationship is a big part of the decision to allow Dr. Siebert to perform the recommended surgery. She agrees to the surgery and is delighted with the outcome, her feelings are enhanced for Dr Siebert, after all he was able to turn back the hands of time and relieve her pain.

The years pass, the responsibility of children, family and personal problems have taken there toll. She ponders at her reflection in the mirror. She sees herself growing older, she wonders if her husband still looks at her the way he did 18 years ago. She thinks of Dr. Siebert and how wonderful she looked and felt after her surgery and decides to make an appointment.

Dr. Siebert welcomes her and again turns on his charm. They discuss her concerns and is reassured that he can help her. This visit is somewhat different than the visits of the past, it's          more personal. They discuss what has transpired in their lives since the last surgery. When it's time to depart Dr. Siebert gives her a big hug and looks into her eyes. She leaves with a warm feeling that he is such a wonderful man. She arrivers home to another problem with her daughter and ends up in an argument with her husband over

it. That night she goes to bed feeling less of a person knowing she has to wakeup and deal with the same problems, sleep was not going to make them go away.

Dr. Siebert's office calls the next day and schedules her surgery. She looks forward to doing something for herself; after all she is always taking care of the rest of the family.

Surgery day comes and she is again delighted with the outcome, further cementing the doctor patient relationship. She looks forward to the healing process and feeling better about herself.

A few weeks later she prepares for a post operative visit and as usual, the children have problems, her parents are ill and her husband is leaving on another business trip. She is stressed and feeling depressed, her life is just not as happy as it used to be. She arrives at Dr. Siebert's office where she feels comfortable, after all everyone is paying attention to her. She is greeted by Dr. Siebert who immediately tells her how beautiful she is and turns on his charm. She does not respond to him as she has in the past, the personal problems are deeply affecting her. He is quick to pick up on this and asks what's troubling her. She tells him that she is having problems with her youngest daughter. He walks over to her and gives her a hug, telling her how beautiful she is and that the type of stress she is under is not good for her health. He proceeds to examine her and tells her he is very satisfied how she is healing and quickly turns the conversation to her personal problems and offers her someone she can talk too. He provides her with one of his private cell phone numbers, one that she can call and not worry about anyone knowing. She takes the number and thanks him for his kindness. He is grooming her, he knows she is vulnerable.

A couple of days pass, her personal problems persist, and she thinks about Dr. Siebert. She has another family crisis and decides to call him. They talk about her problems, he understands, and she wonders why her husband of 18 years does not. She continues to call and eventually provides him with her cell phone number. He invites her to dinner, she is hesitant to accept, but can't explain why she does.

They meet at a restaurant in New York City, Dr. Siebert is very charming. During dinner they have a conversation about Dr. Siebert's personal problems. He tells her he has been having marital problems for a few years, his wife has become distant because of her psychological problems and says he is only in the marriage for the children. Intimacy is totally non existent. He talks about how his wife does not understand him and how she just takes him for granted. At the moment she feels the same about her husband. The wine continues to flow and Dr. Siebert reaches across the table and holds her hand. He again tells her he understands what she is going thru.

They depart the restaurant, he hails a cab, and just as the cab stops he reaches out pulls her close and softly kisses her lips, when he feels her returning the kiss, he kisses her harder. He now gets into the cab with her and directs the driver to proceed to his apartment. During the ride he continues to kiss her and tell her how beautiful she is. She has not had this much personal attention in a long time. They arrive at 245 East 40th St, and go to apartment 29 B. He quickly moves her into the bedroom, they engage in sexual

intercourse. When they finish, she gets up and goes into the bathroom, she looks into the mirror and starts to cry. What has she done, she is the mother of two children, she is a good catholic and she is married. Why would she do this? Was it the alcohol or was she just lonely? He opens the door, comes in and comforts her, telling her she deserves more out of life and gives her a kiss and asks her to come back to bed. They lay down, cuddle and talk for an hour, she feels comforted in his arms, he tells her how he has always had feelings for her. She falls asleep; he wakes her with a kiss. Dr. Siebert tells her he needs to leave for work. She gathers her belongings and prepares to depart. Dr. Siebert tells her how much he wishes he could spend the day with her, but he is needed in surgery. He hails a cab and, gives the driver a fifty dollar bill for a ten dollar ride and tells the driver to take good care of her, that she is someone special. He kisses her goodbye and tells her he will call her.

Later that day Dr. Siebert called and told her how much he missed her, she is all he can think about. He talked about his children and she discussed the problems she is having with her teenage daughter. He somehow has the perfect words of comfort. He asks to see her again; she agrees, they go to dinner and go back to his apartment. They talk and have sex, she could not stay overnight.

The affair continued for eight months, she had fallen in love with Dr. Siebert and Dr. Siebert told her he had fallen in love with her. Unexpectedly she was confronted by her husband who wanted to discuss her trips to New York City. She was able to convince him that she was visiting with me. It wasn't until this moment that she confided in me and asked if she could call Dr. Siebert from my apartment. She told him that her husband suspected something; she told him that she used me for an alibi. He was happy she had convinced her husband, but cautioned her and told her that under no circumstances admit they had sex. I was quite shocked because I thought my friend would be the last person to have an affair. I did what a best friend is supposed to do, I covered for her at the moment knowing we would discuss why at another time

She waited two weeks and called Dr. Siebert. He told her he was going to Las Vegas with his son Chris who was in a basketball tournament and would call her when he returned. She became impatient; over two weeks had passed since she last spoke to Dr. Siebert. She decided to call him and asked to meet him. He told her it was best if they ended the relationship and moved on with their lives. She said I thought you loved me, he said they were both caught up in a moment of time that was good for both of them and now it's time to move on. He said goodbye and disconnected the call.

I didn't want to pressure her to talk about it until she was willing, but I started to see her becoming more stressed and depressed. I convinced her to go away with me to see my mother knowing her husband would not suspect anything because she has accompanied me several times in the past.

I had no intention of visiting my mother; I planned to take her to a special spa for the weekend, what better place to get her to relax. When she got in my car I told her that I just wanted her to enjoy the weekend. She immediately look at me, started to cry and became hysterical. I pulled away quickly as her husband was waving goodbye from the porch.

I drove a few blocks stopped, reached out and hugged her. I felt her pain and cried with her. She wanted to talk; I told her there would be plenty of time for talking. We stopped, fueled the car and treated her to her favorite coffee.

On the way to the spa she continually told me how sorry she was for getting me involved. We have been friends since grade school, went to the same high school and college. I do not have siblings, I consider her my sister.

The weekend enlightened me to pain and suffering that I could never believe a doctor could inflict upon one of his patients for self sexual gratification. I always thought that everyone involved in an extramarital affair was a willing participant until this weekend. It never occurred to me that one of the participants could be abused. My friend was very vulnerable at the time of the affair; her daughter had personal problems that could test the soul of any parent. It caused marital discord that affected intimacy with her husband, Dr. Siebert seized the opportunity. The intimacy of the affair is something I do not want to give details about, except that Dr. Siebert told her he has had affairs with three other patients and that it actually helped their marriages. I was appalled at this statement. My friend confided in me that she has attempted to take her life and still thinks about this often. She has been in therapy for almost two years, which has helped somewhat, she is trying to rebuild her life. Her husband thinks her therapy is in response to her daughters problems. She suffers from panic attacks fearing her family will find out about the affair. She is guilt ridden because she broke her marriage vows and let down her children. She fears that her youngest daughter will not be able to handle the situation and fall more deeply into depression. Her therapist and I have tried to convince her to come forward and confess to her husband. I know he truly loves her. She has refused and threatened to harm herself before she would face the embarrassment. She could not face her family, friends, and especially her husband.

With all his accolades one would wonder why Dr. Siebert would choose to cross boundary lines and commit ethical and moral atrocities against vulnerable female patients. He has chosen to disregard the very oath that binds all physicians. The following is a passage of this oath:

In every house where I come I will enter only for the good of my patients, keeping myself far from all intentional ill-doing and all seduction and especially from the pleasures of love with women or with men, be they free or slaves.

The American Medical Association Council on Ethical and Judicial Affairs states categorically that "sexual contact that occurs concurrent with the physician-patient relationship constitutes sexual misconduct". The physician's general knowledge about the patient (i.e., the patient's past, the patient's family situation, and the patient's current emotional state) creates an imbalance of power. A sexual or romantic relationship with a patient is ethically wrong; the relative position of the patient within the professional relationship is such that it is difficult for the patient to give meaningful consent to such behavior. Simply there are no circumstances in which a patient could give valid consent.

I have recently discovered that that one of Dr. Siebert's patients filed charges against him at New York University Hospital for having a sexual relationship with a patient. He has lost his hospital privileges and his position as a professor at NYU Medical School, which I feel is not a severe penalty; a doctor like this should loose his license. I will find out who this patient is and identify the other patients whom he had affairs. I bet he worked his charm in the same fashion as he did my friend.

A recent medical review on the internet written by one of Dr. Siebert's patients describes him as a sociopath (**a sociopathic personality often brings a person into conflict with society as a consequence of a pattern of behavior that is amoral and unethical, complications that might arise from having this disorder include: unlawful behavior, adultery and lack of remorse for their actions**). This describes Dr. Siebert's actions very well; in fact my friend's psychiatrist believes that based on Dr. Siebert's actions as reported to him, he would believe Dr. Siebert has a complicated sociopathic personality disorder with narcissistic tendencies.

I'm someone who deeply loves her friend and I've chosen to write this letter for many personal reasons, and send it to Dr. Siebert's spouse, children and medical associates so they may know what type of doctor, husband and father he truly is. I also plan to post it on the internet in hopes that other patients may come forward. If they do, it will bring attention to his deeds and I feel my friend will then seriously think about reporting him to medical authorities, although she fears her husband would take matters into his own hands. I will find a way to help control him. Dr Siebert needs to be stopped before he ruins another women's life for self sexual gratification.

At the beginning of this letter I mentioned a YouTube video advertisement for Dr. Siebert; just take a moment to read this letter again and watch the video. You can see his charm, and if you really understand what he is doing to some of his female patients, you will realize that no matter how talented or charming he is he is abusing his patients. He seems to choose women who are depressed, and are in marriages where the flame has died out a bit which makes them vulnerable to an affair. If he wanted to have an affair, he should have at least chosen a divorced or single woman who was not one of his patients. Instead he chooses married female patients who are vulnerable when they visit his office; they are easy prey for this vulture.

If you are or were a patient of Dr. Siebert and you have been victimized by him in any manner, please come forward and present yourself to the medical authority in the state where the offense was committed. The information you provide will be kept confidential, don't allow yourself to be reduced to someone that blames themself for his actions and continues to live their life in agony and fear. You must realize that at all times the professional is in control and makes the decision to cross the boundary line. This type of sociopath does not care what harm he has caused his victims or their families; he is only interested in his self sexual gratification.

Linda M

# Plastic Surgeon
# Dr. Quick Draw John W. Siebert

Dear Quick Draw,

If you think you are going to intimidate me by sending that idiotic MEXICAN ASSHOLE GOMEZ looking for me, you are sadly mistaken. Why don't **YOU** come looking for me? I have **three friends** that would like to meet you. Unfortunately, you don't possess the courage, so you send your ASSHOLE to do your work. Don't ever send me a message again telling me I should take the money and shut up if I know what's good for me; you will never buy my silence. Oh, the girls got a real chuckle watching Gomez; he constantly had his hand in his pants pocket every time one of the girls walked by. Playing a little pocket pool GOMEZ? The next time this guy gets laid, it will be his first time. He is very nervous, spits when he talks and gawks at women.

Quick draw, does you wife know how you truly feel about her? Does she know that you describe her as the worst sex partner you ever had? Does she know how much you wished you were able to divorce her? Does she know you like little girls? Does she know that the first time I dressed like a school girl you did not like my dress because you said it made me look like a teenager and you like little school girls? Does she know you like watching two women make love while you sit in a chair masturbating? Does she know that you also have a thing for little boys? I am sure that you will deny every word I say. I am sure you will cry to your wife telling her you would never do anything like that.

Do you know that most of your colleagues give you credit for being a brilliant surgeon, but do not think much of you socially, most of them feel your a social misfit. I am having a little bit of trouble finding a job, tough economy, so back to the city today on business. I am doing a little favor for a friend of yours. **If you only knew WHO!**

You are the only doctor who ever asked me to dress like a child, tare my panties off and have sex with me with my little skirt on. You are the only doctor I know with such a sick mind. You are the only doctor that spoke about his wife in such a despicable manner. You should thank God you have her, because I do not think any other women in her right frame of mind would want you.

From generation to generation in my family, I give it to you.

*Rachel*

R.C. S.
c/o Smokin Hot Waitress
NY, NY. 10077

92260+25937

JABBERWABBLE  CORPORATION
72960 FRED WARING DR
PALM DESERT, CA 92260



**Langone Medical Center**

August 26, 2010

Mr. Jim Couri
575 Madison Avenue, 10ᵗʰ Floor
New York, NY 10022

Re: Dr. John Siebert

Dear Mr. Couri,

In response to your e-mail request to Annette Johnson requesting information concerning Dr. John Siebert, I am writing to advise you that:

(1) Dr. John Siebert resigned his appointment to the Medical Staff of the NYU Hospitals Center effective December 31, 2009; and
(2) His faculty appointment at the NYU School of Medicine was terminated on November 10, 2009.

As such Dr. John Siebert is no longer affiliated with the NYU Langone Medical Center.  Thank you.

Sincerely,

Hema Mohan
Administrative Director
Medical Staff Services

Medical Staff Services
545 First Avenue, GBH, C-120, New York, NY 10016 * tel: 212.263.6600 * fax: 212.263.8026

 **Langone Medical Center**

August 26, 2010

Mr. Jim Couri
575 Madison Avenue, 10th Floor
New York, NY 10022

Re: Dr. John Siebert

Dear Mr. Couri,

In response to your e-mail request to Annette Johnson requesting information concerning Dr. John Siebert, I am writing to advise you that:

(1) Dr. John Siebert resigned his appointment to the Medical Staff of the NYU Hospitals Center effective December 31, 2009; and

(2) His faculty appointment at the NYU School of Medicine was terminated on November 10, 2009.

As such Dr. John Siebert is no longer affiliated with the NYU Langone Medical Center. Thank you.

Sincerely,

Hema Mohan
Administrative Director
Medical Staff Services

**Medical Staff Services**
545 First Avenue, GBH, C-120, New York, NY 10016 * tel: 212.263.6600 * fax: 212.263.8026

L

# RIVERSIDE COUNTY SHERIFF'S DEPARTMENT
## THERMAL STATION

NARRATIVE OF INITIAL REPORT

Subject: 653PC                                          Dep. Perez #4678
Page: 2                                                 Case # LA150930029

## EVIDENCE:

| ITEM: | QTY: | DESCRIPTION: |
|-------|------|--------------|
| 01 | 20 | Copies of Internet articles on Dr. Siebert |

## ATTACHMENTS:

    **1.)** Copies of Email.
    **2.)** Copies of articles on Dr. Siebert's scams.
    **3.)** Copy of report filed online.

## DETAILS:

On 04/03/15, at 0945 hours, I was dispatched to contact the reporting party, Jim Couri, via telephone, regarding annoying and harassing emails. Jim currently lives in La Quinta.

**The following is a summary of Jim Couri's statement:**

On 03/27/15, Jim received an email from Dr. John Siebert, of whom he has a civil litigation against in the State of New York. The email appeared to have been sent to him by mistake and seemed to have been appeared it was meant for Dr. Sieberts attorney. In the email, Dr. Siebert is telling his attorney "Couri will never stop. Can't we put a bounty hunter type guy on him?" (See attached copies)

Jim feels Dr. Siebert will go out of his way to harm him because Jim has disclosed a lot of information regarding Dr. Sieberts illegal practices. Dr. Siebert has been banned from practicing medicine in several states. Dr. Siebert has been sued civilly and criminally convicted on multiple charges ranging from perjury to sexual abuse and extortion.

After Jim received the email, he obtained a restraining order against Dr. Siebert. The restraining order was served on 04/02/15 at 1300 hours, by the Wisconsin South Sheriff's Department.

Jim stated due to him having stage 4 cancer he was unable to meet with me in person due to several doctor appointments. Jim also filed a complaint online (#I1503281113464201) where he stated the above incident occurred. Jim fears for his life and believes Dr. Siebert is capable of hurting him and/or hiring someone to hurt him.



## INFORMATION:

# RIVERSIDE COUNTY SHERIFF'S DEPARTMENT
## THERMAL STATION

NARRATIVE OF INITIAL REPORT

Subject: 653PC                                          Dep. Perez #4678
Page: 3                                                 Case # LA150930029

1
2     This investigation was initiated within the jurisdiction of Riverside County; however,
3     during the course of my investigation it was determined the crime occurred outside of the
4     Riverside County Jurisdiction.
5
6     Due to the above incident occurring outside the Riverside County's jurisdiction,   I will
7     be forwarding a copy of this report to the South Wisconsin Sheriff Department for further
8     investigation.
9
10    This report will be closed exceptional, as no further follow up or investigation can be
11    done within our jurisdiction
12
13    **Status:**
14    EXC
15



**CH-130**   Civil Harassment Restraining
Order After Hearing

Clerk stamps date here when form is filed.

KBB

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF RIVERSIDE

APR 29 2015

Erica Torres

APR 01 2015

*Person in ① must complete items ①, ②, and ③ only.*

① **Protected Person**
  a. Your Full Name: James Coari

  Your Lawyer *(if you have one for this case):*
  Name: _____ State Bar No.: _____

  Firm Name: _____

  b. Your Address *(If you have a lawyer, give your lawyer's information. If you do not have a lawyer and want to keep your home address private, you may give a different mailing address instead. You do not have to give telephone, fax, or e-mail.)*:
  Address: 78345 Hwy 111 Suite 322
  City: LA QUINTA   State: CA Zip: 92253
  Telephone: _____ Fax: _____
  E-Mail Address: _____

② **Restrained Person**
  Full Name: Justin W Siebert
  Description:

| | | | | |
|---|---|---|---|---|
| Sex: ☒ M ☐ F | Height: 6 FT | Weight: 210 | Date of Birth: UNKNOWN | |
| Hair Color: SANDY | Eye Color: BROWN | Age: 58 | Race: WHITE | |

  Home Address *(if known)*: 634 BASCOM HILL DRIVE
  City: BARABOO   State: WIS Zip: 53913
  Relationship to Protected Person: Business Association

Fill in court name and street address:
Superior Court of California, County of Riverside
3255 E. Tahquitz Canyon Way
Palm Springs, CA 92262

Court fills in case number when form is filed.
Case Number:
PSC  **1501465**

③ ☐ **Additional Protected Persons**
  In addition to the person named in ①, the following family or household members of that person are protected by the orders indicated below:

| Full Name | Sex | Age | Lives with you? | How are they related to you? |
|---|---|---|---|---|
| Marlene Coari | F | 65 | ☒ Yes ☐ No | WIFE |
| | | | ☐ Yes ☐ No | |

  ☐ *Check here if there are additional persons. List them on an attached sheet of paper and write "Attachment 3—Additional Protected Persons" as a title. You may use Form MC-025, Attachment.*

④ **Expiration Date**
  *This Order, except for any award of lawyer's fees, expires at:*

  Time: 1 year   ☐ a.m. ☐ p.m. ☐ midnight on (date): APRIL 28, 2016

  If no expiration date is written here, this Order expires three years from the date of issuance.

**This is a Court Order.**

Judicial Council of California, www.courts.ca.gov
Revised July 1, 2014, Mandatory Form
Code of Civil Procedure, §§ 527.6 and 527.9
Approved by DOJ
**Civil Harassment Restraining Order After Hearing**
**(CLETS-CHO)**
**(Civil Harassment Prevention)**
CH-130, Page 1 of 5 →

Case Number:
PSC     1501465

**(5) Hearing**

a. There was a hearing on *(date):* Apr 25, 2015  at *(time):* 10:10  in Dept.: PS7  Room: _____
   *(Name of judicial officer):* Judge B.J. Bork  made the orders at the hearing.

b. These people were at the hearing:
   (1) ☑ The person in ① (3) ☐ The lawyer for the person in ① *(name):* _____
   (2) ☐ The person in ② (4) ☐ The lawyer for the person in ② *(name):* _____
   ☐ Additional persons present are listed at the end of this Order on Attachment 5.

c. ☐ The hearing is continued. The parties must return to court on *(date):* _____ at *(time):* _____

### To the Person in ❷ :

**The court has granted the orders checked below. If you do not obey these orders, you can be arrested and charged with a crime. You may be sent to jail for up to one year, pay a fine of up to $1,000, or both.**

**(6) ☑ Personal Conduct Orders**

a. You must **not** do the following things to the person named in ①
   ☑ and to the other protected persons listed in ③ :
   (1) ☑ Harass, intimidate, molest, attack, strike, stalk, threaten, assault (sexually or otherwise), hit, abuse, destroy personal property of, or disturb the peace of the person.
   (2) ☑ Contact the person, either directly or indirectly, in any way, including, but not limited to, in person, by telephone, in writing, by public or private mail, by interoffice mail, by e-mail, by text message, by fax, or by other electronic means.
   (3) ☐ Take any action to obtain the person's address or location. If this item (3) is not checked, the court has found good cause not to make this order.
   (4) ☐ Other *(specify):*
       ☐ Other personal conduct orders are attached at the end of this Order on Attachment 6a(4).

b. Peaceful written contact through a lawyer or process server or other person for service of legal papers related to a court case is allowed and does not violate this Order.

**(7) ☑ Stay-Away Orders**

a. You must stay at least ___100___ yards away from *(check all that apply):*
   (1) ☑ The person in ①         (7) ☐ The place of child care of the children of
   (2) ☑ Each person in ③            the person in ①
   (3) ☑ The home of the person in ①  (8) ☑ The vehicle of the person in ①
   (4) ☐ The job or workplace of the person  (9) ☐ Other *(specify):*
       in ①                         _____
   (5) ☐ The school of the person in ①   _____
   (6) ☐ The school of the children of the  _____
       person in ①

### This is a Court Order.

**Civil Harassment Restraining Order After Hearing
(CLETS-CHO)
(Civil Harassment Prevention)**

| Case Number: | |
|---|---|
| PSC | 1 5 0 1 4 6 5 |

b. This stay-away order does not prevent you from going to or from your home or place of employment.

**(8) No Guns or Other Firearms and Ammunition**

   a. **You cannot own, possess, have, buy or try to buy, receive or try to receive, or in any other way get guns, other firearms, or ammunition.**

   b. If you have not already done so, you must:

- Within 24 hours of being served with this Order, sell to or store with a licensed gun dealer, or turn in to a law enforcement agency, any guns or other firearms in your immediate possession or control.

- File a receipt with the court within 48 hours of receiving this Order that proves that your guns or firearms have been turned in, sold, or stored. *(You may use Form CH-800, Proof of Firearms Turned In, Sold, or Stored for the receipt.)*

   c. ☐ The court has received information that you own or possess a firearm.

**(9) ☐ Lawyer's Fees and Costs**

The person in ___ must pay to the person in ___ the following amounts for:

   a. ☐ Lawyer's fees   b. ☐ Costs

| <u>Item</u> | <u>Amount</u> | <u>Item</u> | <u>Amount</u> |
|---|---|---|---|
| _____ | $ _____ | _____ | $ _____ |
| _____ | $ _____ | _____ | $ _____ |

☐ Additional items and amounts are attached at the end of this Order on Attachment 9.

**(10) ☐ Other Orders** *(specify):*

_____

_____

☐ Additional orders are attached at the end of this Order on Attachment 10.

**To the Person in ❶ :**

**(11) Mandatory Entry of Order Into CARPOS Through CLETS**

This Order must be entered into the California Restraining and Protective Order System (CARPOS) through the California Law Enforcement Telecommunications System (CLETS). *(Check one):*

   a. ☐ The clerk will enter this Order and its proof-of-service form into CARPOS.

   b. ☐ The clerk will transmit this Order and its proof-of-service form to a law enforcement agency to be entered into CARPOS.

   c. ☐ By the close of business on the date that this Order is made, the person in ❶ or his or her lawyer should deliver a copy of the Order and its proof-of-service form to the law enforcement agency listed below to enter into CARPOS:

     Name of Law Enforcement Agency       Address *(City, State, Zip)*

_____   _____

☐ Additional law enforcement agencies are listed at the end of this Order on Attachment 11.

**This is a Court Order.**

    **Civil Harassment Restraining Order After Hearing**    
**(CLETS-CHO)**
**(Civil Harassment Prevention)**    →

Case Number:
PSC **1 5 0 1 4 6 5**

**(12) Service of Order on Restrained Person**

a. ☐ The person in ② personally attended the hearing. No other proof of service is needed.

b. ☑ The person in ② did not attend the hearing.

(1) ☑ Proof of service of Form CH-110, *Temporary Restraining Order*, was presented to the court. The judge's orders in this form are the same as in Form CH-110 except for the expiration date. The person in ② must be served with this Order. Service may be by mail.

(2) ☐ The judge's orders in this form are different from the temporary restraining orders in Form CH-110. Someone—but not anyone in ① or ③—must personally serve a copy of this Order on the person in ②.

**(13) ☑ No Fee to Serve (Notify) Restrained Person**

The sheriff or marshal will serve this Order without charge because:

a. ☑ The Order is based on unlawful violence, a credible threat of violence, or stalking.

b. ☐ The person in ① is entitled to a fee waiver.

**(14) Number of pages attached to this Order, if any:** _____

Date: _Apr 29, 2015_                    _____
                                                    *Judicial Officer*

**Warning and Notice to the Restrained Person in ②:**

**You Cannot Have Guns or Firearms**

You cannot own, have, possess, buy or try to buy, receive or try to receive, or otherwise get guns, other firearms, or ammunition while this Order is in effect. If you do, you can go to jail and pay a $1,000 fine. You must sell to or store with a licensed gun dealer, or turn in to a law enforcement agency, any guns or other firearms that you have or control as stated in item ⑧ above. The court will require you to prove that you did so.

**Instructions for Law Enforcement**

**Enforcing the Restraining Order**

This Order is enforceable by any law enforcement agency that has received the Order, is shown a copy of the Order, or has verified its existence on the California Restraining and Protective Order System (CARPOS). If the law enforcement agency has not received proof of service on the restrained person, and the restrained person was not present at the court hearing, the agency must advise the restrained person of the terms of the Order and then must enforce it. Violations of this Order are subject to criminal penalties.

**This is a Court Order.**

**Civil Harassment Restraining Order After Hearing
(CLETS-CHO)**
**(Civil Harassment Prevention)**

Case Number:
PSC **1501465**

## Start Date and End Date of Orders

This Order *starts* on the date next to the judge's signature on page 4 and *ends* on the expiration date in item ④ on page 1.

## Arrest Required If Order Is Violated

If an officer has probable cause to believe that the restrained person had notice of the order and has disobeyed it, the officer must arrest the restrained person. (Pen. Code, §§ 836(c)(1), 13701(b).) A violation of the order may be a violation of Penal Code section 166 or 273.6. Agencies are encouraged to enter violation messages into CARPOS.

## Notice/Proof of Service

The law enforcement agency must first determine if the restrained person had notice of the order. Consider the restrained person "served" (given notice) if (Pen. Code, § 836(c)(2)):

* The officer sees a copy of the *Proof of Service* or confirms that the *Proof of Service* is on file; *or*
* The restrained person was at the restraining order hearing or was informed of the order by an officer.

An officer can obtain information about the contents of the order and proof of service in CARPOS. If proof of service on the restrained person cannot be verified and the restrained person was not present at the court hearing, the agency must advise the restrained person of the terms of the order and then enforce it.

## If the Protected Person Contacts the Restrained Person

Even if the protected person invites or consents to contact with the restrained person, this Order remains in effect and must be enforced. The protected person cannot be arrested for inviting or consenting to contact with the restrained person. The orders can be changed only by another court order. (Pen. Code, § 13710(b).)

## Conflicting Orders—Priorities of Enforcement

**If more than one restraining order has been issued, the orders must be enforced according to the following priorities:** (See Pen. Code, § 136.2, Fam. Code, §§ 6383(h)(2), 6405(b).)

1. *EPO:* If one of the orders is an *Emergency Protective Order* (form EPO-001) and is more restrictive than other restraining or protective orders, it has precedence in enforcement over all other orders.
2. *No Contact Order:* If there is no EPO, a no-contact order that is included in a restraining or protective order has precedence over any other restraining or protective order.
3. *Criminal Order:* If none of the orders includes a no contact order, a domestic violence protective order issued in a criminal case takes precedence in enforcement over any conflicting civil court order. Any nonconflicting terms of the civil restraining order remain in effect and enforceable.
4. *Family, Juvenile, or Civil Order:* If more than one family, juvenile, or other civil restraining or protective order has been issued, the one that was issued last must be enforced.

*Clerk's Certificate*
*[seal]*

(Clerk will fill out this part.)
—**Clerk's Certificate**—

I certify that this *Civil Harassment Restraining Order After Hearing* is a true and correct copy of the original on file in the court.

Date: 4·29·15    Clerk, by _____ , Deputy

**This is a Court Order.**

M



**SHAUN M. MURPHY**
murphy@sbemp.com
ADMITTED IN CA, MI, TX, AND NY
ADMITTED TO THE UNITED STATES SUPREME COURT

REPLY TO:
Palm Springs, California

April 29, 2019

Michael Hestrin
Riverside County District Attorney
135 N Allessandro Street, Suite 210
Banning, California 92220

      **Re:**    **People v. Couri (Case Number: INM1707715)**

Dear Mr. Hestrin:

     I write regarding the above-referenced matter. My interest in the case is as the complaining witness. I made the complaint as a result of electronic harassment through electronic mail communication (I note that the original complaint makes reference to attempts to contact by telephone. Mr. Couri did not conduct any harassment by telephone).

     Since my complaint to the Palm Springs Police Department was made, I filed a civil action for defamation and other related claims. Both actions are presently pending. In the misdemeanor case, there is an outstanding warrant for a non-appearance at the initial hearing.

     Recently Mr. Couri and I discussed and agreed to a settlement of our respective claims against each other. Part of the settlement involves a dismissal of the misdemeanor complaint, which is now over 16 months old without being brought to trial. Mr. Couri disputes any liability or that any of his actions support a criminal charge. For his part, Mr. Couri has agreed to cease all further communications with me or about me (and my firm) and to remove any offending posts from online blog, web or social media sites. I am completely confident that Mr. Couri and those closely associated with him will carry out their obligations and there are provisions in our agreement that provide an incentive and a consequence if they do not.

---

**SLOVAK BARON EMPEY MURPHY & PINKNEY LLP**

1800 E. Tahquitz Canyon Way
Palm Springs, California 92262
T (760) 322-2275 • F (760) 322-2107

650 Town Center Drive, Suite 1400
Costa Mesa, California 92626
T (714) 435-9592 • F (714) 850-9011

2240 Fifth Avenue
San Diego, California 92101
T (619) 501-4540

103 Carnegie Center Blvd., Suite 101
Princeton, New Jersey 08540
T (609) 955-3393 • F (609) 520-8731

Chrysler Building
405 Lexington Avenue, 26th Floor
New York, New York 10174
T (212) 829-4399

**www.sbemp.com**

Michael Hestrin, District Attorney
April 29, 2019
Page 2


However, to complete the agreement, we need to have the misdemeanor harassment complaint dismissed. I have spoken with the supervising attorney for the misdemeanor department and have been advised that despite the age of the charge, the County does not dismiss misdemeanor complaints. I am renewing and confirming in writing my request that the matter be dismissed as adequate relief/restitution has been achieved through the civil action and I no longer desire to pursue the complaint of electronic harassment because circumstances have changed considerably.

If there is any other information you need from me to effect the dismissal, I am available to discuss. Otherwise, please take all appropriate action to dismiss Case Number INM1707715, and vacate the issuance of the warrant against Mr. Couri.

Sincerely,
**SBEMP, LLP**

By:    Shaun M. Murphy

SMM:MSS



**SHAUN M. MURPHY**
murphy@sbemp.com
ADMITTED IN CA, MI, TX, AND NY
ADMITTED TO THE UNITED STATES SUPREME COURT

REPLY TO:
Palm Springs, California

May 3, 2019

Michael Hestrin
Riverside County District Attorney
135 N Allessandro Street, Suite 210
Banning, California 92220

Re:     People v. Couri (Case Number: INM1707715)

Dear Mr. Hestrin:

I write regarding the above-referenced matter. My interest in the case is as the complaining witness. I made the complaint as a result of electronic harassment through electronic mail communication (I note that the original complaint makes reference to attempts to contact by telephone. Mr. Couri did not conduct any harassment by telephone).

Since my complaint to the Palm Springs Police Department was made, I filed a civil action for defamation and other related claims. Both actions are presently pending. In the misdemeanor case, there is an outstanding warrant for a non-appearance at the initial hearing.

Recently Mr. Couri and I discussed and agreed to a settlement of our respective claims against each other. Part of the settlement involves a dismissal of the misdemeanor complaint, which is now over 16 months old without being brought to trial. Mr. Couri disputes any liability or that any of his actions support a criminal charge. For his part, Mr. Couri has agreed to cease all further communications with me or about me (and my firm) and to remove any offending posts from online blog, web or social media

**SLOVAK BARON EMPEY MURPHY & PINKNEY LLP**

| | | | | |
|---|---|---|---|---|
| 1800 E. Tahquitz Canyon Way<br>Palm Springs, California 92262<br>T (760) 322-2275 • F (760)<br>322-2107 | 650 Town Center Drive, Suite<br>1400<br>Costa Mesa, California 92626<br>T (714) 435-9592 • F (714)<br>850-9011 | 2240 Fifth Avenue<br>San Diego, California<br>92101<br>T (619) 501-4540 | 103 Carnegie Center Blvd., Suite<br>101<br>Princeton, New Jersey 08540<br>T (609) 955-3393 • F (609)<br>520-8731 | Chrysler Building<br>405 Lexington Avenue, 26th<br>Floor<br>New York, New York 10174<br>T (212) 829-4399 |

Michael Hestrin, District Attorney
May 3, 2019
Page 2

sites. I am completely confident that Mr. Couri and those closely associated with him will carry out their obligations and there are provisions in our agreement that provide an incentive and a consequence if they do not.

However, to complete the agreement, we need to have the misdemeanor harassment complaint dismissed. I have spoken with the supervising attorney for the misdemeanor department and have been advised that despite the age of the charge, the County does not dismiss misdemeanor complaints. I am renewing and confirming in writing my request that the matter be dismissed as adequate relief/restitution has been achieved through the civil action and I no longer desire to pursue the complaint of electronic harassment because circumstances have changed considerably.

If there is any other information you need from me to effect the dismissal, I am available to discuss. Otherwise, please take all appropriate action to dismiss Case Number INM1707715, and vacate the issuance of the warrant against Mr. Couri.

Sincerely,
**SBEMP, LLP**

By:    Shaun M. Murphy

SMM:MSS

# CRIME INC USA ENTERPRISES
## MONACO - DUBAI

Dated: June 20, 2018

*Via: Email*

To: Riverside California DA Michael Hesterin

Re: Jim Couri - Shaun Murphy (INM7707715-PSC1800166)

We are a Division of CORRUPTION INTERNATIONAL HOLDINGS. and and all affiliates are engaged in forensic/criminal investigations, reporting and exposing such conduct. Our founders have been in engaged in these efforts for over 50 years, and our enterprises have been in business for about 18 years. We are engaged by high-profile clients seeking unbiased and factual proof of corruption in the political, judicial, legal, medical and finance businesses, to name some.

Our "parent" emailed to you communications dated 6-11-18 and 6-13-18, along with evidence regarding the above "INM" Case. Also emailed to you was a Couri Companies letter sent to Judge David Chapman on 3-7-18. In sum, all of these communications are supported by fact, evidence, also shared with you by the Attachments.

Jim Couri, one of the founders of these organizations is 79 years of age and extremely intelligent. He does not have any interest in Shaun Murphy that would cause him to harass, threaten or to have any "fixation" to this man (as Murphy falsely stated in a Police Declaration in support of an Arrest Warrant against Mr. Couri. We attach here this Police Declaration, and the other communications referred to herein.

A reading of the Declaration in support of Arrest Warrant of Mr. Couri, you will see that Murphy engaged in willful perjury to a law enforcement person. Such included the following that are clear and verified evidence of Murphy's fraud, deception and scheme to impact Mr. Couri's Rights afforded under the US Constitution and California and Federal Laws and Codes.

Murphy's fraudulent statements include:
1) Murphy's repeated perjury to a police officer Police Report

M. Hesterin                                                      page 2

2) Murphy's false claims that Mr. Couri phoned Murphy's home (Murphy present no evidence of Mr. Couri phoning him at all)

3) Murphy falsely claims Mr. Couri sent him harassing emails (Mr. Couri sent no emails as it reveals on the email itself)

4) Murphy falsely claims he does not know where Mr Couri is located (Murphy knew full well that Mr. Couri was in New York and communicated to Mr. Couri in NY by Fedex and mail)

5) Murphy falsely claimed Mr. Couri is within the jurisdiction of Palm Springs-Riverside CA

6) Murphy did not exhibit who sent supposed emails as revealed by the Declaration

7) Murphy fails to disclose that Couri and Murphy were opposing "lawyers" (Couri in-pro-per) and Couri was required to respond to Murphy in a Court proceeding

8) Murphy falsely states Couri has a "fixation" for Murphy. It appears otherwise

These are some of Murphy's intentional frauds as--

a) Murphy knew that Mr Couri did not :reside at 48625 Calle Esperanza, La Quinta. The property was rented by LYDIA COURI, and Jim used the property as a "hospice" during years of stage four cancer surgeries and treatment at UCLA and Eisenhower.

b) Murphy knew full well where Mr Couri was at the time as he sent many letters by USPS and by Feds Ex to Jim Couri to his Office of over 21 years at 575 Madison Ave. 10th. Fl. NYC, NY 10022.

c) Murphy also knows that Jim Couri does not possess his home phone.

d) Murphy knew that Mr. Couri was not in the jurisdiction of California based upon the Case Murphy was scheming to embezzle assets belonging to Mr. Couri and an Option. all revealing NYC as Jim Couri's address.

e) Mr. Couri;s Driver License is a NY License with a NY address on its face.

f) Mr. Couri never had a California residence. Years ago Mrs. Couri's Trust did (2005-2008).

g) The emails Murphy claims to have received were not from Jim Couri, facts well known to Murphy. When in 2010. due to cancer, Jim turned over the Forensic Reporting business to others and also all email addresses, which informants used. Those emails bear Jim Couri's name, just like "Col. Sanders-Kentucky Fried Chicken. Murphy was advised of this at least 20 tines since he swindled

M. Hesterin                                                    *page 3*

   Mr Couri in 2011, re asbestos in a property rented by Couri's company
"Flea-Market Enterprises".

h) Murphy has also instigated that Mailings from the Court in the "INM" Case to
be sent to "Calle Esperanza" where Murphy knew Couri was illegally evicted
from 6 months earlier (orchestrated by Murphy).
The "timeline" on Murphy's eviction scam is as follows.

i) Murphy filed suit against Lydia Couri April 2017, naming Jim

ii) Murphy was caught by Couri engaging in documented perjury, fraud,
conspiracy and extortion

iii) Murphy escalated his abuses of Jim Couri, Marlene Couri, Mr. Couri's family
and Jim Couri's daughter Lydia.

iv) Murphy by fraud, deprivation of due process, obstruction of justice, in concert
with Judge Chapman (all documented). Chapman engaged in violations of
CCP170.3 and his refusal to disqualify himself per Canons of Judicial Ethics
and the US Constitution Article 14, Murphy on 6-23-17 caused an illegal
eviction.

v) On or about Nov 2017 a Notice from the Larson Court in the "INM" Case was
mailed to Calle Esperanza: knowing Mr. Couri was never a resident there (only
a hospice guest) and was fraudulently evicted in June 2017--(6 Months earlier).

vi) The Notice mandated an appearance (on Murphy's fraudulent claims against
Mr. Couri) in Dec 2017.

vii) Knowing the Notice was mailed to a incorrect address - a Warrant was
generated by more fraud and deception targeting Jim Couri.

We have emailed to you the evidence of the sewer service Mailings obtained from
the USPS in La Quinta.

As you can see this is a despicable shake-down extortion scheme by Murphy
without basis in fact or law.

Then in Feb 2018 Murphy commenced a Civil Case (PSC1800166) and "steered"
it again to Judge Chapman. The Case was again "sewer-served" as Jim had
terminated a Mail Box in La Quinta in or about March 2017, also known by
Murphy. So Murphy caused Mr. Couri to be served at a terminated Box rather than
at NYC where Murphy had been communicating for over 12 Mos. Then Murphy
sued a company that was dissolved in 2014 and Mr. Couri's Assistant (Wilson) who
has never been in California and we delivered the Wilson Declaration to you as
well.

M. *Hesterin*                                             *page 4*

*Accordingly, we have advised you of all of the foregoing facts. The misuse of your Office by a confirmed perjurer, cheat and extortionist must be rectified (See: Mallory Hill v Murphy SBEMP) in LA Superior Court). We possess a multitude of evidence revealing Murphy's shady and unjust dealings.*

*We have been asked by Jim Couri to encourage you, on the DA's own Motion, to Dismiss this "INM" Case, Vacate the false Warrant, issued based upon "sewer-service" and Murphy's clear fraud upon the Police, and the Court.,*

*Mr. Couri has been and is a victim of massive Civil Rights depravation (42USCJ983 and $2USC1985), and has been seriously medically and financially injured.*

*The PSC Murphy embezzling case has remained "stalled" as we feel that Chapman realizes that calling a Default will be a final knell for the evidence against him.*

*We hope that you will follow the law and rectify this Murphy scam of extortion. We also attach some background information about Jim Couri so that you are aware how Murphy's skulduggery has been damaging to Mr. Couri's reputation.*

*Encls:*

*all parties*                          *CRIME INC USA ENTERPRISES-MONACO*

1705P-5014

SUPERIOR COURT OF CALIFORNIA, COUNTY OF RIVERSIDE

PEOPLE OF THE STATE OF CALIFORNIA

vs.

DEFENDANT: Couri, James "Jim" dob 04/04/1959

Case Number:
1705P-5014

DECLARATION IN SUPPORT OF ARREST WARRANT
(Penal Code — Except in Unusual Cases)

The undersigned, Officer Paula Ramos _____ declares that he/she is a Police Officer employed by the City of Palm Springs _____ in the County of Riverside _____ (city).

That he/she is investigating reported crime of PC 422(a) Annoying Electronic Communication.
That he/she, on information and belief, alleges and states the following to be true:

On Thursday, 5/25/17 I was in full duty uniform and in a marked PSPD unit working day shift patrol in the City of Palm Springs, Palm Desk County and within the State of California. At approximately 1358 hours I was dispatched to the PSPD regarding annoying and harassing phone calls and e-mails.

I spoke with the reporting party Robert Murphy, who stated he is an attorney for Slovak, Baron, Empey, Murphy, and Pinkney LLP law firm whose action is located in Palm Springs. Murphy stated that on April 18, 2017, he has been receiving numerous phone calls and e-mails at his work place from a male he identifies as 78 year old Jim Couri. Murphy stated his firm was hired to have Couri evicted from his home last fall. Murphy stated that although Couri is fixated on him, Couri sends e-mails not only to Murphy's own e-mail, but also other client's including political figures, business owners and prominent community members.

☑ See attached for additional information.

Wherefore, declarant prays that an arrest warrant issue for the arrest (during the day or night) of:
Couri, James "Jim" dob 04/04/1959

SEX: M     RACE: W     DOB: 04/04/1959     EYES: Bro     HAIR: WN     HT: 6 IN
WT: 200     DLIC: C157038573030226     ADDRESS: 48625 Calle Esperanza, La Quinta, CA 92263

LAW ENFORCEMENT:

I declare, under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: 05/00/2017
_____
P. Ramos 15180
(Signature)

JUDICIAL OFFICER:

☐ Approved     ☐ Disapproved
Date: _____     Date: _____

_____
(Signature)

DECLARATION IN SUPPORT OF ARREST WARRANT     Page 1 of 1

**ATTACHMENT – DECLARATION IN SUPPORT OF ARREST WARRANT**

Murphy states Court is a "lunatic" and "attacks people hard," making things up to harass and intimidate him. Murphy stated Court is continuing to harass him by sending out multiple emails. Additionally, Murphy stated the same harassment from the numerous telephone calls, at least 4 phone calls by 7am daily to a half dozen daily he receives from Court. Murphy stated sometimes Court talks, sometimes he stays silent and hangs up the phone.

Murphy states that Court's activity has been escalating and he is now concerned for his and his family's safety. Murphy stated Court is so relayed to Murphy that Murphy is going to end up like Joe Pesci's character in the movie Casino (shot). Murphy stated Court has not been at his workplace but that Court told Murphy he has been there. Murphy has told Court to cease and desist but the emails and telephone calls have not stopped. Murphy is desirous of prosecution.

I spoke with Murphy who also provided me with a file folder that expanded to about 6 inches and it was full of printed emails which he highlighted with yellow and it notes to show tones of higher interest. Inside the file folder was a thumb drive that was also attached as evidence of the ongoing harassment.

I skimmed through most of the stack that Murphy provided me and focused on the highlighted sections Murphy used post-it notes to show areas of interest. I saw that the emails began on Thursday September 29, 2016 from "Jim Court scamaling@gmail.com" to Murphy. This email contained attachments from Senator Jeff Stone that I saw were not related to Murphy, yet it requested a verification of a licensed shorthand reporter in Riverside County. This was consistent with Murphy's statement that Court targets random people at various professions and elicits, which it appeared to me in Murphy's statement that Court targets random people at various professions and elicits, which it appeared to me in attempt to stain for their reputation and harass them as well. Although most of the emails were sent to Murphy, I saw that some were sent to numerous other professionals as well. I saw that Court also has another email, copaljames@gmail.com which he also used to send to Murphy regarding Judges, mayor of cities, and calls Murphy an "Irish Thug."

As I continue to skim over the footage of emails Court sent to Murphy (some of which were sent multiple times throughout the day and just about everyday) I noticed that Court mentioned other local business in addition to other prominent members of the community and professionals and referred to them as engaging in unlawful conduct such as extortion, money laundering, racketeering and corruption.

I was unable to make any further attempts at contacting or locating Court. Although I was not able to read the emails in their entirety or listen to every voice message in its entirety to the that Court is a "deranged idiot who is harassing Murphy as well as Court's attempt to forward these emails. Based on Murphy's statements along with the numerous emails he printed and provided to me, as well as the recorded voice messages, I believe Court is in violation of PC 653m(b) Annoying Electronic Communication.



INM1707715 Case Report - Countywide Criminal & Traffic          http://public-access.riverside.courts.ca.gov/OpenAccess/Criminal/...

# RIVERSIDE SUPERIOR COURT
## PUBLIC ACCESS
### Criminal Case Report
#### Pay Ticket / Case Fine

Send me an email to heavier case information here



### Case INM1707715 - Defendants

| Seq | Defendant | Next Court Date | Status | Agency / DR Number | Arrest Date | Count 1 Charge | Violation Date |
|-----|-----------|-----------------|--------|-------------------|-------------|----------------|----------------|
| 1 | COURI, JAMES CYRYL | | | PSPD 1705P5014 | 04/10/2017 | PC 653M(A) | 04/10/2017 |

### Case INM1707715 - COURI, JAMES CYRYL - Status

Filing Type    Complaint
Ordered Bail $2,600.00
D A
Next Action

Custody        Letter From DA
Filing Date    11/09/2017
Posted Bail    $0.00
Defense
Deputy Report E: PSPD 1705P5014

| Warrant | Type | Status | Issued | Affidavit |
|---------|------|--------|--------|-----------|
| | ARR | ISSUED | 12/12/2017 | N/A |
| Probation | Type | | Granted | Expiration |
| | N/A | | N/A | N/A |
| Sentence | Convicted Date | | Fine and Penalty | Restitution Fine |
| | N/A | | | 0 |

### Case INM1707715 - COURI, JAMES CYRYL - Charges

Arrest Charges

1 of 3                                                                      6/11/18, 9:12 AM

INM1707715 Case Report - Countywide Criminal & Traffic          http://public-access.riverside.courts.ca.gov/OpenAccess/Criminal/...

| Count | Charge | Severity | Description | Violation Date | Plea | Status |
|-------|--------|----------|-------------|----------------|------|--------|
| 1 | PC 653M(A) | M | Harassing by Telephone | 04/10/2017 | N/A | |

**Filed Charges**

| Count | Charge | Severity | Description | Violation Date | Plea | Status |
|-------|--------|----------|-------------|----------------|------|--------|
| 1 | PC 653M(A) | M | Harassing by Telephone | 04/10/2017 | N/A | ACTIVE |

### Case INM1707715 - COURI, JAMES CYRYL - Probation

Probation Has Not Been Granted On This Case For This Defendant.

### Case INM1707715 - COURI, JAMES CYRYL - Related Cases On Calendar

| Related Cases On Calendar |
|---------------------------|
| This Defendant Does Not Have Any Other Cases With Future Hearings Scheduled. |

### Case INM1707715 - COURI, JAMES CYRYL - All of Defendant's Other Cases

| Case Number | Filed Date | Charge | Next Hearing | Jurisdiction | Status |
|-------------|-----------|--------|--------------|--------------|--------|
| This Defendant Does Not Have Any Other Reportable Cases. | | | | | |

### Case INM1707715 - COURI, JAMES CYRYL - Actions & Minutes

| Action Date | Action Text | | Disposition | Hearing Type |
|-------------|-------------|---|-------------|--------------|
| 01/08/2018 | MISCELLANEOUS PAYMENT OF $2.50 RECEIVED | | | |
| **Minutes** | Print Minute Order | | | |
| INSNP | 180108-2573-CK R03/ 2.50 000 | | | |
| 12/13/2017 | ELECTRONIC WARRANT SENT AT 10:48 | | | |
| 12/12/2017 | DECLARATION IN SUPPORT OF ARREST WARRANT FILED. JUDGE KIRA L KLATCHKO | | | |
| 12/12/2017 8:3. AM DEPT 2K | ARRAIGNMENT | | DISPOSED | ARRAIGNMENT |
| **Minutes** | Print Minute Order | | | |
| 11/20/2017 | MISCELLANEOUS PAYMENT OF $2.00 RECEIVED | | | |
| **Minutes** | Print Minute Order | | | |
| INSNP | 171120-1199-CK R01/ 2.00 000 | | | |

2 of 3                                                                          6/11/18, 9:17 AM

INM1707715 Case Report - Countywide Criminal & Traffic          http://public-access.riverside.courts.ca.gov/OpenAccess/Criminal/...



| | 11/14/2017 | CASE DESIGNATION: VERTICAL. CASE ASSIGNED TO DEPT. |
| | 11/14/2017 | NOTICE MAILED TO DEFENDANT ON 11/09/2017 TO APPEAR: 12/12/2017 |
| | 11/09/2017 | ELECTRONIC - DECLARATION IN SUPPORT OF ARREST WARRANT RECEIVED |
| | 11/09/2017 | ELECTRONIC - COMPLAINT FILED |

### Case INM1707715 - COURI, JAMES CYRYL - Fine Information

Date To Pay:  **N/A**   First Payment: II

Prior NSF:   Payment Amount: $0.00   Last Payment: II

| Fine Number | Fine Type | Fine Description | Original Amount | Paid To Date | Current Due |
|---|---|---|---|---|---|
| | | | | | |
| | | Total: | 50.00 | $0.00 | $0.00 |

Print This Report

Purchase Documents for this Case

Close This Window

Riverside Public Access 6.2.2™ © 2018 Journal Technologies, Inc. All Rights Reserved. www.jtd-corp.com
Contact Us

3 of 3                                                                       6/11/18 9:42 AM

## CORRUPTION INTERNATIONAL INVESTIGATIONS
### MONACO - DUBAI - UAE

Dated: 6-11-18

Via: Email

Michael Hesterin, DA
Riverside County CA

Re: your conspiracy with SBEMP/S.Murphy Esq.
Ref: violations of 42USC1983, 1985,
conspiracy to obstruct justice & racketeering

We are a forensic investigative organization working for clients who have retained us to uncover and assemble the details of what we have uncovered as a pervasive criminal enterprise in the Coachella Valley and Riverside County.

Focused on the criminal activities of SBEMP and a lawyer at their firm, Shaun Murphy Esq., we have amassed a significant sum of evidence confirming that Murphy and SBMP have been engaged in repeated acts of courthouse fixes, perjury, money laundering, obstruction of justice, deprivation of due process, forgery, suborning perjury. Such reveals reckless misuse of law-enforcement to extort, harass, intimidate and the filling of fabricated claims against any person who begins to open the "can of worms" of the Riverside public officials' larceny, corruption, embezzling, tax evasion, bribery and criminality.

We have caused your office and you to be recipients of much of these verified acts of criminality, police and Sheriff extortion, corruption, false charges, brutality and bodily harm, instigated by Murphy, SBEMP, Murphy's Mafia clients Castiglione, in conspiracy with exposed Judge David Chapman. Chapman in concert with Murphy embezzled 48625 Calle Esperanza, La Quinta Ca, rented by Mr Couri's daughter Lydia for Jim Couri's use as a "hospice" as Mr. Couri suffers from melanoma stage four cancer, cardiac disease, COPD and intestinal disorders.

Murphy also engaged in the Judge Chapman looting a $45Million default judgment Mr. Couri Filed against George and Antonia Pavia for Defaulting in a case domiciled in Palm Springs. Chapman deprived access to the Court, conspired with Murphy and SBEMP, who were recruited by Pavia, a known fixer and who has been convicted for tax evasion, sued for embezzling and extortion and who is a defendant now in embezzling a woman out of $30Million and others. Murphy again used Chapman to loot an adversary by depriving Mr. Couri of Due Process

M. Hesterin DA                                              page 2

in the theft of Calle Esperanza and the $45 Million from Pavias that now will be before a Federal Judge in NYC-SDNY.

You and your office, Riverside Deputy Sheriffs, and Palm Springs Police have conspired with SBEMP and Murphy in April 2017, in order to set-up a phony charge by Murphy claiming supposed "phone harassment" directed to Murphy by Mr Couri, who is 79 years of age, having undergone about 10 surgeries for cancer and heart disease and who was in NYC at his office at the time.

Notwithstanding that, Mr Couri caught Murphy in a series of crimes, and conspiring with Judge Chapman. Mr Couri was a Litigant/adversary of Murphy's client Castiglione who Mr. Couri uncovered are a Mafia family from New York and Queens NY. Thus, as a vicious and falsified abuse of the law, Murphy and SBEMP concocted a sham story that any law enforcement official with a "frontal lobotomy" would quickly see that the Murphy Charge against Mr. Couri was ludicrous and a malicious intent to harm Mr. Couri, his health and reputation, while trying to Gag an investigation into a criminal enterprise.

Accordingly, a bogus Murphy Charge was "OK'D" by Hesterin; a Case was commenced (INM1707715) replete with fraudulent claims that Murphy was "victimized" by Mr. Couri by phone, who also engaged in threats against Murphy and his family. All of this were obvious fabrications and retaliation by Murphy who was caught by Mr. Couri engaging in extortion, larceny and thefts. Meanwhile, Mr. Couri was not within the Palm Springs jurisdiction and does not engage in threats. Eor months Murphy was communicating with Mr. Couri to NYC where Murphy was calling and mailing Court documents to regarding the Castiglione v Couri Case. Thus Murphy knew Mr. Couri was in NYC and his mailing address as 575 Madison Ave, NYC, not Calle Esperanza.

Murphy, a litigant caught engaging in mafia extortion, perjury and larceny, recruited Hesterin, PS Cops and an Asst. DA in order to embezzle Mr. Couri's liberty and his health.

We attach the evidence of your conspiracy with SBEMP and Murphy, which has resulted in a Warrant docketed against Mr. Couri, by all of you falsifying a absurd claim without a shred of evidence other than the SAY-SO of a corrupt trapped criminal Murphy, whose motives are as transparent as the dishonesty of Satan.

M. Hesterin DA

Then Hesterin and Murphy, knowing that Mr. Couri was wrongfully evicted from 48625 Calle Esperanza on June 23, 2017, engaged in fraud and "Sewer-Service" of the Court Notice in the fabricated Criminal Case-----causing the NOTICE to be fraudulently mailed by Hesterin to Calle Esperanza address on Nov 19, 2017

The Court Notice was Mailed by Hesterin to an address that Murphy and Hesterin knew Mr Couri was embezzled-evicted from 6 months earlier in June 2017. On 12-12-17 the return date for the Hearing referred to in of the Notice, sewer-served, Mr. Couri was not present as he was set-up by Hesterin and Murphy and PS cops. No one advised Judge Katachikp (Indio judge) that the address was willfully wrong, so the Judge ordered a Warrant Issued, impacting the liberty of a victim of Murphy, Chapman, and Hesterin's corruption. With a reading of the Palm Springs Officer's "Report", Murphy's allegations, any legitimate Court and law enforcement officer would "vomit". Officer P. Ramos' Declaration-Report in support of Mr. Couri Arrest Warrant is a commission of a corrupt DA Hesterin, a perjurer-corrupt lawyer Murphy, and SBEMP, all set-up to gag a patriot Mr. Couri, who has been awarded accolades for his efforts to sanitize America from the polluted pockets of exposed criminal enterprises.

Accordingly, Mr. DA Hesterin, we have provided you with the opportunity to withdraw this sham series of mail and wire fraud, law enforcement abuse, larceny and willful violations of Mr. Couri's Civil Rights - and rights under the US Constitution. You have willfully engaged in aiding a criminal enterprise by abusing your Oath of Office, by using the law to abuse and extort citizens and you have aided Murphy and Slovak, et-al. and the Mafia to embezzle millions from Mr. Couri and property. By corruption and racketeering you have again turned a "blind-eye" to these criminal acts perpetrated by Murphy and your office, resulting in grave injury to Mr. Couri , his reputation and his health.

Your DA phony criminal charges, without basis in fact or law, and fabricated by Murphy and "blessed" by you have resulted in Mr Couri having a phony "open warrant" over his head. This criminal charge was concocted by a confirmed criminal (Murphy), against Mr Couri, who is ill and without any such crimes attached to his background. Your Riverside Court Docket confirms that Mr. Couri has "no reportable criminal" cases against him. Our investigation reveals that you and your DA Office has have condoned massive crimes ongoing in Beaumont, Palm Springs Court, Riverside Courts; money laundering in La Quinta and the fraud and embezzling ref Silver Rock et-al, Wells Marvin-Old Town, Murphy,

M. Hesterin DA

SBEMP Ponzi scams with all of the above. Accordingly, be advised that Riverside DA Office, Michel Hesterin, Riverside County, Palm Springs and Judge Chapman will be Defendants in a RICO and Civil Rights Action to be filed in USDC SDNY. Re: you, Murphy, Chapman and others persons who have engaged in these corrupt acts of racketeering and causing grave loss and injury involving interstate commerce from New York to California re: mail fraud, wire fraud, money laundering, bribery, obstruction of justice and conspiracy to obstruct justice while misusing your public official status. Any violation of the US Constitution and depriving Due Process voids any form of immunity of judges, DA, elected officers.

We also inform you that all of the documents revealed with this communication have been obtained by our investigators from the USPD, the Larssen Courthouse Records, and from informants.

We are also aware that you have conspired with Murphy and SBEMP, in order to "sandbag" and use your position to mutilate Mr. Couri's Rights and your attempt to incarcerate him to aid the Riverside corruption enterprises that we have exposed and reported.  No sooner the abuse of criminal law resulted in the sewer service and warrant was issued, Murphy in concert with inpotent Judge David Chapman and Filed a case (Murhy v Couri, Wilson) (Couri's assistant and a non existent Company "scams inc", rehashing the phony criminal charges by Murphy, making wild and groundless claims. Case PSC1800166 ( See  Wilson Dec. here). Again, Murphy engages un fraudulent POS, perjury, mail fraud and forgery.

Then Murphy caused the sham case to be steered to PS2 --Judge David Chapman who was disqualified and automatically removed from two other cases involving Mr. Couri, grounded on statements made by Mr Couri outlining Chapman's depraved and corrupt acts, all verified, and as per CCP170.3; and Article 14 of the US Constitution, the California Constitution and Canons of Judicial Ethics.

Judge Chapman was disqualified by Law, by California Code 170.3 and the Rulings of the US Supreme Court, yet Chapman, who has taken the law into his own hands, accepted the Murphy case, which is another desperation maneuver by Murphy, SBEMP and Chapman.  These activities will result in not only Civil reprisals, treble damages, disgorgement and Federal Sanctions but will result in criminal referral by USDJ-SDNY, to the US Attorneys Office at St Andrews Plaza in NYX foe prosecution-----you can bet on it.

M. Hesterin DA

page 5

In sum , Mr Hesterin, you are a disgrace to Public Office, you are a liar, a cheat and a man without morals or integrity, ands a disgrace to America. You have abused many, condoned massive criminality ongoing in the Coachella Valley, in Beaumont, thefts by corrupt lawyers, public officials and the embezzling from La Quinta, Beaumont Palm Springs and the larceny by judges in Riverside, Palm Springs, Clerks, Police, and Sheriffs. A sad testimonial for America.

Mr Hesterin, "Rome is burning and you lit the match.

Please carefully review the attachments which will confirm the criminal scheme of Murphy, Police, your DA office and the ADA involved.

Encls.
cc: all parties                              CORRUPTION INTL. INV.

# *CORRUPTION INTERNATIONAL GROUP (MONACO)*

Dated: 4-11-2019                                                     By Email


Riverside County District Attorney's Office                 Re: Shaun Murphy Esq.
Att: DA M. Hesterin, ADA Beherens                           Ref: INM1707715 (Murphy)

On or about 3-26-19, Shaun Murphy Esq. and Jim Couri executed an Agreement
disposing of all of their differences. As a part of the Agreement, Mr. Murphy
withdrew the "Harassment" Complaint Murphy Filed against Mr. Couri in or about
10-2017 with your Riverside Jurisdiction using a bogus address in La Quinta for
Mr. Couri.

The address used was known to be false by you and by Mr. Murphy, as Mr. Couri's
address has always been NYC. Thus, no legal Notice of the Complaint was ever
Served upon Mr. Couri. In fact, Couri advised your Agent on 6-28-17 that he was
not in Riverside County, is in NYC and not subject to Riverside Jurisdiction. This
was told to Baron Lane your Officer, who commenced harassing Mr. Couri at your
behest.Tour conduct now can only be construes as malicious interference.

Such "Complaint" never Served resulted in an illegal Arrest Warrant issued on
12-12-17 in violation of PC812, et-seq, and by corrupted Judge Klatchko who was
not  informed that the address recorded for Mr. Couri was false. This Arrest
Warrant, though illegal and illegally issued by you, has remained outstanding since
12-12-17, and being used as a mode of retaliation, extortion and a violation of Mr.
Couri's Civil Rights.

Now Murphy reports the your Office refuses to follow the complaining witness
(Shaun Murphy) withdrawal of the Complaint and the vacating of the Arrest
Warrant. Murphy has every right to withdraw these false claims notwithstanding
that the Complaint on its face is a fraud, illegally Filed and never Served according
to Law. You have no legal right to demand "ACD" or anything else as the Charge
has been withdrawn per Agreement between Murphy and Couri, and the Charge

Riverside DA Office                                    page 2


and your involvement and exhibit of prosecutorial abuse of power and retaliation
as defined under Title 18of the US Code (ie:18USC1513, RICO, 42USC1983) to
name some. Your refusal to withdraw this Complaint per complaining party's
demands, such will be at your peril, as your abuse of power, false arrest warrants,
conspiracy and fraud will be pled against you in a RICO Complaint being Filed in
USDC-SDNY within a few weeks. Your abusive acts and illegal acts have caused
Mr. Couri grave harm for which you will be held accountable.


cc: S. Murphy                          CIG INVESTIGATIONS (MONACO)
    S. Wilson                                 For Mr. Couri

,

# THE SCAMS INC GROUP INVESTIGATIONS
## BOULEVARD DES MOULINS. MONTE CARLO, MONACO 9800

Dated: 12-13-17
SBEMP/Shaun Murphy/ Judge Chapman                    Via: Email & Post
1800 Tahaquitz Canyon Road
Palm Springs Ca                              Re: Case PSC1702031

As you probably know by now, we believe in facts, the truth, full disclosure, an
penalties for criminal conduct.

Accordingly, we advise all of you thet we have assembled diligent and careful
outline and evidence proving that Judge David Chapman has engaged in a
pervasive scheme acts, Rulings, Orders, fraud and larceny, inter-alia repugnant to
the US Constitution and rendering immunity impotent.

Chapman has engaged in willful and repeated acts in violation of the Supreme Law
of the USA, and therefore, as a matter of Law has engaged in acts of treason
(Cooper v Aaron). And in a pattern of Lawless Violence (Albeman vBooth). US
Supreme Court Justice black has staited tha "judges must be punished for their
crimes" Justice Douglas stated "Judges must be held liable in their violations of
citizens rights, privileges, immunities or guarantees afforded under the US
Constitution. There is no immunity to shroud judicial misconduct resulting in
irreprable injury to citizens Constitutional Rights.

Chapman has acted with impunity as a trespasser of the Law and has with
impunity refused to follow the law (ie: CCP170.3; Article 14 of the US
Constitution, the CA Constitution, Canons of Judicial Ethics, Civil Rights Statutes,
Elder Abuse Statutes and CA penal Codes368, 503,504, 18USC241, 242, 245,
18USC1341,1343,1962,1964, 42USC1983.To name some.

When Judge Chapman refused to follow the State and federal Laws, warred
against the US Constitution and the Due Process Clause, deprives Property
without  Due Process, issuing Orders that are Void , as a result of Chapman's
refusal to Disqualify himself per the US Constitution mandates and the mandates
under CCP170.3; chapman did not follow the law, engaged in reckless and illegal
activities by law, Chapman's Orders are VOID, not simply "voidable". Chapman
acting undefr California Law violated the US Constitution repeatedly and

*SBEMP*                                                                    *PAGE 2*

*intentionally in order to embezzle Mr Jim Couri's Rights, property and money, Chapman stripped himself of his "official character" and subjected himself in his persons to the consequences of his individual misconduct. The State of California thereby has no power to impart to Chapman any immunity from responsibility to the Supreme Authority to America (The US Constitution). See Siump v Sparkman.*

*When a judge acts in the face of clearly valid Statutes depriving him of jurisdiction (ie CCP170.3, US Constitution Due Process, racketeering, fraud, judicial perjury, falsification of claims, under color of law ordering Sheriff menacing, brutality, stalking, breaking and entering, Civil Right Violations and Elder abuses with intent to inflict harm, loss, injury, pain and suffering and looting of Property, CHAPMAN'S IMMUNITY IS LOST. See USA v Lee; Zeller v Rankin.*

*ACCORDINGLY, SBEMP, MURPHY ACTING IN CONCERT WITH CORRUPT JUDGE DAVID CHAPMAN WILL BE HELD ACCOUNTABLE ALONG WITH CHAPMAN IN THE CASE THAT IS SHORTLY BEING FILED IN USDC-SDNY.*

*We have provided you with some of the Law, Facts and Evidence that establishes beyond any doubt, and grounded on Mr Couri's Pleadings in the Case ./ PSC1702031. This has not embraced Chapman's pervasive and corrupt acts in Case PSC16004028 (Couri v Siebert). Chapman in concert with SBEMP, Murphy and Castiglione, engaging in the extreme damage, loss, injury, physical injury, racketeering, embezzling, willful violations of Mr and Mrs Couri's Constitutional Rights, misuse of Police, Sheriff, to menace and invade Mr Couri's Property with Void Orders, Fabricated claims, extortion and outright Judicial Crimes will be fully aired and litigated in the USCD Complaint under multiple of Penal Laws, Federal Title 18 Laws.*

*The Federal Courts know that Riverside is a pervasive corrupt County and by the facts have exhibited further Conspiracy with Chapman, Murphy and SBEMP on the one hand and the Appeal Clerks, Seltzer, Conceptione, ETC and Judge R. Marquez, to name some. INFORMANTS HAVE LOTS TO REPORT ABOUT RIVERSIDE APP DEPT OF SPUP CT.*

*Finally, we have received oover 15 Whistleblower Calls from persons with further proof of Chapman, Murphy, SBEMP, Courthouse crimes, fixes and larceny.*

*Cc: all parties*                          *THE SCAMS INC GROUP INVESTIGATIONS*

N

## OPTION AGREEMENT

AGREEMENT: dated _12-14-16_ , between James Couri [Couri, as Attorney in Fact (POA)for Marlene Couri], of 575 Madison Ave. 10th Floor NYC, NY 10022 and Theresa Castiglione (Theresa and Vincent Castiglione (Vincent) of 41032 Calle San Leon, Indio Ca, 92203; Owners of 48625 Calle Esperanza located in Laguna de la Paz La Quinta Ca 92253 (Property), for the Optioning of Purchase of Property for Marlene Couri (Marlene) or her assigns:

WHEREAS: Vincent and Theresa are the Owners of Property, Free and Clear of any and all encumbrances, and desire to grant a Option to purchase the Property to Couri, as for a period of Five, 5, years from the date hereof, for a total purchase price of $285,000.00 pursuant to the following terms and conditions:

NOW THEREFORE: in consideration for the payment by Couri as POA for Marlene of $2,500.00, in cash, and other good and valuable consideration, which is herewith acknowledged, the Parties agree as follows:

A. Owners hereby grant a FIVE YEAR OPTION to purchase Property to POA Couri for Marlene and or her assigns for the total sum of $285,000.00 payable as follows to Owners or to their Estate or Heirs. ( there will be no liens on Property):
1) 10% in cash at Closing (ie: $28,500.00).
2) a 21 year Series Promissory Note bearing Interest of 4% per annum in the sum of $256,500.00. Payments on the Note will be semi annually of $6,000.00 ( ie: $12,000.00 per year) for 20 years plus any interest due on unpaid balances; and in year 21 the final balance due on the Note of $16,500.00 (payable semi-annually in the sums of $8,250.00) plus interest that may be due. Owners may file a UCC lien.

B. Owners unconditionally agree to deliver (upon Demand by Marlene or Couri), the Deed to the Property and all other Association Documents with duly executed Assignments to Marlene or her designated Assigns in exchange for the Payment of $28, 500.00 and delivery of the Series Promissory Note in the amount of $256,500,00 made payable to Owners or their heirs, Owners agree to continue to lease Property to Couri and or Marlene for Rents at $1,650 per month pursuant to Lease Agreement until the Option is exercised or lapses.

NOW THEREFORE: the Parties unconditionally agree to all of the conditions and terms herein, and execute this Agreement on the date set forth herein.

Dated: 12-14-16

_Theru Castig__    Vincent Castiglione_

O

*107240-04 DISPOSED* (handwritten)

# SCROLL
## The Supreme Court Records On-Line Library

| | |
|---|---|
| INDEX NO.: | 107240-2004 |
| PLAINTIFF: | COURI, JAMES |
| DEFENDANT: | SIEBERT, JOHN M.D. |
| CASE STATUS: | RESTORED (REOPENED) |
| ACTION: | OTHER |
| LAST UPDATE: | 07-26-2011 10:00AM |
| JUSTICE: | PAUL WOOTEN |

Home / SCROLL / CASE INFORMATION

*107240/04 Dismissed By woo ford Aug 2 2010* (handwritten)

| | |
|---|---|
| DATE CASE COMMENCED / BEGUN | 06-11-2004 |
| DATE RJI FILED WITH COUNTY CLERK | Thursday, Jun 10, 2004 |
| DISPOSITION DEADLINE | Monday, Sep 11, 2006 |
| PRELIMINARY CONFERENCE HELD | Thursday, Jun 24, 2004 |
| COMPLIANCE CONFERENCE DATE HELD | Wednesday, Jul 21, 2004 |
| DATE NOI DUE | Monday, Mar 27, 2006 |
| DATE NOI WAS FILED | Wednesday, Mar 22, 2006 |
| CASE DISPOSED / CONCLUDED | Tuesday, Aug 3, 2010 |

BACK    NEW SEARCH

**CASE INFORMATION:** Provides information on conferences held and case processing standards. The several deadlines listed are based upon the Differentiated Case Management track assigned and the standards associated therewith. The deadlines as shown here do not reflect any specific deadlines that may have been set by the Justices in a preliminary conference or other order, which control. See Uniform Rule 202.19.

60 Centre Street, New York NY 10007
Copyright © 2006 Unified Court System

BY WOOTEN 9-1-10- STATUSCONF DISPOSED OF CASE
107240-04 DISPOSED

| JUSTICE | APPEARANCE SEQUENCE | APPEARANCE DATE | APPEARANCE TYPE/ PART | ACTION AT APPEARANCE | COMMENT/ TIME | ADDITIONAL COMMENT |
|---------|---------------------|-----------------|----------------------|----------------------|---------------|--------------------|
| WOOTEN, PAUL | 23 | Wednesday, Nov 2, 2011 | STATUS CONFERENCE 7 | ADJOURNED WITHOUT A DATE | 11:00AM | M/P |
| WOOTEN, PAUL | 22 | Thursday, Sep 22, 2011 | IAS PART 7 | PRETRIAL CONFERENCE HELD | 11:00AM | - |
| WOOTEN, PAUL | 21 | Thursday, Sep 8, 2011 | IAS TRIAL READY 7 | ADJOURNED | 10:00 A.M. | - |
| WOOTEN, PAUL | 20 | Wednesday, Dec 13, 2010 | IAS PART 7 | PD - HEARING HELD | 2:30PM | - |
| WOOTEN, PAUL | 19 | Wednesday, Sep 1, 2010 | STATUS CONFERENCE 7 | DISPOSED/RESULT OF MOTION | 2:30 PM | - |
| HEITLER, SHERRY KLEIN | 18 | Monday, Jan 8, 2007 | IAS PRE-TRIAL 30 | ADJOURNED WITHOUT A DATE | MOT.DEC.PENDING | - |
| HEITLER, SHERRY KLEIN | 17 | Monday, Dec 11, 2006 | IAS PRE-TRIAL 30 | PRETRIAL CONFERENCE HELD | 4PM | W/MOTION |
| HEITLER, SHERRY KLEIN | 16 | Monday, Dec 4, 2006 | IAS PRE-TRIAL 30 | PRETRIAL CONFERENCE HELD | 9:45AM | W/MOTION |
| HEITLER, SHERRY KLEIN | 15 | Wednesday, Oct 18, 2006 | IAS PRE-TRIAL 30 | PRETRIAL CONFERENCE ADJOURNED | AWAITING MOTION | PAPERS |
| HEITLER, SHERRY KLEIN | 14 | Wednesday, Oct 11, 2006 | IAS PRE-TRIAL 30 | PRETRIAL CONFERENCE ADJOURNED | AWAITING MOTION | PAPERS |
| HEITLER, SHERRY KLEIN | 13 | Monday, Oct 2, 2006 | IAS PRE-TRIAL 30 | PRETRIAL CONFERENCE ADJOURNED | CONTROL DATE | - |
| HEITLER, SHERRY KLEIN | 12 | Friday, May 26, 2006 | IAS PRE-TRIAL 30 | ADJOURNED | 9:30AM | - |
| HEITLER, SHERRY KLEIN | 11 | Thursday, May 25, 2006 | IAS PART 30 | PRETRIAL CONFERENCE HELD | NOON | CALL PARTIES/REF. |
| HEITLER, SHERRY KLEIN | 10 | Monday, May 1, 2006 | IAS PART 30 | ADJOURNED - HEARING HELD | NOON | - |
| HEITLER, SHERRY KLEIN | 9 | Tuesday, Apr 25, 2006 | IAS PART 30 | ADJOURNED | 9:30AM | - |
| HEITLER, SHERRY KLEIN | 8 | Thursday, Mar 23, 2006 | IAS PART 30 | ADJOURNED | SEE REFEREE | - |
| HEITLER, SHERRY KLEIN | 7 | Tuesday, Feb 21, 2006 | IAS PART 30 | ADJOURNED | SEE REFEREE | - |
| BEELER HAROLD B. | 6 | Tuesday, Oct 25, 2005 | STATUS CONFERENCE 9 | ADJOURNED WITHOUT A DATE | MP | - |
| GAMMERMAN, IRA (JHO) | 5 | Tuesday, Jan 11, 2005 | STATUS CONFERENCE 27 | STATUS CONFERENCE ADJOURNED | 4:00 PM | - |
| GAMMERMAN, IRA (JHO) | 4 | Tuesday, Dec 14, 2004 | STATUS CONFERENCE 27 | STATUS CONFERENCE ADJOURNED | - | - |
| GAMMERMAN, IRA (JHO) | 3 | Wednesday, Sep 8, 2004 | STATUS CONFERENCE 27 | STATUS CONFERENCE HELD | - | - |
| GAMMERMAN, IRA (JHO) | 2 | Wednesday, Jul 21, 2004 | COMPLIANCE CONFERENCE 27 | COMPLIANCE CONFERENCE HELD | 4:00 PM | - |
| GAMMERMAN, IRA (JHO) | 1 | Thursday, Jun 24, 2004 | IAS PRELIMINARY CONFERENCE 27 | PRELIMINARY CONFERENCE HELD | - | - |

*107240-04 DISPO*

**SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY**
**PRESENT:   HON. PAUL WOOTEN**
                    *Justice*                                          **PART  7**

JAMES COURI,
                                                    INDEX NO.          107240/04
                          Plaintiff,                MOTION DATE
         - v -                                      MOTION SEQ. NO.        052

JOHN SIEBERT, MD, et. al.
                                                    MOTION CAL. NO.
                          Defendants.

The following papers, numbered 1 to 3, were read on this motion by the plaintiff to renew, reargue, and reform pursuant to CPLR 2221, defendants' prior motion.

|  | PAPERS NUMBERED |
|---|---|
| Notice of Motion / Order to Show Cause — Affidavits — Exhibits ... | |
| Answering Affidavits — Exhibits (Memo) | 2 |
| Replying Affidavits (Reply Memo) | |

Cross-Motion:  ☐ Yes   ■ No

*FILED*
*AUG 05 2010*
*NEW YORK*
*COUNTY CLERKS OFFICE*

        Plaintiff's motion is denied for failure to comply with this Court's order, dated December 12, 2005, by Honorable Harold J. Beeler, Justice, New York State Supreme Court.  The Court's order requires that plaintiff seek leave or permission to file any such motions after December 12, 2005. Hence, the above motion, again, is improper and must be dismissed.

        The Court notes that the parties have filed the above motions and their answer and reply without compliance to the Rule 130 requirement. See 22 NYCRR 130.1-1., et seq. The Court hereby places all parties on notice that if they file papers or seek leave to file a motion they must adhere to the New York State Rules of the Court § 130-1.1 et seq.

        Upon the foregoing papers, it is,

        ORDERED, that plaintiff's motion is denied in their entirety, and further,

        ORDERED, that the above parties motion and papers must comply with the New York State Rules of the Court § 130-1.1 et seq. Failure to comply with the terms of the order will subject the parties to penalties of Rule 130, including an order of dismissal.

        This constitutes the Decision and Order of the Court.

Dated: August 3, 2010

                                          Enter:

                                          PAUL WOOTEN    J.S.C.

Check one:   ■ FINAL DISPOSITION  ☐ NON-FINAL DISPOSITION

Check if appropriate:           ☐ DO NOT POST

P

*Recd 10-5-15*



STATE OF NEW YORK
## EXECUTIVE CHAMBER
ALBANY 12224

**ANDREW M. CUOMO**
GOVERNOR

September 25, 2015

James Couri
78365 Highway 111, Suite 322
La Quinta, CA 92253

Dear Mr. Couri:

This letter responds to your correspondence dated September 17, 2015, which clarified your FOIL request to seek:

> any and all Documents, Records, and all other written Information that was considered in the Appointment or otherwise regarding Paul Wooten and as required by "THE SCREENING PROCESS". Such shall include but not limited to: Appointments Questionnaires and related Documents; any and all "Screening Panels" and "Statutory Nominating Bodies"; and any other duly appointed or elected Advisory Council

Please be advised that the New York State Executive Chamber has conducted a diligent search but does not possess records responsive to your request.

Pursuant to Public Officers Law § 89(4)(a), you have thirty (30) days to take a written appeal of this determination. You may make an appeal by writing: FOIL Appeals Officer, Executive Chamber, State Capitol, Albany, New York, 12224.

Very truly yours,

*Mongthu Zago*

Mongthu Zago
FOIL Counsel
Records Access Officer

## WE WORK FOR THE PEOPLE
PERFORMANCE ★ INTEGRITY ★ PRIDE

# JAMES COURI

78365 Highway 111, Suite 322, La Quinta, CA 92253 . 760-346-2808

September 11, 2015

Judge Paul Wooten                                    Fax: 212-952-2757
Part 7
Supreme Courthouse
60 Center Street                  Re: Judicial Application & Appointments Questionnaire
NYC, NY 10007


Over the past few weeks, FOIL Requests have been made seeking your mandated Forty
Five Page plus Judicial Application, Appointments Questionnaire, Resume, Investigation
Reports and other pertinent Documents that you were required to complete, Swear-to and
submit with fifteen copies to Governors Office and other Agencies before Governor
Patterson approved your Appointment as a Supreme Court Judge, in or about 2008. Thus
far the effort has been futile as various Offices have failed, up to now, to advise the
location and existence of these important Records. All Judicial Applicants are and have
been an essential element before anyone can be appointed to the NY Supreme Court.

These Records are Public Documents and required to be produced under FOIL Request.
Since tha FOIL required Five days passed, a FOIL Appeal has also been made, which is
obligatory to be Answered within ten days. Since 15 copies of all such Documents and
Exhibits were required you should surely have copies of this 45 page Form, plus multiple
Exhibits to it. Accordingly, I ask that you produce, per FOIL all such Applications,
Certifications, Consents, Exhibits and Authorizations.

IF on the other hand, you failed to fully execuite these compulsory Disclosure Documents
so that you could be properly Vetted, Investigated and Questioned as to your
Qualifications, before Governor Patterson Approved your Appointment, such may mean
that you have been presiding as a Supreme Court Judge illegally, and that if you were
subsequently Elected on a Ballot, that election may wel be invalid as per the NY
Constitution regarding Judicial Fitness and other reasons, thus making it essential that
you are Disqualified and or Impeached as a presiding Judge.

What makes thes matters mor complex for you are the facts surrounding your supposed
"Appointment" relating to Clarence Norman and John Sampson; no Judicial Application
and Related Documents and your Documented acts of Fraud on the Court, ex-party
activities with Joseph M Burke Esq, perjury, suborning perjury, failure to Disqualify
yourself in violation of Law, and a rampant and documented pattern of misconduct,
cheating, lying and forgery of Court Docket and Files along with Burke; and dishonesty,
all carefully outlined in various of my Pleadings. Accordingly, please produce these
Records if they exist, as should they not be available, the next step will be a Article 78,
seeking answers and your Removal altogether as a illegally presiding judge in violation
of the State Constitution and the mandates of Albany.

Cc: Joseph m. Burke Esq-Fax                                James Couri

# JAMES COURI

78365 Highway 111, Suite 322, La Quinta, CA 92253 . 760-346-2808

August 26, 2015

Judge Paul Wooten                                    Fax: 212-952-2757
Part 7
Supreme Courthouse                          Re: JSC Wooten "timeline of fraud"
60 Centre Street
NYC, NY 10007

Just as you told Rapper 50Cent that he brought his troubles on himself, I must
respectfully remind you of that here. Evidence has been carefully assembled,
investigations into your activities before, during and after your L & T Days in Brooklyn,
trysts with jailed Clarence Norman, convicted State Senator John Sampson, back room
collusion to buy your "Black Robes" and your morphing into first 80 Centre Street from
Kings County. Surely, Judge, you have not been new to "Fixes". You are well known in
Brooklyn and your "shell-game" supposed run for Brooklyn DA. Some familiar names
such as Sandra Roper, David Yasky, Mark Peters and Arnold Kass come to mind. Your
three-card charade with Clarence Norman and Sampson. Back out5 of DA Race and win
a set of "Black Robes".

When Honorable Wooten "set up shop" in NYC, and in about end of 2009, JSC Madden,
George Pavia Esq, Joseph M Burke Esq, Kenneth V Gomez Esq. had a good deal. A 70
year old, sick, self represented senior citizen (James Couri) that Madden and Pavia
wanted to "financially and personally and physically destroy" out of vengeance and
retaliation for uncovering their corruption. Wooten was just assigned the Couri v Siebert
Cases (# 107240-04 and # 113512-08). You were the "perfect storm" for them and Burke.
You needed a "Score", you were beholden to the likes of Sampson and Norman and
others and you needed money. After all Norman 's job was to "Sell Robes". Burke's
client John Siebert owes me over $60 Million, and Burke, with the aid of Madden and
Pavia had polluted the Courts with trickery, perjury, fraud on the court and collusion,
depriving me of Due Process. You "bought-in"; and the rest is clear in the Record. You
have made a mockery of these Courts, violating the Rules of Law, withholding Due
Process, fraud on the court, engaging in perjury, condoning perjury, and attempting to
manipulate the Rules of law for your and Siebert-Burke's self enrichment at my expense.
You have used and manipulated your Clerks, Nicholas Moyne, Rachel Horovitv Mandel
and others, who were smart enough to get out of your Part 7 cesspool.

All of your corrupt acts have been set forth in my Affidavits and Exhibits to them and in
particular in Motion Sequences # 67, # 68, and # 69 in Case # 107240-04 and my Motion
seeking Summary Judgment and Inquest in Case # 113512-08 for Siebert-Burke 6 year
willful refusal to comply with Article 31 of CPLR. Your farce and deception, using
"HIPAA Forms" as a basis to strike my Answer in Case 107240-04 is proof positive of
your Fixed Courtroom. Evidence proves my compliance and in the purged Courthouse

JSC Wooten                                                              page 2

Record. HIPAA was irrelevant to the Case, and Burke had made the exact same Motion twice before # 39 and # 54). # 39 was made without Beeler Order compliance, and # 59 you Denied. Further my Medical Records were produced to Burke and Part 7 about 8 times since 2010. Proven by Part 7 Stamp on the Production, and Affs. of Service on Burke. No matter, as you and Burke needed a scam to railroad me. Meanwhile, you intimidated Trial Support (Gloria Gottinger), and forged the Court Docket in Case 107240-04, illegally restoring # 107240-04 that was legally Dismissed by virtue of Uniform Rule 202.21f, and CPLR 3404. The Case was revealed on the Docket and Scroll as "Disposed". A motion was mandated by Law. You avoided the Law and simply bullied the Clerks to help you in your fraud on the court and mail and wire fraud.

You lied over phone lines, You Filed a Decision of 12-24-13 that ignored Burke's Fraud, trickery and perjury in his Motion # 67. You lied and violated Special Referee Part Rules and Steered JHO Gammerman to your counterfeit Inquest knowing it was grounded on fraud and deception. You knew that Siebert owes me over $60 Million as confirmed by a Independent Notary Affidavit and by Records in evidence where Siebert Confessed, under oath that Siebert is the Debtor, not me. You set into motion Gammerman and his polluted fraud negligence and perjury in the Record, and fraud on the court. You. Burke and Gammerman in that process if the diabolic phony Inquest violated Uniform Rules 202.43, 202.44, 202.21. You permitted Burke, as a result of your adulterated Decision of 12-24-13, to illegally file a Note of Issue in violation pof Law. You deprived me of access to the Courts by misuse of the Beeler Decision of 12-12-05 as a weapon and hatchet, ignoring my documented pleas. You refused my right to Oral Argument. You have refused to Disqualify yourself in violation of State and federal Laws and the mandates of the US Supreme Court. You have rampantly violated my Constitutional Rights to Due Process. Your refusal to recuse yourself and thus your acts are defined by the US Supreme Court that your failure to Disqualify yourself as mandated by law results in your acting without jurisdiction as you have been "automatically disqualified by law"and that suggests that you are engaging in extortion and the interference with interstate commerce. Courts have repeatedly ruled that judges have no immunity for their criminal acts. Further to the forgoing "Fraud on the Court" by a Judge, a lawyer, and any "officer of the court" makes void the orders, decisions and judgments of that court. These are the mandated of the US Supreme Court. The 7th Circuit further stated "a decision produced by fraud on the court is not a decision at all and never becomes final.

You have engaged in intentional egregious, fraudulent and criminal conduct, all now proven by documentary evidence. You have engaged in a persistent pattern of unethical and illegal acts. You have issued Decisions that you knew or should have known were fraud on the court. You issued a bogus Order in Feb 2014 demanding that I offer Siebert money whole you knew Siebert Confessed to owing me a face value of $19million in 2003 and by 2014 over $60million. You knew that Burke was engaged in perjury and fraud as Siebert had admitted in Agreements, Resolutions and other Records to the fact that he is the indebted person. You also knew that not one payment Siebert and Burke Claimed were payable or paid to me, and the money Siebert did pay to his affiliated Companies were payments for legitimate Company purposes, memorialized by Agreements and Siebert Confessed in Agreements that neither me or any affiliated

JSC Wooten                                                page 3

Company owe him anything. Siebert also waved the right to assert Counterclaims in Settlement Agreement prepared by his lawyers. On top of all of this Siebert issueg General Releases to me and all affiliated Companies in the years, 2000, 2002 and 2003, all validated further with Agreements and Notary Attestment.

Accordingly, I have set forth here the despicable and now proven acts of fraud on the court, deceit, collusion, misuse of court clerks to engage in acts of corruption, phony Decision writing, deprivation of Due Process, ghostwriting and condoning perjury to further the Railroading. In Couri v Burke Case # 101033-15, there are further clear and proven acts of fraud, perjury, misrepresentation, deceit abd thefts engaged in by Burke, Russo & Burke and documented. Judge Wooten is a man who, beholden to Clarence Norman, and who owes the Bounty for his un-earned Black Robes. This supposed Judge figured that he has a unfettered sand-box to rob and railroad a sick, self-represented 76 year old who can not travel. Wooten figured that he could lie, cheat, manipulate the Rules of law, engage in forgery, planting bogus Records, help Burke and Siebert in their crusade to rob me for a piece of the Action. Then they brought in Gammerman to finish me off by more perjury, fraud and hiding evidence. As a side line they Robbed my Med-mal Recovery of $230,000.00 by fraud on the court and by robbing Medicare leaned Funds. This done with the infected acts of JSC Madden, Kenneth V Gomez and George Pavia. Wooten has now been caught and is going to be exposed. These polluted Judges believe that they are above the law. They are not. The SDNY US Attorney's Office has been given (by me and others) thousands of pages of Documents and other evidence of this and other State Court Corruption, Bribery, Fixes RICO, and other Crimes. What the Prosecutors do with this evidence is up to Mr. Preet Bharara, and his Fine Office.

I on the other hand, plan shortly to turn over to Donald Trump my Findings. I have known Mr. Trump since about 1965, when I was introduced by a old friend of both of us. I know that he is very aware of the Unified Courthouse Scams and Fixes and I believe he will be the next President of the USA. The Wooten blackjacking of me in his 12-24-13 Decision is clear fraud, larceny, trickery and perjury. Burke's Perjured Motion Sequence # 67 was a set-up. The HIPAA Forms were irrelevant and pled 2 times before, illegally and falsely. The Wooten 12-24-13 Decision rambles on for 18 pages of lies that I did not prove my Healthcare Production (in evidence 10 fold), I did not produce HIPAA Forms (in evidence, in my Affs. in Op. and Proof produced to Burke 5 times). False character assassination of me with Ghostwritten lies and proved so as such in my Motion Sequence #68 to Vacate this 12-24-13 Disgrace and fraud on the Court. Depriving me from asserting my medical condition which I presented 12 Dr Affs and hospital Records 12 plus times. All of this will be aired per Freedom of Speech and Freedom of Press on Youtube, and other venues.

This 60 Centre Street Court is a adulterated abomination. Many wonder why Gail Prudente made such a "quick exit". I think I have learned the Gory Details.

In sum JSC Wooten, Gammerman, Madden and others have gone far to far and they will pay the consequences for their crimes in Federal Court.

cc: Joe Burke Esq., et-al                                James Couri

Q

<u>Scams Inc</u>

Fighting Scams and Corruption

Search this website ...          ( Search )

- <u>Home</u>
- <u>Scams »</u>
- <u>Resources</u>
- <u>Scam-Free Zone</u>
- <u>Archive</u>
- <u>Blog</u>
- <u>About</u>
- <u>Mission</u>
- <u>Contact</u>

You are here: <u>Home</u> / <u>Featured</u> / JUDGE PAUL WOOTEN—A UNVETTED, UN-SCREENED & ILLEGALLY APPOINTED NY SUPREME COURT JUDGE WHOSE CONDUCT HAS BEEN GROUNDED ON CHEATING, LYING, CORRUPTION AND FRAUD

# JUDGE PAUL WOOTEN—A UNVETTED, UN-SCREENED & ILLEGALLY APPOINTED NY SUPREME COURT JUDGE WHOSE CONDUCT HAS BEEN GROUNDED ON CHEATING, LYING, CORRUPTION AND FRAUD

January 4, 2016 By <u>admin</u>

1-4-16



Judge Paul Wooten

Scams inc has spent a number of years, extensive investigation time, interviews, scouring Court Pleadings, receiving tips from "insiders", talks with 60 Center Street Courthouse Clerks located in the Motion Support Office, Trial Support Office, Office of the Special Referee Part, Scroll Office, County Clerk Office, Court Record-Room Clerks, and former Clerks in the Wooten Part 7 Chambers. This effort has taken well over 2-3 years and it is a "Horror Story"

Wooten was a "knock-around" third-rate" Tenant Lawyer in Brooklyn. He befriended in about 2006 State Senators John Sampson and Kevin Parker. Wooten then was introduced to Clarence Norman. Wooten was desperate to forge ahead as he has a penchant for fancy clothes, fine dining and the "Good-Life". It should be noted that Norman was soon after charged and convicted for "selling-Judgeships", and other crimes. Sampson was later

charged and convicted. Kevin Parker has been often admonished for "physically fighting" on the State Senate Hearing Rooms Etc. Parker was well connected, so Wooten forked over about $12,000.00 to Parker and soon Wooten was running for DA in Brooklyn. Wooten did some glad-handing and harassing Joe Hines, the adversary, at the behest of Sampson and his crew.

Wooten, we have been told, was called in and a deal was struck for him to resign from the Race. Get out and Norman will "bless Wooten" for a Supreme Court Judge. This was done with the cheer-leading" of Parker and Sampson. Soon after Wooten pulled his "Hat from the Ring", Norman OK'd Wooten for Judgeship. Of course Norman was promised hie "pound of cash" on Wooten's "slow-gas".

At the time Gov Spitzer had "Resigned" and Patterson was dispensing Judgeships as fast as a "Tommy-Gun". The Deed was done nd Paul Wooten, Brookyyn "hanger-on" was elevated to a Supreme Court Judge and installed in Kings County. Not long after by some magic, Wooten was "transferred" to NY County and to 80 Center Street. Within a few Monts he was "moved" to Part 7 and to a Courtroom at 60 Center Street. Not bad for a low-line Tenant lawyer with marginal experience and with the evidence already created that Wooten had made Unholy Alliances with Criminals to obtain a set of "Black-Robes".

We have written and exposed the well documented conduct engaged in by Wooten from at or about 2007 through the present, 2015. Wooten has engaged in lying, cheating, violationd of the US and NY State Constitutions, depriving Due Process, Obstruction of Justice, Mail and Wire Fraud, Racketeering, Trickery, Forgery, theft of Records, condoning Perjury, having Decisions Illegally "Ghostwritten" for him. depriving access to the Court, Extorting Litigants, precluding material Evidence and other Racketeering and criminal Acts.

Wooten has not only proven himself to be a thief, he has violated the Law by ignoring the Judicial Obligations to Disqualify himself as mandated by the US Supreme Court, when a "appearence of partiality is displayed by a judge". Wooten has engaged in documented acts far worse than "appearance". He has looted and created a bogus charade Scam of allowing, among other things, a charade of conspiring with Joseph M Burke Esq, John Siebert and others, to fabricate a supposed claim that a Adversary who is owed over $40million from Siebert, failed to produce irrelevant HIPAA Forms and his Medical Records. Although Evidence Confirms that the Claim was blatant Fraud and Perjury, Wooten pressed ahead, used wire fraud at a bogus-set-up hearing on the phone, allowed Burke to File by Mail intentionally Fraudulent Affidavits and Memo of Law in direct contravention to the evidence, and Court Filings.

Then Wooten allowed Burke and his partner kenneth Gomez Esq to Ghostwrite a Decision of 12-24-13 replete with fraud, ignoring the Evidence and testimony of others and Court Stamps confirming that the claim is blatant fraud and theft. Further this fraudulent Wooten Decision made clains tht were bogus, deprived the Litigant from introducing his grave medical condition and Ordered the Filing of a illegal Note of Issue in violation of Court Law and Rules and Ordered a liiegal Inquest in favor of Siebert who belatedly claimed money due him in direct contravention to the sworn-to Record created by Siebert and his Lawyers. All ignored by Wooten. ThenWooten Doctored the Docket, Illegall Restored Case that was Legally Dismissed, Steered this Illegal Inquest to his "partner-in-crime" JHO Gammerman" who allowed fraud perjury and collusion without reviewing the facts.

All of this and car-loads more are proofs of the criminal conduct of JSC Wooten. His former Clerks report that Wooten was shrouded by corrupted-ally-law-clerk Rachel Horowitz (now Rachel Horowitz Mandel). We have uncovered that Wooten himself is a incompetent and can not wright a cogent-legal Order. We have proof that Wooten Ordered Trial Support Clerk Gloria Gottinger to Forge the Court Docket and to Steer a fraudulent Inquest to JHO Gammerman without any Written Order, another illegal act. Court Clerks paint a picture of a bully judge, a thief and incompetent. The former Court Clerks report that Wooten was hile a Parrot, following the direction of Rachel and Courtroom Clerk Warren Rubio, old-hands at Courthouse fraud. Then ther is Erin Gelfand who is now still learning how to misuse Part 7 to loot and rape legitimate litigants who Wooten has beeb Bribed and Fixed to excoriate.

But there is more to this horrible man. Scams Inc has obtained absolute Proof that Paul Wooten was Never Vetted, Screened, Investigated at all. The NY State Courts and the Governor's Office Requires that anyone Running for or Appointed a Supreme Court Judge MUST fill-out and Sign a 46 page Questionnaire, presrent evidence of

finances, agree to full Background, and Credit Reports, Evidence of ability to write Court Pleadings, numbers of Screening Recommendations and Qualifications.

Under FOIL, directed to the Executive Chambers in Albany, and to the Unified Courts and to all other Sources that are supposed to maintain Costody of all such Judicial Records, and not one posess or ever had any Records regarding Wooten, before his name was presented to Patterson by Norman, Sampson, and before Wooten was placed on a "unopposed ballot" for his election a few years after Patterson-Norman sold "wiley-Paul Wooten" his Robes.

As such, as "night turns into day" it would seem as a Matter of Law that Wooten is performing his Judicial Acts not only themselves illegal and Racketeering, but illegal as Wooten is not a legally Appointed or Elected Judge. Wooten has intentionally circumvented to required Obligations to be Appointed and Elected, and his conduct "charadeing as a judge" has been fraudulent. Wooten appear to be no more a judge as would be your butcher.

Further to that even if Wooten were a legally installed Judge, he would be Automatically Disqualified based on the Rules and Laws imposed by the US Supreme Court, mandating disqualification based on "appearance of bias"

We have also received many Inquiries from other Litigants who have had the misfortune to be before Wooten. One glaring Case is a Ms. Veronica Medina. Ms Medina was a employee of Macys on Herald Square in NYC for about 15 years. She Reports in her Complaint Filed in NY Supreme Court that Macys and Elizabeth Arden targeted her as she refused to fire a employee because according to Veronica was a young black man trying his best to perform his job. Ms Madina wrote her Macys superior and President Lundgrin that the Demand was against the Religion and as a Citizen ot do this. Finally someone else fired tis man and soon after Veronica was targeted, harassed, deprived of a promised elevation and raise. She became ill as a result and thing became untenable when Veronica testified in a unrelated Case for the Fired Black man. She became more abused harassed and maligned. She wrote a letter of Resignation, Hired a lawyer with a small office in White Plains NY and Sued Macys and Arden. Enter Wooten. Macys and Arden were 'represented" by large NY Law Firms.

Wooten again here ignored the Facts that Ms Medina was a top-notch employee for over 14 years, has obtained Accolades for her charitable works, evidence of the abuses, her medical records, proof of the In-House Macy's harassment and demands that Veronica commit Acts that she believed were illegal, taggeting a black "stock-boy" We and others have read the Medina Complaint and other Proofs. Surely Ms Medina had many Triable Factual issues to be allowed to pursue a Trial by Jury as demanded.

Rather, Wooten heard the Gunslinger Lawyers for Macys and Arden's Motion For Summary Judgment. Some time later Wooten issued a Decision and Threw out Ms Medina's Case.

We believe and based on the Proof that Wooten more than Erred. Why would a Judge write a 16 page highly detailed Decision involving a fine lady who was robbed and extorted out of her job of over 14 years, and grounded on ignoring Ms Medina's Evidence?

These curious and irregular Wooten supposed Judicial acts have now created an Pattern, a "MO", just like the MO of criminals. The same conduct Wooten engages in after he is FIXED. Ignoring facts, Ghostwritten Decisions and thus Depriving Due Process and Obstructing Justice.

Ms Medina seems to have been "rooked" by fancy lawyering and a foolhardy Judge. The Decision smaks of Ghostwritten, as Wooten is simply not competent to write in the manner the Medina Decision is written and the finite detail it displays. Remember, each Judge in Supreme NY has a case-load all of the time of more than 5,000 Cases. Wooten would either need help from the HAL–Computer from 2001 or seek the aid of persons more familiar with all ofvthe supposed facts and then qualified to contort them ignoring the real evidence. Persons who "have skin in the game" and a motive to recruit Corrupt Illegal Judge Paul Wooten.

Ms Medina Filed Charges against Wooten at the Commission on Judicial Conduct and elsewhere, of course all ignored.

This is not the way our Country and Justice System is supposed to function. Judges are not supposed to seek and obtain unjust personal gains at the expense of Citizens and the Constitution and other Laws.Judicial Immunity is not for Judges who go far beyond their conventional duties to commit crimes. Wooten is just an example of the Judicial fraud, corruption and fixes ongoing in many NY State Courtrooms and it must be stopped. Becoming a Judge is not a reward for License to Steal.

We have provided the 'tip-of-the-Iceberg'. There is much, much, more evidence of many acts of fraud, corruption and extortion ongoing in NY State Supreme Court and Appellate Courts. We will be putting these facts out to the World.

Thank God for the Federal Judiciary

Filed Under: Featured



**Recent**

- GEORGE PAVIA ESQ, KENNETH V. GOMEZ, ESQ JOSEPH M. BURKE, ESQ COLLABERATION, MISUSE OF GOOGLE & INTERNET TO SHROUD COURTHOUSE BRIBERY, EXTORTION AND MAIL & WIRE FRAUD
- GEORGE PAVIA ESQ CONVICTED TAX CHEAT, PERJURER, THIEF NOW INFECTS "THE REAL DEAL" & "THE OBSERVER" TO PUBLISH FRAULENT ARITCLES SHROUDING PAVIA'S CRIMINAL ENTERPRISE
- JAY ITKOWITZ ESQ, & MICHELLE MARATTO ITKOWITZ ESQ HAVE ROBBED MANY FROM THEIR HOMES BY ENGAGING IN "GAMESMANSHIP", AKA FRAUD, CORRUPTION & RACKETEERING AT THE NY STATE/CITY COURTS. LETS TAKE A LOOK
- JUDGE JOAN MADDEN, NY SUPREME COURT, SOLD OUT TO LAWYER GEORGE PAVIA AND ENGAGED IN FRAUD, DEPRIVATION OF DUE PROCESS, BETRAYAL OF PUBLIC TRUST, RAILROADING, CHEATING AND LYING
- LAWYER JAY ITKOWITZ AND HIS LAW-OFFICE PARTNER MICHELLE MARATTO ITKOWITZ — ARE THEY HONEST? CORRUPT? CHEATERS? LIARS? OR SIMPLY STUPID?



**Sotheby's**

**IMPRESSIONIST & MODERN ART DAY SALE**
LONDON 4 FEBRUARY 2016

**Scams Inc News Newwork**

- DR JOHN SIEBERT WITH DIANE HENDRICKS---A CONFESSED MARRIED THIEF SEX PERVERT WITH A BILLIONAIRE WIDOW---A ODD COUPLE November 18, 2015
- RUSSO & BURKE ESQ AND JOSEPH M BURKE ESQ CAUGHT ENGAGED IN BRIBERY, EXTORTION, BLACKMAIL, TAMPERING AND FRAUD ON COURTS IN NY UNIFIED COURT

R

# CORRUPTION INTERNATIONAL GROUP
## MONACO - DUBAI - UAE

### MEMORANDUM

Dated: 9-24-18                                    By: Email

Diane Hendricks                              Re: John Siebert
Hendricks Holdings

Ms. Hendricks:

We, as a forensic investigation organization, are writing to you at the request of Jim Couri in order to inform you of facts that you may not be aware of. First Mr. Couri is now convinced that you have been another victim of John Siebert (Siebert), who is a proven sex-predator, a sociopath, a perjurer, embezzler, thief and tax cheat, among other things.

Our organization has evidence that categorically establishes that Siebert has physically and mentally abused and "raped" over twelve patients while Siebert was associated with NYU-Langone Hospital, Lenox hill Hospital, Manhattan Eye and Ear Hospital, New York Eye-Ear Infirmary; all in NYC. Siebert was convicted by NYU-Langone Hearings and fired. He was fired by all other New York hospitals as a sex-offender. Siebert was charged by NY State Dept. of Health and was convicted as "morally unfit".

Siebert was thereafter evicted from five New York Medical offices including offices of doctors Glen Jelks, Sherill Aston, Dan Baker, 799 Park Ave and #300 E 64St. NYC, all for sexual perverted acts, etc. Siebert has been caught perpetrating massive financial frauds, bribery, money laundering, and racketeering in concert with Joseph M. Burke and Kenneth V. Gomez Esqs. Siebert cheated Banks, such as Chase, Fleet, Bank Audi, US Trust, and others. Siebert embezzled millions from Ms. Christopher Zimmerman, Richard Jacobs, Jim Couri and his companies, Barbara Pollucci, Muriel Karass; Diane Kleeman, Linda M, Ms. Rachel and others who have filed various litigations against Siebert. We have extensive reports from KROLL, Safir Rosetti and others revealing the extensive frauds, money laundering and embezzling by Siebert.

Hendricks                                                    Page 2

We have Affidavits from many of Siebert victims charging his and Kenneth Gomez stalking, threats and extorting many of Siebert victims, intimidating these women to refuse to Testify against Siebert.

Siebert and Burke engaged in conspiring to and did corrupt (with the aid of others) various judges in NY County Courts in order to deprive due process, obstruct justice and issue Orders in violation of the mandates of the New York Constitution, the US Constitution and mandated "Disqualification" based upon judicial corruption, bias and fraud. We have evidence of conspiracy and corruption engaged in by disgraced Judge Paul Wooten, who was removed from the New York Bench for cause and accusations of bribery, fraud and alliance with criminals jailed - Sen. Sampson and Clarence Norman where Wooten "bought" his unvetted judgeship. The compromising of a JHO is even more transparent based upon the fraud and perjury-RICO proved by transcripts.

That said, it appears that you were lured in by Siebert. You gave him a job as a "Researcher" and a UW Press Release was generated replete with fraud and false statements as to this sociopath-Siebert's "background". Thereafter, when Siebert learned of Reporter JOHN FAUBER AND SENTINEL-JOURNAL NEWSPAPER'S expose about the sexual abuses engaged in by Siebert towards his patient-victims and Siebert's sexual predatory acts, grand larceny and worse, we know that you were "recruited" by Siebert and likely Joe Burke, to use your "clout" as a billionaire to QUASH the John Fauber Journal Sentinel Expose. You were successful until Jim Couri pressed Fauber on what sadly was an act of "obstructing of justice" in that a expose of Siebert to alert patients in Wisconsin where Siebert is working at UW Hospital Clinics was important for public disclosures.

Fauber was forced to publish a "watered-down" article. Then the Wisconsin DSPS (Dept of Safety and Professional Services) began an Investigation to terminate Siebert's Medical License. Agents Hoff and Sarles were provided with sufficient "proof" from New York State to terminate Siebert. We were then advised that the DSPS Investigation was "closed-down" by order of Gov. Scott Walker. We later learned that you, as Walker's "ANGEL-SPONSOR" instigated Walker's "intervention" to save Siebert.

Hendricks                                                    Page 3

Sadly, these acts are gravely serious and are acts of obstruction of justice to whitewash a sexual predator doctor, a confirmed embezzler and thief, John Siebert.

Accordingly, Mr. Couri is finalizing his Complaint to be Filed in USDC-SDNY shortly. Charging RICO, Constitutional-Civil Rights and other Counts and violations. Siebert and his PC are Defendants.

Mr. Couri will not name you as a Defendant at this time but intends to plead your involvement with Siebert as generally outlined in this letter. You will be asked to appear and provide testimony before a USDJ relating to the acts of obstructing of justice. Mr. Couri will likewise call for the testimony of Reporter John Fauber who engaged in dozens of phone conversations with Mr. Couri and was the recipient of over 100 Siebert documents confirming Siebert's depraved sex-predator acts harming patients and his grand larceny, perjury, conviction for Tax Evasion and other illegal acts.

As you know, RICO Acts attach to it grave consequences, and Siebert is a sex predator worse than Cosby or Weinstein as Siebert is a doctor.

Finally, we wish to advise you that when Mr. Couri's Complaint (referred to herein) is filed, served and posted on PACER, our organization will deliver to the New York City District Attorney, Cyrus Vance, a complete forensic report outlining John Siebert's sexual predatory activities. We will also include affidavits and statements from all of Siebert's victims who are anxious to testify at the New York City Grand Jury for the indictment of Siebert.

We regret your being involved and if you wish, please have your lawyers contact Jim Couri if you wish to contest any charge here as Mr. Couri wants only to plead the truth as he knows it.

Mr. Couri's NYC Office is: 575 Madison Ave, 10th. Fl. NYC, NY 10022; Tel: 212-605-0277.

Thank you                                    CIG (MONACO)

# CORRUPTION INTERNATIONAL GROUP
## MONACO - DUBAI - UAE

Dated: 2-7-19

Via: Email & USPS

Diane Hendricks

Re: Dr John Siebert

Hendricks Holdings

690 3rd. St, #300

Ref: obstruction of justice, racketeering

Beloit, WI 93511

## FOR SETTLEMENT PURPOSES ONLY

Mrs. Hendricks:

One of our investigators called your office 2-6-19, at the request of Mr. Jim Couri, and in the utmost of good faith. The purpose of our call was simply to inquire as to the name of your attorney, in order to communicate in connection with your activities involving John Siebert (Siebert), and the Counts against you in the RICO Complaint that is being Filed in the USDC-SDNY at 500 Pearl Street, Federal Courthouse shortly.

The inquiry was met by your "office-manager" "Dave", who responded to this simple request with ad hominem verbal assaults. Reporting this to Mr. Couri he has authorized that we inform you of the charges that are set forth in the Complaint that involve your activities involving Siebert that have caused Mr. Couri extreme financial loss and other injuries. In sum, your acts of obstruction of justice by using your political and financial position to attempt to "whitewash" Siebert has provided Siebert and his other RICO Actors the platform to engage in perjury, fraud on the court, money laundering, bribery and grand larceny.

D. Hendricks                                        page 2

Accordingly, we will provide you here, in "bullet-point" outline fashion, the paper trail supported by evidence of the claims that are asserted against you. Mr. Couri is allowing this to be provided to you before the Complaint is Filed so that you can determine with your Attorneys if you wish to attempt a resolution of the charges against you and  possibly provide evidence against Siebert and his corrupt activities.

Accordingly, to follow is what we know regarding your activities with Siebert and its  injurious effect upon Mr. Couri and others.

1.  Ken Hendricks, your husband died 12-21-2007 in a accidental fall, leaving you ABC Supply and other assets now exceeding $5Billion.

2. You are aged 72, and have 7 adult children. Married Ken Hendricks after divorcing your first husband of 10 years. You are a daughter of "dairy farmers" and have a marginal education.

3. In or about 2011 you "consulted" Dr. John Siebert at UW Hospital for the purpose of undergoing a "face-lift" and related cosmetic surgery. Siebert conducted the surgery upon you in or about 2012, and you and Siebert commenced a "personal relationship".

4. Although UW Hospital (ie: R. Slwinski, Pres.; Lisa Brunette and UW Trustees) were provided with detailed Exposes regarding Siebert's conviction and firing by NYU-Langone Medical Center in NYC; Siebert's serial acts of sexual assaults on his victim-patients, termination of Siebert from five other NY Hospitals and his confession to being "MORALLY UNFIT" resulting in NY State Department of Health, NYS suspension of Siebert as a NY State Medical Doctor, UW Hospital failed and refused to terminate Siebert.

5. UW Hospital was also provided evidence of Siebert's thefts of millions from many of his patients including Ben Ossmen, Mrs. C. Zimmerman, R. Jacobs. Jim Couri and his Companies, Barbara Pollucci and others including Siebert's

D.Hendricks                                        page 3

6. fraud involving Chase Bank, Bank Audi, US Trust Bank, Fleet Bank, Citi Bank and Gilbride Tusa Last Spellaine and Thomas Gilbride. UW Hospital continued to ignore all of these facts.

7. Siebert entered into various Settlement Agreements with Mr Couri and others from years 2002- 2009 and repeatedly defaulted on payment of his and his "PC" obligations. Siebert rather hired Lawyer Joseph M.Burke (Burke) and Kenneth V. Gomez to plot to defraud Jim Couri from his and his Companies Contract Rights by bribery, perjury, fraud, extortion and embezzling.

8. Siebert and Burke engaged in rampant perjury denying Siebert's criminal acts of sexual abuses of patients, and did so to cause the Courts to discredit Mr. Couri's sworn charges that Siebert is a criminal sex offender (in serial fashion). Siebert issued at least 6 perjured Sworn Affidavits in Cases against him in NY County Supreme Court; Appellate Division 1st. Department; Riverside Federal Court; Palm Springs Superior Court and at IRS Audits regarding Siebert's tax evasion.

9. Siebert in or about 2008 began an affiliation at UW Hospital in Madison WI and quickly began to continue his criminal activities of sexual abuses of patients, fakery as a Parry Rhomberg Syndrone "savior"- a Siebert and UW Hospital scam. Siebert was at the time under investigation in Connecticut for acts as a pedophile, and his sexual abuses of multiple patient victims (Karass, Kleiman, Pollucci, Rachel, Linda M. and others). These victims also published Affidavits as to Dr. Siebert's sexual predatory acts.

10. Victims Karras and Linda M. delivered evidence of Siebert's sexual predatory activities towards them and evidence of his looting of funds to the Wisconsin Department of Safety and Public Services, the WI State Agency that investigates medical doctors bad-acts and has the power to terminate medical doctor's License to practice Medicine in WI. Ms.Tiffany Hoff was assigned this Siebert investigation launched in or about 2013.

D.Hendricks                                        page 4

11. Our forensic predecessor communicated with Ms. Hoff and delivered to her a plethora of evidence regarding Siebert's sexual abuses of patients, 5 patient affidavits, criminal charges filed against Siebert in NY County by victim Karass, Siebert's grand larceny, perjury, filling fraudulent Financial Statements with US Trust for extension of credit, Siebert's serial perjury in multiple courts and Siebert's stalking, threats and intimidation of victim patients.

12. Investigator Hoff repeatedly affirmed that the case against Siebert and his being "terminated" by WI as a medical doctor was all but assured. This was in or about 2014-2015. This sadly never occurred due to unwarranted intervention.

13. During that period of time, we were informed, Siebert continued his "intimate relationship" with Diane Hendricks, although we delivered to Hendricks multiple documents and Affidavits verifying Siebert's RICO thefts of money Siebert unconditionally swore is due to Mr. Couri per Agreements, Notes, Confessions of Judgments, etc.

14. Undaunted by evidence that Siebert was a documented sexual predator and thief, Hendericks, in concert with Siebert and UW Hospital (Slwinski and Bruinette, etc.), falsified a Press Release that Siebert had a pristine background and fine reputation (all known to be false). Such was made with the intend to defraud and stated that Hendricks Holdings had hired Siebert as a "Researcher" and made him a director of a Hendricks endowed "Chair" for "breast surgery involving "cancer-issues".

15. Hendricks, knowing that Siebert was convicted in NY State as a sex-offender, perjurer, thief and racketeer, participated in a massive Mail and Wire Fraud scam to whitewash Siebert (who is married to Kimberly Siebert for over 30 years).

16. Hendricks knew that Siebert was engaged in a RICO scam with Burke, Gomez, George Pavia and others to disenfranchise Mr. Couri out of about $50Million in money due per Contract Rights and knowing the fraudulent Press Release and

D. Hendricks                                    page 5

Hendricks hiring Siebert would give Siebert unwarranted credibility and shroud
Siebert's RICO frauds and stealing of Due Process from Jim Couri.

17. In or about the end of 2014, Investigator Hoff advised Mr. Couri that the
    Siebert Investigation was "CLOSED". It was clear that the financial power of
    Hendricks had to be behind this aborting an Investigation that only weeks before
    was assured of terminating Siebert.

18. After our in-depth inquiries, Mr. Couri's talked with Hoff and others at the
    Safety and Prof Services Investigators and other Officers, it was learned that on
    Orders of Gov. Scott Walker (who was the recipient of millions in contributions
    from D. Hendricks and was beholding to her), the Siebert investigation and
    termination was closed. Meanwhile many of Siebert victims communicated
    directly with Gov. Walker, including Charges in writing from Linda M, Muriel
    Karass, Jim Couri and others.

19. Diane Hendricks had given Walker millions for his attempted "Run for US
    President". Based our months of inquiries it became clear that Siebert implored
    Hendricks to get Gov. Walker to quash the WI Siebert Investigation.

20. This was a clear act of obstruction of justice derailing a Removal of a convicted
    sex-predator, Dr. Siebert, who had been continuing his sexual abused of UW
    patients. The closing of the Siebert Investigation imperilled WI citizens and
    allowed Siebert unfettered free-reign to continue his courthouse frauds and
    discrediting Mr. Couri and by fraud, perjury and bribery to deprive Jim Couri of
    by then over $50million due from Siebert.

21. In or about 2017, The Journal Sentinel Newspaper by Medical Reporter John
    Fauber commenced a full expose Article regarding the criminal activities, sex
    abuses of patients, grand larceny, perjury, fraud,  and racketeering.

22. We supplied, at Fauber's request, a car-load of evidence as to Siebert;s crimes.
    We gave Fauber names of Siebert's victims, his Agreements, falsified tax

D. Hendricks                                                    page 6

returns, fraudulent Financial Statements with US Trust, and other criminal acs of
Siebert and his RICO Associates.

23. Fauber was elated and advised that his Siebert Expose would be "explosive".

24. Weeks later, Mr. Couri called Fauber to inquire when the Article was being
    published only to learn that his Expose about Siebert was "terminated and
    trashed".

25. We quickly learned that Diane Hendricks caused the intimidation of Fauber and
    the Milwaukee Journal Sentinel and that the Fauber expose re Siebert be
    aborted.

26. We advised Fauber that Hendricks engaging in obstruction of justice would
    imperil citizens to remain 'in the dark" as to Siebert's sexual predatory acts, thus
    allowing this criminal Siebert to continue his Harvey Weinstein sex abuses; and
    again allowing Siebert to continue to defraud Jim Couri by calling Couri a liar
    and conspiring with fixed judges to gang-up on Mr. Couri and deprive his claims
    and deprive access to the NY and California Courts by serial fraud, perjury,
    retaliation and murder plots to use the RICO conspiracies and Hendricks to
    block the truth about Siebert.

27. Finally, Fauber did print a "watered-down" Article, but Siebert was able to
    continue at UW Hospital and continue to imperil patients.

28. Now, unfortunately, on 2-1-19 Siebert was sued by another victim who was
    abused by Siebert at UW Hospital (Case # 19cv284. Filed in Dane County Court
    by Lawyer Robert Gingrass, charging Medical Malpractice against Siebert and
    UW Hospital and sexual deviant acts, etc.

Accordingly, we have in outline fashion, attempted to reveal the facts and the
complicity by Diane Hendricks by her serial acts of obstruction of justice by using
her power to shroud the truth and facts as to Siebert, his criminal acts, his fraud,

D. Hendricks                                              page 7

perjury at multiple courthouses and his resultant grand larceny with the aid of his criminal RICO Actors, including allowing Kenneth Gomez to print "character assassinations" and frauds to discredit Jim Couri and other of Siebert victims in order to allow Siebert to steal and secrete over $50Million Siebert confessed to Owing in Notarized and Sworn-to Agreements and General Releases in favor of Jim Couri.

Finally we are providing this so that Mrs. Hendricks can determine if she is willing to "come clean" and avoid the battle in the courtroom at USDC-SDNY and the public exposing of these issues.

Please accept this as a good-faith overture and done so with that in mind.

If your attorney wished to discuss this matter please direct same to:

Jim Couri
575 Madison Ave. 10th fl.
NYC, NY 10022
212-605-0277

                                    CIG INVESTIGATIONS

# COURI  COMPANIES

*575 MADISON AVE. 10TH. FL. NYC, NY 10022. YEL: 212-605-0277*

*Dated: May 3, 2019*                                    *Via: Email*

*Leo Law*                                    *Re: Diane Hendriks, John Siebert, et al*
*Karl Leo Esq.*                                    *Ref: your letter to Jim Couri 5-1-19*
*200 Randolph Ave.*
*Huntsville, AL 35801*

*Mr. Leo:*

*Couri Companies is replying to your letter emailed to our affiliate Corruption International Group(CIG), forensic investigators domiciled in Monaco. All emails bearing the name "Couri" were assigned to CIG by Jim Couri in 2009 as those "gmails" were used to communicate with informants. Google would not delete the name Jim Couri. Thus, sorry for that confusion, as Jim Couri does not personally use emails.*

*Now, that said, as to the issues outlined in the various documentary pieces of evidence CIG emailed to you so that you have a clear view of the Counts under USC Title 18 (including mail and wire fraud, obstruction of justice, money laundering, bribery, RICO, retaliation, etc.) that Ms. Hendricks will be charged in the USDC-SDNY Complaint being filed in about 10days at USDC 500 Pearl St, NYC, NY.  CIG has a complete outline of evidence of activities by Diane Hendricks in concert with and for benefit of herself and Dr. John Siebert. Evidence further confirms that Ms. Hendricks has abused the power of her money to engage in obstruction of justice, mail and wire fraud, conspiracy to defraud and other acts in violation of federal and state laws. We really don't care as to whatever phycological hold that Siebert apparently has over Ms. Hendricks, except to state to you that this supposed paragon of virtue (Diane Hendricks) has*

*Leo Law*                                                    *page 2*

*misused her clout to loot Mr. Couri out of his over-fifty million dollars due from Siebert.*

*Such activities by Ms. Hendricks have used her wealth to try and whitewash Siebert and his perverted reputation as a scoundrel, thief, perjurer, conman and a sex pervert. The scheme was to cause Siebert to be able to engage in Fraud on the Courts in concert with Siebert's RICO Actors and deprive Mr. Couri being paid over $50Million in sums due to Couri by Siebert (unconditionally), sworn to by Siebert and at the same time Siebert Released Mr. Couri all in 2003. Siebert was represented by Gilbride Tusa Last Spellaine, and Tom Spellaine Esq. at no time ever claimed that Siebert was owed any money from Couri. Soon after Siebert also issued two Sworn Financial Statements to US Trust Bank where Siebert and his PS DID NOT schedule one cent due to him from Mr. Couri or any affiliated entity.*

*From 2008 to present, and in concert with RICO Actors, and with the aid of Hendricks, by engaging in over sixty Counts of Title 18 violations, Siebert has engaged in tax evasion, grand larceny, extortion, retaliation, and threats of murder of Mr. Couri (resulting in a National Restraining Order). Hendricks involvement with this criminal enterprise is clear, convincing and undenied.*

*Mr. Couri asked CIG to advise you of the gravity of this matter as it relates to Diane Hendricks and her activities and her recruiting the former Wisconsin Governor Scott Walker (Diane's minion) to use the power of the Governor's Office to abort an about completed investigation to terminate Siebert as a WI Medical Doctor for his doctor/patient sex perversions and other criminal acts.*

*Diane endowed a $1.75Million UW Chair for Siebert and Issued a Press Release jointly with UW Hospital fraudulently claiming that Siebert was a "paragon of virtue doctor", with a fine background and who is an important "Researcher"; when Diane knew Siebert was a convicted sex pervert/offender fired from five NY Hospitals and confessed to and convicted as "morally unfit". Diane was hysterical that all of Siebert's bad acts would be exposed and her Endowment an*

*Leo Law*                                                    *page 3*

*exposed joke. So Diane went to her "boy" Walker and got him to quash the termination of Siebert and she paid Walker another $5Million.*

*Thereafter when Diane learned of the soon to be released Expose by Reporter John Fauber (Journal Sentinel) Diane"struck again", and by phone and emails threatened Fauber and the Newspaper to abort the revealing Siebert Expose that he is a thief and sex pervert. The Article was aborted until Mr. Couri became involved and then a watered-down Expose was published.*

*Hendericks then lied to Fauber by phone claiming that she never involved Gov. Walker (a fraudulent statement) and that the Siebert convictions for tax evasion, sex abuses and perjury were all "inconsequential".*

*Accordingly, this is the "tip of the iceberg" re the Counts that Diane Hendricks, her companies and associates will be charged-- her willful interference in interstate commerce and the looting of over $100Million due to Mr. Couri derived by the RICO Activities of the other RICO Actors and intentional infliction of emotional distress, Civil Rights violations, elder abuse and murder plots orchestrated by Siebert, Diane Hendricks in concert. Surely you are aware that should this case be successful. treble damages are attached to RICO claims.*

*There can be no denials by Hendricks, Siebert or any competent lawyers-------as we have all the facts and evidence.*

*Should you desire to discuss a resolution with Mr. Couri, all such conversations will be confidential and for settlement purposes only. Please be aware that time is of the essence. You may use this email address if you wish or you certainly may telephone Mr. Couri at the above phone number.*

*If a Settlement is agreed to we can craft it with a confidentiality Agreement, and all other Protections for Diane and her Associates, Gov Walker, Siebert, etc. Mr. Couri is not spiteful, but at the age of eighty with medical issues he has had years of his life ruined by Siebert's Courthouse frauds, bribery, extortion, perjury*

*Leo Law*                                                    *page 4*

*and the fraud on the Courts depriving Due Process, by bribery, forgery, serial perjury and extortion by Siebert /RICO Actors including the internet extortion by Siebert lawyers Gomez, Burke, Russo, Richardson, Eherenberg and others.*

*Be sure we have it all, and it is sad that Kenneth Hendricks memory and legacy will be shredded and contaminated by the evidence of these criminal activities perpetrated by Kenneth's widow Diane.*

*Accordingly, any resolve (if any) will be agreed upon or not by Jim Couri only and with your Law Offices. The call to try to arrive at a resolution is in your hands as Jim is holding the evidence of grave and illegal acts by Diane Hendricks who seems to believe that she is above the law. Sadly for her, Siebert, UW, Diane Hendricks and her $5Billion can be very fleeting if she is found guilty of racketeering to aid a convict-sex pervert Siebert whose acts have imperiled the citizens of Wisconsin and "let-loose" to commit more crimes (just as Siebert has done again by molesting a UW Hospital patient in Dec 2018). Please advise.*

                                            *COURI COMPANIES*

# CORRUPTION INTERNATIONAL GROUP
## MONACO - DUBAI - UAE

Dated: 12-6-18                                          Via: Email

John Fauber, Medical Reporter              Re: Dr. John Siebert sex-predatory acts
Journal Sentinel Newspaper
                                           Ref: Gov. Scott Walker & Diane Hendricks

Mr. Fauber:

Jim Couri has asked us to write to you regarding your discussions with Jim
regarding John Siebert MD, and the sharing of evidence of Siebert's sexual abuses
of many of his patients, his confessions to NY State as being "morally unfit", his
conviction at NYU-Langone Hospital as a "sex-pervert" and an unethical doctor,
and Siebert's perjury, bribery, grand larceny and looting of millions from Jim Couri
by engaging in racketeering, bribery and fraud.

In the middle of your investigation, in or about early 2018, we know that
billionaire Diane Hendricks, who has been intimately and sexually involved with
Siebert, communicated with Journal Sentinel and bullied you and free-press, to
cause the aborting of your Siebert Expose. When Jim learned of this he rattled
enough "cages" to cause you to publish a "watered-down" version of the Siebert
Expose.

That said, at or about 2014-2015 the Wisconsin Medical Safety Board was
investigating Siebert for the purpose of terminating Siebert's Medical License. The
Investigation precipitated by the NY State Suspension of Siebert's License there.

An informant disclosed that Diane Hendricks, a financial Angel for now Lame
Duck Gov. Scott Walker, instigated Walker's "intervention" and his willful and
illegal quashing the Wisconsin Medical Board's almost completed Investigation
that would have terminated Siebert as a medical doctor in Wisconsin. We have all
of the names and evidence submitted to Wisconsin, all of which Walker caused to
be ignored and quashed the termination Siebert as a doctor.

page 2

This conduct by Hendricks and a sitting Governor and public official is clear and convincing Obstruction of Justice, a gaging of Freedom of the Press, and resultant impact on the citizens of Wisconsin, by permitting a convicted sex-predator (Siebert) to continue his well documented physical, financial and emotional abuses of his patients and others.

Accordingly, we advise you that we are assembling all of these facts and evidence materials and we will be delivering these materials to Governor-Elect Tony Evers, as the willful interference into an investigation and a press expose about a sex-predator, thief, perjurer and a convicted tax cheat (John Siebert) constitutes crimes of attempted "cover-up", obstruction of justice and conspiracy to shroud Siebert's embezzling, extortion and fraud.

Mr. Jim Couri advised us to alert you to the forgoing as both Hendricks and Walker will be named in the RICO Case being Filed in USDC-SDNY by Mr. Couri, in which Siebert is a Defendant having engaged in a conspiracy to embezzle over $50million from Jim Couri as part of a RICO conspiracy and threats, resulting in Restraining Orders, including money laundering, perjury, bribery and murder plots.

cc: all parties
Gov. T. Evers                    CIG (MONACO) INVESTIGATIONS

# CORRUPTION INTERNATIONAL GROUP (MONACO)

April 5, 2019                                    Via: Email

Diane Hendricks                    Re: Scott Walker, John Siebert, UW Hospital
ABC Supply
Beloit, WI

Ms. Hendricks:

Our investigations and research confirms that you instigated and caused Gov. Scott
Walker to misuse the power of his office to abort and quash a Wisconsin
investigation into the serial sexual predatory acts engaged in by John Siebert MD
that was about to expunge Siebert's Medical License.

You used the power of your money to allow Siebert to continue the practice of
medicine in Wisconsin, and as a result, imperil the safety of citizen-victim patients.
You knew of Siebert's perverted past, his convictions, his termination in New York
as a doctor and his being fired by five NYC hospitals for sexual abuses and
narcotics misuses.

Armed with all of these facts, you endowed a "Chair" for Siebert at UW-Hospital,
donated $1.75Million in Honor of Siebert, and you and UW used interstate
instrumentalities to disseminate a false press release announcing your "Gift" and
lying as to the Siebert's horrible background. Knowing that Siebert sexually
abused about a dozen patients, was convicted as a "sex-offender", was fired by five
NY Medical Institutions, and he confessed to being "morally-unfit". The press
release you caused reported that Siebert was a "researcher with a pristine
background and a asset to the medical community as to his work on breast cancer,
etc." Such was willful fraud.

Hendericks                                              page 2

You became hysterical learning that soon after your Siebert Accolades and "Grant", Siebert's Medical License was being terminated by Wisconsin. So you reacted as any woman might who was being "serviced" by a corrupt-sociopath (Siebert). You ignored the law and used the clout of your money, went to Walker, who you funded royally with about $500,000.00 months before, and got Walker to abort the terminating of Siebert's Medical License. Walker violated federal law and caused Siebert's imminent discharge as a medical doctor in Wisconsin to be quashed, and you then you gave Scott another $5Million.

You engaged in the same illegal acts aborting Exposes about Siebert's crimes being developed by the Journal Sentinel Newspaper (John Fauber). Our findings reveal that you lied to Fauber as to your causing Gov. Walker's quashing a sex offender doctor to continue his abuses in UW Hospital armed with your "Chair". Have you no shame? Have you no interest in the safety of patients? Or are you only interested in your own self indulgence and personal pleasures? Siebert is a menace to society. In fact, thanks to your and Gov. Walker's willful obstruction of justice, in March 2018, Siebert and UW have been recently charged again with sexual abuses of a UW Patient who was sexually abused by Siebert. Siebert's wife for over 30 years, Kimberly, is clueless to the extent Siebert again has accepted "Service" of this new Complaint "by proxy" as he did when Siebert was Restrained for instigation of a "murder-plot" against Mr. Jim Couri in 2015.

Accordingly, as a result of your acts of obstruction of justice, as part of a criminal enterprise and conspiracy to allow Siebert to embezzle over $50million from Jim Couri by whitewashing Siebert's background permitting Siebert to engage in perjury, bribery and extortion, you and Walker will be named as Defendants in the RICO Counts in the Complaint being Filed by Mr. Couri in SDNY. A Governor who has abused his authority to placate a large donor, and engages in criminal acts must be exposed and must answer for his violations of Title 18 of US Codes. No person is above the Law, including you. See attached Exhibits.

Encls.                                              CIG INVESTIGATIONS

# *CORRUPTION INTERNATIONAL GROUP*
# *MONACO - DUBAI - UAE*

# PRELIMINARY FORENSIC REPORT
# DEATH OF KENNETH HENDRICKS
# ON 12-21-07

## INTRODUCTION

Our organization and predecessor entities have been engaged in forensic
investigations for over fifty years. Our founder (Jim Couri) in 1961 became a
protege of the founder of the FBI, J. Edgar Hoover, working with and for Mr.
Hoover on high profile investigations and research. Jim Couri's work was for Mr.
Hoover's personal demands, not for the FBI. CIG has been retained by a client to
conduct in-depth investigations into the activities of Diane Hendricks (2nd wife of
Kenneth Hendricks); the death of Kenneth Hendricks; Diane Hendricks'
involvement with John Siebert MD, UW Hospital, Gov Scott Walker, John Fauber;
Journal Sentinel Newspaper, Siebert's criminal activities and litigations, etc.

This Report focuses on the Death of Ken Hendricks, and it is grounded on:
**a.** Fact
**b.** Documentary evidence & Reports
**c.** Forensic pathologist reviews
**d.** Diane Hendricks activities
**e.** John Siebert
**f.** Interviews
**g.** Background of Ken & Diane Hendricks

CIG Report                                                        Page 4


## CONCLUSION

CIG  has set forth a chronology of fact, supported by documentary evidence,
Reports, Forensic Analysis, Interviews and other evidence materials.

We base our findings only on fact and the determination grounded upon
"Reasonable Inference"- "if a person enters a shelter dripping wet, it is logic to
determine that it is raining". Here we have a plethora of evidence establishing that
the death of Kenneth Hendricks was the result of "fowl play". Setting aside all
forensics, here are some incontrovertible facts:

1. On 12-21-07 at 10PM in Wisconsin, it was dark, freezing cold and a few days
   before Christmas.
2. Diane and Ken had arrived at their home after attending a four hour Christmas
   party.
3. Diane admitted that Ken was drinking at the party and the toxicology report
   reveals "positive" readings for Ken.
4. Ken was a "roofing contractor" and knew all of the procedures and safety issues.
5. According to Diane, Ken insisted that at 10:15PM, in the dark of night, he climb
   to the garage roof to "inspect" the progress of some "roof-renovations".
6. Thus this 67 year old 200 plus pounds climbed to the garage roof, and according
   to Diane, Ken walked on top of a "blue tarp", and fell through a large hole
   covered by the tarp, which was nailed down by some 2x4 boards.
7. Ken, as a over 40 year roofing contractor, knew that a tarp is used to cover
   openings to prevent elements from damaging the space below.
8. No roof contractor would attempt to walk on top of a tarp,
9. Here Ken, a 67 year old billionaire, after drinking and eating, in the "dead-of-
   night", in zero degree weather, attempted an :"inspection" at his home when in a
   few more hours it would be daylight and Ken could see what he was trying to
   inspect.
10. The supposed fall was between 12-15 feet according to reports, from the roof to
    the garage floor.

CIG Report                                                        **Page 5**

**11.** According to Autopsy Report and related documents, the only injury Ken experienced was a severe "blunt damage" to his skull, that was fatal.
**12.** Not a broken bone, back, side, nothing.
**13.** Fall from 12-15 feet, unless Ken was walking on his hands, he would have suffered other skeletal injuries from such a fall.
**14.** This finding is verified by forensic pathologists and other professionals.

Accordingly, the forgoing is linked to Siebert and his involvement with Diane. Diane's shopping-sprees, multiple post-death cosmetic surgeries by Siebert, squandering moneys FBO Siebert, local politicians, including Gov.Walker, others, her marked inferiority complexes, bribery of judges for Siebert, paying for Siebert lawyers to engage in fraud, perjury and racketeering all points to RICO, murder plots by Siebert and the suspect death of Kenneth Hendricks, more than likely also involving Siebert who has threatened murder and been caught.

A final Report will be made public when forensic doctors render their reports, etc.

Dated: 3-19-19

Encls:                                          CIG-INVESTIGATIONS

CC: ALL PERSONS INVOLVED

# Don't kill me, doc!

## revealing the secrets of modern medicine

## Tag Archives: Hendricks

# John W. Siebert, MD- "morally unfit"

*November 26, 2018* by *drnoharm*

 (https://www.uwhealth.org/findadoctor/profile/john-w-siebert-md/7508)

John Siebert- photo from U Wisconsin website

John W. Siebert, MD (https://www.uwhealth.org/findadoctor/profile/john-w-siebert-md/7508), a 70+ year old confirmed predator. Siebert entered into a consent agreement with the New York State Department of Health. Usually, such agreements are designed to allow a physician to avoid the embarrassment of a public hearing and a *worse* outcome. In this case Siebert "did not contest the charge of engaging in conduct which evidences moral unfitness."

NY was actually fairly lenient in that the "penalty" was

> *License suspension for three years, stayed with probation for thirty-six months. Effective one hundred and twenty days after the effective date of this order, the physician has a permanent license restriction whereby he may only examine and/or treat female patients in the presence of a chaperone.*

But Siebert made the best of it. He fled to Wisconsin where the University of Wisconsin gave him a *named endowed chair*. In case you don't know what that means- he's now got a position funded by some wealthy person. Literally, someone has given money to the university to hire this "doctor" who admits he is morally unfit.

Who and how much you ask? According to medpage today (https://www.medpagetoday.com/special-reports/statesofdisgrace/71419), the benefactor would be

> *Wisconsin billionaire Diane Hendricks, who was treated by Siebert in 2014, had put up $1.75 million to help fund two endowed chairs at the University of Wisconsin, including one now held by Siebert.*

> *With a net worth of $4.9 billion, Hendricks, 70, is the second-richest woman in America, according to Forbes magazine. She has been a major contributor to Wisconsin Gov. Scott Walker, who appoints all 13 members of the state's medical board. She gave $500,000 to Walker's 2012 recall campaign and $5 million toward his 2016 presidential run.*

> *In a telephone interview, Hendricks said she never discussed Siebert with the governor. She said she was aware of "a blemish" on his record before she funded the UW endowed chair.*

> *"To me it was insignificant," she said, adding: "He is a wonderful physician."*

Certainly seems significance is judged in dollars in Wisconsin. Maybe the chaperone will protect the patients in Wisconsin. You can find the entire NY consent agreement here (https://apps.health.ny.gov/pubdoh/professionals/doctors/conduct/factions/FileDownloadAction.action?finalActionId=8560&fileName=BRD+165821.pdf&fileSeqNum=1). (https://dontkillmedocblog.files.wordpress.com/2018/11/2013-06-06-siebert.pdf)

You can also download directly : 2013-06-06 siebert (https://dontkillmedocblog.files.wordpress.com/2018/11/2013-06-06-siebert.pdf)

Read the agreement and decide how "insignificant" it is. Definitely check *before* you leave him alone with a loved one.

*Posted in boards, certification, consent, medical board, quackery, Uncategorized | Tagged ethics, Hendricks, Siebert, training, University of Wisconsin | Leave a comment |*

Create a free website or blog at WordPress.com.

≡    **journal
sentinel**     <u>Subscribe</u>

# UW plastic surgeon sued by a female patient who alleges sexual exploitation and negligence



Dr. John Siebert

HANDOUT

**JOHN FAUBER** ┊ MILWAUKEE JOURNAL SENTINEL | 10:11 am CST February 5, 2019



A University of Wisconsin-Madison plastic surgeon who was the subject of a sexual

2019-04-04, 07:33

UW plastic surgeon sued by a female patient who alleges sexual e...    https://amp.jsonline.com/amp/2772657002

misconduct case in New York before being hired by the university has been accused in a lawsuit of sexual exploitation and medical negligence in his care of a woman who had undergone cosmetic surgery procedures by him last year.

Ad



Watch Live Now

Watch TV Now            VISIT SITE

The patient, Keri Anne Connaughty of Wausau, had gone to UW plastic surgeon John Siebert for a tummy tuck and breast augmentation surgery.

In her lawsuit, she alleges she selected silicone breast implants that were 225-250 cubic centimeters, but Siebert disregarded her instructions and instead put in implants that were 350-375 cubic centimeters.

Her lawsuit, which was filed Friday in Dane County Circuit Court, also says she experienced pain, swelling and bleeding from her abdomen after the surgery.

Ad



Watch Live Now

Watch TV Now            VISIT SITE

2019-04-04, 07:33

When she went to see Siebert about the problems, he allegedly put his hands on her shoulders and said he would do anything to make her happy. He also said her breasts merely appeared larger because of swelling.

The **lawsuit claims** he also called her "babe." At a visit a few days later he allegedly called her "sweetie."

When she cried while he inserted a drain in her abdomen wound, he wiped the tears from her face and placed his hands on her bare legs and rubbed them up and down, the lawsuit says.

Siebert who works for UW Health Transformations did not respond to an email seeking comment.

UW Health Transformations also was named as a defendant. It was accused of negligence in hiring Siebert and for allegedly failing to inform patients of Siebert's past discipline.

Ad

UW Health spokeswoman Lisa Brunette said it does not publicly comment on pending litigation.

In filing the lawsuit, Connaughty, 35, said in a statement, "I am advocating for others so no one has to experience what I did." Her lawsuit says she is married and has three children. She is described as an avid marathon runner, triathlete and boxer who was dissatisfied with her appearance.

In a separate statement, her attorney, Robert Gingras, said: "We hope to make

medical institutions be more forthright with their patients."

Siebert was included in a February 2018 investigation by the Milwaukee Journal Sentinel and MedPage Today about doctors who move around the country after facing disciplinary action.

**SPECIAL REPORT: Is your doctor banned from practicing in other states? State licensing system keeps patients in the dark**

Ad

The investigation found Siebert had sex with a patient in New York, got his license suspended for three years and was permanently ordered to have a chaperone in the room with any female patients.

It noted that he operated free of state medical board restrictions in Wisconsin. In fact, he was appointed to an endowed chair at UW, funded in part by billionaire Diane Hendricks, a Siebert patient and a major political contributor to former Gov. Scott Walker.

Between 2000 and 2008, Siebert performed multiple surgeries at New York University Medical Center on a woman with whom he had a sexual relationship between 2006 and 2008. An investigation began in 2009 and New York disciplined Siebert for the relationship in 2013.

His "inappropriate intimate relationship" was determined to be professional misconduct and his license in New York was suspended for three years. The board stayed the suspension and put Siebert on probation.

UW plastic surgeon sued by a female patient who alleges sexual e...          https://amp.jsonline.com/amp/2772657002

Ad

In 2011, Siebert became a full-time employee at UW-Madison, where he had been working part-time.

After New York imposed the chaperone requirement in 2013, UW-Madison worked out its own such requirement with Siebert, but unlike New York's, which is permanent, the UW requirement could be reopened in the future.

After New York's disciplinary action, the Wisconsin medical board looked into the case and decided to put no restrictions on his license.

While New York said Siebert showed a "moral unfitness to practice," Wisconsin officials described his sex with a patient as "a minor or technical violation," that was "not seriously harmful to the public."

In the 2018 Journal Sentinel/MedPage Today story, Siebert said the incident in New York "was a mistake that I made and for which I have accepted responsibility and followed all requirements. I am proud I've been given the opportunity to move ahead and provide the care that I was trained to give."

Originally Published 8:00 am CST February 5, 2019
**Updated** 10:11 am CST February 5, 2019

## Subscribe Now – Get Your Offer

S

CAMRAIDERS IS A SCAM

Recommend this on Google



http://scamraidersisascam.blogspo...com/

T

‑02‑2010 TUE 11:54 AM WILKOFSKY, F, K, & C   FAX NO. 212 285 0531   P. 04



*Dismissed by Wooten on 1-20-16* 113512-08
*with a Forged Order + Barry Dismissed*
*false not appear at*
*status conf which I appeared Barry*
*did not w [...]*

Index No. 8 1 1 3 5 1 2 0
Date purchased

**Supreme Court of the State of New York**
**County of NEW YORK**

FILED
OCT 07 2008
COUNTY CLERK'S OFFICE
NEW YORK

JAMES COURI

Plaintiff(s)

against

JOHN SIEBERT, JOHN W. SIEBERT MD PC

Defendant(s)

Plaintiff(s) designate(s)
NEW YORK
County as the place of trial.

The basis of the venue is
BUSINESS OF PLAINTIFF

**Summons**

Plaintiff(s) reside(s) at
575 MADISON AVENUE

County of NEW YORK

To the above named Defendant(s)

**You are hereby summoned** to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's Attorney(s) within   20   days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated.

JAMES COURI
Attorney(s) for Plaintiff

Defendant's address:
634 Brancom Hill Drive- 50 E.71st St.
Baraboo, Wisconsin      NYC, NY 10021

Office and Post Office Address
575 Madison Ave.
NYC, NY 10022
(212) 605-0277

Notice: The nature of this action is
Breach of Agreements, defaulted notes, theft of
services, defaulted guarantees, fraud, loss of
business opportunities.

The relief sought is compensatory damages and
punitive damages

Upon your failure to appear, judgment will be taken against you by default for the sum of   $19,535,000.00
with interest from  January 1, 2003    and the costs of this action.

Original Complaint

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------X

JAMES COURI,

       Plaintiff,

   -- against---

JOHN SIEBERT, JOHN SIEBERT, MD, PC

       Defendants.

-------------------------------------------------------------------X

**VERIFIED
COMPLAINT**

INDEX:

113512/08

JAMES COURI (Couri), for his     complaint, states:

1.  Couri is an individual who maintains an office and conducts business in the City, County and State of New York.

2.  Defendant John Siebert (Siebert) is an individual who maintains an office and conducts business in the City, County and State of New York, at 50 East 71st Street, New York, NY.

3.  Defendant John W. Siebert, MD, PC (PC) is a New York medical corporation, owned and controlled by Siebert.

4.  The claims herein belong to James Couri, individually, and have not been litigated in this or any other Court.

### FIRST CAUSE OF ACTION

FILED

NOV 17 2008

COUNTY

5.  Couri & Siebert met in 1996.

6.  Siebert solicited and promoted Couri to conduct services for Siebert and PC, and sought Couri's business advice and counseling, which Siebert in numerous writings has

defined as valuable, and in Siebert's best interest, for which Couri has never been compensated by Siebert and PC. Such activities by Couri involved investments Siebert either had made or intended to make, as well as extensive advice regarding the sale of Siebert's medical practice to a consortium.

7.      Couri and Siebert also participated in various other business transactions, involving various corporations in which Siebert became a Director and Corporate Secretary, and sometimes shareholder.

8.      Couri was also "retained" by Siebert and PC to review, assess and evaluate various business activities in which Siebert was involved, or contemplated becoming involved, in particular, the outright sale of Siebert's medical practice to others, and other investments, including but not limited to, investments in Celexus, Lithium Battery Corp., Physicians Cosmetic Health Care Corp (PCHC), Freedom Wireless Corp., Bicycle Club, Inc., V. Michale Hogan, Southern and Northern California non-Indian gaming and others.

9.      At Siebert's and PC's behest and direction, Couri devoted substantial time, effort, and expense on Siebert's projects and proposal projects. Couri traveled to Arizona and California repeatedly, engaged in meetings, conferences with Siebert and the principals of PCHC, Dr. Roy Oeconomous, Celexus, Dr. Larry Day, and D. Fougnes, Henry Muehlinger and many others. Couri was never personally reimbursed for any out-of-pocket expenses by Siebert or PC.

10.     Couri determined after extensive time, effort, and analyses that many of the proposed investments Siebert and PC were contemplating were improper, risky, and suspect, and so advised Siebert, that any such participation by Siebert or PC could result in significant loss and injury for Siebert and PC.

11      Couri also counseled Siebert and PC that Freedom Wireless Corp. could have potential, if the patents they possessed withstood regulatory and/or judicial scrutiny. Siebert was a stockholder of Freedom Wireless Corp. and was contemplating disposing of his shares to Management of Freedom Wireless Corp.

12.     As a result of Couri's research and acts, investigations and analysis, and frequent journeys to Arizona to Freedom Wireless Corp. headquarters and meetings with Larry Day and review of a plethora of documents, Siebert and PC retained his holdings in Freedom Wireless and also avoided substantial losses. As a result of Couri's counsel to Siebert and PC, Siebert and PC medical practice was saved from potential destruction and ruin, if turned over to PCHC and resultant disgrace and loss to Siebert and PC.

13.     Couri's efforts saved Siebert's and PC's medical practice and millions of dollars in income annually to Siebert and PC. Freedom Wireless Corp. in 2006 won a $100 million award on the grounds of patent infringements.

14.     Siebert and PC extolled Couri for his services, yet Couri never received any compensation for these and other efforts Couri performed for Siebert and PC at his request, behest, and benefit, although repeatedly promised by Siebert and PC to do so.

15      By at or about February 2000, Siebert and PC were in default of obligations, commitments, etc., pursuant to a February 22, 1999 Agreement and the included guarantees and commitments Siebert and PC agreed to. Said Agreement also affirmed and ratified Couri's valuable services to Siebert and PC and for their best interests.

16.     After extensive negotiations, Couri, on behalf of companies in which he was an officer, Siebert, and his PC and attorneys, Gilbride, Tusa, Last and Spellane (GTL&S), entered into an Agreement, dated December 19, 2002, in which Siebert and PC agreed to pay

$1,400,000.00 to Couri Acquisition Corporation, in settlement of Siebert and PC defaults on obligations to companies Siebert was involved in as Secretary and Director, etc.

17    In or about February 2003, Siebert defaulted under the terms of the December 19, 2001 Agreement.

18.    After further negotiations with Siebert, PC and GTL&S, another Agreement was executed on May 14, 2003.

19    As of July 31, 2003, Siebert and PC again defaulted, and failed to fulfill the terms and conditions of the Agreement of May 14, 2003, although all sums due were promised and committed by Fax Letter to Couri Acquisition Corp. from Siebert and GTL&S on July 29, 2003.

20.    On or about August 15, 2003, Siebert and PC induced Couri Acquisition Corp. to accept a partial payment of the sums due and owed, falsely claiming they were broke and had no ability to pay and that they would declare bankruptcy.

21.    Believing the statement and in need of the funds to pay obligations that Siebert and PC had failed to satisfy, Couri Acquisition Corp. accepted the sum.

22.    Shortly thereafter Couri Acquisition Corp. learned that Siebert had executed documents with US Trust Company, under penalty of perjury, that he was worth no less than $18,000,000.00.

23.    Couri had still not yet been compensated by Siebert and PC for the valuable services performed for about five and a half years although duly demanded.

24.    Couri became disgusted at Siebert's and PC's improper acts of default and deception, etc., and filed Summons with Notice against Siebert and PC in or about September

-4-

2003 (Index 117494/03 in Supreme Court, New York, charging Siebert and PC with fraud, breach of contract and other claims. No Complaint was filed or served.

25.     Upon being served with the Summons with Notice, Siebert, his PC, and GTL&S commenced negotiations with Couri to withdraw and discontinue the case and resolve all differences.

26.     On October 8, 2003, Couri, Siebert and PC entered into an Agreement.

27.     The Terms of the October 8, 2003 Agreement *inter alia* were that:

a)     The October 8, 2003 Agreement superseded all prior agreements and understandings between and among Siebert, PC and Couri.

b)     Upon execution, Couri would withdraw Case 117494/03, without prejudice.

c)     Siebert and PC would pay to Couri $700,000.00 on or before six months from October 8, 2003, plus 5% interest per annum.

d)     Siebert and PC would pay to Couri $200,000.00 on or before six months from October 8, 2003, in additional damages, losses, and expenses incurred by Couri, due to Siebert's failure to fulfill his commitments and contractual obligations to Couri.

e)     Siebert and PC unconditionally agreed that a failure by them to pay the aforesaid sums of $900,000.00 plus interest within six months of October 8, 2003 to Couri, Siebert and PC agreed to permit Couri, individually, to bring suit against Siebert and PC for the collection of all sums Siebert and PC guaranteed and due pursuant to the February

-5-

22, 1999 Agreement. Siebert and PC further waived any defenses to said action.

f)   Siebert and PC also reaffirmed all obligations pursuant to the February 22, 1999 Agreement, and all of their obligations pursuant to the December 19, 2002 Agreement.

28.   The October 8, 2003 Agreement was duly executed by Siebert on behalf of himself and his PC on October 8, 2003, and "Sworn to" before a Notary Public. At the same time, Siebert and his PC issued a General Release to Couri and affiliated companies, dated October 8, 2003. On October 10, 2003, Couri discontinued case 117494/03, without prejudice, and filed same with the Clerk of the Court.

29.   Six months thereafter, Siebert and PC defaulted on the terms and conditions of the October 8, 2003 Agreement, and failed and refused to pay to Couri the agreed sums of $900,000.00 plus 5% interest, as required by the Agreement of October 8, 2003.

30.   By reason thereof, there is due and owing to Couri from Siebert and PC the amount of $900,000.00 plus 5% interest from October 8, 2003 and all sums, due pursuant to Siebert and PC guarantees and commitments pursuant to the February 22, 1999 Agreement, in the sum of $13 million, plus interest at the statutory rate.

31.   Siebert and PC also issued, under a separate Agreement, a full indemnity and hold harmless to Couri and affiliates in connection with PC and Siebert's tax matters, audits, and involvement with any and all tax authorities, arising out of Siebert and PC tax returns, and any tax matters or issues in which they were or had become involved.

32.   Couri confirmed that Siebert and PC, in fact, filed numerous false and fraudulent Federal, New York State, New York City and Connecticut State tax returns and

amendments, spanning years, at least, from 1996 through 2006, where Siebert and PC, *inter alia*, have falsified and misused Couri and affiliates' business records, stolen by Siebert while he was a Director and Secretary of these companies, in order to cheat and defraud Federal and State Tax Authorities, for $15 million, or more, through willful evasion and bogus PC and personal returns and related false "deductions" (on over 16 amended and other returns), bifurcated tax filings, false documents, fraudulent misapplication of concocted fee deductions and other illegal tax entries, and misapplications, using Couri's and other person's records to act in Siebert's and PC's tax evasion schemes, in concert with Siebert, his PC, CPA Shine & Co., Brian Pecker, CPA, and others.

13.    These willful and illegal activities by Siebert and PC, B. Pecker, and Shine & Co., CPA have caused Couri damages, irreparable injury, loss, expense and involvements in Siebert's tax frauds, which are, on information and belief, the subject of Federal and State criminal investigations, audits and other inquiries, etc..

14.    By reason thereof, there is due and owing from Siebert and PC pursuant to Siebert's indemnity the sum of $300,000.00, to date in damages, expenses, fees, etc., arising out of the indemnity and Siebert's and PC's tax evasion schemes, and misuse of Couri's business records to perpetrate Siebert's and PC's tax evasion and frauds, resulting in audits, investigations, inquiries, etc. and other actions by Federal and State Authorities, involving Siebert and PC, B. Pecker, and Shine & Co., CPA. These damages to Couri arising out of the Indemnity are continuing and ongoing in view of the magnitude of Siebert and PC tax evasion acts—both personal and PC, Federal, NY State, NY City and Connecticut.

## SECOND CAUSE OF ACTION

35. Couri repeats and re-alleges all of the claims set forth in paragraphs 1-34 above.

36. Defendants entered into agreements and notes to finance Desert Holdings Corp. (Desert) on or about July 30, 2003. Couri Siebert, PC and Desert were to engage in development of land and non-Indian gaming in the Cochlea Valley California and in Los Angeles, i.e., the purchase of the Bicycle Club, Commerce Club, with RD Hubbard and others.

37. Defendants entered into agreements with Couri to finance the purchase of other properties and land in California through various entities including The Reserve, Thunderbird Heights, Travertine Company and other developments. Couri devoted over 2 years of uncompensated time pursuing these business opportunities and substantial expenses in reliance on Defendants' commitments and agreements.

38. In each instance, Defendants defaulted on their agreements, notes and commitments to Couri for the financing of these ventures resulting in significant loss and loss of business opportunity. Defendants failed to fund these transactions as committed, including commitments made by Defendants through their attorneys Gilbride, Tusa, Last & Spellane, confirming funds were being wired on account of Defendants' commitment which never came.

39. Siebert and PC also guaranteed the payments to Worldwide Business Company, Inc., Landlord of Couri, Siebert and affiliates, where office space was maintained at 575 Madison Avenue, NYC. Siebert and PC defaulted on the ongoing guarantee and failed and refused to pay Worldwide Business for rents and services provided to Siebert and Couri to the extent of not less than $135,000 due and owing to Worldwide which they are holding Couri accountable.

40. By reason thereof, Siebert defaulted on agreements and notes, guarantees due to

8

Court in the sum of not less than $4,000,000.00 plus interest in loss, damages, defaulted notes, abrogated agreements, expenses, and loss of business opportunities; and $135,000.00 plus interest arising out of Defendants' guarantee to pay Worldwide Business. None of these sums have been paid and none of these claims have been litigated.

41. Conversely, Siebert and PC maintain counter-claims in Case 107240/04 against Court that are without basis in fact or law, fraudulent and in contravention to the facts and Siebert and PC tax returns. I respectfully ask that the Court not deprive me of seeking redress and recovery of millions of dollars Siebert and PC committed to pay me and have defaulted upon.

WHEREFORE, Couri demands Judgment

a)      in the sum of $900,000.00 plus interest;

b)      in the sum of $14,200,000.00 plus interest;

c)      in the sum of $300,000.00 plus interest;

d)      in the sum not less than $4,000,000.00 plus interest;

e)      in the sum of $135,000.00 plus interest; and

f)      together with costs and disbursements and for all other and further relief as the Court deems just.

Dated: October 2, 2008

James Couri
575 Madison Avenue, 10th Floor
New York, NY 10022
(212) 605-0277

TO:     Russo Burke
        600 Siebert MD, PC
        50 East 71st Street
        New York, NY 10022

9

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
----------------------------------------------------------------X

JAMES COURI,

                              Plaintiff,                        **VERIFICATION**

              - against -                                       **INDEX:** 113512/08

JOHN SIEBERT, JOHN SIEBERT, MD, PC

                              Defendants.

----------------------------------------------------------------X

State of California      )
County of Los Angeles    ) ss.:
                         )

        JAMES COURI, being duly sworn, deposes and says:

        1    Deponent is plaintiff in the within action.

        2    Deponent has read the foregoing Complaint and knows the context thereof; the

same is true to plaintiff's knowledge, except as to matters therein stated to be alleged on

information and belief and as to those matters plaintiff believes them to be true.

Dated 10-2-08

                                                    _____
                                                    JAMES COURI, Plaintiff

Sworn to before me this
22 day of October 2008

_____
NOTARY PUBLIC



EILEEN OHANIAN
Commission # 1719841
Notary Public - California
Los Angeles County
My Comm. Expires Jan 23, 2011

U

# *CORRUPTION INTERNATIONAL GROUP (MONACO)*

Dated: 3-22-19                                Via: Email & FedEx


USBJ Wayne Johnson                  Re: Case 6:14bk12555 WJ (Dismissed)
USBC (Suite 384)                    & 2-14 ap 001143 WJ  (Jim Couri)
3420 12th. Street
Riverside CA 92501                  Ref: Fraud on the Court, obstruction of
                                    justice & suborning perjury by Sulmeyer
                                    Kupetz, David Richardson Esq., John Siebert

Your Honor:

We write to you in connection with the above proceedings.

Our organization and predecessor entities have been involved in forensic
investigations for about fifteen years, founded by Mr. Jim Couri. By way of
background and clarification, before our addressing the substance and purpose of
this communication, we are authorized to disclose to the Court that Jim Couri, in or
about 1960, was introduced to J. Edgar Hoover (founder of the FBI), via lawyer
Roy M. Cohn and columnist Walter Winchell.

After a number of social events and meetings, Mr. Hoover suggested that Jim (like
Winchell and Cohn) consent to work with Mr. Hoover's personal investigative staff
on developing hi-profile matters. Jim consented to this appointment and engaged in
these undertakings for Mr. Hoover from 1960-1974. Mr. Hoover was impressed
with Jim's innate abilities to uncover and prove criminal conduct. Jim has received
a number of accolades for his "great value" to the nation and to law enforcement.
He is a recipient of the Senate Medal of Freedom and the Congress Medal of
Distinction as well as other awards and government accolades.

Mr. Couri worked for Mr. Hoover (not the FBI) on matters involving Richard Nixon, Frank Costello, Frank Sinatra, William Zeckendorf, Robert Vesco, and others that we cannot disclose.

Mr. Couri was also exposed (from 1948-1960) to corruption in the political and judicial "arenas" in Kings County and in NY County as a result of his father's central position in Brooklyn politics and as a Presidential Appointee as Commissioner of US Customs under Eisenhower. Jim was exposed to weekly meetings at his family home on Shore Road, Brooklyn where "power-meetings" took place. Such involved the "movers and shakers" of NY State including Gov. Tom Dewy, Mayor Bill O'dwyer. Louis Lefkowitz, Sen Jacob Javitz, John R. Crews, many judges and others.

Thereafter Jim was educated by Roy Cohn re the fixes and bribery ongoing in NY State Unified Courts, and the NY Criminal Courts. Jim recognized all of this had a grave and adverse effect on Citizen Rights under the US Constitution, the NY Constitution and many US Codes and Penal Codes.

In or about the latter part of the 1980s, after the death of Jim's friend Roy Cohn, with the NY State Judges attack upon Roy (the same judges who willing loot "brown-bag" bribes to fix cases causing Roy's disbarment) Jim was determined to expose to the American People the rampant state judicial, political and attorney, prosecutorial corruption. Such deprives Citizens with fair Due Process by judicial fraud, and acts of violations of US Codes Title 18, etc. With his unique exposure, Jim decided that the American public have a right to know to what extent their courts are corrupted.

Although this undertaking began with the pervasive fraud ongoing in the NY Courts, the investigation continued into State Courts, and corrupt judges, prosecutors, and lawyers who bribe them for fixed orders in California courts in Riverside County, Palm Springs, Indio and Los Angeles Counties.

USBJ                                                    page 3

Further, this investigation devoted time and effort in exposing the same MO and systemic judicial fixes in the Greene County Courts in Springfield Missouri and also in Dallas Texas. All of the findings are supported by evidence, documents, whistleblower reports, and other proofs.

Mr. Couri has appraised various senators, Congress, the DOJ, and the White House as to this undertaking (Jim has known Trump for over 45 years and was the person who introduced Roy Cohn to Trump in about 1974, and to Carl Ichan in 1980).

These matters have grave consequences for American Justice if left to continue to "blossom"; thus the Congress will be attending to this pervasive corruption by hearings exposing the abuse of power, fraud and deprivation of due process.

Accordingly, we write to your Honor to advise that we have absolute proof of the misuse of the Federal Court (USBC) to extort, embezzle and defraud by a serial pattern of Siebert and Sulmeyer Kupitz (David Richardson), filing a willfully perjured Adversary Proceeding charging Mr. Couri with non existent claims and liabilities that were and are fabrications, using forged records and false claims all to insulate Siebert from his unconditional sworn to contractual obligations to pay Mr. Couri what now exceeds over $50million.

Lawyer Richardson, in concert with Siebert, engaged in over forty Counts of perjury in your court, and then moved to Superior Court in Palm Springs to engage in fraud and perjury by Richardson to cheat justice, by fraud on that court as well.

To follow is some of the evidence for the Court's review:

1. In 2002 Siebert, with his then lawyers in NY (Gilbride Tusa Last Spellaine), entered into Agreement #1 prepared by GTLS (a prominent NY and CT law firm) stated that Siebert is indebted to Couri Acquisition Corp (CA) for millions in defaults, and agreed to settle with CA for $1.6Million. Siebert, with the advice of GTLS, Released CA, Jim Couri and all other affiliated Companies.

Siebert also waved any assertion of any Defenses to any suit against Siebert or his PC by Couri and-or CA. Siebert Defaulted the Settlement Agreement #1.

2. In Oct. 2003 Siebert entered into Settlement Agreement #2 with Jim Couri, and again issued a General Release in favor of Jim Couri. This Agreement between Siebert and his PC and Jim Couri Swears in front of a Licensed Notary that Siebert owes Jim Couri unconditionally then over $19Million, and again waved all defenses on the collection of such sums.

3. Thereafter, Siebert Defaulted again, resulting in a theft of 50Million (after sixteen years of interest). Siebert also "stiffed" GTLS and hired Russo Burke Esqs. (now defunct) who embarked on a fraudulent scam along with others in a RICO Enterprise along with Sulmeyer Kupetz (SK) and others.

4. In or about June 2003, under penalty of perjury and for the extension of credit, Siebert and his PC Issued a Financial Statement to the US Trust Bank. That Financial Statement does not list any asset belonging to Siebert or PC of any sums of money due to them by Jim Couri, CA or any other affiliated entity. Surely if Siebert believed that over $8million was owed to him or his PC, with Siebert trying to borrow $500,000.00 from US Bank, these sums would have been scheduled as a listed Asset.

5. Furthermore, GTLS confirmed in the Settlement Agreement that neither Couri or Affiliates owes Siebert/PC anything. Siebert's then lawyer, Thomas Spellane Esq., will testify that at no time did Siebert ever elude to GTLS that Siebert or PC is owed any money at all or related entities. These facts were well known to SK and Richardson, and SK also knew that Siebert and lawyer Burke engaged in serial perjury denying that Siebert signed Settlement Agreements as well as Siebert and Burke's denials that Siebert was a convicted sex offender.

6. The Licensed Notary issued a Sworn Affidavit swearing that she knows Siebert, that he swore and signed the Settlement Agreement in her presence and the Release in favor of Mr. Couri.

7. Evidence also verified that Siebert was fired by five NY hospitals as a sex-offender and pervert, and in 2012 Siebert was Convicted by the NY State Dept. of Health as "morally unfit" and barred from NY State as a medical doctor.

8. Siebert, SK and Burke continued to engage in fraud, perjury and falsifying evidence in your Court, filing a reckless and perjured Adv Proceeding accusing

USBJ                                                      page 5

Mr. Couri of fraud. In fact this was done to shroud the fact that Siebert and Burke
had bribed and compromised disgraced NY Judge Wooten who was
caught engaging in clandestine ex-party meetings with Burke, forgery of the
Docket, litigating a case that Wooten Dismissed himself and then Forgery of
Judicial Orders involving Siebert.

9. It is important to note that NY Court Referee Jack Suter was caught engaging in
   ex-party emails with Lawyer Joe Burke in connection with the Couri/Siebert
   Case. Referee Suter also reveal to Jim Couri over the telephone in about Sept.
   2011 that the "Siebert Case is fixed and you (Couri) have no chance winning in
   any court in NY" in the Siebert Case. The transcript of this phone conversation
   is in our procession and in the court files, sworn-to by Mr. Couri.

The forgoing is just the tip of the iceberg. Siebert and SK-Richardson furthered
their fraud in the Riverside Superior Court falsely Swearing that Couri, not SK
Filed the Adv Proceedibg in this Court, and that Siebert was never subject to
California Jurisdiction - a willful perjury again.

Siebert was previously caught conspiring with Burke by captured emails in a
scheme to hire a 'hit-man" to take out Jim Couri. The Sheriff Dept caused a
National Restraining Order to be Issued restraining Siebert, also out of California.

SK and Richardson have engaged in serial fraud on this court and on other courts
to defraud Couri and deprive his Rights against Siebert.

Mr. Couri will be Filing a Complaint in SDNY-USDC against Siebert, Burke,
Richardson and other actors, charging RICO, Constitutional violations, Mail and
Wire Fraud, obstruction of justice, money laundering and murder plots.

Furthermore, after Siebert was fired out of NY he became involved in UW Hospital
in Wisconsin in or about 2006 and began as clandestine sexual relationship wit
Diane Hendricks, widow of Kenneth Hendricks. We have reason to believer that
SK was hired by Hendricks FBO of Siebert.

USBJ                                                      page 6

Our investigations have exposed Diane Hendricks' obstructing justice causing Gov. Scott Walker to abort a Wisconsin medical termination of Siebert as a licensed doctor for his confessed sexual predatory acts verified by twelve of Siebert's victims (Affs on the Internet).

Hendricks accomplished this crime with Walker and Siebert and UW Hospital after Hendricks gave about $2Million to UW Hospital endowing a Chair in Honor of Siebert when UW and Hendricks were given evidence that Siebert is a fraud, a sex predator and fired by five hospitals and NY State. Hendricks and UW with Siebert also engaged in Mail Fraud by disseminating a willfully fraudulent Press Release falsely stating that Siebert has a pristine background, a researcher and is a highly respected doctor.

We also have learned that Ms. Hendricks used her political clout to intimidate and quash a full expose into Siebert's crimes, being worked on by Journal Sentinel Reporter John Fauber. Ms. Hendricks here again used interstate instrumentalities to obstruct justice for her "lover" John Siebert, a married man for over thirty years.

We have now been tipped by a powerful o news organization that the untimely death of her husband Ken Hendricks from a suspect fall points to the result of foul play (on 12-21-07).

We have all the autopsy reports and views of forensic pathologists. We are seeking other records, but the present facts are gravely suspicious especially as a result of Siebert, Burke, Hendricks, SK and UW Hospital activities. These will be set forth in Counts in the RICO Complaint as in part geared to strip Mr. Couri of the findings denied by Siebert and Burke in a fixed court that Siebert is a Convicted sex predator, thief and possibly involved in a murder.

Finally the Court should know that Ken Hendricks left to Diane about $5Billion, making Diane the richest woman in America according to Forbes Magazine.

USBJ                                                    page 7

Accordingly, Jim Couri wishes to File and Serve a Motion, bringing this serial
fraud engaged in on this Court by SK, Richardson and Siebert, as these acts will
also be Counts in the RICO Complaint in the USDC-SDNY by Jim Couri shortly.
Jim wants your Honor to have the facts of this Criminal Enterprise that has stung
this Court by a corrupt law office and "sharp practice" Richardson, to shroud a
criminal. We attach some relevant communications for the Court's review.

We respectfully have written this later at the direction of Jim Couri, who is
presently undergoing cancer treatment at UCLA Medical Center and who recently
underwent a cornea transplant. Mr. Couri is respectfully seeking an evidentiary
hearing before Your Honor with testimony from John Siebert, Joseph Burke Esq.,
David Richardson Esq., and Jim Couri in order for the Court to see firsthand by
document and testimony that there has been willful and criminal fraud upon this
Court depriving Mr. Couri of Due Process under the law. Mr. Couri wishes this
hearing to take place before the filing of his RICO Complaint in SDNY naming
these and other individuals as part of a Criminal Enterprise.

cc: David Richardson Esq.                          RESPECTFULLY,
     Howard Eherenberg Esq.
     SulmeyerKupitz Esq
     John Siebert                            CIG INVESTIGATIONS (MONACO)
     Joe Burke Esq.                              For  JIM COURI
     George Pavia Esq.
     Sean Murphy Esq.
     K. Gomez Esq.
     Diane Hendricks
     UW Hospital
     L. Brunette
     NYU Langone Legal
ENCLS.

V



1   James Couri, in pro per

2   78365 Hwy 111

3   La Quinta Ca

    310-975-9500

4

5

6          SUPERIOR COURT COUNTY OR RIVERSIDE CALIFORNIA

                  PALM SPRINGS BRANCH

7

8                              Case No:PSC 1702031

9   T&V CASTIGLIONE

             Plaintiffs

10

        v                      JAMES COURI DECLARATION

11                         MANDATED DUE TO FRAUD UPON COURT

  LYDIA ALEXANDRA COURI, ET-AL          CHAPMAN RETALIATION CAUSING

12           Defendants         COURI TO BE SUBJECT TO JUDICIAL

13                        EXTORTION & IMPACT TO MEDICAL

                        MANDATE THAT ARE LIFE THREATENING

14                     1-52 _____ (7 [5-(7-17

15   James Couri, being duly sworn deposes and declares:

16   1. I have Caused Judge Chapman to be Served 5-9-17 with my Motion and Exhibits to

17

18   Disqualify him for cause pursuant to CCP170.1(a)(6)(C).

19   2. CHAPMAN is rabid with spite and is again causing me to suffer Cardiac pain as I have 

20   Sterns, and cause me to become more infirmed than I have been.

21   3. He previously has made these demands and has abused me by phone, blocking my access

22

23   to Court Call, blocking my right to Due Process, Obstructing Justice, retaliating against me

24   by depriving a timely and legal "prove-up hearing" on a $40Million Default. Chapman

25   believes that he will somehow continue to extort me, 'set-me-up", try and hoild me in

26

27   contempt for asserting my legal rights and acting like a Nazi Comendante in  Auschwitz.

28

                        EXA

4. The SCAMS INC GROUP, a International Organization with offices in Monaco, and elsewhere, none in USA, have filed exposes about Chapman that are all verified and also delivered to the DOJ, in DC.

5. These Charges will be pled in a Civil Rights Case against California, Chapman and others seeking Damages for violations og rthe 4th and 5th Amendments of the US Constitution, willful and wantonreckless, deliberate acts of malice, spite greed collusion, judicial extortion, Deprivation of Freedom of Speech, deprivation of Due Process, Intentional infliction of acts of collusion to extort my rights to pursue default judgment of over $45Million in a legal "Prove-UP Hearing". Extorting my family, causing the Stalking, trespass of Property in concert with SBEMP, Murphy and Wells Marvin, Causing my Health to he severely impacted and imperiling my access to my Doctors by Judicial threats and absurd demands. I attach some oif the Medical Doctor Mandates here and state that Chapman Demand that I be in Person in his Courtroom on 5-17-17 is another set-up to cause me grave consequences under the threat of Chapman misuse of his Public Trust to loot and Rob my Rights, Money and Property by Chapman's transparent Judicial Racketeering. See Exhibit A collectively. anD A—1,

6. Accordingly, I will be on Court Call on 5-17-17 only to assert my demand for Chapman's Disqualification for Cause. I will he also seeking a change of Venue in view of the clear and convincing trickery, fraud, deprivation of Due Process exhibited by Haines and by Chapman for about 18 Months and the skulduggery collusion , etc engaged in and documented among Murphy SBEMP, Judge Latting and  Murphy's CLIENT sell-out and threats by phone of this Victim Client who Murphy extorted over $20,000,00 from, then secreted and stole the Clients



1  Records and threatened viciously this client over two Recorded Phone calls, in the possession

2  of others that I have listened to.

4  7. Accordingly, the SBEMP Fraud, larceny, collusion with Chapman to trespass and

5  vandalize leased Property under my control is despicable and will be exposed in and under

6

7  Federal Jurisdiction inter-alia, as a result of Chapman's violations of 18 USC 1341 and 18

8  USC 1343, alone and in concert with Shaun Murphy (SBEMP) and Wells Marvin

9

10  I declare under penalty of perjury under the laws of the United States of America that the

12  forgoing is true to the best of my knowledge, information and belief.

13

14

15  Dated: May 10, 2017

16                                            JAMES COURI

17

# COURI COMPANIES

575 Madison Avenue, 10th. floor. New York City, NY. Tel: 212-605-0277

Dated: 5-12-17

Judge David Chapman
Maggie Martinez, Clerk
Palm Springs Superior Courthouse
3255 E. Tahquitz Canyon Way
Palm Springs Ca 92262

Via Fax

Re: Stalking, obstructing justice
assault, battery, deprivation of access
deprivation of due process on Chapman
orders

Be advised that this communication is sent to advise all of you that the conduct displayed in the Palm Springs Courthouse was shocking, a violation of Mr Couri's Constitutional rights, and constitutes the crimes of Harassment, Stalking, Assault, Assault -Battery and unfounded use of force on a 78 year old and physically infirmed cancer and cardiac victim. Facts well known to Chapman who, in concert with Martinez Orchestrated this abuse and unfounded use of "police" force and intimidation. Clearly this extortion and threats was instigated to thwart Mr Couri's Filing of his Motion to Change Venue with proof of Chapman's (and other judges) dishonest, retaliatory and hijacking the rules of law and his long trail of obstructing justice in concert with others including Shaun Murphy and SBEMP. We have evidence and witnesses of Chapman and Murphy in concert with Wells Marvin, causing on 11-2-16 and after a "Lindsay" (Ca Plate 6WWH307, on a grey Toyota Scion) to harass, trespass, stalk, Mr Couri at property 48625 Calle Espereanza La Quinta Ca, (property) in a scheme to try and "gag" Mr Couri from Reporting and exposing the Ponzi-Scheme orchestrated by SBEMP, Marvin, Murphy and Chapman involving the Fraudulent supposed Expansion of Old Town , a Marvin complex that was at the time and now, in financial distress. Yet a phony "expansion" was plotted to lure investors into the Scheme. They Tagged the Berger Foundation for $11Million, and the supposed Expansion was then "Aborted" as they Fleeced Berger. Thus they got Chapman to sign a Phony Ex-Party Restraining Order to Gag and harass Mr Couri, but it Failed as Mr Couri was not at Property. In Fact Chapman was part of a scheme to obstruct Justice on this occasion and during PSC 1600482 and now PSC1702031.

These activities are all now in the hands of the DOJ in DC and at other Law Enforcement Agencies, as the conduct engaged in involves, mail and wire fraud, Racketeering, constitutional violations, bribery, tax evasion money laundering, defrauding City Municipalities, extortion, threats, collusion and unconstitutional taking of property. We have also Filed with the CID of the Dep. of Treasury, "Whistelblower" charges regarding Old Town, Berger, SBEMP and Murphy. Litigation in Federal Court SDNY will be commenced shortly embracing this and other Violations of Articles of the US Constitution, damages involving Judicial Corruption and acts beyond a judges normal functions, thefts of over $100Million as a result of the forgoing and such will involve the State and Jerry Brown for wanton negligence condoning this larceny & RICO

to all parties

COURI COMPANIES ET-AL

# JIM COURI

575 Madison Avenue , 10th Floor , New York City, New York 10022 , Tel 212-605-0277

Dated: May 11, 2017
Judge David Chapman
Palm Springs Superior Court
3255 E. Tahquitz Canyon Way
Palm Springs Ca 92262

Via FedEx
Re PSC 1702031

Ref: Couri Motion to Change Venue
Per: CCP397(b)(d)

Judge Chapman:

I am dictating this letter to my assistant, Stanley Wilson, as I am in the Emergency Room at Eisenhower Medical Center doe to severe cardiac pains caused by my being accosted by two Court-Guards (one of which is the person who is usually i PS2), wbo accosted me about 12 months ago when you threatened me when I properly stated that you were "sand-bagging" my rights in Case PSC1600482.

Today, at about 12:30PM PAC, I appeared in the Clerk's Office traveling from Los Angeles Ca, to File My Motion to Change Venue in this Case (PSC1702031) pursuant to CCP397(b)(d), on the grounds that, based on the long trail of illicit conduct I have proven and the fact that the Palm Springs Court has only 3Judges, none of wbich have displayed competence, justice and honesty, a change of venue is mandated. All of which is carefully Briefed and evidenced in my Motion. I tendered the Motion Declaration, Exhibits and POS to the Clerk at the "window". She accepted my Fee of $60.00 although my "Fee-Waver Demand is pending for 5-17-17. Judge Haines originally and improvidently "Denied" the Waver, and provided me until 5-10-17 to pay the $375.00 UD Fee. Thereafter I asked for a "Reconsideration based on additional proofs submitted and the Reconsideration was granted for "hearing" before Haines on 5-10-17. I thereafter Filed a Peremptory Challenge of Haines which he granted, and oddly, assigned this Case to PS2.

I appeared by Court-Call on 5-10-17 and you adjourned these matters until 5-17-17 as I Moved to have you Disqualified "For Cause" per CCP 170.1. You have displayed far more egregious conduct in your documented lust to deprive me of my rights and your acts to unconstitutionally take my property, money and deprive due process. As a result you have violated Canons of Judicial Conduct, 18 USC 1341, 18 USC 1343, and a plethora of CCP and RICO.

In any event, after the Clerk assigned a Date for my Motion to Change Venue for 5-31-17, Maggie Martinez and another woman Demanded that I pay $375.00 or they would not permit the Clerk to Docket this Motion. I explaiued the paper-trail and stated

Chapman

page 2

that if I am denied the FW, I would pay the $375.00 Sua-sponte. I also advised Martinez and the other interloper that per CCP170.3(c)(1) that when a judge is removed by disqualification all of his orders and rulings are Vacated. Thus the date of 5-10-17 is Moot until Hearing on my additional proofs is resolved. Then I again asked that my Motion be Filed and again tendered the Motion Fee of $60.00. apparently the other woman called you and your Guard and another Large bully of a man appeared and began to jostel me and demanded that I take my Motion Filing and leave. I again insisted my Motion be Filed as I have Paid the Fee of $60.00, but the large thug blocked my access and demanded I leave, With that your Court_guard stated "aint you supposed to be in the courtroom of PS2 on May 17? I responded by stating "what does that have to do with this Motion? He then turned and scurried back to PS2 and you. As any reasonable observer would deduct is the Fact that I am deprived of access to the Court and I was treated like a criminal. I am 78 Years of age and have a myriad of grave medical issues and you and your thugs are and have harassed me, extorted me, embezzled my rights and engaged in extortion. I audio recorded these diabolic acts and threats, and the Recording is now on its way to the DOJ in DC along with My Motion to change Venue.

I ams having my assistant send this Motion to you and Martinez with my check for the $60,00 ( I tendered Cash at the window today.) If you refuse to File my Motion and if you deprive me of Due Process and scheme to loot and pillage my Property Rights by your demands of me against Medical Orders you and your thugs will have to answer to a Federal Judge as my Constitutional Rights have been dismembered by you and your Minions by use of interstate instrumentalities mail and wire fraud and racketeering in cocert with SBEMP, Shaun Murphy, Sulmeyer Kupetz, John Siebert, Jos M. Burke, Theresa, Vincent and Maria Castiglione, confirmed as members of a NY and Brooklyn Organized Crime family (they have property and travel to NY and Brooklyn often. Accordingly these matters will be Filed in the USDC-SDNY and have been before the DOJ in DC for a while.

Accordingly you may believe that you are winning a "battle" but you WILL loose the "War" as we have a plethora of proof to cause your Indictment and Conviction on multiple Counts of Racketeering, mail and wire fraud, extortion bribery and money laundering and tax evasion to name some.

Encls
Cc: all parties
DOJ-DC

JIM COURI
dictated not read

W



| HOME | SCAMS | RESOURCES | SCAM-FREE ZONE | ARCHIVE | BLOG | ABOUT | MISSION | CONTACT |

Search

# JUDGE DAVID CHAPMAN EMBEZZLES $43MILLION BY ENGAGING IN JUDICIAL RACKETEERING, COLUSION, OBSTRUCTING JUSTICE AND EXTORTION

■ August 20, 2017 by admin

THE SCAMS INC GROUP INVESTIGATIONS has been engaged in using its resources, talents and experience to research, investigate, uncover, verify and expose State Court Judicial bribery, incompetence,conspiracy, racketeering and larceny.

JUDGE DAVID CHAPMAN is a example of the pervasive and systemic conduct of many Syate Court Judges in America today. The System of selection and appointing of a State Judge is a Farce. The process is that the Governor of a State, relying on political hacks and corrupt lawyers, and without any meaningful vetting simply OK;s and appoints "JOE-SHMOE" a State Judge.

usually a State Judge is supposed to be a lawyer, but in the 20th qn 21 Century, such is meaningless as most lawyers are pretty pathetic.

We have spent over 11 years researching the State Court Judges in NY State and in California, and researching many lawyers that pollute the Courts.

The Federal Judges who ate appointed by the Prsient are vetted by the FBI, and then by the Congress and the Senate before Affirmed or Rejected.

In NY the deal was and is Make nice to the ilk of Fixer Clarence Norman froom Brooklyn, who then told the Governor to Sign the Judicial State Court Appointment. NYCity Judge are appointed by the Mayor. Most of these appointments are marginal, malliable and who effectively join in the Menue of Corruption of Fixes. They are all incest, and all protect the other as Business of Bribery is good, really good.

Then there are the lawyers who fuel the Fixes, another group of crooks. In California, like NY, it is the same deal. So we were tipped to Palm Springs Ca, the Superior Court, Riverside and the pathetic cheating, larceny, collusion and racketeering engaged in a Courthouse in Palm Springs that has 2 corrupted Judges (J. Latting and D Chapman) and now Judge Haynes.

Chapman in the ringleader and a documented thief, liar and a fraud. We followed a few Cases. And the comes  our Founder Jim Couri with a RICO Case PSC 1600482  Naming the same cheats who were caught engaging in fraud, collusion, bribery, ex-parte Conspiracy and triclery in NY Supreme Court.

These confirmed perjurers, forgers, cheats and embezzlers 9ie JOHN SIEBERT, GEORGE PAVIA, ANTONIA PAVIA, KEN GOMEZ, JOS M BURKE, JUDGE JOAN MADDEEN, JUDGE PAUL WDOTEN, JUDGE PETER MOULTON, AND A MEDLY OF APPELLATE COURT CROOKS). This is not to mention JHO Ira Gammerman a well known judicial cheat and fraudster.

We were given audio Recordings by Court Referee Jack Suter who confessed that these Cases (Couri v Siebert, et al were FIXED). We have evience of Burke conspiring with Suter and engaging in Larceny, perjury and fraud.T perfect storm for a RICO Case, and the Proven and found Larceny of the Pavias filing Forged Records with the Dept of Buildings, Imperiling the Safety and Life of

## RECENT

▸ JUDGE DAVID CHAPMAN DESPERATE TO WHITEWASH HIS RACKETEERING, FIXED CASES & OBSTRUCTION OF JUSTICE RESORTS (UNDER COLOR OF LAW) TO EXTORTION & "MURDER" PLOTS

▸ THE PERPETUATION & COVER-UP OF FRAUD, CRIMINALITY, RACKETEERING IN LA QUINTA AND THE COVER-UP OF A USELESS SILVERROCK DEVELOPMENT

▸ IN MEMORY OF JOHN MC CAIN

▸ SHAUN MURPHY ESQ, JUDGE DAVID CHAPMAN & DA MIKED HESTERIN ALL OF RIVERSIDE CALIFORNIA CONSPIRE TO CAUSE THE DEMISE OF A PATRIUOT-INFORMANT

▸ MIKE HESTERIN DA RIVERSIDE COUNTY CALIFORNIA, IN THE "POCKET" OF PALM SPRINGS LAWYERS SLOVAK BARON EMPT & SHAUN MURPHY ESQS OF THAT FIRM, USING THE COLOR OF LAW TO GAG WHISTELBLOWERTS BY MISUSE OF CRIMINAL CHARGES, FALSE ARRESTS, SHERIFF BRUTALITY TO COVER UP THE RIVERSIDE CRIMINAL ENTERPRISE



DiscountFilters.com    Free Shipping

■ SCAMS INC NEWS NEWWORK

▸ DR JOHN SIEBERT WITH DIANE HENDRICKS---A CONFESSED MARRIED THIEF SEX PERVERT WITH A BILLIONAIRE WIDOW---A ODD COUPLE November 18, 2015

Tenants, and the Pavia's and Gomez accused of Perjury at the ECB Court, where the Violations against NYC Properties are Tried.

Pavia and Gomez with Burke, Siebert and Jay Itkowitz bribed and compromised Maden to Cheat, deprive due process, to pollute the Courts against Mr Couri who proved Madden was compromised by Pavia.

Madeen refused to remove herself although by law required to do so. The Fraud upon the NY State Courts have Statute of Limitations and thus the Collusion, farce Decisions made b y Wooten who was Expelled, for Cause, from NY County Courts, and who lied, Forged, was bribed, refused Couri Access to thge Court to loot Millions.

So Jim Couri saw the same "Stacked Deck in California and in the PS Court PS2 Chapman..

Chapman did not know that Jim Couri was and is a Expert on Court Corruption, cheating and Racketeering.

Chapman had been bought and paid for by Sulemeyer Kupetz the front Lawyers for Siebert, Pavia, Burke all defendants in the RICO Case Jim Brought before Chapman.

Chapman knew as much about RICO as Jim does about mining for Coal— ZERO—-.

Chapman appeared to be a irratic and unstable person. Chapman was a Indio Ca Negligence lawyer after he went to a "mail-order" law college.

Chapman could not get a job at any law Firm as the law school was not approved by the Bar Association.

Chapman was recommended by Fixre-law crooks Mary Gilstrap and Brian Harnik and Gov Brown BIT. Soon after the same slime balls Recommended Latting who worked for Harnik. He was also OKd by Gov Brown.

So Harnik, Gilstrap, and their allies in Courthouse Fraud, corruption and larceny, Slovak Baron Empy and Herpes thief Shaun Murphy began a campaign of Courthouse Fixes and Larceny using Chapman and Latting.

So between Burke, Siebert, Pavia, Howarsd eherenberg and David Richardson of Sulemeyer Kupetz, the Fix with Chapman was etched in Stone. But Jim Couri was onto these crooks.

Phone records, boasting, emails where Siebert and Burke were caught trying to hire a HIT MAN to Get Couri. In March 2015 Couri obtained a Restraining Order against Burke and Siebert in the same Court where Chapman Sits. Chapman in PS2 and Couri's Order obtained in PS# in the next Room.

Couri got it Extended for 3 more years in Feb 2016 until 2019.

Well Chapman b egan hi documented campaign ot destroy Jim Couri's Valid case and charges.

Chapman who is a Judicial idiot Ruled on Defendant's Motion to Strike the Summons ofv the Couri RICO Complaint due to "supposed lack of jurisdiction". Chapman condoned Richardson, the sulmeyer lawyer, Burke and Siebert's perjury, fraud and hearsay versus evidence that Siebert was active in California.

The Chapman death-knell proving that he is a thief, cheat and incompitent is the very Fact that Siebert and Burke were and are bound to California by virtue of the Restraining Order and thus Venue and Jurisdiction is mandated. But not for Criminal Chapman.

Then Chapman forged the Minutes 3 times, the Docket, conspired with Richardson to Gag Couri. Couri Filed a Statement as per CCP170.3 and CCP170.4 demanding the Disqualification of Chapman. Such a Statement REQUIRES by Ca Law that the Judge Stand-Do9wn and refrain fom acting any further in the Case until his Disqualification is determined by another and Impartial Judge.

The Judge being Disqualified CAN-NOT Rule on his own Disqualification as per California Law. This is not to menttion the Mandates of the california Canpns of Judicial Ethics and the US and Ca

▶ RUSSO & BURKE ESQ AND JOSEPH M BURKE ESQ CAUGHT ENGAGED IN BRIBERY, EXTORTION, BLACKMAIL, TAMPERING AND FRAUD ON COURTS IN NY UNIFIED COURT SYSTEM. THEY ARE PARASITES USING AND MISUSING THE LEGAL SYSTEMS AND THE INTERNET TO PREY ON THE INNOCENT AND UNSUSPECTING VICTIMS AND POTENTIAL CLIENTS. DO NOT TRUST RUSSO AND BURKE ESQS. THEY ARE LIARS AND CONMEN December 2, 2012

▶ COURTS ARE NOT ALWAYS A HONORABLE TRIBUNAL—MORE OFTEN THAN NOT THE JUDGE IS ONE OF THE CORRUPT 'OLD-BOYS' HAND PICKED BY THE POLITICOS— WE ARE GOING TO SHOW YOU WHAT TO BE ON THE LOOKOUT FOR SO THAT YOU ARE NOT RIPPED OFF BY A JUDGE YOUR OPPONENT HAS BRIBED OR OTHERWISE FIXED—WHEN YOU GO INTO THE NEXT COURTROOM YOU BETTER BE 'TRUSTING IN MORE THAN GOD'–AND DONT BE MISLED BY THE BLACK ROBES VERSUS A 'BLACK-HEART' — January 2, 2012



Click Here to Watch Our Video!

**CATEGORIES**

▶ Big News (95)

▶ Charity (2)

▶ Dating (1)

▶ Family (5)

▶ Featured (206)

▶ Finance (11)

▶ Government (15)

▶ Healthcare (16)

▶ Holiday (6)

▶ Internet (8)

Constitutions "Due-Process Clauses".

Chapman not only lied, cheated and by Fraud Ruled on his own Disqualification throwing out Mr Couri's Valid Statement, Then Chapman conspired with Sulmeyer Kupetz esqs, Richardson, Burke and Siebert to concoct a charge that Couri was a Vexatious Litigant using Fraud, deception and extortion. Then Chapman Directed Couri to Post $45,000.00 to continue the Litigatiin based on the phony Vexatious claim that was not even remotely within the CCP.

Then Chapman began to harass Mr Couri, blocking his access to the Court via Court-Call althoubh Mr Couri was scheduled for Cancer Surgerleas and could no appear. All verified by 3 Doctor Affs. and all ignored by Chapman.

The Pavias defaulted and Couri Filed a $$)Million Default and Chapman went wild, causing the Docket to be Forged by Clerks Letty Reyna and then Demanded that a Prove-up Hearing be held before Chapman in violation of the Mandates of CCP170.3 and CCP170.4 that Chapman by fraud, collusion and larceny ignored to Obstruct Justice ].

On 5 occations Chapman Blocked Mr Couri access to the Court viua Court Call. Couri was Forced to withdraw his Default, that Chapoman caused to be illegally Docketed by Clerk Reyna, and the Result became that Mr Couri spent about 15 Months to end up as a result of Chapman's pervasive fraud wit a GOOSE EGG, Dismissals Without Prejudice against Defendants in the RICO Case that should have been litigated and Couri had the Proofs.

This is not to mention that Chapman colluded with Terri Dickneider to cover-up her no-renewal of her CRB License.

Then Chapman interfered with the Judges in Riverside re the Vexatious LitiganT Sham. Chapman had no authority to Rule on the Motonn, even if ir were Valid and under CCP170.3 he was mandated to cease and desist until his Disqualification was determined by anotrher Ciourt, not Chapman himself.

Then The 3 Judges in th Appeal Court, all Pals with Corruption and Chapman Refused to Hear and decide the Phony Vexatious Litigant sham.

We have all ofvthe evidence ofv this Judicial Chicanery. This Corruption in these Ciourts will be stopped. This Great Country must not allow this Pollution to proliferate.

We have assembled a Group to put before the Press and the Senate-Congress to lying, cheating and embezzling Citizens by State Court Racketeering, cover-ups, bullyism, and Mafia Style antics. Be sure all of the Culprits will be exposed.

TH SCAMS INC GROUP AND ITS ASSOCIATES HAVE JUST LAUNCHED NEW OFFICES IN FRANCE AND MONACO. AS A INTERNATIONAL FORENSIC ORGANIZATION.
STAY TUNED

THE SCAMS INC GROUP INVESTIGATIONS

> Legal (12)

> More Big News (24)

> More Stories (94)

> Scam of the Week (20)

> Scam-Free Zone (1)

> Scams (28)

> Seniors (1)

> Social Media (1)

> Top Story (1)

> Uncategorized (7)

Terms of Use

X

# CORRUPTION INTERNATIONAL GROUP
# MONACO-DUBAI-UAE

Dated: Feb. 9, 2018                                              Via: Email

Larry Page                          Re: Blogger closed by fraudulent representations
Alphabet
2400 Bayshore Parkway
Mountain View, Ca 94043             Ref: Riverside County Ca- criminal enterprise

In furtherance to our communication to your "Blogger-Team and to you  on
2-8-18, this letter will confirm, as you already know, that our Organization,
Founded by Jim Couri and a founding Google associate in 2006, has ALWAYS,
published verified and documented FACTS. We have never been sued and any
supposed "complaints" if any, have been made by the very criminals and
racketeers who we expose.

Here as you can see by the Blog-Posts, all of the charges and allegations are
bolstered by documents, Court pleadings, unauthorized and Void Rulings by
corrupt Ca Superior Court Judges, deprivation of Due-Process, Conspiracy, under
color of law, fraud, extortion, sewer service, corruption and collusion at the
Riverside DA office and DA Mike Hestrin who has made a career of using his
office to falsify claims and charges against any advocate who attempts to expose
the proven and pervasive racketeering enterprise ongoing for years in the
Riverside County and the money laundering of (we estimate) exceeds $200Million
a year.

These RICO activities embrace law firms including Slovak, Baron,Empy and ring-
leader-extortionist Shaun Murphy Esq, a proved perjurer, embezzler and thug. The
Da Hestrin here has misused his Public Office and a minion ADA to defraud
Google Blogger to Gag our truthful and detailed Reports of the Crimes, police and
Sheriff extortion, forged abd falsified charges against innocent persons who have
exposed Murphy, the DA, Judges and other officers of the Riverside Courts, and

*Google*                                              ´                    *Page 2*

*Pthe Grand Larceny involving a scam supposed land development project*
*(SILVERROCK) in La Quinta Ca involving over $60Million in money launderin*

*The Racketeering Enterprise has been a "Perfect-Storm" until we and  JIM*
*COURI, began a in depth investigation into this cesspool over 7 years ago. Now*
*that we have exposed Michael Hestrin Riverside DA and his confirmed acts of*
*sewar-service, false charges filed by Lawyer Murphy as a "Gag-Retaliation" to*
*abuse, threaten and unjust criminal activities against a former protege of FBI*
*Founder J. Edgar Hoover, with over 50 years of aiding Federal and NY State US*
*Attorneys and DA Morgenthau and the Criminal Division of the IRS, these RICO*
*actors including Hestrin, Judge David Chapman, and the calling in corrupt Sheriff*
*and Police, menace, threaten, permit clear illegal and phony clains against a NY*
*Domaciliary and then falsify addresses so that these co-conspirators secure*
*a :default-warrant" by deception, forgery, fraud upon the court and collusion.*

*Accordingly, as you can see, we have as always, performed our legal duty, only to*
*be impacted by a criminal enterprise and a corrupt group of actors involved in*
*Public Corruption, including a corrupt DA Hestrin who conned your Blogger*
*Group.*

*We are sending to you with this letter bt FedEx, completer evidence of all of our*
*exposes so that Google will be fully appraised of this Corrosive disgrace to*
*America and to the US Constitution.*

*Durther, as you were told, these crimes, RICO, money laundering, tax evasuon*
*and extortion, briber6y and grand larceny has been delivered to th DOJ in DCl the*
*CID of IRS, in DC, the Senate and Congress as this criminal Enterprise in a*
*National Problem that must and will be sanitized to protect the honest citizen*
*victims.*

*We are also publishing this letter on our Sites and emailing same to these*
*ringleaders of the Riverside Criminal Enterprise, so that if they deny or object we*
*will have further evidence of their acts of Mail and Wire Fraud. (18USC1341*
*&1343) as well as larceny, extiortion, embezzling, fraud, brutality, false charges,*
*Public Corruption Under Color of Law (42USC1983 and 42USC1985), to name*

*Google*                                                           *Page 3*

*Gsome including RICO, the foundation for a USDC0SDNY Complaint to be Filed
by Jim Couri very soon. Thanks and best regards.*

*Cc: all parties*                    *CORRUPTION INTERNATIONAL GROUP
  _-INVESTIGATIONS--*